UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>      Plaintiff,<br><br>      v.<br><br>BF LABS, INC., *et al.*,<br><br>      Defendants. | CASE NO. 4:14-cv-00815-BCW |

**PLAINTIFF'S SUGGESTIONS IN SUPPORT OF ITS *EX PARTE* MOTION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF
RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE
WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

**(FILED UNDER SEAL)**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 5

II.     PARTIES ...................................................................................................... 6

III.    BACKGROUND ON BITCOINS AND BITCOIN MINING ........................................... 8

IV.     DEFENDANTS HAVE DECEPTIVELY MARKETED THEIR BITCOIN MINING
        PRODUCTS AND SERVICES ........................................................................... 12

        A.    Defendants Misrepresent That Consumers Can Use Their Machines and Services to
              Mine a Substantial Number of Bitcoins or Generate a Profit.................................. 13

        B.    Defendants Misrepresent That They Will Timely Deliver Bitcoin Mining Machines
              and Services to Consumers ................................................................................... 16

              1.   Defendants' Misrepresentations Regarding the BitForce Mining Machine ........ 16

              2.   Defendants' Misrepresentations Regarding the Monarch Mining Machine and
                   Services ....................................................................................................... 19

        C.    Defendants' Customers Have Either Been Unable to Mine at All or Have Only
              Mined a Fraction of What They Could Have Had Delivery Occurred When Promised
              ...................................................................................................................... 23

V.      THE COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER ............. 24

        A.    The Court Has Authority to Grant the Relief Sought................................................ 25

        B.    The FTC Will Likely Succeed on the Merits ........................................................... 27

              1.   Defendants' Claims That Consumers Could Use Their Machines and Services to
                   Mine for Bitcoins, Generate a Substantial Amount of Bitcoins, or Mine
                   Profitably Violate Section 5 ......................................................................... 29

              2.   Defendants' Claims That They Would Timely Deliver Bitcoin Mining Machines
                   and Services Violate Section 5...................................................................... 31

        C.    The Balance of Equities Favors Injunctive Relief.................................................... 33

        D.    The Individual Defendants Are Liable For Injunctive and Monetary Relief ........... 34

        E.    An Ex Parte TRO With Additional Equitable Relief Is Necessary to Preserve
              Effective Final Relief ........................................................................................... 37

              1.   The TRO Is Narrowly Tailored to Prohibit Defendants' Law Violations........... 38

              2.   An Asset Freeze Is Necessary to Preserve Possibility of Final Relief ............... 38

              3.   The Court Should Appoint a Temporary Receiver .............................................. 40

              4.   Immediate Access to Defendants' Business Premises and Expedited Discovery
                   Are  Essential to Preserve Defendants' Assets.................................................... 42

              5.   The Proposed TRO Should Be Entered Ex Parte ............................................... 43

VI.     CONCLUSION.............................................................................................. 45

2

## TABLE OF AUTHORITIES

**Cases**

*AT&T Broadband v. Tech Comm'n., Inc.*, 381 F.3d 1309 (11th Cir. 2004) .................................. 43

*Aviation Sup. Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993)............................ 40

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977) .......................... 34

*Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)............................................. 27

*Fed. Express Corp. v. Fed. Espresso, Inc.*, No. 97-CV-1219, 1997 U.S. Dist. LEXIS 19144
   (N.D.N.Y. Nov. 24, 1997) ................................................................................................... 42

*FSLIC v. Dixon*, 835 F.2d 554 (5th Cir. 1987) ...................................................................... 42

*FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085 (D. Kan. 2011)....................................... 32

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .................................................. 33, 35

*FTC v. AMG Servs., Inc.*, Case No. 2:12-cv-00536-GMN-VCF, 2014 U.S. Dist. LEXIS 12524 36
   (D. Nev. Jan. 28, 2014) ...................................................................................................... 32

*FTC v. Amy Travel*, 875 F.2d 564 (7th Cir. 1989)................................................................ 34, 35

*FTC v. Business Card Experts, Inc.*, Case No. 0:06-CV-04671-PJS (D. Minn. Nov. 29, 2006)  26,
   41

*FTC v. Business Card Experts, Inc.*, No. 06-4671, 2007 WL 1266636 (D. Minn. Apr. 27, 2007)
   .......................................................................................................................................... 27

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................ 28, 30, 32

*FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)................................. 28, 29, 31

*FTC v. Grant Search, Inc.*, Civil No. 02-4174-CV-C-NKL (W.D. Mo. Aug. 15, 2002) . 26, 38, 43

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................................................... 25

*FTC v. Jordan Ashley, Inc.*, No. 93-2257, 1994 U.S. Dist. LEXIS 7494 (S.D. Fla. Apr. 5, 1994)
   .......................................................................................................................................... 35

*FTC v. Kitco*, 612 F.Supp 1282 (D. Minn. 1985) .............................................................. 34, 38

*FTC v. Kitco*, No. 4-83-467 (D. Minn. June 10, 1983)............................................................. 38

*FTC v. Kruchten*, Case No. 01-523- ADM/RLE (D. Minn. May 10, 2001)......................... passim

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011) ................................................ 28, 29, 31, 33

*FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048 (C.D. Cal. 2002)................................................. 35

*FTC v. Neiswonger*, Case No. 4:96-CV-2225-SNL (E.D. Mo July 17, 2006) .................... passim

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)....................................................... 28, 32

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)........................................ 34

*FTC v. Real Wealth, Inc.*, Case No. 10-0060-CV-W-FJG (W.D. Mo. Jan. 26, 2010)  26, 28, 31,38

*FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ....................... 25, 26, 29

*FTC v. Sec. Rare Coin & Bullion Corp.*, Case No. 3:86-CV-1067 (D. Minn. Dec. 29, 1986)..... 26

*FTC v. Skybiz.com*, No. 01-396, 2001 U.S. Dist. LEXIS 26175 (N.D. Okla. Aug. 2, 2001) . 39, 40

*FTC v. SlimAmerica*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ............................................... 28, 32

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)............................................................... 32, 35

*FTC v. TG Morgan*, Case No. 4:91-CV-638-DEM (D. Minn. Aug. 26, 1991) ........................... 26

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007)................. 28, 29, 34, 35

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)............................................. 25, 26

*FTC v. Univ. Health*, 938 F.2d 1206 (11th Cir. 1991);................................................................ 27

*FTC v. USA Financial, LLC*, 415 Fed. Appx. 970 (11th Cir. Feb. 25, 2011)............................... 35

*FTC v. Vocational Guides, Inc.*, No. 01-0170, 2008 WL 4908769 (M.D. Tenn. Nov. 12, 2008) 42

*FTC v. Warner Comms., Inc.*, 742 F.2d 1156 (9th Cir. 1984) .................................................... 33

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) .................................................................. 28

*FTC v. Windward Mktg., Ltd.*, No. 1-96-CV-615, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ............................................................................................................................................ 35

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)...................... passim

*In re Thompson Med. Co.,* 104 F.T.C. 648 (1984*), aff'd, Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987)...................................................... 28

*In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979)...................................................................... 43

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992), *cert. denied* 507 U.S. 909 (1993); ................. 28

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995) ......................... 28

*Minn. Bearing Co. v. White Motor Corp,* 1470 F.2d 1323 (8th Cir. 1973) ................................. 27

*Montgomery Ward & Co. v. FTC*, 379 F.2d 666 (7th Cir. 1967) ................................................. 32

*Porter v. Warner Holding Co*., 328 U.S. 395 (1946); ................................................................... 42

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) .................................................. 28

*SEC v. First Fin. Grp.*, 645 F.2d 429 (5th Cir. 1981) .................................................................. 41

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ..................................................................... 41

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)............................................... 38

*United States v. Hopkins Dodge Sales, Inc.*, 661 F. Supp. 1155 (D. Minn. 1987) ...................... 35

## Statutes
15 U.S.C. §41 ...................................................................................................................................... 7

15 U.S.C. §45(a) ......................................................................................................................... 6, 7, 29

15 U.S.C. §53(b) ........................................................................................................................ 7, 26, 28

## Other Authorities
S. Rep. No. 103-130 (1993), *as reprinted in* 1994 U.S.C.C.A.N. 1776 ........................................ 27

## Rules
Fed. R. Civ. P. 1 .............................................................................................................................. 42

Fed. R. Civ. P. 26(d) .................................................................................................................. 42, 43

Fed. R. Civ. P. 34(b) ........................................................................................................................ 43

Fed. R. Civ. P. 65(b)(1)(A) .............................................................................................................. 44

4

## I.     INTRODUCTION

Defendants sell products and services that they claim consumers can use to "mine" or generate Bitcoins, a form of virtual currency worth hundreds of dollars per unit. They represent that their Bitcoin mining machines and services use the latest technology, and that consumers will be able to use them to generate a substantial number of Bitcoins or make a profit. Defendants have collected up to $50 million up front from consumers in exchange for these products and services, but have failed to deliver on their promises. Indeed, they often fail to deliver machines or provide services at all. In other instances, they have taken many months or even a year to deliver the machines, which arrive damaged or have depreciated so significantly due to the delay that consumers cannot generate a substantial or profitable amount of Bitcoins. By Defendants' own admission, the passage of time has rendered the effectiveness of one product line of their mining machines to the functional equivalent of a "room heater."

Defendants' practices have left a trail of victims. Many of these consumers have spent thousands of dollars for a Bitcoin mining machine or service, and received little or nothing in exchange. Thousands of consumers have complained about these practices and requested to cancel these orders or receive a refund - requests that Defendants often ignored. A payment processor even froze Defendants' account due to non-delivery and requests for refunds. Undaunted, they marketed another generation of Bitcoin mining machines, which they again failed to deliver timely or at all. Not long after, Defendants started marketing Bitcoin mining services, which thus far, they have failed to deliver at all.

Defendants' conduct violates Section 5(a) of the FTC Act, 15 U.S.C. §45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. To halt these unlawful practices, the FTC requests that the Court enter the proposed *ex parte* temporary restraining

order.  To preserve the Court's ability to remedy Defendants' law violations through final relief such as consumer redress, the FTC's proposed order also would, among other things, freeze Defendants' assets, appoint a temporary receiver over the corporate Defendant, and permit the receiver and the FTC immediate access to Defendants' business premises.

