IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 14-CV-0815-W-BCW |
| | ) |
| **BF LABS INC., et al.,** | ) |
| | ) |
|     **Defendants.** | ) |

**DEFENDANT BF LABS INC.'S STATEMENT OF REASONS
WHY THE COURT SHOULD NOT HAVE GRANTED PLAINTIFF'S
REQUEST FOR *EX PARTE* ORDER, MOTION TO DISSOLVE
THAT ORDER, AND STATEMENT OF GOOD CAUSE WHY
<u>A PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u>**

No cause existed for the Court's entry of its *Ex Parte* Temporary Restraining Order ("TRO"). BF Labs moves the Court to dissolve that TRO, and further makes its statement of cause why a preliminary injunction should not issue.[1] The FTC was not entitled to the TRO, and is not entitled to a preliminary injunction, because it has not demonstrated and cannot demonstrate *either* that it is likely to prevail on the merits of its complaint, *or* that there is some reasonable likelihood of future violations of the FTC Act by BF Labs.

---

[1] The September 29, 2014 hearing has been formally styled a supposed "show cause" hearing for Defendants, but the FTC has at all times the burden of proving every required element of its preliminary injunction motion, and of making the heightened showing for the asset freeze. *See, e.g., CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). Under no circumstances does the burden shift back to Defendants. *See Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) (remanding after finding the district court improperly shifted the burden to defendants because the burden "is at all times upon the plaintiff to prove the elements of a preliminary injunction); *see also S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1037, 1043 (2nd Cir. 1990); *S.E.C. v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978) (finding that "[t]o obtain injunctive relief the Commission must offer positive proof" to satisfy the elements for the relief requested).

1

48893858.6

Had the Court known the real facts—as opposed to the version presented *ex parte*—the Court would have concluded that a TRO against BF Labs was unwarranted. In filing its application *ex parte*, the FTC put the Court in a difficult position. The FTC gave the Court the impression that there was a high profile emergency that required extraordinary action to protect consumers and company assets. In fact, there was no basis at all for the FTC to proceed *ex parte* and, by filing its motion, the FTC is harming the interests of the very consumers it purports to protect. As set forth more fully herein, the TRO should be dissolved in its entirety, lifting the freeze that now encumbers virtually all of BF Labs' assets, and no preliminary injunction should issue.

## I. BACKGROUND

BF Labs manufactures a line of high-speed encryption processors for use in emerging bitcoin mining, research, telecommunication, and security applications.[2] BF Labs has unquestionably experienced growing pains—particularly speed-to-market issues—in this rapidly developing market. Those growing pains are exploited in the FTC's motion and twisted into a sordid tale of deception and fraud. The reality is much simpler.

### A. Overview of Competitive Market

An understanding of the nature of the technological market in which BF Labs competes is critical to the Court's injunctive-relief analysis. Bitcoin mining is a relatively new endeavor— bitcoin came into existence in 2009. Two years later, BF Labs was incorporated. Bitcoin was initially mined with the central processing unit (CPU) in laptop or desktop computers, and

---

[2] BF Labs learned of the Court's TRO and show-cause order on Friday, September 19, 2014. Because of the extreme time limitation of the single business day that BF Labs had to respond to the TRO and the Court's Show Cause Order, BF Labs is contemporaneously filing a motion to present live testimony at the preliminary injunction hearing on September 29, 2014, which will support each of the factual assertions made herein.

subsequently with the more powerful graphics cards (GPU) in these types of computers. This type of mining required a degree of technical knowledge, largely the province of "techies."

BF Labs' FPGA technology (introduced in 2012), was approximately two times faster than graphics cards, which were in turn hundreds of times faster than the original CPUs. Then in 2013, BF Labs introduced ASIC 65nm technology that was approximately 80 times faster than its FPGA technology. The ASIC 28nm technology that BF Labs is presently rolling out to the market is approximately 10 times faster than the ASIC 65nm technology. At this point, speeds are 1600 times faster than the GPUs and many thousands of times faster than the original CPUs. Each succeeding generation of technology introduced by BF Labs has required less and less technical knowledge on the part of the miner, thus making mining accessible to more people.

Because the CPU/GPU miners were a relatively small group and had the space to themselves, the introduction of specialized mining chips that made mining possible for non-technical consumers disrupted the mining industry status quo and upset the apple cart for many of the original miners. While the majority of them accepted the new development, they now had to be willing to invest money in specialized equipment in order to compete with thousands of new entrants into "their" industry, or they risked not being able to keep pace. A vocal minority, however, chose to try to "scare off" the new miners by painting BF Labs and later mining rig manufacturers as unreliable and untrustworthy, or even as scams and frauds.

