

PROTECTING AMERICA'S CONSUMERS

MAIN MENU  SEARCH

# The FTC and Class Actions

**Remarks before The Class Action Litigation Summit**

**Washington, D.C.,**

**DATE:** June 26, 2003

**BY:** Thomas B. Leary, Former Commissioner

## I. Introduction.

Thank you for giving me the opportunity to explain why the Commission has a compelling interest in class action issues, what our concerns are and how we are addressing them.

The first thing you need to understand is that the Federal Trade Commission is a very small agency with a very large mission. We have about 1000 employees overall, of whom about half are lawyers and economists. We share antitrust jurisdiction with the Department of Justice but have primary responsibility for enforcement of federal laws prohibiting false and deceptive practices. Our jurisdiction extends over virtually the entire economy. It is obvious that we need a lot of help.

Our law enforcement efforts are supplemented by an extensive consumer education program, on the theory that a better informed public is the first line of defense against misrepresentation and fraud. We bring a lot of cases on our own but we also cooperate closely with other agencies in the states and in foreign countries. Our efforts are further reinforced by an extensive array of private remedies, which include class actions. Class actions have an important role in compensating injured consumers and punishing or deterring wrongful conduct. This article will explore certain problems that make class actions less effective than they might be.

## II. The Genesis of Modern Class Actions.

The effort to accommodate multiparty litigation in a manageable way has a long and complex history. A variety of devices evolved for resolving claims (or defenses) of numerous parties that presented common legal issues.(2) At the risk of over simplification, the major problem seemed to be potential conflicts of interest among multiple parties.

Multiparty litigation was dramatically transformed by the 1966 amendments to Federal Rule of Civil Procedure 23,

EXHIBIT 3

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 1 of 12

which provides the governing framework for class actions today. Before these 1966 amendments, the text of Rule 23 was silent on the issue of whether all potential class members were excluded unless they affirmatively "opt in" or whether all potential class members are included unless they affirmatively "opt out."(3) In other words, was the default standard exclusion or inclusion?

Despite this ambiguity, it was well established that the default standard before 1966 was exclusion. One district court observed, "Prior to the 1966 amendment to the Rule, an individual could wait to see the outcome of the litigation before deciding whether or not to become a party."(4) This all changed when the new rule permitted opt-out classes. The Supreme Court noted that, because it "permitt[ed] judgments for money that would bind all class members save those who opt out," section (b)(3) of Rule 23 "was the most adventuresome innovation of the 1966 Amendments."(5)

There were plausible arguments for this innovation. The principal problem with an opt-in requirement was that large numbers of people may not even realize they had been harmed. It is difficult to communicate effectively with large numbers of potential class members. An affirmative opt-in requirement can be a substantial obstacle to class formation and can leave large numbers of uninformed claimants with no remedy. Moreover, a failure to compensate fully can result in underdeterrence of wrongdoing. There were problems for defendants, as well. Opt-in classes can lead to serial litigation as claimants "game" the system by waiting to see what will happen before they commit. An opt-out regime appeared to alleviate all these concerns. It also allowed classes to be created more quickly and it facilitated the prompt adjudication of claims.(6)

Notwithstanding the fact that the opt-out mechanism would consolidate the claims of largely silent class members, the supporters of the amendments expected that consumers would remain the real parties in interest. As the Ninth Circuit explained, "there is nothing in the Advisory Committee's Note that suggests that the amendments had as their purpose the authorization of massive class actions conducted by attorneys engaged by near-nominal plaintiffs."(7)

There is, however, a fundamental flaw in an opt-out system that was not widely recognized in 1966. Simply put, people have to opt-in at some point if they ever are to be compensated for the wrongs that gave rise to the litigation. If class counsel is successful, the matter typically will be resolved by a settlement or verdict that creates a fund for the class. In order to take advantage of that compensation, individual class members will have to identify themselves and demonstrate affirmatively that they are entitled to share in the fruits of victory.