## II.    PARTIES

Plaintiff **FTC** is an independent agency of the United States government, created by statute, 15 U.S.C. §41, *et seq*.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. §45(a). Section 13(b) of the FTC Act, 15 U.S.C. §53(b), authorizes the FTC, through its own attorneys, to initiate federal court proceedings to enjoin violations of "any provision of law enforced by the [FTC]" and to secure such equitable relief as may be appropriate in each case, including consumer redress and disgorgement of ill-gotten gains.

Defendant **BF Labs, Inc.**, d/b/a "Butterfly Labs" (hereinafter, "Butterfly Labs"), is a Wyoming corporation formed in August 2011.[1]  Butterfly Labs markets and sells Bitcoin mining machines to consumers through its website, www.butterflylabs.com, and has done so since at least September 2011.[2]  It has been registered to do business as a foreign for-profit corporation in Kansas and Missouri since October 2012.[3]  Its principal place of business is currently located at 10770 El Monte St., #101, Leawood, Johnson County, Kansas, and until May 2013, was located at 2507 Jefferson St., Kansas City, Missouri.[4]

---

[1] PX 1 ¶ 5, Att. C.
[2] PX 1, ¶¶ 5 & 11, Att. G.
[3] PX 1 ¶ 5, Atts. A & B.
[4] *Id.*

Defendant **Sonny Vleisides** (hereinafter, "Vleisides"), founded Butterfly Labs and is its majority owner.[5] He also serves as its Innovation Officer, Vice President, and one of its directors.[6] He has signed and filed corporate papers and is authorized to file and sign tax returns on the company's behalf.[7] In addition, he is a signatory on several of Butterfly Labs' bank accounts, including its main operating account.[8] He is also the registrant for its PayPal account, through which it received approximately $19 million in payments from customers.[9] Vleisides is currently serving a term of supervised release for a federal felony mail fraud conviction stemming from a lottery scam that induced consumers to pay up front to join a lottery pool by falsely guaranteeing that they would win substantial amounts of money.[10] In March of this year, this Court found that he violated a condition of his supervised release that requires him to seek permission from his probabtion officer to apply for credit or loans.[11] Specifically, he failed to disclose to his probation officer an approximately $65,000 loan from Butterfly Labs.[12]

---

[5] Defendants' Memorandum In Opposition To Show Cause And Violation Report ("Def. Opp."), *United States v. Vleisides*, Case No. 4:11-CR-00125-DKG-1 (W.D. Mo. Sept. 20, 2013), Exh. 1, at 2, *available at* http://www.scribd.com/doc/217190033/defendant-s-memorandum-in-opposition-to-show-cause-and-violation-report-sept-3-2013.

[6] PX 1 ¶ 5, Atts. B & C, ¶ 9, Atts. E & F.

[7] PX 1 ¶ 5, Att. C; Defendants' Supplemental Update To September 20, 2013 Memorandum In Opposition To Show Cause And Violation Report, *United States v. Vleisides*, Case No. 4:11-CR-00125-DKG-1 (W.D. Mo. Dec. 17, 2013).

[8] PX 1 ¶ 72.

[9] PX 1 ¶ 65.

[10] Press Release, United States Attorney for the Central District of California, Santa Barbara County Man Linked To International Lottery Scam That Took More Than $25 million From Victims Surrenders To Face Charges (May 11, 2007), http://www.justice.gov/usao/cac/Pressroom/pr2007/065.html; Press Release, United States Postal Inspection Service (Jan. 14, 2011), https://postalinspectors.uspis.gov/radDocs/PressRoom/nr110114.htm; Def. Opp., *supra* note 5, Exh. 1, at 3.

[11] Transcript of Show Cause Hearing ("Transcript"), *United States v. Vleisides*, Case No. 4:11-CR-00125-DKG-1 (W.D. Mo. Jan. 28, 2014), at 107:4-16, 114:4-17, *available at* http://www.scribd.com/doc/217190031/2014-01-28-USA-v-Vleisides-Transcript.

Defendant **Darla Drake**, a/k/a Jody Drake (hereinafter, "Drake"), has held multiple roles at Butterfly Labs, including director, Secretary, Treasurer, and General Manager.[13] She currently serves as General Manager and has signed and filed corporate papers on the company's behalf.[14] She leads the company's customer service, shipping, and human resources departments, and oversees general office purchases.[15] She frequently represents Butterfly Labs on the online web forum that it hosts on its website and uses as a channel of communication with customers.[16] She is a signatory on several of its financial accounts, including its main operating account.[17]

Defendant **Nasser Ghoseiri** (hereinafter, "Ghoseiri"), co-founded and co-owns Butterfly Labs.[18] He holds several offices at the company, including CEO, President, Innovation Officer, Chief Technology Officer, and co-director, and serves as its authorized "communications contact person" with the Wyoming Secretary of State.[19] He is a recipient of a corporate credit card.[20]

## III.    BACKGROUND ON BITCOINS AND BITCOIN MINING

Bitcoin is a payment system that is also referred to as a "virtual currency."[21] It can be used for the exchange of goods and services and also can be exchanged for traditional currency.[22]

---

[12] *Id.* at 44:17 to 45:6, 45:23 to 46:18, 114:4-17.
[13] PX 1 ¶ 5, Atts. A & B.
[14] PX 1 ¶¶ 5 & 9, Atts. A, B, E & F.
[15] PX 1, ¶ 9, Atts. E & F.
[16] *See, e.g.*,  PX 1 ¶ 23, Att. T.
[17] PX 1 ¶¶ 72 & 73.
[18] Nasser Ghoseiri, *CTO at Butterfly Labs Inc*, LinkedIn, http://www.linkedin.com/pub/nasser-ghoseiri/a/419/940 (last visited Sept. 9, 2014).
[19] PX 1 ¶¶ 5 & 9, Atts. B, C, E & F.
[20] PX 1 ¶ 73.
[21] Natasha Lomas, *BitPay Passes 10,000 Bitcoin-Accepting Merchants On Its Payment Processing Network,* TechCrunch, Sept. 16, 2013, http://techcrunch.com/2013/09/16/bitpay-10000-merchants/; Ben Rooney, *Online Retailer Overstock to Accept Bitcoin*, CNN, Dec. 20, 2013, http://money.cnn.com/2013/12/20/technology/innovation/overstock-bitcoin/index.html.

Its exchange rate fluctuates continuously, and sometimes wildly.[23] Bitcoins are accepted by over 10,000 businesses around the world, including larger retailers such as Overstock.com, DirecTV, and Expedia.[24]

Bitcoins do not have a central bank for distribution and are administered by a decentralized peer-to-peer network that operates based on a pre-programmed algorithm.[25] Bitcoins can only be generated through the process of solving a discrete puzzles in the algorithm using a computer, a process referred to as "mining."[26] Bitcoin "miners" are consumers who solve these puzzles with computer.[27] Bitcoin miners compete with each other to finish the computational work to solve the puzzle.[28] In a winner-take-all approach, once one miner solves a puzzle, the Bitcoin network awards Bitcoins to that miner, and the other miners get nothing.[29] The more coins the network awards over time, the more difficult and complex the algorithm becomes.[30]

Although the total number of Bitcoins in the network increases as miners solve these computations, Bitcoins are being generated at a reduced rate. Roughly every four years, the

---

[22] Joon I. Wong, *How Bitcoin Brokers Trade Millions Without An Exchange*, CoinDesk, Sept. 5, 2014, http://www.coindesk.com/bitcoin-brokers-trade-millions-without-exchange.

[23] *See* Rooney, *supra* note 21.

[24] Rooney, *supra* note 21.

[25] *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008), *available at* https://bitcoin.org/bitcoin.pdf (last visited Sept. 9, 2014).

[26] *Id.* at 4.

[27] Ashlee Vance, *Bitcoin Mining Chips, a High-Tech Arms Race*, BloombergBusinessweek, Nov. 14, 2013, http://www.businessweek.com/articles/2013-11-14/2014-outlook-bitcoin-mining-chips-a-high-tech-arms-race.

[28] *Id.*; *How Bitcoin Mining Works*, CoinDesk, Mar. 6, 2014 www.coindesk.com/information/how-bitcoin-mining-works (last visited September 9, 2014).

[29] Vance, *supra* note 27.

[30] *Id.*; Anthony Volastro, *CNBC Explains: How To Mine Bitcoins On Your Own,* CNBC, Jan. 23, 2014, http://www.cnbc.com/id/101332124# (last visited Sept. 9, 2014).

number of Bitcoins awarded by the network halves.[31]  For example, from 2009 to 2012, a miner

was able to earn 50 Bitcoins for solving a computational puzzle, with one puzzle solved every 10

minutes.[32] Based on this rate, the network created approximately 10,500,000 Bitcoins from

January 2009 to November 2012.[33]  But in 2012, the reward was halved to 25 Bitcoins every 10

minutes, and in 2016, the reward will be halved to 12.5 Bitcoins every 10 minutes; reductions are

set to continue at that rate.[34]  As a result, the total number of Bitcoins in existence will never

exceed 21,000,000, and all Bitcoins are expected to be mined by 2140.[35]

      The finite number of Bitcoins and the increasing number of miners competing to solve

the increasingly complex puzzles make having the most cutting-edge technology paramount.