Miners desire faster, more powerful, more energy efficient devices as soon as they can get them, in order to get a perceived "jump on the other guy." As soon as a new product is announced, some miners insist on queuing up to be as near the front of the line as possible, and these miners have been willing to put down deposits of up to 100% to secure a delivery slot. However, as the market price of bitcoin fluctuates up (or down), more miners want to join the

race (or drop out of it). Some miners even try to arbitrage the market fluctuation by placing, canceling, and reinstituting orders as the price of bitcoin rises, falls, and rises again. This practice creates havoc for the manufacturer, who is trying to forecast demand, buy parts with long lead times in order to meet the demand, and hire staff to assemble the orders. The financial risk in this situation is shifted onto the manufacturer, who runs the risk of getting stuck with obsolete inventory if a competitor announces a product that is promised for future delivery but seems more attractive, and customers in the queue shift their orders over to the competitor. The above factors led to the implementation of the fully paid pre-order business model and the "no refunds once manufacturing starts" policy.

The desire for "more firepower" leads to an effort on the part of the manufacturers to accelerate product development and delivery cycles. While the pace of development of a new computer chip for the PC industry can be measured in years, the cycle in bitcoin mining has been compressed to a period of months. This speed means that prototyping and testing cannot be done until late in the process, and any adjustments that are required extend the eventual delivery time beyond initial expectations. The fabricators of chips and components for the mining industry are generally the same as those for the PC industry; they have also struggled to adapt to the speed requirements of this newly emerging industry, sometimes causing significant product delays.

Most products a consumer can purchase do not have a potential return on investment. Bitcoin-mining equipment, however, is seen as an almost "sure-fire" way to make money. Because of this, some people feel that any wait required for delivery of their new, cutting-edge equipment is harmful to them as a result of their inability to mine; however, they do not consider that their returns are affected by the fluctuating price of bitcoin, the electricity cost of running their equipment, and their "luck" in solving the required algorithms, as well as their timing of

selling or spending any coins that are mined. To hold manufacturers responsible for speculative investment losses would make manufacturing an entirely too risky proposition, and would drive all of them out of business. BF Labs has always been careful not to guarantee mining results; only that its equipment will perform at the advertised speed and power consumption.

Bitcoin miners started out as a community of like-minded people pursuing a common interest. They shared information among themselves on internet "forums" and these forums became the go-to place for information. As bitcoin mining grew more popular, new miners went to these forums to research information. Internet trolls found these forums to be fertile ground for criticizing mining equipment manufacturers. Almost every equipment manufacturer has been attacked: HashFast (now in chapter 11 bankruptcy), Cointerra (battling Better Business Bureau complaints), and KnC Miner (assembly and shipping issues) are examples.

### B. The Putative Class Action and the Kansas DA Investigation

In April 2014, a putative class action concerning BF Labs' speed-to-market issues was filed in the United States District Court for the District of Kansas. *See Alexander et al. v. BF Labs*, 2:14-cv-2159-KHV-JPO (D. Kan. Apr. 4, 2014). The Johnson County District Attorney also began investigating BF Labs in early fall 2013, and has subsequently worked with BF Labs to revise and enhance its policies and practices without need for an injunction or restraining order, or to resort to an asset freeze or heavy-handed efforts to shut the business down.

BF Labs has fully cooperated with the inquiries of the Johnson County District Attorney and has worked to address the concerns expressed by it to comply with state laws. BF Labs has similarly acted in good faith and cooperated with plaintiffs in the putative class-action matter. The same cooperation would have been extended by BF Labs to the FTC, had the FTC approached BF Labs rather than needlessly proceeding *ex parte* in a non-emergent situation.

### C. BF Labs' Actions Since Receiving Notice of the *Ex Parte* Order

Immediately after BF Labs and the individual defendants were served with the FTC's pleadings, all BF Labs' efforts have been designed to help the Temporary Receiver locate assets and do his job.[3] BF Labs delivered to the Receiver, for example, a bitcoin wallet that contains roughly $11 million dollars' worth of bitcoin[4] and has offered up two company vehicles. BF Labs has also helped the Receiver identify and locate Bitcoin wallet addresses, corporate formation documents, financial documents, and insurance policies, and has listed critical tasks that the Receiver needs to perform to maintain BF Labs' viability. BF Labs also had its employees assist the Receiver over the weekend on payroll issues and announcements related to refund eligibility.