Since individual class members are still required to opt-in, the 1966 Rule amendments postpone but do not eliminate notice and mass communication problems. The bulk of the class members are still likely to be uninformed and indifferent. The opt-in rates for some recent class action settlements are astonishingly low. In Strong v. BellSouth Telecommunications, Inc.,(8) for example, the settlement provided class members with the option of either continuing under a service plan or canceling and receiving a credit. Although the settlement purportedly provided $64 million in compensation, the credit requests submitted by class members amounted to less than $1.8 million. In Buchet v. ITT Consumer Fin. Corp.,(9) the proposed settlement would have provided class members with coupons worth up to $39 toward the purchase of property insurance or related products. The court refused to approve the settlement, citing actual redemption rates that ranged from 0.002% to 0.11% for similar coupons.

## III. The Unintended Consequences of "Opt-Out" Classes.

Postponement of opt-ins from the beginning to the end of litigation not only fails to solve some basic difficulties with class actions, but also aggravates other problems in ways that were not anticipated.

## A. Lawyers in Control

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 2 of 12

One direct effect is that lawyers, rather than clients, become the real parties in interest. If consumers are required to opt-in affirmatively before class certification, class action attorneys will have bona fide clients to whom they must be attentive and responsive. If consumers are not identified until the remedy phase, class action attorneys themselves can act on their own. And, if the response rate is minimal at that phase, they largely are still on their own.

Amended Rule 23 permits lawyers to speak for immense "phantom" classes of people who have not selected them - - who may, in fact, be entirely unaware that they are parties to a lawsuit. In theory, individual notice is required if it can be undertaken with reasonable effort, so that people will have the opportunity to opt-out.(10) In practice, this requirement has not been strictly applied and, even if it were, experience shows that most people either do not pay attention or have little incentive to opt-out. The lawyer can still purport to speak on behalf of a horde of passive people, and automatically acquires substantial bargaining power.

Lawyers are subject to the same frailties as any other group of human beings and it is unreasonable to expect that they will always be able to differentiate between their own interests and the interests of the class members they are supposed to represent. The traditional problem of conflicts among a class of plaintiffs or defendants that has always existed in multiparty litigation has been transmuted into a potential problem of conflicts between lawyers and class members.

A further consequence of delayed opt-in and low response rates is that class action litigation subtly shifts away from the goal of compensating people for wrongs that they have suffered toward the goal of punishing wrongdoers, or at least assuring that they do not profit from their misconduct. There is nothing wrong with this idea, in principle. Punishment or disgorgement of ill-gotten gains are powerful weapons that serve the important public purpose of deterring misconduct in the future. The problem is that these weapons have been placed in the hands of people who act, in effect, as private bounty hunters but who are not primarily concerned with public benefit. There is heightened need for public oversight to avoid outcomes that underdeter, overdeter or deter the wrong parties.

## B. The Risk of "Collusive Settlements"

The overwhelming majority of class actions, like the overwhelming majority of other lawsuits, are settled before trial.(11) When response rates and actual payouts are expected to be low, however, there is the potential for a substantial pool of unclaimed funds. This surplus can, in effect, be split between plaintiffs' lawyers, who are essentially free agents, and the defendants. Certain recurring features of modern class action settlements suggest that these "parties" may be tempted to craft a compromise that subordinates the interests of the class. Two examples of particular concern are (1) so-called "coupon" settlements, where class members receive discounts on future purchases from the defendants rather than cash and (2) settlements where class counsel get an inordinately large share of the recovery.

There may be situations in which the use of coupon compensation is appropriate - - for example, when the size of each class member's individual recovery is likely to be de minimis - - but even a cursory review of current class action practice suggests that this particular form of compensation is over-used. Defendants may be tempted to agree on coupon compensation because they are counting on a low redemption rate or because the coupons can actually generate additional sales. The net cost is minimal and a settlement has minimal deterrent effect. Class action attorneys may be tempted to settle for coupon compensation that ultimately is of limited value, or even no value to the class, provided that the coupons facially appear valuable enough to justify counsel's own substantial cash fees.