Bitcoin mining becomes more difficult over time.[36]  Originally, Bitcoin mining started as a

process that miners could undertake using a personal computer.[37]  As more miners joined the

network and the difficulty of Bitcoin mining increased, the computer hardware required to

profitably mine Bitcoins evolved from general purpose personal computers to specialized

---

[31] *How Bitcoin Works*, Forbes, Aug. 1, 2013,
http://www.forbes.com/sites/investopedia/2013/08/01/how-bitcoin-works.
[32] *See* Benjamin Wallace, *The Rise And Fall Of Bitcoin*, Wired, Nov. 23, 2011, *available at*
http://www.wired.com/2011/11/mf_bitcoin/all; Vitalik Buterin, *Block Reward Halving:  A
Guide*, Bitcoin Magazine, Nov. 27, 2012, http://bitcoinmagazine.com/2842/block-reward-
halving-a-guide.
[33] https://en.bitcoin.it/wiki/Controlled_Currency_Supply.
[34] *Id.*
[35] *How Bitcoin Works*, *supra* note 31.
[36] How does Bitcoin work?, Economist, April 11, 2013,
http://www.economist.com/blogs/economist-explains/2013/04/economist-explains-how-does-
bitcoin-work
[37] John Kelleher, *What is Bitcoin Mining?*, Forbes, May 8, 2014,
http://www.forbes.com/sites/investopedia/2014/05/08/what-is-bitcoin-mining.

computers with microchips whose sole purpose was to perform the calculations necessary for Bitcoin mining.[38]

      Accordingly, the development and release of each new generation of mining technology substantially depreciates the value of the previous generation of mining technology.  In light of ever-increasing competition, coupled with operating costs, such as electricity bills and wear-and-tear on the equipment, the margin for profiting from Bitcoin mining becomes tight and the value of Bitcoin mining equipment constantly decreases.[39]  By one estimate, the value of Bitcoin mining equipment depreciates 18% every 10 days.[40]  Under that calculation, if a consumer ordered a $599 Bitcoin mining machine, and received it six months later, that same machine would be worth less than $17.  Some news sources have stated that Bitcoin mining equipment becomes obsolete within one to two years, or less.[41]

---

[38] *Id.*

[39] Jason Clenfield & Pavel Alpeyev, *The Other Bitcoin Power Struggle*, BloombergBusinessweek, Apr. 24, 2014,  http://www.businessweek.com/articles/2014-04-24/bitcoin-miners-seek-cheap-electricity-to-eke-out-a-profit (mining bitcoins with "powerful computers… takes a tremendous amount of energy… To ensure they can turn a profit, Bitcoin miners are scouring the globe for the cheapest power…"); Mark Gimein, *Virtual Bitcoin Mining Is A Real World Environmental Disaster*, Bloomberg, Apr. 12, 2013, http://www.bloomberg.com/news/2013-04-12/virtual-bitcoin-mining-is-a-real-world-environmental-disaster.html.

[40] *See* Declaration of Gregory Bachrach In Support of Emerg. Mot. of Liquidbits Corp. for Entry of an Order Appointing a Ch. 7 Trustee ("Bacharach Dec."), ¶ 6, *In re Hashfast Techs. LLC*, Case No. 14-30725 (Bankr. N.D. Cal. filed May 9, 2014) ("[T]he value of the equipment used in Bitcoin mining declines approximately eighteen percent (18%) every ten (10) days.").

[41] Nathanial Popper, *Inside Bitcoin Mines*, N.Y. Times, Dec. 21, 2013, http://dealbook.nytimes.com/2013/12/21/into-the-Bitcoin-mines ("Even if you had hardware earlier this year, that is becoming obsolete"), said Greg Schvey, a co-founder of Genesis Block, a virtual-currency research firm. ("You are talking about order-of-magnitude jumps."); Zachary Gruskin, *How to Run a Profitable Bitcoin Mining Farm*, Coinbrief, http://coinbrief.net/profitable-Bitcoin-mining-farm (last visited August 8, 2014).

11

## IV.  DEFENDANTS HAVE DECEPTIVELY MARKETED THEIR BITCOIN MINING PRODUCTS AND SERVICES

Defendants have induced consumers into parting with up to $50 million[42] for Bitcoin mining machines and services that have yet to materialize or have arrived so late or defective that consumers cannot use them to generate a substantial number of Bitcoins or make a profit. Defendants have marketed and sold two generations of Bitcoin mining machines.  The first generation is the BitForce SC Chip ("BitForce"), which began selling in June 2012 and is still available on Butterfly Labs' website.[43]  The second generation is the Monarch Mining Card ("Monarch"), which consumers could purchase from August 2013 to July 2014.[44]  Defendants also introduced a Bitcoin mining service using the Monarch machine that was available for purchase from December 2013 to July 2014.[45]

Defendants reeled in consumers with claims that their purportedly cutting-edge technology would be delivered in a timely fashion, providing a competitive advantage in the race to mine for Bitcoins and allowing consumers to generate a significant or profitable amount of Bitcoins.  Defendants represented, and still represent, that their Bitcoin mining machines are the "most competitive" and "fastest."[46]  The website also touts the low power consumption and high efficiency and processing speed of Defendants' mining machines.[47]  Further, Defendants represent that they will deliver the machines in a timely fashion, a crucial factor in determining the machine's Bitcoin yield and profitability, given the increase in mining difficulty over time.[48]

---

[42] PX 1 ¶ 74.
[43] PX 1 ¶ 14, Att. K.
[44] PX 1 ¶ 41, Att. AO.
[45] PX 1 ¶ 46, Att. AS.
[46] PX 1 ¶¶ 18, 19 & 41, Atts. O, P & AO.
[47] PX 1 ¶¶ 18 & 41, Atts. O & AO.
[48] PX 1 ¶¶ 13, 18 & 41, Atts. J, O & AO.

These claims are false.  Defendants delivered BitForce machines up to one year late, and in some cases, the product arrived defective.  The BitForce machines were so delayed that one of Defendants' payment process, Paypal, froze Butterfly Labs' account.  Paypal received nearly 5,000 complaints requesting refunds for Butterfly Labs purchases because of non-delivery issues. For the Monarch, very few, if any, consumers have received the Monarch.  Defendants recently claimed that they are delivering the product – eight months after they originally promised delivery.[49]  Given the increase in mining difficulty and competition that occurred during the delay, for both products, once the machines arrive (if they have arrived at all, and if they are not defective), consumers would only be able to generate a fraction of the Bitcoins that they could have had delivery occurred timely.

### A.     *Defendants Misrepresent That Consumers Can Use Their Machines and Services to Mine a Substantial Number of Bitcoins or Generate a Profit*

Defendants hold themselves out as leaders in the sale of Bitcoin mining machines. According to the company website, "Butterfly Labs manufactures a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication and security applications."[50] Each product order page on their website states that the machine comes with a "Bitcoin block mining application."[51]  Through their webpage and web forum, Defendants represent that their Bitcoin mining machines are the "most competitive" and "perform faster than any other product currently available."[52]  The website touts the low power consumption and high efficiency and processing speed of Defendants' mining machines.[53]

---

[49] PX 1 ¶ 45, Att. AR.
[50] PX 1 ¶ 11, Att. H.
[51] PX 1 ¶ 12, Att. I.
[52] PX 1 ¶¶ 19 & 41, Atts. P & AO.
[53] PX 1 ¶¶ 19 & 41, Atts. P & AO.

13

Defendants have market their machines and services as means to turn a profit or mine a substantial number of Bitcoins. They state that their "objective is to make sure you can recover your investment whether you wish to continue mining or not."[54] In November 2012, Defendants posted a link on the company Facebook page to a calculator that applies a mathematical formula to determine the profitability and return on investment of their Bitcoin mining machines.[55] The post reads, "Measure your ROI with this cool Bitcoin mining calculator."[56] The description of the calculator displayed on the page reads as follows:

> "Ultimate Bitcoin Calculator. Bitcoin Mining, Profitability and Power Calculator. Calculate how much your shiny new rig is making you. Daily, weekly, monthly and annual net profit, power consumption cost, break even time. Everything you can ever need!. . ."[57]

Links to the calculator have appeared on other Butterfly Labs' Twitter page and web forum, which is accessible from the company website.[58]

The calculator, as well as the numerous other profitability calculators available online, requires consumers to input data specific to the machine at issue, such as machine cost, power consumption, and processing speed – all data points provided by Defendants in their advertising.[59] The calculator also requires the user to input the current difficulty of mining, a figure solely dependent on when a consumer is able to start mining. It provides output, including net hourly, daily, weekly, monthly, and annual profit, and the date by when the consumer can expect to break even on the machine and power costs.[60]

---

[54] PX 1 ¶ 18, Att. AO.
[55] PX 1 ¶¶ 49 & 54, Att. AV.
[56] PX 1 ¶ 49, Att. AV.
[57] PX 1 ¶ 53, Att. AAA.
[58] PX 1 ¶¶ 50 & 53, Atts. AX & AAA.
[59] PX 1 ¶¶ 19, 20, 41, & 55, Atts. P, Q, AH & AO.
[60] PX 1 ¶¶ 55-56.

14

However, as discussed below, in reality Defendants frequently fail to deliver products, deliver them after substantial delays, or ship defective products, resulting in consumers not being able to generate Bitcoins, or not being able to generate a profitable or substantial amount of Bitcoins. Nevertheless, Defendants continue to make claims about the profitability of their products. In fact, shortly before failing to meet their initial delivery deadline, Defendants bolstered their profitability claims by representing that the advertised BitForce products would *exceed* the product specifications released three months earlier.[61] This would mean that consumers would be able to generate an even more profitable or substantial amount of Bitcoins than previously represented. Defendants claimed that they had originally planned to wait to announce this performance increase, but decided to announce it early in light of the "maturity of our development and competition in the market."[62] They further explained that they made the announcement "to clarify what customers will actually receive both in speed and particularly in power consumption so they can properly evaluate their options and make good decisions."[63]

Defendants also touted the profitability of their mining machines through various press articles. As discussed further below, even before delivering a single machine to consumers who had paid up front (and had been waiting for over six months since the promised delivery date), Defendants released the BitForce to media and reviewers. This resulted in a series of positive product reviews about the BitForce. In one of these media articles, the author stated that BitForce machine was generating "something like $20 every day."[64] On its Twitter page and

---

[61] PX 1 ¶ 19, Att. P.
[62] PX 1 ¶ 19, Att. P.
[63] *Id.*
[64] Lee Hutchinson, *How A Total n00b Mined $700 In Bitcoins*, ArsTechnica, June 29, 2013, http://arstechnica.com/gadgets/2013/06/how-a-total-n00b-mined-700-in-Bitcoins/ (last visited Aug. 20, 2014).

15

Facebook page, Butterfly Labs posted video demonstrations of the BitForce mining machine and linked back to positive media reviews it received.[65]  But these press articles and Defendants' previous representations about profitability would prove to be false for consumers.  As admitted by Defendants themselves, "Bitcoin mining becomes more difficult over time,"[66] and the time delay rendered Defendants' representations about profitability and Bitcoin yield to be false.

### B.     Defendants Misrepresent That They Will Timely Deliver Bitcoin Mining Machines and Services to Consumers

#### 1.     Defendants' Misrepresentations Regarding the BitForce Mining Machine

Defendants began selling the BitForce on Butterfly Labs' website in June 2012.  They required consumers to pay the entire cost of the machine upfront, which ranged from $149 for a 3.5 GH/s machine to $29,800 for a 1000 GH/s machine.[67]  Defendants accepted payment through bank wire, Bitcoin, or the payment processor, Paypal.  Defendants represented multiple times that the BitForce would begin shipping in October 2012, and would probably even occur ahead of schedule.[68]  For instance, Defendants stated on their webpage that "[T]he speed of production is on pace to ensure most customers will get their [BitForce] Mini Rigs ahead of schedule.