At each stage of the nascent receivership process, BF Labs has provided cooperation and assistance. The BF Labs representatives believe in the company, and are doing everything necessary to help the Receiver maintain BF Labs as a going concern.

## II.     ARGUMENT

BF Labs has been working to remedy the speed-to-market issues noted in the FTC's papers for some time, both on its own initiative and as the result of the Johnson County, Kansas District Attorney's investigation and the District of Kansas putative class-action lawsuit.

The FTC is late to the game, and its motion and the Court's order hinder the progress the company has already achieved. In this case, the FTC's overzealous *ex parte* prosecution has worked to the company and its consumers' detriment. But worse, the "facts" that the FTC argues support injunctive relief and an asset freeze are either incorrect, or do not meet the stringent

---

[3] The remaining time has been devoted to defending against the FTC.

[4] Counsel for BF Labs informed the FTC and the Temporary Receiver on September 19, that the surrendered wallet contained approximately $20 or $22 million dollars worth of bitcoin. While at one time that was true, it turns out that fluctuations in the bitcoin market now result in a value of approximately $11 million.

standards imposed by law. For these reasons, as set forth herein, the TRO and its accompanying asset freeze should be dissolved, and no preliminary injunction should issue.

**Neither *ex parte* treatment of the FTC's motion, nor an asset freeze, were supportable.**

Federal Rule of Civil Procedure 65 allows for the issuance of a TRO without written or oral notice to the adverse party or its attorney in only one limited circumstance. Such an order may be issued "only if specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

The FTC offered no specific facts in its Suggestions in Support that clearly show immediate and irreparable injury, loss, or damage, as required by the Federal Rules. The FTC simply stated, in conclusory fashion, that "[t]he proposed TRO is narrowly tailored to prevent ongoing consumer injury by prohibiting Defendants from misrepresenting that the Bitcoin mining machines and services will generate Bitcoins or generate a substantial or profitable amount of Bitcoins. In addition, the proposed TRO prohibits Defendants from misrepresenting when they will ship and deliver products." See *Plaintiff's Suggestions in Support of its Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue*, p. 38 (doc. 8). But the FTC has been monitoring consumer complaints against BF Labs through its Sentinel reporting system since at least 2013, yet was not apparently concerned about "immediate and irreparable harm" until now, and has offered no explanation for its sudden change of heart.

The facts known to the FTC before it filed its motion for an *ex parte* temporary restraining order with asset freeze also demonstrate a complete absence of any need to proceed in secret. The FTC knew or should have known—and should have informed this Court in the *ex parte* hearing—that BF Labs was cooperating with the Johnson County District Attorneys' investigation and BF Labs had responded to inquiries from the Better Business Bureau. Yet without mentioning those facts, the FTC proceeded to this Court without notice to BF Labs, and informed the Court that "experience has shown, that defendants who engage in deceptive practices… are likely to waste assets prior to resolution of the action. *Id*. at p. 39. But the moving papers are devoid of any evidence or any citation to support the extraordinary relief requested—relief that, incidentally, left the individual defendants wondering if they were permitted even to purchase groceries.

Rule 65 required the FTC to show when moving *ex parte* for a TRO that giving notice to BF Labs "will result" in *immediate and irreparable damage*, not that there is merely an opportunity for assets to be moved or sold. If the law were as the FTC argues—that only "an opportunity" needs to be shown—then every case that the FTC files would warrant *ex parte* proceedings because there is always an opportunity for assets to be sold or moved before a case is concluded. This cannot be the law.

Furthermore, if the FTC had approached and investigated BF Labs, it would have learned that on September 2 and 3, 2014, Modus, a data management company, came to BF Labs headquarters and captured all emails and imaged key custodians' hard drives for purposes of the class action lawsuit. Instead the FTC filed *ex parte* because they were (incorrectly) worried about "the concealment, transfer or destruction of Defendants' records…" *See* Wong Decl. para 21.

### A. No cause existed to support the entry of a TRO, and good cause demonstrates that no preliminary injunction should issue.

Under 15 U.S.C. § 53(b), preliminary injunctive relief in the form of either a TRO or a preliminary injunction is *only* appropriate where the movant can demonstrate a likelihood of success on the merits and that the balance of the equities favors the requested relief. The relevant facts here, as applied to those standards, are simply not as the FTC represents.