Two publicly reported examples - - admittedly extreme - - illustrate the anti-consumer potential of coupon settlements. In the Bank of Boston settlement, the bank was accused of over-collecting escrow money from

homeowners and profiting from the float. The settlement gave up to $8.76 to each class member, and $8.5 million in fees to attorneys. The fees were paid by deducting money - - usually more than the amount of the award - - from class members' accounts, resulting in net losses for class members.(12) In the Charter Communications settlement, defendant cable company was accused of charging customers excessive late-payment fees. Under the settlement, attorneys got $5.5 million in fees. Customers got a new late-payment policy and a choice of various free services, but they also got larger cable bills. One class member complained: "please don't sue anyone else on my behalf. I can't afford any more of these brilliant legal victories."(13)

## C. Unrealistic Expectations for Judicial Oversight

In theory, judges can oversee over the entire process, from the initial decision on whether to certify a class to the ultimate approval of a plan for the distribution of whatever money is collected. In practice, this oversight may not be as rigorous as it looks in theory.

It is true that class action settlements must be affirmatively approved by judges. One problem, however, is that judges are accustomed to resolving disputes between adversaries but, once the case settles, the lawyers for the class and the lawyers for the defendant(s) are no longer adversaries. They have a common interest in touting the advantages of settlement and minimizing the difficulties. Ordinarily, the judge has no other source of information or contrary views. In some cases, of course, new counsel will appear to object to certain aspects of the class settlement, but they are likely to be self-appointed, as well, with the same potential for conflicts.

It is also important to remember that the amended federal class action rules, and the state-law counterparts, have given individual judges immense discretion. When a lawyer pleads a massive class action, it instantly creates a potential "big case." Some judges, faced with calendar pressures, may be tempted to resist certification of a broad class, but other judges welcome the opportunity to preside over a proceeding with massive stakes. The likelihood that there will be "surplus" unclaimed funds also leaves room for a cy-pres settlement, in whole or in part, under which a judge may have substantial discretionary authority to disburse substantial sums.

Class action lawyers who sue defendants with a national presence (and deep pockets) have the ability to search out those judges most likely to be receptive. A review of class action trends suggests that lawyers are increasingly, and successfully, engaged in forum shopping. A recent study by the Manhattan Institute, for example, focused on three jurisdictions with disproportionately high volumes of class action filings: Madison County, Illinois; Jefferson County, Texas; and Palm Beach County, Florida. The results were surprising.

First, all three counties showed a substantial increase in class action filings. The most extreme case, Madison County, Ill., experienced a 1850% increase in filings between 1998 and 2000. In fact, Madison County has been the forum for more class actions than all but two counties in the United States - - Los Angeles County and Cook County, Ill. - - which are vastly greater in size. Jefferson County filings nearly doubled and Palm Beach filings increased 31% in the same period.(14)

Second, a significant number of these class actions were filed: (1) against a defendant that was not based in the county, and (2) on behalf of a putative nationwide class. In other words, a handful of class action friendly jurisdictions increasingly determine the contours of lawsuits that can affect public policy on a nationwide basis. Again, Madison County was the most extreme. Not one class action was filed against a defendant based in the county, and 81% (57 out of 70) were brought on behalf of a putative nationwide class.(15) In Jefferson County, only 8% of class actions were filed against defendants based in the county, and 57% (27 out of 47) were brought on behalf of a putative nationwide class.(16) In Palm Beach County, only 50% of class actions were filed against defendants based in the county, and 51% (46 out of 91) were brought on behalf of a putative nationwide class. (17)

## D. The Process Can Drive the Result

The problems resulting from the amendments to Rule 23 - - the rise of lawyer-driven class actions, and forum shopping - - have been exacerbated by the tendency for the needs of process to drive substantive outcomes. This development results from the fact that classes are certified before courts become well informed about the significance of the issues.

In the landmark Eisen case, the Supreme Court concluded that "nothing in either the language or the history of Rule 23 . . . gives a court any authority to conduct a preliminary hearing into the merits of a suit in order to determine whether it may be maintained as a class action."(18) A court is supposed to be able to decide whether "questions of law or fact common to members of the class predominate over any questions affecting only individual members,"(19) without inquiring deeply into the merits. It is very difficult to draw this overall balance in a factual vacuum. The rules also provide, however, that a class action may proceed "with respect to particular issues."(20) So, a court may be tempted to look for some common element up front and worry about the individual issues later on. For instance, a class plaintiff can plead the existence of a "conspiracy" or a "misrepresentation," which looks like a factual issue that is appropriate to decide only once - - and, indeed, in a government prosecution it would be - - but which may only be the beginning of a complex inquiry in a private class action, where individual class members are affected in different ways.