---

[65] PX 1¶ 49, Att. AV; ¶ 50, Att. AX.

[66] PX 1 ¶ 13, Att. J.

[67] PX 1 ¶ 16, Att. M.  The price range varies by gigahash ("GH") because a GH is a measure of computational power in bitcoin mining; a hash is an attempted mathematical solution to an algorithm, which, if correct, is rewarded with bitcoins.  One GH equals one billion hashes, or attempts, and the higher the GH of a mining machine, the more attempts the miner can make at solving the algorithm, thus increasing the odds of earning bitcoins.  *See, e.g.,* John Biggs, *Blockchain Smashers*, TechCrunch (Oct. 16, 2013), http://techcrunch.com/2013/10/16/blockchain-smashers/; *How Bitcoin Mining Works*, CoinDesk (March 6 2014), http://www.coindesk.com/information/how-bitcoin-mining-works/

[68] PX 1 ¶ 17, Att N.  Through September 2012, the website stated that initial delivery would begin in October 2012.  *Id.*  Specifically, it stated that the "BitForce SC chip is now in the final stage of development. Initial product delivery is scheduled for October 2012,"; PX 1 ¶ 18, Att. O.

Although there are always issues during development, our team is highly experienced in exactly this field and we're currently ahead of our original timeline. Honest Abe, we're scheduling shipments for October of 2012."[69]

Not only did Defendants fail to deliver ahead of schedule, they failed to meet the October deadline at all, and in late October 2012, revised the delivery date to November 2012.[70] Despite missing the delivery deadline, Defendants continued to market the BitForce through their website, social media sites and various other media outlets. Defendants released photographs of the BitForce[71] and undertook a public relations campaign touting their products with bloggers and magazines.[72] Defendants then posted links to the positive press articles on Butterfly Labs' Facebook and Twitter page.[73]

Over the following months, Defendants continued to announce revised shipment dates and continued to miss them. They changed shipment dates to December 2012, then January 2013,[74] February 2013,[75] March 2013,[76] and April 2013.[77] Defendants often gave no indication

---

[69] PX 1 ¶ 18, Att. O.

[70] PX 1 ¶¶ 23, 24 & 26, Atts. T, V & X.

[71] PX 1 ¶¶ 25 & 49, Atts. V & AO.

[72] *First Look At BFL's ASIC Hardware*, Coding In My Sleep (Sept. 25, 2012), http://codinginmysleep.com/first-look-at-bfls-asic-hardware; Justin Porter, *BFL Confirms 65nm Process for SC Lineup*, Bitcoin Magazine, Nov. 6, 2012, http://bitcoinmagazine.com/2686/bfl-confirms-65nm-process-for-sc-lineup; Vitalik Buterin, *Butterfly Labs Release More ASIC Photos*, Bitcoin Magazine, Oct. 19, 2012, http://bitcoinmagazine.com/2627/butterfly-labs-releases-more-asic-photos.

[73] PX 1 ¶ 49, Att. AV.

[74] PX 1 ¶ 27, Att. Y & AA.

[75] PX 1 ¶ 28, Att. AB.

[76] PX 1 ¶ 30, Att. AD. It was not until March 2013 that Defendants first acknowledged a possibility of continued delays. The revised shipment notice still claimed that initial shipments would begin in the last half of that month, but Defendants modified their pre-order terms to state that delivery could be delayed for more than two months. *Id.*

[77] PX 1 ¶ 32, Att. AF.

of a delay until after they had missed the promised delivery date. For example, in February 2013, Butterfly Labs' website stated:

> Pre-Order Terms: BitForce SC (ASIC) products are in final stage development with initial shipping scheduled for the last half of February 2013. Products are shipped according to placement in the order queue.[78]

These extensive delays generated numerous consumer complaints and requests for refunds. Because Defendants were unresponsive, their customers complained to Paypal, a payment processor that Defendants used for BitForce transactions. Paypal received nearly 5,000 complaints regarding the non-delivery of the BitForce.[79] As a result, Paypal froze the company's account.[80] In September, 2013, Paypal refused to accept new orders from Butterfly Labs and suspended their account.[81]

Still, Defendants did not ship a single machine until April 2013.[82] Even then, instead of shipping machines to consumers, Defendants announced that they were shipping the first BitForce machines only to the media, various developers, and reviewers.[83] Instead of apologizing for the several-months wait, Defendants told consumers not to "cry because [the media] get[s] them first."[84] Defendants' media-first, customer-last strategy resulted in a slew of positive press for Butterfly Labs that only served to string consumers along.[85] Defendants were

---

[78] PX 1 ¶ 28, Att. AB.
[79] PX 1 ¶ 90.
[80] *Supra* note 11, Transcript at 59:25 to 60:4; 60:21 – 61:3.
[81] *Supra* note 11, Transcript at 61: 11-25; 66: 4 – 19.
[82] PX 1 ¶ 34, Att. AH.
[83] PX 1 ¶ 34, Att. AH.
[84] PX 1 ¶ 34, Att. AH.
[85] David Perry, *BFL Jalapeno Unboxing And Demo*, Coding in my Sleep (Apr. 20, 2013), http://codinginmysleep.com/bfl-jalapeno-unboxing-and-demo; Hutchinson, *supra* note 64; Lee Hutchinson, *We've Got A Butterfly Labs Bitcoin Miner, And It's Pretty Darn Fast*, ArsTechnica, May 8, 2013, http://arstechnica.com/gadgets/2013/05/weve-got-a-butterfly-labs-bitcoin-miner-

18

so concerned with their media image that they purchased a website (buttcoin.org) that had posted unfavorable reviews of its products, and substituted positive articles instead.[86]  By September 2013, almost a year after Defendants had initially promised to ship the BitForce machines, Defendants had shipped only approximately 2,000 mining machines of the 23,000 ordered.[87]

### 2.     Defendants' Misrepresentations Regarding the Monarch Mining Machine and Services

Despite their inability to timely fulfill BitForce orders, Defendants began selling the Monarch in August 2013, which the company website advertised as the "fastest and most power-efficient Bitcoin miner yet."[88]  This time, Defendants only accepted payments through bank wire and Bitcoins.  Defendants used this new announcement to lure in even more consumers.  In marketing emails sent to their customers around November 2013, Defendants stated that Monarch "products will ship early 2014."[89]

Defendants told BitForce purchasers that they could transfer their existing orders for a "10% transfer fee…that will close out your old order and credit your account towards the purchase of a 28nm Monarch pre-order."[90]  Like the BitForce, Defendants required consumers to

---

and-its-pretty-darn-fast; Vitalik Buterin, *Butterfly Labs Ships First Finished ASIC For Review*, Bitcoin Magazine, Apr. 22, 2013, http://bitcoinmagazine.com/4221/butterfly-labs-ships-first-finished-asic-for-review; Danny Bradbury, *Butterfly Labs' Jalapeno Aims To Spice Up Bitcoin Mining*, Coindesk, Apr. 24, 2013,  http://www.coindesk.com/jalapeno-aims-to-spice-up-bitcoin-mining.

[86] John Biggs, *Bitcoin Mining Company Buys Critical Site To Improve Search Results,* TechCrunch, July 14, 2014, http://techcrunch.com/2014/07/14/bitcoin-mining-company-buys-critical-site-to-improve-google-results/.

[87] Transcript, *supra* note 11, at 63:10-13.  *Id*. at 62:1-5 (company CFO admitted that production volumes for consumers remained low until June 2013).

[88] PX 1 ¶ 41, Att. AO.

[89] PX 1 ¶ 52, Att. AY.

[90] PX 1 ¶ 52, Att. AY.

19

pay the entire cost of the machine upfront – up to $4,680.[91]  Thus, a BitForce purchaser either

would have to keep waiting for a product that was no longer the latest generation product in

Bitcoin mining, or have had to pay additional money to Defendants to wait for a newer, non-

existent product.

The company website represented that shipping would begin by the end of 2013 and even

provided a detailed timeline to bolster their promise of a December 2013 delivery date.[92]

Although at times Defendants attempted to excuse themselves of any responsibility to deliver

their costly products within a reasonable time frame, they promised that the December 2013

delivery date was "solid."  They state the following on their website:

> This is a Pre-Order product which is not yet shipping. If you're
> uncomfortable waiting until the development is complete and the product is
> shipped, do NOT pre-order this product. Perhaps undesirable, but this is a pre-
> order market. Customers flatly demand to get in line for the new technology
> before it's finished development. This has created a lot of drama for the
> manufacturers but it's something we simply have to deal with. All manufacturers
> in this space have experienced some degree of delay with their first generation
> ASIC. Every last one of them, so we're reluctant to give a specific delivery date.
> **However, this is our second generation, so we have much greater clarity on
> the process and we feel our timeline to begin shipments towards the end of
> the year is solid.**
>
> **Since this is our 2nd generation ASIC chip, we're free from the
> pitfalls sometimes associated with a first generation design.  Testing systems,**

---

[91] PX 1 ¶ 41, Att. A.
[92] The website stated:
> Our timeline to begin shipments towards the end of the year is solid.
> Here's a breakdown of the timeline.
> - We're now in at the final stage of development (Tapeout) and are
>   sending wafers into production at the foundry in the next few weeks
> - Foundry production takes 10 weeks
> - Bumping, Slicing & BGA packaging takes approximately 2 weeks
> - Initial shipments begin and ramp up to full capacity over the following
>   3 weeks.

PX 1 ¶ 41, Att. AO.

**Bumping masks, Substrates & under fill engineering are all carryovers from our last version of the ship, so they're ready for high volume production once the wafers are ready. The importance of this can't be overstated when considering schedule certainty.** Nevertheless, please do not purchase this product if you are unwilling to wait for the product to complete its development.