Even if the FTC could demonstrate a likelihood of success on the merits (it cannot), the FTC must also show there is a "cognizable danger of recurrent violation" or "some reasonable likelihood of future violations" for an injunction to issue. *FTC v. Netfran Dev. Corp.*, Case No. 05-22223-CIV-Ungaro-Benages (S.D. Fla. 2006); *see also FTC v. Evans Prods. Co.*, 775 F. 2d. 1084, 1087 (9th Cir. 1985). Because it is not the role of equity to punish, an injunction should not be issued absent the requisite proof of a threat of *future wrongdoing*. *SEC v. Wills*, 472 F. Supp. 1250, 1275 (D.D.C. 1978) (holding that neither injunctive relief nor disgorgement were appropriate against corporate officers who allegedly violated Securities Exchange Act).

Indeed, 15 U.S.C. §53, the provision of the FTC Act authorizing injunctive relief first requires present or future violations of any provision of law enforced by the FTC. *See* 15 U.S.C. §53(b)(1) (allowing the FTC to seek preliminary injunctive relief only when any person ... is violating, or is about to violate, any provision of law enforced by the FTC) (emphasis added). This provision differs from the injunctive relief provision under the Commodity Exchange Act ("CEA"), which expressly authorizes the Commodity Futures Trading Commission ("CFTC") to seek injunctive relief to address past, present, or future violations.

The FTC Act's exclusion of "past violations" is hardly unimportant. Had Congress wanted to grant the FTC authority to seek injunctive relief for past violations of the Act (similar to the CEA), it could have done so. But it did not, and the FTC's authority cannot be implied or extrapolated. Rather, the statute granting the FTC limited authority must be applied as written.

*See Dunn v. CFTC*, 519 U.S. 465, 470 (1997) (confirming that "absent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it). "Generally, a preliminary injunction under section 53(b) of the FTC Act will only issue if the wrongs are *ongoing, or are apt to continue*. An injunction is only authorized where a party is violating, or is about to violate, the law." *FTC v. Marketing Response Group, Inc.*, 1996 WL 420865, *2 (M.D. Fla. 1996) (internal citations omitted, emphasis added).

While 15 U.S.C. § 53(b) is clear that the FTC may only seek injunctive relief when there is reason to believe that any person is violating or about to violate any FTC law, the FTC seems to argue in this case that past allegations of misconduct are suggestive of future violations. Here, BF Labs now offers its customers refunds. BF Labs has fully cooperated with the inquiries of the Johnson County District Attorney and has worked to address the concerns expressed by it to modify its business practices and comply with state laws. Even if BF Labs were found to have violated the law during the past, past violations alone are insufficient to warrant injunctive relief. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978). Rather, it was and is the FTC's burden to offer positive proof that the wrongdoing will likely recur. *Id*.

**B.     The FTC is Not Likely to Succeed on the Merits.**

BF Labs did not, as the FTC alleges, make deceptive representations about timely delivery and the profitability and yield of their machines and services in violation of Section 5 of the FTC Act. The "timely delivery" prong of the FTC's complaint is governed by the FTC Rule set forth at 16 C.F.R. § 435.2. That Rule provides that a seller must have "a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer . . . within that time clearly and conspicuously stated" in the seller's solicitation, and that the seller must have a reasonable basis for any revised shipping date that it represents. 16 C.F.R. § 435.2(a), (b).

When buyers placed pre-orders with BF Labs, BF Labs notified each and every buyer on the BF Labs online order form that the shipping date for the ordered product was "two months or longer." At times, BF Labs' website even instructed customers who could not tolerate a two-month or longer waiting period for the ordered product: do NOT preorder this product.

The FTC's motion attempts to fault BF Labs for updating its anticipated shipping dates for various products. *See* Doc. 8, p. 17. As an initial matter, BF Labs updated its anticipated shipping dates for products in the interest of providing its customers *more* information, not less. But for purposes of meeting the 16 C.F.R. § 435.2 standard, BF Labs can unequivocally state—and support with evidence at the hearing—that each and every time that it posted, cited, or stated an anticipated shipping date, it had "a reasonable basis to expect that it w[ould] be able to ship any ordered merchandise to the buyer . . . [at] that time."

BF Labs' anticipated shipping-date representations were reasonably based on representations provided by its vendors, contractors, and subcontractors, including but not limited to Global Foundries, Chronicle Technologies, PCB Overnight, and I2A. These entities are each tenured Silicon Valley semiconductor vendors. Chronicle Technologies, for example, is a 25-year company that counts NASA, TI, and Qualcomm among its customers, and certainly warrants its clients' reasonable reliance. And in light of BF Lab's clear and conspicuous "two months or longer" warning, the FTC's attempt to use BF Lab's good-faith customer updates to argue that BF Labs somehow sought to mislead its customers is not supportable.