Once a class is certified to address a single common factor, it acquires a life of its own. If the case does not settle promptly, conservation of judicial resources may motivate courts to find ways to shortcut a burdensome inquiry into other substantive elements of the plaintiff's case, like actual "impact" on, or "reliance" by, a large number of individuals who are differently situated.(21) Substance is tailored to serve the needs of process rather than the other way around.

It is more likely that the easy certification of a single common issue will put a case on the settlement track. The level of litigation exposure inherent in many statewide or nationwide class

actions often makes a trial unlikely, even unthinkable, and puts enormous pressure on defendants to settle claims, regardless of their merit.

## IV. The FTC's Interest in the Process

The FTC is an agency with responsibility for consumer protection. It is therefore obvious why it would be concerned about settlements that do not adequately compensate injured consumers, either because they only provide class members with largely worthless discount coupons or because the class action lawyers are awarded a too generous share of the proceeds. Similarly, when consumer redress is impractical because claimants cannot be located or because individual claims are too small - - and deterrence is therefore the primary objective - - it is obvious why the agency would be concerned if the recovery appears to be inadequate.

It is less obvious why the FTC is concerned about forum shopping and procedural rulings that increase plaintiff's bargaining power to such an extent that defendant's may settle meritless claims or pay too much money. Why should we care if class action defendants pay too much? There are a number of reasons.

First, class action settlements that are too large increase the cost of doing business. These costs are ultimately passed on to consumers - - all consumers, not merely the much smaller subset of consumers that have actually received some form of class action compensation. This phenomenon has promoted some legal commentators to refer, glibly but with justification, to the imposition of a "tort tax" - - a key component of which is the explosion of class actions.(22) According to some current estimates, the "tort tax" costs over $200 billion annually. Much of this cost can be attributed to the increase in class action filings which, between 1997 and 2000, increased 300% in federal courts and 1000% in state courts.(23) I do not necessarily endorse this estimate and, of course, it includes lawsuits based on matters with which the FTC is not directly concerned. I do not doubt, however, that the impact on consumers is substantial.

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 5 of 12

It can be argued that the "tort tax" is not all bad because the large sums involved may deter illegal or careless behavior. This is not necessarily true, however, if the people who are bear the burden are ultimate consumers rather than actual wrongdoers. (Consumers can also be harmed indirectly if competitive companies are crippled or destroyed by crushing damage recoveries.) Moreover, there can be such a thing as "over-deterrence" if the risk of large class actions causes businesses to avoid pro-consumer activities. For example, if some minor defect in a message to consumers can give rise to substantial liability, regardless of the amount of consumer harm, it may inhibit sellers from providing useful information in the first place.

Overdeterrence can also have a chilling effect on the Commission itself. The agency was originally established to provide more precise guidance to the business community and to the public on commercial practices that are acceptable. We have maximum flexibility to adapt to new situations because our orders are prospective and do not automatically give rise to retroactive liability. If massive liabilities can flow from conduct that was not clearly understood to be wrong at the time, I personally would be less willing to consider the imposition of new legal duties.

Finally, it is troublesome if people in the business community become cynical about the legal profession and the legal process. This concern is based on a hard-headed calculation that disrespect for the law does not foster compliance with the law. All the efforts of government and private enforcers combined cannot monitor the entire business landscape - - the health of our system depends in large measure on voluntary law compliance. People are more highly motivated to obey the law if it appears to be both sensible and fair.

## V. The FTC's Involvement in Class Action Issues

The Commission has expressed its views in class actions generally, and in specific class action settlements, in a variety of ways. Some comments are voiced informally in interviews or speeches like this one,(24) other summary comments are included in consumer education pamphlets.(25) More formal submissions include comments to the Judicial Conference and to Congress and amicus briefs in judicial proceedings. The overall thrust of these submissions will be summarized below.