(emphasis added).[93]

Defendants failed to deliver any Monarch machines by the end of 2013. Defendants did not provide a revised shipment date until March 2014, when they announced that shipments would begin within five weeks (April 2014).[94] As part of the delay announcement, Defendants also stated that they would refund consumers who placed orders more than six months prior to the delay announcement.[95] Multiple consumer complained, however, that the company provided no such refunds.[96] After missing the April shipment date, Defendants emailed their customers in May 2014, advising that the Monarch product line will "begin shipping within the next week," but again failed to deliver any products.[97] In June 2014, nearly one year after initially taking consumers' money and six months past the initial promised "end of the year" shipment date, Defendants admitted they still had not fulfilled a single Monarch order.[98] In August 2014, Defendants claimed for the first time that they had started delivering Monarch machines to consumers.[99] Based on Defendants' pattern of conduct with the Bitforce, it is likely that the vast majority of Monarch machine purchasers have yet to receive any product. For the BitForce, Defendants first asserted that they began delivering in April 2013. However, five months later,

---

[93] PX 1 ¶ 41, Att. AO.
[94] PX 1 ¶ 42, Att. AP.
[95] PX 1 ¶ 42, Att. AP.
[96] PX 1 ¶ 86.
[97] PX 1 ¶ 52, Att. AZ.
[98] PX 1 ¶ 44, Att. AQ.
[99] PX 1 ¶ 45, Att. AR.

Defendants had only delivered 2,000 BitForce machines out of the 23,000 ordered.[100]  Similarly, most consumers likely have not received Monarch machines.

In December 2013, the same month that they failed to meet the initial Monarch shipping deadline, Defendants began offering 12 month mining services contracts, at an average cost of approximately $10/GH, which consumers had to pay up-front.[101]  A gigahash is a measure of computation power in Bitcoin mining, one mining service company estimates that in order to generate a significant amount of Bitcoins, a consumer would need to purchase 1000 GH per year.[102]  Under the terms of the contracts, Butterfly Labs would use the Monarch mining machines to generate Bitcoins for the consumer. Defendants stated that the service would allow consumers to "harness the power of the latest Bitcoin mining machine technology" without any "technical knowledge."[103]  Butterfly Labs stated that they would begin generating Bitcoins for consumers in the "March 2014 time frame."[104]  On June 17, 2014, Defendants stated on their online forum that the mining services would start in late June and that they would post an "update when we start activating users on Cloud Mining."[105]  However, at the time of this filing, Defendants have not started providing the services or providing additional status updates.[106]

---

[100] Transcript, *supra* note 11, at 63:10-13.
[101] PX 1 ¶ 46, Att. AS; *supra* note 66.
[102] See generally, *How to Value a Mining Contract*, NimbusMining, http://www.nimbusmining.com/wp-content/uploads/2014/06/HowToValueAMiningContract.pdf (last visited September 1, 2014).
[103] PX 1 ¶ 46, Att. AS.
[104] *Id.*
[105] PX 1 ¶ 44, Att. AQ.
[106] PX 1 ¶ 47, Att. AT.

**C.** **_Defendants' Customers Have Either Been Unable to Mine at All or Have Only_**
**_Mined a Fraction of What They Could Have Had Delivery Occurred When Promised_**

Thousands of consumers have complained and requested refunds and cancellation of their orders.[107]  As shown above, these requests have fallen on deaf ears, while Defendants continue to hold their money without providing anything in return, or without providing the benefits for which consumers have paid.  To the extent consumers have received the any machines, it is either defective or have significantly depreciated in value to the point that consumers can no longer use it to generate a significant amount of Bitcoins or earn a profit.[108]

For the BitForce, the extended delivery delay has caused the machines to significantly depreciate in value.[109]  Specifically, consumers have indicated that the mining effectiveness of the BitForce machine is far below what it would have been if the machine was shipped at the earlier represented times.[110]  One of the Defendants' own employee admitted that the passage of time has rendered the BitForce as "useful as a room heater."[111]  The profitability calculator provided by Defendants illustrates the effects of delivery delays on the machines' yield.  Per the calculator, a 4.5 GH/s BitForce machine (Jalapeno) that shipped as promised in October 2012 would have mined up to 43 Bitcoins in 30 days.[112]  By contrast, a machine that shipped in November 2013, when Defendants claimed that they had completed fulfillment of BitForce orders, could have mined up to 0.11 Bitcoin in 30 days.[113]  Similarly, a 30 GH/s machine (Bitforce Single SC) delivered as promised in October 2012 could have generated up to 287

---

[107] PX 1 ¶¶ 82-86 & 88-90.
[108] PX 1 ¶¶ 84, 93.
[109] PX 1 ¶¶ 55-58; Bacharach Dec., _supra_ note 40, ¶ 6.
[110] PX 1 ¶ 87.
[111] PX 1 ¶¶ 59-61, Att. AAB, at 7:17 to 8:4.
[112] PX 1 ¶¶ 53-58.
[113] _Id._

Bitcoins, but if shipped at the end in November 2013, could only have generated up to 0.74 Bitcoins in 30 days.[114]

Most consumers who purchased the Monarch have been unable to mine for Bitcoins at all. As discussed above, it is unlikely that most consumers who paid for the Monarch received it. Even if some consumers have recently received a Monarch, they will only be able to mine a fraction of the Bitcoins that Defendants originally represented was possible. Using the profitability calculator that Defendants posted, a 600GH/s machine that shipped as promised in December 2013 could have mined up to 8.6 Bitcoins in December 2013.[115] By contrast, the same machine delivered in August 2014 could have mined up to .38 Bitcoins in 30 days.[116]

Finally, the delivery delays eliminated the profitability of the machines not only by decreasing their yield, as discussed above, but also by increasing the machines' operating costs. Due to increases in mining difficulty over time, mining machines must operate longer to yield the same amount of Bitcoins.[117] Powering Bitcoin mining machines require a great deal of electricity, and the cost of electricity required to power an outdated mining machine would be significant.[118] Therefore, the delay in shipment has drastically decreased the value of both the BitForce and the Monarch, and rendered their operation unprofitable.

## V.     THE COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER

To immediately halt Defendants' illegal practices and preserve assets necessary for consumer redress, the FTC requests that the Court issue a Temporary Restraining Order (TRO) enjoining the deceptive and illegal conduct described herein, freezing Defendants' assets,

---

[114] PX 1 ¶¶ 53-58.
[115] *Id.*
[116] *Id.*
[117] *See* Popper, *supra* note 41; Gruskin, *supra* note 41.
[118] Kelleher, *supra* note 37.

24

appointing a temporary receiver, granting immediate access to Defendants' business premises,

providing for other ancillary relief, and ordering Defendants to show cause why a preliminary

injunction should not issue.  As set forth below: (A) this Court has authority to grant the

requested relief; (B) the FTC is likely to succeed on the merits of proving the violations of the

FTC Act; (C) the balance of equities favor entry of an injunction; (D) Defendants are jointly and

severally liable for injunctive and monetary relief, and; (E) an ex parte TRO with additional

equitable relief is necessary to preserve effective final relief.

### A. *The Court Has Authority to Grant the Relief Sought*

Section 13(b) of the FTC Act authorizes the FTC to seek, and the Court to issue,

temporary, preliminary, and permanent injunctions.  *FTC v. Sec. Rare Coin & Bullion Corp.*, 931

F.2d 1312, 1314-15 (8th Cir. 1991) (*citing FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d

1020, 1026 (7th Cir. 1988); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431-34 (11th Cir. 1984);

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982)).  The second proviso of Section

13(b),[119] under which this action is brought, states that "the Commission may seek, and after

proper proof, the court may issue, a permanent injunction" against violations of "any provision

of law enforced by the Federal Trade Commission."  15 U.S.C. §53(b); *see also Sec. Rare Coin*,

931 F.2d at 1314.  The Eighth Circuit has further recognized that Section 13(b) empowers the

---

[119]This action is not brought pursuant to the first proviso of Section 13(b), which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding.  Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso.  *U.S. Oil & Gas Corp.*, 748 F.2d at 1434 ("Congress did not limit the court's powers under the [second and] final proviso of § 13(b) and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief"); *H.N. Singer*, 668 F.2d at 1111 (holding that routine fraud cases may be brought under second proviso, without being conditioned on first proviso requirement that the FTC institute an administrative proceeding).

courts to exercise the full breadth of their equitable powers, including ordering rescission of contracts, restitution, and disgorgement of ill-gotten gains. *Id.*

By enabling the courts to use their full range of equitable powers, Congress gave them authority to grant preliminary relief, including a temporary restraining order, preliminary injunction, and asset freeze. *U.S. Oil & Gas*, 748 F.2d at 1434 ("Congress did not limit the court's powers under the final proviso of § 13(b) and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief."). *See, e.g.*, *FTC v. Real Wealth, Inc.*, Case No. 10-0060-CV-W-FJG (W.D. Mo. Jan. 26, 2010) (temporary restraining order with asset freeze); *FTC v. Grant Search, Inc.*, Civil No. 02-4174-CV-C-NKL (W.D. Mo. Aug. 15, 2002) (temporary restraining order with asset freeze).[120] This Court therefore can order the full range of equitable relief sought and can do so on an *ex parte basis*. *U.S. Oil & Gas*, 748 F.2d at 1432 (authorizing preliminary injunction and asset freeze); s*ee also* S. Rep. No. 103-130, at 15-16 (1993), *as reprinted in* 1994 U.S.C.C.A.N. 1776, 1790-91 ("Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]. The FTC can go into court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress.").

---

[120] Numerous other courts in this Circuit have ordered temporary restraining orders and other ancillary relief in circumstances similar to those found here. *See, e.g.*, *FTC v. Business Card Experts, Inc.*, Case No. 0:06-CV-04671-PJS (D. Minn. Nov. 29, 2006) (*ex parte* TRO with appointment of receiver, asset freeze, and expedited discovery, including financial reporting); *FTC v. Kruchten*, Case No. 01-523- ADM/RLE (D. Minn. May 10, 2001) (*ex parte* TRO with appointment of receiver and asset freeze); *FTC v. Neiswonger*, Case No. 4:96-CV-2225-SNL (E.D. Mo July 17, 2006) (*ex parte* TRO with appointment of receiver, asset freeze, and expedited discovery); *FTC v. TG Morgan*, Case No. 4:91-CV-638-DEM (D. Minn. Aug. 26, 1991) (*ex parte* TRO with asset freeze, and immediate access to business premises); *FTC v. Sec. Rare Coin & Bullion Corp.*, Case No. 3:86-CV-1067 (D. Minn. Dec. 29, 1986) (granting FTC's *ex parte* TRO with asset freeze and financial accounting).