Similarly, the FTC bases its "substantial profits" misrepresentation argument in significant part on an online calculator that purportedly measures return on investment for various Bitcoin mining tools. But the calculator on which the FTC relies is not a creation or product of BF Labs; it is simply an online tool that BF Labs "shared" (or linked from the

calculator's original, non-BF-Labs-generated source) on BF Labs' Facebook page and Twitter account in November 2012. (BF Labs links to both its Facebook and Twitter accounts from its website.) The FTC's suggestion that the "sharing" of an online calculator constitutes a misrepresentation by BF Labs that its products will generate substantial profits is untenable.

BF Labs has consistently made accurate representations about its products' speed capabilities and functionalities. Outside of its two November 2012 publications of the link to the third-party's bitcoin calculator, BF Labs never made a representation about levels of profitability that its customers may be able to achieve. BF Labs disputes that its link to the calculator constitutes an actionable misrepresentation. But even if it did, that past action cannot form the basis for a preliminary injunction. *See FTC v. Marketing Response Group, Inc*., 1996 WL 420865, *2 (M.D. Fla. 1996).

For these reasons, the FTC is not likely to succeed on the merits of its Section 5 claims.

## C. The Balance of The Equities Weigh Heavily *Against* Injunctive Relief.

The FTC acted in its *ex parte* papers as if it was the first to learn of BF Labs' delay issues and that, without the Court's immediate *ex parte* intervention, consumers had no hope of recovery. The reality—as BF Labs intends to present in the preliminary-injunction hearing—is starkly different.

As previously noted, a putative class-action complaint has been filed in the District of Kansas. *See, e.g.*, *Alexander et al. v. BF Labs*, 2:14-cv-2159-KHV-JPO (D. Kan. Apr. 4, 2014). The Johnson County, Kansas District Attorney has been investigating and working with BF Labs since fall 2013. And the FTC's own Sentinel consumer reporting system has monitored consumer complaints related to BF Labs since at least 2013 yet the FTC has waited in silence, only to decide now (without apparent impetus) that the situation demanded this Court's

*immediate* attention. The equities did not warrant a TRO, *ex parte* or otherwise, as set forth below, and they do not warrant a preliminary injunction either.

D. **BF Labs' Previous and Current Practices**

As was industry standard practice and consistent with significant competing manufacturers of similar equipment, BF Labs *previously* used a fully prepaid pre-order process where the funds paid by a customer are applied to pay for the purchase of parts and labor used in the multi-month manufacturing process, making it impractical to reverse an order. But BF Labs, voluntarily and at its own discretion, ceased the practice of accepting pre-orders for future products. BF Labs believes its pre-order model was fully disclosed to its customers and its customers were made clear that the pre-order funds may be used to complete the development, and manufacture of the products. Despite clear and unequivocal warnings that consumers were entering into a pre-order arrangement for undeveloped products and that a delivery timeframe could not be assured, consumers voluntarily chose to complete their orders. BF Labs strongly denies that it misled any consumer into completing any purchase transaction, and rather states that it simply abandoned this approach based on a business decision.

BF Labs has also made several changes in its personnel, supply-chain, technology-platform, and refund programs to enhance its consumer interactions and speed-to-market capabilities.

1. **Personnel**

As of September 1, 2013, BF Labs has contracted Bruce Bourne, an individual with over 30 years of experience in accounting, finance, and management, a Certified Public Accountant designation, and a Masters in Business Administration degree from the Harvard Business School. This has already resulted in more disciplined decision making and better financial reporting and controls. BF Labs has also contracted for the services of a well-qualified consultant who is expert

in the purchasing, inventory, and accounting systems that the company uses. The linkage between these systems was not optimized in the past, and the company is making efforts to improve its technology underpinnings to ensure that information for decision making is available faster and more reliably. BF Labs has added staff in the areas of Customer Service and Accounting to be more responsive to customer inquiries and to provide more timely information about transactions. BF Labs has added staff in Product Development to spread the workload and speed design and testing of future products.