## A. The Amicus Program

Although the Commission's amicus briefs have expressed a variety of concerns about proposed class action settlements, two problems mentioned above have been the source of ongoing concern. They are excessive awards of attorneys fees and non-monetary settlements such as the use of coupons.

In some cases, it is obvious that excessive fees will directly diminish the total compensation available for injured consumers. As Chairman Muris has noted: "Our job is to get more money to consumers, and by giving attorneys less, we're giving consumers more."(26) This effect was particularly obvious in the case of In re First Databank. (27) The Commission had attacked a merger as anticompetitive and, as part of the settlement, obtained agreement on $16 million in consumer redress. Later, private class action counsel negotiated a settlement that added $8 million to the fund, for a total of $24 million. Class counsel sought 30% of the $24 million as a fee - - a sum, which approved, would have captured 90% of the value added by their efforts. This would directly reduce the funds available to identifiable customers who had been overcharged. After the Commission objected, the Court awarded counsel 30% of the $8 million value added. In my view, this was more than generous because the Commission had already done most of the work.

Another recent case involved an inflated estimate of the damages that actually would be paid. In Carter v. ICR, (28) class counsel claimed to have negotiated a settlement worth more than $10 million, and requested a $1.2 million fee. In fact, defendant was required to deposit no more than $2.8 million into the settlement fund. As the Commission suggested, the court ordered that the claims of certain class members be treated as presumptively valid. However, it did not reduce the fee.

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 6 of 12

Erikson v. Ameritech involved a proposed coupon settlement that the Commission believed was not only unlikely to be of value but actually likely to be affirmatively harmful. To compensate consumers for its failure to disclose key terms of its voice mail service, Ameritech offered to provide coupons for one free month of speed dial service. There was no evidence that consumers would want this unrelated service and, worse, the settlement notice did not adequately disclose that consumers who accepted the free service for a month would thereafter be billed for it unless they affirmatively canceled. The court rejected the proposed settlement, with the comment that it "smacks of a court-sponsored promotion gimmick."(29)

One very recent case involved both what appeared to be an excessive fee and a coupon settlement of dubious value. H&R Block is well known for providing assistance with tax returns. Class counsel in Haese v. H&R Block(30) claimed that defendant recommended a particular bank to its clients who wanted to borrow against an anticipated tax refund, without disclosing that it got a referral fee from the bank. A state court judge found that this omission constituted a violation of a fiduciary obligation for which the class could recover the total referral fees collected, notwithstanding the absence of any evidence that bank charged above-market rates for the refund anticipation loans.

Faced with this large potential liability (plus the risk of punitive damages in addition) H&R Block agreed to a settlement that provided coupons for books and software of questionable value to the consumers in the class and a $50 million fee to the lawyers, who then agreed to make a "gift" of approximately half to the consumer class. The Commission filed an amicus brief, objecting to the settlement on multiple grounds.(31)

There are two alternative possibilities in this situation, and the settlement seems inappropriate in both of them. If there was indeed real consumer injury, class counsel will receive half of the monetary portion, which is excessive. In our view, the coupons will do very little either to help consumers or deter similar conduct in the future. Alternatively, there was no real consumer injury, which means that class members did not get less than they deserved, but which also means that the fees were excessive and likely to encourage the kind of litigation that may be damaging to consumers as a whole.

## B. Comments and Reports

FTC staff have also submitted specific comments to the Judicial Conference on possible amendments to Federal Rule 23.(32) The comments endorse the proposal that would provide a more competitive process for selection of class counsel. They endorse mutual notification, so a class action court would be aware of the FTC's involvement in a similar matter, and vice versa. The comments also caution that courts should review coupon settlements with particular care to ensure that the coupons are properly valued when calculating attorney fees (i.e., assume a reasonable redemption rate), that they are not unreasonably difficult to use, and that they do not simply create bonus sales for the defendant that will vitiate the deterrent value of the settlement.