Two factors determine whether preliminary injunctive relief should issue under Section 13(b): (1) the likelihood of success on the merits; and (2) the balance of equities. [121] *See* 15 U.S.C. §53(b); *see also FTC v. Univ. Health*, 938 F.2d 1206, 1217 (11th Cir. 1991); *World Travel Vacation Brokers*, 861 F.2d at 1029; *FTC v. Business Card Experts, Inc.*, No. 06-4671, 2007 WL 1266636, at *3 (D. Minn. Apr. 27, 2007) (*citing World Wide Factors*, 882 F.2d at 347 and stating that "under § 53(b), irreparable harm is presumed and the Court need only consider the FTC's likelihood of success and the balance of any conflicting equities."). Irreparable injury need not be shown because its existence is presumed in a statutory enforcement action. *World Wide Factors*, 882 F.2d at 346; *Univ. Health*, 938 F.2d at 1218. As set forth below, both considerations militate in favor of the requested relief.

### B.     The FTC Will Likely Succeed on the Merits

To demonstrate a likelihood of success on the merits, the FTC must show that it will likely prevail and need not present evidence to justify a "final determination" that Defendants violated the law, although the record abounds with such evidence. *Univ. Health*, 938 F.2d at 1218; *see also World Wide Factors*, 882 F.2d at 346 (FTC need only demonstrate "some chance

---

[121] Although not required to do so, the FTC also meets the Eighth Circuit's four-part test for private litigants to obtain injunctive relief. *See, e.g., Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In deciding whether to grant or deny preliminary injunctive relief, the district court weighs the following factors (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Id*. at 113 (citing *Minn. Bearing Co. v. White Motor Corp,* 1470 F.2d 1323, 1326 (8th Cir. 1973)). The FTC will suffer irreparable injury without an injunction, because Defendants would be able to abscond with millions that could be used for consumer redress and destroy evidence of wrongdoing. Harm to other interested parties if relief is granted is low, as the FTC seeks to preserve assets through a receivership. Furthermore, the risk of any harm is greatly outweighed by the potential gain to interested consumers who have lost millions due to Defendants' scheme. Additionally, the FTC has already demonstrated a likelihood of success on the merits. *See supra*, Section V. B.. Lastly, putting a stop to Defendants' deceptive tactics will only serve to enhance the public interest and will further deter similar schemes.

of probable success on the merits"). Further, in considering this motion, the Court "may rely on affidavits and hearsay materials" if appropriate. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

Defendants' deceptive representations about timely delivery and the profitability and yield of their machines and services violate Section 5 of the FTC Act. A representation or practice is deceptive under Section 5(a) of the FTC Act, 15 U.S.C. §45(a), if it is material and likely to mislead consumers, acting reasonably under the circumstances. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992), *cert. denied* 507 U.S. 909 (1993); *Real Wealth Inc.*, 2011 WL 1930401, at \*2 (*citing FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006).

A representation is material if it is one upon which a reasonably prudent person would rely in making a purchase decision. *Sec. Rare Coin*, 931 F.2d at 1316; *Real Wealth Inc.*, 2011 WL 1930401, at \*2; *FTC v. Mallett*, 818 F. Supp. 2d 142, 148 (D.D.C. 2011); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007). The Commission need not prove actual reliance to establish materiality. *Sec. Rare Coin*, 931 F.2d at 1316; *Real Wealth Inc.*, 2011 WL 1930401, at \*2; *Transnet*, 506 F. Supp. 2d at 1266-67. Express and deliberate claims are presumed material.[122] *FTC v. SlimAmerica*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999); *FTC v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995). False claims are inherently "likely to mislead." *In re Thompson Med. Co.*, 104 F.T.C. 648, 788 (1984*), aff'd, Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987).

---

[122] The FTC need not prove that Defendants acted with intent to defraud or in bad faith. *See, e.g.*, *World Travel Vacation Brokers*, 861 F.2d at 1029; *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 526 (S.D.N.Y. 2000).

28

### 1. Defendants' Claims That Consumers Could Use Their Machines and Services to Mine for Bitcoins, Generate a Substantial Amount of Bitcoins, or Mine Profitably Violate Section 5

Defendants have expressly represented that consumers could use their machines or services to mine for Bitcoins. As discussed in Section IV. A., the website stated that the machines and later services could be used for Bitcoin mining. Further, Defendants posted a calculator on various social media pages and on its web forum to allow consumers to "measure your ROI [return on investment] with this cool Bitcoin mining calculator." The data points required by the calculator (and virtually all other Bitcoin profitability calculators) included, among other things, the cost of the machine, and various machine specifications, all of which Defendants supplied in its marketing materials for the BitForce and the Monarch. The calculator also requires the user to input the current difficulty of mining, a figure solely on when a consumer is able to start mining (thus, dependent on the Defendants' delivery date representation).

The express nature of these claims renders them presumptively material. *Five-Star Auto Club,* 97 F. Supp. 2d at 528. Regardless, the record demonstrates the materiality of Defendants' yield and profitability claims. A representation is material if it is one upon which a reasonably prudent person would rely in making a purchase decision. *Mallett*, 818 F. Supp. 2d at 148; *Transnet*, 506 F. Supp. 2d at 1266-67. Here, Defendants' yield and profitability claims were likely to mislead because a reasonably prudent person would rely upon claims about the profitability of their investment in making a purchase decision. *See Sec. Rare Coin*, 931 F.2d at 1316 (holding that it is "reasonable for consumers entering this specialized and technical market to rely on the representations of an apparently reputable firm…").

29

Additionally, Defendants' express claims that consumers could use the machines to mine for Bitcoins and claims about yield and profitability were false, and therefore likely to mislead reasonable consumers. *Five-Star Auto Club,* 97 F. Supp. 2d at 528. For most consumers who purchased the Monarch, representations that consumers could use the machine to mine for Bitcoins at all is false. As discussed, it is unlikely that Defendants delivered the Monarch machines to many consumers. Therefore, these consumers have not been able to mine a single Bitcoin. Even if Defendants start delivering the Monarch now, the Monarch mining machines will mine far less Bitcoins than if the Monarch were delivered by the original 2013 shipment date.[123] The same holds true with respect to Defendants' mining services, which have yet to be delivered.

Yield and profitability representations regarding the BitForce are also false. For the consumers who purchased the BitForce, the delivery delays substantially depreciated the value of the machine. Consumers can only mine a fraction of the Bitcoins that Defendants originally represented with the initial shipment date and Bitcoin mining calculator. Consumer complaints show and the Defendants themselves admit that the machine is currently as useful as a room heater. Additionally the record is replete with proof that consumers were actually misled. The evidence shows that hundreds, if not thousands, of consumers have complained or requested refunds from Butterfly Labs because they failed to receive the BitForce in time to mine for Bitcoins profitably or even to mine a fraction of the coins they could have mined had the

---

[123] As stated in Section IV. C., for the Monarch products, a 600GH/s machine that shipped in December, 2013, would have mined 8.6 bitcoins in 30 days. Even if Defendants were actually shipping the machines in August 2014, that same Monarch machine would generate 0.38 bitcoins in 30 days.

machine timely arrived.[124]  Such proof that consumers were actually deceived is "highly probative" to show that a practice is likely to mislead consumers acting reasonably under the circumstances. *See Cyberspace.com*, 453 F.3d at 1201.

### 2.   *Defendants' Claims That They Would Timely Deliver Bitcoin Mining Machines and Services Violate Section 5*

Defendants made deceptive claims of timely delivery.  As set forth in Section IV. B. above, Defendants expressly stated on their website and in emails to consumers that both the BitForce and Monarch would begin shipping by certain dates.  Defendants expressly  represented that the BitForce mining machine would begin shipping in October 2012.  However, this representation was false, as were the promised the delivery dates of November 2012, February 2013, March 2013, and April 2013.  Like the claim about profitability and yield, the express claim about timing is presumed to be material.  *Five-Star Auto Club,* 97 F. Supp. 2d at 528. Further, as noted above, a representation is material if it is likely to affect a consumer's conduct or choices regarding a product. *See, e.g., Mallett*, 818 F. Supp. 2d at 148. Here, if consumers had known that they would only receive the product after a six month to one year delay, many likely would not have purchased the product because it would no longer yield a significant or profitable amount of Bitcoins.

Similarly, Defendants represented that the Monarch would begin shipping by the end of 2013.  *See infra*, at IV.B.  After missing that deadline, Defendants simply plugged in later delivery dates.  While the end-of-2013 shipment representation remained on their website, Defendants emailed consumers in November 2013 advising that shipment would occur in early 2014.  Defendants did not make any attempts to qualify or disclaim that representation.  Further,

---

[124] PX 1 ¶¶ 82-84 & 88-90.

even while failing to produce the Monarch machines, Defendants began making false representations about the timing of providing the Monarch Mining Services.

Moreover, Defendants' vague statements about general delays in the market, when combined with their promises that the end of the year shipment date "is solid," that their second generation product is "free from the pitfalls sometimes associated with a first generation design," that "they are ready for high volume production," and that the "importance of [these factors] cannot be overstated" when considering schedule certainty contribute to the net impression that shipment would occur at the end of 2013. *Real Wealth Inc.*, 2011 WL 1930401, at *2 (citing *Cyberspace.com*, 453 F.3d at 1200 (solicitation can be deceptive based on its net impression even if it contains truthful disclosures)); *see also FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) ("Deception may be found based on the 'net impression' created by a representation"). Defendants even provided a specific timeline to consumers of when each event required for timely delivery would occur.[125] Vaguely warning consumers not to order the product if they are unwilling to wait for the completion of its development does not overcome the very specific reasons that the Defendants provided as to why delivery would occur on time. *FTC v. AMG Servs., Inc.*, Case No. 2:12-cv-00536-GMN-VCF, 2014 U.S. Dist. LEXIS 12524, at 36 (D. Nev. Jan. 28, 2014) (finding net impression misleading because of "vague," "uncertain," and "contradictory" provisions).

Although Defendants may argue that they have provided refunds to some consumers, this argument is dubious and does not negate their law violations. Specifically, many consumers have complained that Defendants are not actually providing refunds. Further, even if they were actually providing refunds, that would have no bearing on whether they deceived consumers in

---

[125] *Supra* note 92.

the first instance. "The existence of a money-back guarantee . . . is neither a cure for deception nor a remedy for consumer injury." *SlimAmerica, Inc.*, 77 F. Supp. 2d at 1272 (citing *Pantron I*, 33 F.3d 1088). Otherwise, "anything might then be advertised as long as unsatisfied consumers were returned their money." *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 671 (7th Cir. 1967); *see also FTC v. Affiliate Strategies, Inc.,* 849 F. Supp. 2d 1085 (D. Kan. 2011) (injunctive relief entered despite company's argument that it should not be enjoined because it, among other things, refunded over $1 million).