### 2. Supply Chain Vendors

BF Labs has also taken steps to more effectively manage the supply chain vendors which are responsible for furnishing parts critical to the manufacture of the company's products. BF Labs has pre-ordered and paid in advance for more computer chips than are currently needed for its existing orders. This is a $1 million investment to ensure that the most crucial part of BF Labs product – the computer chip – is available prior to start of production. BF Labs has met with its supplier of printed circuit boards (upon which the computer chips sit, along with hundreds of supporting components) to emphasize the need for speed in delivery of this crucial component. Although the company has current orders for approximately 12,500 units of its soon-to-be-released product, component orders have been placed with suppliers sufficient to construct as many as 20,000 units. This is intended to prevent parts shortages, and is again a $1+ million effort by the company to ensure that a spike in demand can be addressed expeditiously.

### 3. Critical Technology Platforms

BF Labs has taking steps to integrate its critical technology platforms. The company has three primary computer software systems – Magento (order entry), Fishbowl (purchasing and inventory) and QuickBooks (accounting). Efforts are ongoing to link these three systems in order to speed the flow and accuracy of information, allowing the company to better manage its

production planning and financial reporting. External consultants have been engaged to assist the company with this effort. Furthermore, BF Labs has simplified the design and the final assembly process for its upcoming product in order to be able to shorten the time between start of final assembly and shipment of the finished product.

### 4. Refunds

The current product line that BF Labs is working to bring to market is called the Monarch line. The Monarch line was preceded by eight lines: Bitforce Single, Bitforce Mini-Rig, Jalapeno, Super Jalapeno, 30gH Single, 60gH Single, Asic Mini-Rig, and 230gH Rackmount. As of December 31, 2013, full product shipment had been made or a refund given for *every single order* of one of these eight pre-Monarch product lines.

As for the Monarch line, full product shipment or a refund has been given for *every single order* made between August 17 and November 9, 2013. Thereafter, BF Labs instituted a six-month refund policy. Requests are generally paid within 30-40 days of receipt, after the purchaser's identity, order status and prior payment have all been confirmed. BF Labs has received approximately $5.6 million in refund requests as of June 19, 2014 and has paid out $2.8 million so far; currently, all valid requests received that are 45-days old or older have been processed.

*Less than 2%* of the more-than-50,000 units shipped to customers over BF Labs' corporate lifespan have been returned due to customer dissatisfaction with the performance of their product. In short, BF Labs has either delivered or refunded every order that is not currently waiting in the order queue for the next generation product, and the products that have been delivered *work*.

### 5. Free cloud-based mining services

Related to its upcoming product, as of June 23, 2014 BF Labs has been providing free cloud-based mining services to customers in the sequence and quantity that their orders were received. Although under BF Labs was under no obligation to take any such action, it did so as a business decision intended to demonstrate BF Labs' commitment to customer satisfaction and to reward its current customers for their loyalty and patience.

As these facts amply demonstrate, the equities do not come close to favoring a preliminary injunction.

## CONCLUSION

BF Labs respectfully requests that this Court enter an order denying the FTC's request for preliminary injunction and asset freeze with prejudice, enter an order vacating the *ex parte* TRO with asset freeze, appointment of Receiver, and other equitable relief.

Respectfully submitted,

/s/ James M. Humphrey
| | |
|---|---|
| James M. Humphrey | MO # 50200 |
| Michael S. Foster | MO # 61205 |
| Miriam E. Bailey | MO # 60366 |

Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

/s/ Braden M. Perry
Braden M. Perry                               MO # 53865
KENNYHERTZ PERRY, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Mobile: 913-488-4882
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendant BF Labs Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

>Helen Wong
>Teresa N. Kosmidis
>Leah Frazier
>Federal Trade Commission
>600 Pennsylvania Ave., N.W.
>Mail Stop CC-10232
>Washington DC  20580
>202-326-3779 (Wong)
>202-326-3216 (Kosmidis)
>202-326-2187 (Frazier)
>hwong@ftc.gov
>tkosmidis@ftc.gov
>lfrazier@ftc.gov
>
>Charles M. Thomas
>Assistant United States Attorney
>Charles Evans Whittaker Courthouse
>400 East Ninth Street, Room 5510
>Kansas City, MO  64106
>816-426-3130
>charles.thomas@usdoj.gov
>
>Attorneys for Plaintiff
>
>Bryant T. Lamer
>Kersten L. Holzhueter
>Andrea M. Chase
>Katie Jo Wheeler
>Spencer Fane Britt & Browne LLP
>1000 Walnut Street, Suite 1400
>Kansas City MO  64106
>816-474-8100
>blamer@spencerfane.com
>kholzheuter@spencerfane.com
>achase@spencerfane.com
>kwheeler@spencerfane.com
>
>Attorneys for Receiver Eric L. Johnson

      /s/ James M. Humphrey
    Attorney for Defendants