Also worthy of mention is a Report that the Commission provided to a Congressional Task Force in 1997 on the impact of what was then the proposed multi-billion dollar tobacco industry settlement.(33) The settlement addressed in the Report did not involve consumer class actions but rather the settlement of claims by public agencies for excess burdens imposed on public health systems by cigarette smoking. The Report is of interest, however, because of the ultimate conclusion that an immense settlement, ostensibly paid by tobacco companies, will ultimately be paid in large measure by consumers, in the form of higher prices. These consumers are disproportionately poor and presumably addicted, and therefore unlikely to be able to change their behavior in significant numbers. In addition, these consumers will substantially contribute to the immense counsel fees associated with the settlement.(34)

This is not the place to argue the overall pros and cons of the tobacco settlement. The Report does, however, provide a useful illustration of the fact that the major impact of mass tort settlements may fall on the wrong people

and that bigger recoveries are not necessarily better for consumers.

# Conclusion

I want to emphasize again, in closing, that private litigation - - including class actions - - potentially offers a vital supplement to our own law enforcement activities. However, class actions have evolved in ways that were not fully anticipated in 1966, when Rule 23 was amended. They are no longer just an efficient way to process multiple claims but also have an important public policy dimension.

There are certain aspects of modern class action practice that are troublesome. The fact that there may be no actual plaintiffs on the scene heightens the risk of collusive settlements between class counsel and defendants' counsel. The FTC has expressed particular concern about consumer "redress" that does not really provide anything of value and/or excessive attorneys' fees that may either reduce consumer redress in meritorious cases or provide incentives for prosecution of meritless cases that can hurt consumers indirectly.

For these and other reasons outlined above, the Commission - - as a consumer protection agency - - has a keen interest in the ways that class actions are administered in the courts. We have been actively involved in the debate, and will continue to do so. I have observed that FTC intervention sometimes irritates class counsel and sometimes irritates defense counsel, or it may irritate both sides. That's all right. Some consumers, at least, seem to appreciate the efforts. A recent USA Today editorial opined: "Token settlements and high fees benefit everyone involved in class action suits except the damaged parties. If judges and lawyers aren't looking out for their interests, consumers can at least count on the FTC . . . to make sure they're treated fairly."(35)

1. Commissioner, Federal Trade Commission. This article is based on oral remarks before The Class Action Litigation Summit, Washington, D.C., on June 26, 2003. As always, these remarks do not necessarily represent the views of any other Commissioners. I would like particularly to acknowledge the assistance of John Delacourt and Lisa Kopchik.

2. See Note, Multiparty Litigation in the Federal Courts, 71 Harv. L. Rev. 874 (1957) (providing comprehensive treatment of multiparty litigation just before the beginning of the modern era).

3. See text of the pre- and post-amendment versions of Rule 23, attached as Appendices A and B. See also Benjamin Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure, 81 Harv. L. Rev. 356 (1967).

4. Chrapliwy v. Uniroyal, Inc., 71 F.R.D. 461, 463 (N.D. Ind. 1976).

5. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 592 (1997).

6. Richard A. Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 226 (2003).

7. La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 465 (9th Cir. 1973).

8. 173 F.R.D. 167, 172 (W.D. La. 1997).

9. 845 F. Supp. 684, 694-95, modified, 858 F. Supp. 944 (D. Minn. 1994).

10. Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974).

11. See, e.g., Bryant G. Garth, Studying Civil Litigation Through the Class Action, 62 Ind. L.J. 497, 501 (1987) (concluding that "most class actions, like most litigation, settle prior to trial" based on a 78% settlement rate - - 36 out of 46 - - in a sample of certified class actions).

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 8 of 12

12. Joe Stephens, Coupons Create Cash for Lawyers: Class Action 'Paper' Settlements Mean Little to Individual Plaintiffs, Wash. Post, Nov. 14, 1999, at A1.

13. Bryan Bruggerman, Hall of Shame Announced for Class-Action Lawsuits in County, Bellevill News-Democrat, Sept. 6, 2002, at A40.

14. John H. Beisner & Jessica Davidson Miller, They're Making a Federal Case Out of It . . . In State Court, 25 Harv. J.L. & Pub. Pol'y 143, 162, 169, 185, 193 (2001).