### C. *The Balance of Equities Favors Injunctive Relief*

The balance of equities favors the relief sought because the public interest in halting Defendants' unlawful conduct and in preserving assets to redress consumers far outweighs any interest Defendants may have in continuing to operate their illegal business or in continuing to control consumer funds. In balancing public and private interests, "public equities receive far greater weight." *World Travel Vacation Brokers*, 861 F.2d at 1030; *see also FTC v. Warner Comms., Inc.,* 742 F.2d 1156, 1165 (9th Cir. 1984); *World Wide Factors*, 882 F.2d at 347. This principle is especially important in the context of enforcement of consumer protection laws. *Mallett*, 818 F. Supp. 2d at 149 ("The public interest in ensuring the enforcement of federal consumer protection is strong.").

Here, the equities justify the relief sought. Great public interest exists in putting a stop to Defendants' tactics. Defendants, through deception, have taken up-front payments up to $50 million from thousands of consumers, and in exchange have either shipped obsolete and worthless merchandise up to one year late or failed to fulfill orders at all, while ignoring or refusing requests for refunds. Defendants have exhibited a continued pattern of advertising new

33

and allegedly innovative equipment, while failing to deliver on their promises to ship older equipment.

In contrast, "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment." *World Wide Factors*, 882 F.2d at 347; *see also FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) ("Obviously, the public interest in preserving the illicit proceeds . . . for restitution to the victims is great."); *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) (court has no obligation to protect ill-gotten profits or illegal business interests). No value exists in Defendants' desire to continue to take money from consumers or to retain consumers' money without actually providing any products or services or providing these products and services in a timely manner.

Moreover, although it has already been determined that the equities in permitting Defendants to retain their ill-gotten gains should receive little or no weight, requiring Defendants to preserve their assets is particularly important in this case. Defendants have consistently refused to refund money to consumers even after they have provided nothing in return for the money. Thus, Defendants have no equitable interest in retaining, or being able to use, the monies that they have collected. The balance therefore tips strongly in favor of issuance of the requested TRO.

### D. *The Individual Defendants Are Liable For Injunctive and Monetary Relief*

An individual defendant faces liability for injunctive relief for corporate practices if: (1) the individual participated directly in the challenged conduct or (2) had the authority to control it. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *FTC v. Amy Travel*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. Kitco*, 612 F.Supp 1282 (D. Minn. 1985). An

34

individual's status as a corporate officer or authority to sign documents gives rise to a presumption of authority to control a small, closely held corporation. *Transnet Wireless*, 506 F. Supp. 2d at 1270; *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997). Assuming the duties of a corporate officer is also probative of an individual's participation. *Amy Travel*, 875 F.2d at 573. Even where an individual is not officially designated as a corporate officer, courts consider "the control that a person actually exercises over given activities." *FTC v. Windward Mktg., Ltd.*, No. 1-96-CV-615, 1997 WL 33642380, at *5 (N.D. Ga. Sept. 30, 1997) (holding that defendant did not have to be an officer or even an employee to control corporate activities). *See also United States v. Hopkins Dodge Sales, Inc.*, 661 F. Supp. 1155, 1158 (D. Minn. 1987) (individual defendants liable for injunctive relief in light of position of authority and management responsibility); *FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1055-56 (C.D. Cal. 2002). Bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control corporate practices. *See FTC v. USA Financial, LLC*, 415 Fed. Appx. 970, 974-75 (11th Cir. Feb. 25, 2011).

An individual may be held liable for monetary relief for corporate practices if he or she knew or should have known of the illicit conduct, showed reckless indifference to the truth or falsity of a representation, or had an awareness of a high probability of fraud with an intentional avoidance of the truth. *Affordable Media*, 179 F.2d at 1234; *Stefanchik*, 559 F.3d at 931. Participation in corporate affairs is probative of knowledge. *Affordable Media*, 179 F.3d at 1235; *Amy Travel*, 875 F.2d at 564. The FTC need not show that the individual defendant had the intent to defraud consumers. *FTC v. Jordan Ashley, Inc.*, No. 93-2257, 1994 U.S. Dist. LEXIS 7494, at *11 (S.D. Fla. Apr. 5, 1994).

35

Here, the conduct of each individual Defendant satisfies the standards for individual liability for both injunctive and monetary relief. Section II sets forth the role of all three individual Defendants. All three Defendants have bank signatory authority and/or serve as corporate officers, or otherwise hold a position of authority at Butterfly Labs. A presumption therefore exists that each had authority to control the corporation. *Transnet Wireless*, 506 F. Supp. 2d at 1270; *Amy Travel*, 875 F.2d at 573.

Furthermore, given that the illicit practices alleged here go to the core of the company's operations and involve publicly stated corporate policy, the individual Defendants either knew, or should have known, about them. Indeed, it would be implausible for any of them to claim unawareness that 1) the company represented on its website that the products would ship by certain times and 2) that the company did not meet those deadlines.

Also, the individual defendants were or should have been put on notice of the illicit practices by PayPal's actions. PayPal, which provided one of three payment methods accepted by the company, cut off Butterfly Labs' account in September 2013 due to its failure to ship, and then froze the company's account.[126] Vleisides was the signatory on the cancelled Paypal account, and therefore knew or should have known about the conduct that PayPal cited for cancelling the account, the same conduct that the FTC alleges is illegal here.[127]

The record similarly demonstrates Defendant Ghoseiri's and Drake's awareness of the company's illegal practices. Ghoseiri has also spoken on behalf of the company on a public online Bitcoin forum about his involvement in the company. He stated, "The time I dedicate to our corporation has dramatically increased during the last 4 months, to about 7 hours during

---

[126] Transcript, *supra* note 11, at 60:21 to 61.
[127] PX 1 ¶ 63.

36

work days and a minimum of 25 hours during the weekend."[128]  Given his day-to-day involvement in the company, he likely knew about the company's deceptive conduct.  Further, as discussed above, consumers have flooded the Defendants' web forum with complaints about the company's misrepresentations regarding shipment dates and its failure to provide refunds.  Similarly, Drake's job functions demonstrate participation in and knowledge of the company's illegal conduct.  She administers the company's web forum and frequently posts on it.  Specifically, she made the comment that consumers should not "cry" because reviewers would be the first to get the BitForce.[129]  She also has responded to the delivery delay issues in question here, something that she alluded to in one of her public forum posts.[130]

E.    **_An Ex Parte TRO With Additional Equitable Relief Is Necessary to Preserve Effective Final Relief_**

As part of the permanent relief sought in this case, the FTC seeks restitution for the consumer victims of Defendants' scheme.  To preserve the possibility of such relief, the FTC seeks an *ex parte* TRO that would require that Defendants immediately cease their deceptive practices; freeze Defendants' assets; appoint a temporary receiver; mandate financial reporting and expedited discovery; provide immediate access to Defendants' business premises; and require Defendants to preserve documents. Absent such relief, a substantial risk looms that Defendants will continue to operate their illicit scheme, dissipate assets, and destroy documents to preclude satisfaction of any final order requiring monetary relief.  Courts in this Circuit have

---

[128] PX 1 ¶ 93 Att. AAK.
[129] PX 1 ¶ 34, Att. AH.
[130] PX 1 ¶ 23, Att. T; ¶ 25, Att. V; ¶ 26; Att. X ¶ 35, Att. AI; ¶ 38, Att. AL.

regularly granted temporary restraining orders with the relief requested here, including on an *ex parte* basis.[131]

### 1.    *The TRO Is Narrowly Tailored to Prohibit Defendants' Law Violations*

The proposed TRO is narrowly tailored to prevent ongoing consumer injury by prohibiting Defendants from misrepresenting that the Bitcoin mining machines and services will generate Bitcoins or generate a substantial or profitable amount of Bitcoins. In addition, the proposed TRO prohibits Defendants from misrepresenting when they will ship and deliver products. These provisions would prohibit Defendants from making specific, material misrepresentations. Thus, these provisions do no more than require Defendants to comply with the law. *Kitco*, 612 F. Supp. at 1296-97 (holding that an "order prohibiting misrepresentation will not unduly harm defendants, since it will not prohibit them from doing business, but only from doing business in an unlawful manner").

### 2.    *An Asset Freeze Is Necessary to Preserve Possibility of Final Relief*

The Court should freeze Defendants' assets to ensure that funds necessary to redress Defendants' victims do not disappear during the course of this action. *World Travel Vacation Brokers*, 861 F.2d at 1031 (holding that district courts have a "duty to ensure that . . . assets . . . [are] available to make restitution to the injured customers").    Courts in this Circuit have repeatedly ordered asset freezes to preserve the possibility of consumer redress. *See*, *e.g.*, *Real Wealth*, No. 10-0060-cv-W-FJG (W.D. Mo. Jan. 26, 2010); *Grant Search*, No. 2:02-cv-04174-NKL (W.D. Mo. Aug. 15, 2002) (*ex parte* TRO with asset freeze and expedited discovery); *Neiswonger*, No. 4:96-cv-02225-SNLJ (E.D. Mo. July 17, 2006); *Kruchten*, No. 01-523

---

[131] *Supra* note 115.

ADM/RLE (D. Minn. May 10, 2001); *FTC v. Kitco*, No. 4-83-467 (D. Minn. June 10, 1983) (TRO with asset freeze).[132]

As discussed above, Defendants have operated a pervasive and deceptive scheme that has affected thousands of consumers and caused millions of dollars in consumer injury. Courts have held, and experience has shown, that defendants who engage in deceptive practices or other serious law violations are likely to waste assets prior to resolution of the action. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972); *see generally* Certification And Declaration Of Helen P. Wong In Support Of Plaintiff's *Ex Parte* Motion To Temporarily Seal Case File And Plaintiff's *Ex Parte* Motion For A Temporary Restraining Order With An Asset Freeze, Appointment Of A Receiver, And Other Equitable Relief ("Wong Dec.").