15. Id. at 164, 169.

16. Id. at 164, 185.

17. Id. at 164, 193.

18. Supra n.9, at 173.

19. Fed. R. Civ. P. 23(b)(3).

20. Fed. R. Civ. P. 23(c)(3).

21. See George L. Priest, Class Warfare, Wall St. J., May 5, 2003, at A14 (noting that, in a recent antitrust action against Visa and MasterCard, plaintiffs' counsel only managed to obtain certification of a class of four million merchants by convincing the court to accept a radically simplified damages theory that did not account for important differences in the merchants' proportion of credit and debit card usage).

22. Jim Copeland, The Tort Tax, Wall St. J., June 11, 2003. at A16.

23. Id.

24. E.g., R. Ted Cruz, Director, Office of Policy Planning, Friend of the Court: The Federal Trade Commission's Amicus Program, Prepared Remarks for the American Bar Association's Antitrust Section, Washington, D.C. (Dec. 12, 2002) available at </speeches/other/tcamicus.pdf>

25. Need a Lawyer? Judge for Yourself (June 2002) available at </bcp/conline/pubs/services/lawyer.pdf>

26. Caroline E. Mayer, FTC Seeks to Limit Attorney Fees in Class Action Suit; Cases that Follow Government Probes Closely Examined, Wash. Post, Sept. 30, 2002, at A17.

27. 209 F. Supp. 2d 96 (D.D.C. 2002).

28. No. CV-00-C-2666-W, slip op. (N.D. Ala. Sept. 6, 2002).

29. No. 99 CH 18873, slip op. (Cook County Cir. Ct., Ch. Div. Sept. 18, 2002).

30. No. CV-96-423, slip op. (Dist. Ct. Of Kleberg County, Tex. June 24, 2003).

31. The settlement was approved, notwithstanding the FTC's objection.

32. Letter to the Judicial Conference on Proposed Amendments to Rule 23 of the Federal Rules of Civil Procedure (Feb. 15, 2002) available at </os/2002/02/ rule23letter.pdf>.

33. Competition and the Financial Impact of the Proposed Tobacco Industry Settlement (Sept. 1997) available at </reports/tobacco/ndoc95.pdf>.

34. Susan Beck, The Fee Giver, The American Lawyer, Dec. 2002.

35. Editorial, Class-Action Plaintiffs Deserve More than Coupons, USA Today, Oct. 9, 2002.

## Media Resources

Our Media Resources library provides one-stop collections of materials on numerous issues in which the FTC has been actively engaged. These pages are especially useful for members of the media.

Contact

Stay Connected

Privacy Policy

FTC en español

**ABOUT THE FTC**

What We Do

Our History

Commissioners

Bureaus & Offices

Biographies

Budgets

Performance

Office of Inspector General

FOIA

Careers at the FTC

**NEWS & EVENTS**

Press Releases

Commission Actions

Media Resources

Events Calendar

Speeches

Audio/Video

Social Media

Blogs

**ENFORCEMENT**

Cases and Proceedings

Premerger Notification Program

Merger Review

Anticompetitive Practices

Rules

Statutes

Consumer Sentinel Network

Criminal Liaison Unit

**POLICY**

Advocacy

Advisory Opinions

Cooperation Agreements

Federal Register Notices

Reports

Studies

Testimony

Public Comments

Policy Statements

International

**TIPS & ADVICE**

For Consumers

Business Center

Competition Guidance

**I WOULD LIKE TO...**

Submit a Consumer Complaint to the FTC

File a Comment

Get a Free Copy of My Credit Report

List a Number on the National Do Not Call Registry

Report An Antitrust Violation

File Documents in Adjudicative Proceedings

**SITE INFORMATION**

Privacy Policy

Website Policy

No FEAR Act

Case 4:14-cv-00815-BCW   Document 44-3   Filed 09/28/14   Page 11 of 12

USA.gov

Accessibility

Digital Government Strategy

Open Government

**FEDERAL TRADE COMMISSION**

Headquarters:
600 Pennsylvania Avenue, NW
Washington, DC 20580
Contact Us

Stay Connected with the FTC