Further, these particular Defendants are likely to dissipate assets. Large amounts of Butterfly Lab's corporate funds are going to non-business purposes such as: department stores (including Nordstrom, Bed, Bath, & Beyond, Restoration Hardware, and Hobby Lobby), massages, auto maintenance, day care services, gun stores, hunting stores, and sporting event tickets.[133] Bank records indicate that once consumer funds enter into Defendants' bank accounts, they are quickly dissipated. Despite receiving large sums of money each time consumers place orders, Defendants never leave more than around $2 million in bank accounts. Instead, funds are diverted to other accounts almost as quickly as consumers place their orders.[134]

Also demonstrating the need for an asset freeze, Defendant Vleisides, the company's majority owner, has failed to provide accurate information about his finances to his probation

---

[132] Where, as here, individual defendants control the deceptive activity and have actual or constructive knowledge of the deceptive practices, freezing individual assets is appropriate. *See, e.g., Real Wealth*, No. 10-0060-cv-W-FJG (W.D. Mo. Jan. 26, 2010).
[133] PX 1 ¶¶ 76-78.
[134] PX 1 ¶ 76.

officer in violation of a prior order of this Court.[135]  Defendant Vleisides' behavior heightens

concerns about potential for concealment of assets, and therefore provides additional justification

for an asset freeze.

### 3. *The Court Should Appoint a Temporary Receiver*

The appointment of a receiver for the Corporate Defendant, which is within this Court's

equitable powers, is critical.  *FTC v. Skybiz.com*, No. 01-396, 2001 U.S. Dist. LEXIS 26175, at

*23-24 (N.D. Okla. Aug. 2, 2001); *see also Neiswonger*, No. 4:96-cv-02225-SNLJ (E.D. Mo.

July 17, 2006) (granting FTC's *ex parte* TRO with appointment of reciever, asset freeze, and

expedited discovery); *Kruchten*, No. 01-523 ADM/RLE (D. Minn. May 10, 2001) (granting

FTC's *ex parte* TRO with appointment of reciever, asset freeze, and expedited discovery).  In

determining whether to appoint a receiver, courts consider several factors, including the

"[validity of the] claim by the party seeking the appointment; the probability that fraudulent

conduct has occurred or will occur to frustrate that claim; imminent danger that property will be

concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic

equitable remedy; and likelihood that appointing the receiver will do more good than harm."

*Aviation Sup. Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993).  Here,

each of these factors easily weighs in favor of appointing a receiver.  As discussed in section

V.B., the validity of FTC's claim and the probability that fraudulent conduct will frustrate that

claim are grounded in the fact that the FTC has demonstrated a likelihood of success on the

merits that Defendants have violated Section 5 of the FTC Act, and that the appointment of a

receiver for such a claim is well-established.  *See FTC v. Skybiz.com*, No. 01-396, 2001 U.S.

Dist. LEXIS 26175, at *23-24 (N.D. Ok. Aug. 2, 2001); *see also Neiswonger*, No. 4:96-cv-

---

[135] *Supra* notes 11 & 12.

02225-SNLJ (E.D. Mo. July 17, 2006) (granting FTC's *ex parte* TRO with appointment of reciever, asset freeze, and expedited discovery); *Kruchten*, No. 01-523 ADM/RLE (D. Minn. May 10, 2001) (granting FTC's *ex parte* TRO with appointment of reciever, asset freeze, and expedited discovery)  As explained in section V.E.2, Plaintiff has demonstrated that there is an imminent danger that property will be at the very least, diminished in value.  Defendants have used large amounts of corporate funds for non-business purposes and bank records indicate that once consumer funds enter into Defendants' bank accounts, they are quickly dissipated.[136] Given Defendants' course of conduct with regard to such property, other legal remedies aside from a receivership will not suffice to protect property for consumer redress.  Lastly, the risk that a receiver will do more harm than good is extremely low.  As explained in the accompanying Motion for Receiver, the FTC has put forth two candidates for receivers who have proven themselves to be upstanding officers of the court, and the receiver's role is laid out in the accompanying proposed TRO in detail.

As discussed in Section V.E.3, a receiver is necessary because Defendants' operation is permeated by unlawful practices.  Courts have held that, when corporate defendants have used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of the victims.  *SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981); *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963).  A receiver is also necessary to secure Defendants' business locations, perform standard functions such as ensuring corporate compliance with any order, trace and secure assets, and take possession of computers,

---

[136] See supra Section VI.B.

41

documents, and other evidence of Defendants' illegal practices.[137]  Courts of this district have

appointed receivers for corporate defendants in numerous similar FTC enforcement actions.[138]

### 4. *Immediate Access to Defendants' Business Premises and Expedited Discovery Are Essential to Preserve Defendants' Assets*

District courts are authorized to depart from normal discovery procedures and fashion

discovery by order to meet discovery needs in particular cases. Fed. R. Civ. P. 1, 26(d), and

34(b).  The scope of discovery sought here falls within the court's broad and flexible authority in

equity to grant preliminary emergency relief in cases involving the public interest.  *See Porter v.*

*Warner Holding Co.*, 328 U.S. 395, 398 (1946); *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir.

1987); *Fed. Express Corp. v. Fed. Espresso, Inc.*, No. 97-CV-1219, 1997 U.S. Dist. LEXIS

19144, at *6 (N.D.N.Y. Nov. 24, 1997) (early discovery "will be appropriate in some cases, such

as those involving requests for a preliminary injunction") (quoting commentary to FED. R. CIV.

P. 26(d)); *FTC v. Vocational Guides, Inc.*, No. 01-0170, 2008 WL 4908769 (M.D. Tenn. Nov.

12, 2008) (finding that financial disclosure and expedited discovery are in the public interest).

In order to locate assets and documents pertaining to Defendants' business practices, the

FTC respectfully requests that this Court grant it and the temporary receiver immediate access to

Defendants' business premises.  Defendants have taken in tens of millions of dollars from

consumers, and in many cases, have provided nothing in return.  It is unclear whether they are

---

[137] Plaintiff has identified a potential candidate in the pleading entitled "Plaintiff's Suggestion of Temporary Receiver," filed simultaneously with this memorandum.
[138] *See e.g.*, *Business Card Experts*, Case No. 0:06-CV-04671-PJS (D. Minn. Nov. 29, 2006) (granting FTC's *ex parte* TRO with appointment of receiver, asset freeze, and expedited discovery, including financial reporting); *Kruchten*, Case No. 01-523- ADM/RLE (D. Minn. May 10, 2001) (granting FTC's *ex parte* TRO with appointment of receiver and asset freeze); *Neiswonger*, No. 4:96-CV-2225-SNL (E.D. Mo July. 17, 2006) (granting FTC's *ex parte* TRO with appointment of reciever, asset freeze, and expedited discovery).

even developing products for consumers; they are certainly not shipping them in a timely manner An immediate access would allow the receiver to gain an accurate picture of the current state of business operations, including the inventory, its condition, and the efforts currently underway to fulfill orders.

Similarly, the FTC requests limited expedited discovery to identify the location and nature of assets and documents. Defendants are misusing corporate funds, immediately transferring consumer funds to different accounts, and spending money on marketing new products rather than developing and delivering products consumers have purchased.

### 5.  The Proposed TRO Should Be Entered Ex Parte

The requested preliminary relief should be issued without notice to preserve the Court's ability to effectuate final relief. Federal Rule of Civil Procedure 65(b) permits entry of an *ex parte* order upon a clear showing that "immediate and irreparable injury, loss, or damage will result to the movant" if notice is given to defendants. Fed. R. Civ. P. 65(b)(1)(A). In such cases, *ex parte* relief is "indispensable" because "it is the sole method of preserving a state of affairs in which the Court can provide effective final relief." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979). Recognizing the necessity of such relief, courts across jurisdictions have regularly granted the FTC requests for *ex parte* temporary restraining orders.[139] *See, e.g.*, *Grant Search*, No. 2:02-cv-04174-NKL (W.D. Mo. Aug. 15, 2002).

---

[139] *See supra* note 115. In addition, Congress has observed with approval the use of *ex parte* relief under the FTC Act: "Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]. The FTC can go into court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, *reprinted in* 1994 U.S. Code Cong. & Admin. News 1776, 1790-91.

43

*Ex parte* relief is indispensable here. Thousands of consumers have collectively paid Defendants up to $50 million and received nothing in return or received machines that are obsolete, have depreciated significantly, or are defective. The record shows that once Defendants take possession of consumer funds, they quickly exit company accounts, and that Defendants, in many instances, have diverted them to personal use.[140] Further, Defendant Ghoseiri, the company president, holds bank accounts in France. Finally, the FTC's experience shows that defendants engaged in similar schemes have withdrawn funds and moved or shredded documents upon learning of impending federal law enforcement action.[141]

Yet another factor warrants granting the requested relief without notice to Defendants. A defendants' past concealment of evidence or past disregard for court orders weighs in favor of *ex parte* relief. *See AT&T Broadband v. Tech Comm'n., Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004) (holding that *ex parte* relief is appropriate where either the defendant or persons involved in similar activities have concealed evidence or disregarded court orders in the past). As explained above, the Court has determined that Defendant Vleisides violated the conditions of his supervised release. Further, his mail fraud conviction stems from a lottery fraud scam that required consumers to pay up front to join a lottery pool, and induced consumers to join based on false guarantees of winning substantial sums. Even while on supervised release, Defendant Vleisides is engaging in another scheme that requires consumers to pay up front, and which induces them to do so based on false promises of generating a substantial amount of earnings. His disregard for court orders makes it unlikely that he would comply with a noticed order requiring preservation of documents and assets.

---

[140] PX 1 ¶ 76.
[141] PX 3, Wong Dec. ¶ 22-23

44

## VI.    CONCLUSION

For these reasons, the FTC respectfully requests that the Court grant its motion for an *ex parte* TRO with an asset freeze, appointment of a temporary receiver, and other equitable relief.

Respectfully submitted,

JONATHAN E. NEUCHTERLEIN
General Counsel

Dated:  September 17, 2014

\_\_\_/s/ Helen Wong_____
Helen P. Wong, DC Bar # 997800
Teresa Kosmidis, NY Bar # 4533824
Leah Frazier, DC Bar # 492540
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Mail Stop CC-10232
Washington, D.C. 20580
202-326-3779 (Wong)
202-326-3216 (Kosmidis)
202-326-2187 (Frazier)
202-326-3768 (facsimile)
E-mail:  hwong@ftc.gov
E-mail:  tkosmidis@ftc.gov
E-mail:  lfrazier@ftc.gov

TAMMY DICKINSON
United States Attorney

Dated: September 17, 2014

\_/s/ Charles M. Thomas_____
Charles M. Thomas, MO Bar #28522
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, MO  64106
Telephone:  (816) 426-3130
Facsimile:  (816) 426-3165
E-mail:       charles.thomas@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

45