# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 14-CV-0815-W-BCW** |
| | ) |
| **BF LABS INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS BF LABS INC., SONNY VLEISIDES, AND DARLA JO DRAKE'S AMENDED SUGGESTIONS IN SUPPORT OF RULE 12(b)(6) MOTION TO <u>DISMISS FOR FAILURE TO STATE A CLAIM</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    Motion to Dismiss Standard ................................................................................. 3

II.   Plaintiff's Complaint fails to state a claim upon which relief can be granted. ....................... 4

       A.    BF Labs' Shipping-Date and Product-Development Representations—Even Standing Alone—Were Not "Material" or "Misleading" as a Matter of Law ........ 5

       B.    The "Net Impression" of BF Labs' Representations, in Context, was not Materially Misleading as a Matter of law. ............................................................ 7

       C.    Plaintiff's Profitability Allegations Also Fail as a Matter of Law ...................... 16

CONCLUSION ................................................................................................................ 17

49054416.1

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................3

*Borow v. nVIEW Corp.*,
   829 F. Supp. 828 (E.D. Va. 1993) .................................................................. *passim*

*FTC v. PayDay Fin. LLC*,
   989 F. Supp. 2d 799 (D.S.D. 2013) ...............................................................3

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ..........................................................................4

*In re Marion Merrell Dow Inc., Secs. Litig. II*,
   No. 93-0251-CV-W-6, 1994 WL 396187 (W.D. Mo. July 18, 1994) ...................17

*In re Number Nine Visual Tech. Corp. Secs. Litig.*,
   51 F. Supp. 2d 1 (D. Mass. 1999) ................................................................5, 7

*Silver v. H&R Block, Inc.*,
   105 F.3d 394 (8th Cir. 1997) .....................................................................3, 4, 5

*Young v. Principal Fin. Group, Inc.*,
   547 F. Supp. 2d 965 (S.D. Iowa 2008) ...........................................................4

**Statutes**

28 U.S.C. § 1404(a) ..............................................................................................2

15 U.S.C. § 45(a) ..................................................................................................3

**Other Authorities**

7 Moore, Fed. Prac. § 66.05(2) (2d ed. 1974),....................................................2

Fed. R. Civ. P. Rule 12(b)(6) ............................................................................1, 3

49054416.1

Our Federal Trade Commission, no doubt well-intentioned, has strayed from its mission (and apparently its core values) in its campaign to destroy BF Labs Inc.[1] The FTC has followed an "ask questions later" script, but there are real lives, real jobs, and a real company paying a steep price: total uncertainty about the future. And the FTC has, through its actions, stopped both customer refunds and the fulfillment of customer orders.

For now, there is potentially a way out of the legal morass the FTC has created. To the extent the FTC has sought to meet its legal burden, it has selectively used self-serving evidence. This motion seeks to provide a broader picture of the evidence – an accurate one. While the Court is constrained in its review of evidence on a motion to dismiss, the claims against BF Labs and the individual Defendants fail as a matter of law even under Rule 12(b)(6) standards.

\* \* \* \* \*

It's been said, but it bears repeating. Plaintiff placed this Court in a difficult position by filing papers in secret, alleging dire circumstances and heinous deeds, but apparently lacking even the most basic information about BF Labs, and thus depriving this Court of an accurate factual background.

---

[1] "Campaign" and "destroy" are not overstatements:

"At FTC's Request, Court Halts Bogus Bitcoin Mining Operation."

"We often see that when a new and little-understood opportunity like Bitcoin presents itself, scammers will find ways to capitalize on the public's excitement and interest," said Jessica Rich, director of the FTC's Bureau of Consumer Protection. "We're pleased the court granted our request to halt this operation, and we look forward to putting the company's ill-gotten gains back in the hands of consumers." FTC Press Release (Sept. 23, 2014), *available at* http://www.ftc.gov/news-events/press-releases/2014/09/ftcs-request-court-halts-bogus-bitcoin-mining-operation (last visited Oct. 10, 2014).

Only six days after this press release issued, the FTC agreed that BF Labs could reopen its doors for limited operations. Doc. 54.

1

49054416.1

Plaintiff could have learned (if it didn't already know), for example – as the Court did by asking a single question at the opening of the intended September 29, 2014 preliminary injunction hearing – that BF Labs voluntarily ended its preorder sales on July 17, 2014 (rendering much of the prospective relief sought by Plaintiff moot). Plaintiff could have learned that the alleged complaining customers, to whom Plaintiff turned a deaf ear for more than a year before Plaintiff filed its *ex parte* papers, had filed a putative class action in the District of Kansas approximately six months ago. Plaintiff could have learned that BF Labs shipped approximately 45,000 units in 2013. Plaintiff also could have learned that the Defendants who collectively file this motion had been cooperating for more than a year in a Johnson County District Attorney's investigation without once trying to secrete away assets.

Yet here the Defendants find themselves, in the midst of a full-blown FTC complaint and receivership action (a receivership, incidentally, in which a receiver has been appointed in a state (Missouri) different than the state in which the bulk of the receivership property at issue is located (Kansas)).[2] And that property—the lease to a real office, a real shipping dock, real

_____

[2] BF Labs is interested in the most efficient resolution to this matter practicable, so that BF Labs can fully resume its order fulfillment and refund processes and thus relieve consumers from the burden that Plaintiff has placed on them, and provide them their much-anticipated Bitcoin-mining hardware. Efficiency is also essential so that BF Labs' employees can get back to work, and the company can begin attempting to repair the incalculable damage caused by Plaintiff's unfounded accusations and media-focused name-calling. For this reason, Defendants are electing not to file a motion to transfer venue to the United States District Court for the District of Kansas under 28 U.S.C. § 1404(a), but note that transfer would be appropriate (and that Plaintiff's venue selection is suspect) for at least the following reasons:

- BF Labs maintains its principal place of business in Johnson County, Kansas and the future of a tax-generating business in Kansas and the livelihoods of BF Labs' Kansas-resident employees are at stake.

- Virtually all property subject to the receivership in this case is located in Kansas. *See* 7 Moore, Fed. Prac. § 66.05(2) (2d ed. 1974) (noting impropriety of appointment of a receiver in a district where most intended receivership assets were elsewhere).

2

49054416.1

shelves loaded with real bitcoin-mining equipment being prepared for shipment—belies

Plaintiff's media claims that BF Labs is a "bogus" company of "scammers" who must be

prevented from "defrauding" an unsuspecting public.

These truths, brought to light in the days and weeks that have followed Plaintiff's

surreptitious plea to this Court, are important. Even more important at this juncture, however, is

the fact that Plaintiff's allegations of supposed FTC Act violations utterly fail to state a claim on

which relief can be granted. Plaintiff's Complaint should be dismissed in its entirety.

## I.     MOTION TO DISMISS STANDARD.

In considering whether a complaint is sufficient to state a claim, the Court must accept as

true all factual allegations contained in the complaint and then determine whether those

allegations give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).

To have stated a claim for deceptive representations in violation of Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), Plaintiff must have alleged facts to establish that BF Labs made a

representation that was (1) material and (2) likely to mislead consumers, acting reasonably under

the circumstances. *See FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 816 (D.S.D. 2013).

Ordinarily, the Court considers only the complaint and documents attached to the

complaint in ruling on a 12(b)(6) motion to dismiss. *See Silver v. H&R Block, Inc.*, 105 F.3d 394,

- •   Defendants Sonny Vleisides and Jody Drake both reside in Johnson County, Kansas.

- •   Two cases concerning BF Labs and alleging claims similar to those asserted by the FTC are already pending in the District of Kansas.

- •   The Johnson County, Kansas District Attorneys' office investigated BF Labs for more than a year based on the same alleged complaints that Plaintiff received and found no reason to pursue a TRO or otherwise shut down the business.

- •   The proposed witnesses (including Plaintiff's anticipated witness) for the preliminary injunction hearing either reside or work in Kansas. *See* Docs. 15, 24.

- •   The overwhelming majority of documents and physical evidence (e.g., bitcoin-mining equipment) relevant to the claims and defenses in this case are located in Kansas.

3

49054416.1

397 (8th Cir. 1997). But where a claim is based on a defendant's undisputed statements, the plaintiff "cannot defeat a motion to dismiss by choosing not to attach the full statements to the complaint." *Id.*; *accord Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (a court may consider documents whose contents are alleged in a complaint and whose authenticity no party questions," even if not physically attached to the pleading). This Court may thus consider all "materials that are necessarily embraced by the pleadings." *Young v. Principal Fin. Group, Inc.*, 547 F. Supp. 2d 965, 973-74 (S.D. Iowa 2008) (citing cases).

Plaintiff's Complaint selectively cites from, but does not attach, certain BF Labs website pages and social media entries that Plaintiff alleges were materially misleading. *See* Doc. 1-1, ¶¶ 21-22, 26-27, 29-32, 34. Plaintiff's TRO motion papers cite the same statements and others, but attach the cited website pages and social media entries. *See, e.g.*, Doc. 8, pp. 12-22, 31-32. While Plaintiff asserted in its TRO motion papers that the "net impression" of BF Labs' website representations rendered those representations misleading (*see id.* at p. 32), Plaintiff's Complaint only provides the Court a cherry-picked few. The full text of the statements on which Plaintiff's claims are allegedly based should be considered by the Court in ruling on this motion.

## II.     PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The same day that Plaintiff issued its press release calling BF Labs a "bogus" company of "scammers," two of Plaintiff's attorneys held a Twitter-feed Q&A session about the BF Labs case. In that session, the attorneys stated that BFL took "[a]t least $20 million, and potentially up to $50 million" from customers, and stated that "[t]housands of orders were placed, and thousands of consumers have complained about non-delivery."[3] Yet six days later, Plaintiff

---

[3] Sept. 23, 2014 FTC Twitter feed at (Q12, A12), (Q14, A14), *available at* http://tinyurl.com/p7pl2nj.

49054416.1

agreed to permit BF Labs, the "operation" that Plaintiff proclaimed to the world (and this Court) had taken between $20 and $50 million from thousands of customers, to reopen for limited operations. Doc. 54. Even Plaintiff must realize at this point that things are not as it represented them to be. But even if the facts alleged in Plaintiff's Complaint are taken as true, Plaintiff's claims fail as a matter of law, and must be dismissed.

### A. BF Labs' Shipping-Date and Product-Development Representations—Even Standing Alone—Were Not "Material" or "Misleading" as a Matter of Law.

Where no reasonable consumer could conclude that statements were misleading, a statement's propensity to mislead is an issue "appropriately resolved as a matter of law." *Silver*, 105 F.3d at 396. The materiality of statements is frequently resolved as a matter of law. *See, e.g., In re Number Nine Visual Tech. Corp. Secs. Litig.*, 51 F. Supp. 2d 1, 28-29 (D. Mass. 1999) ("anticipated" shipping-date representations were not material as a matter of law); *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 834-35 (E.D. Va. 1993) (shipping-date and product-development representations were not material or misleading as a matter of law). Because no reasonable Bitcoin-mining consumer could have concluded that the anticipated shipping-date and product-development representations on which Plaintiff's Complaint is based were either material or misleading, Plaintiff's Complaint must be dismissed to that extent, at the very least.

With respect to shipping-date and product-development representations, Plaintiff's Complaint alleges:

- Beginning in June 2012, Defendants informed consumers that the BitForce mining machine "is now in final state [sic] development. Initial product delivery is scheduled for October 2012." However, Defendant did not deliver any BitForce mining machines to its customers in October 2012. Indeed, by April 1, 2013, Defendants still had not delivered a single BitForce mining machine to their customers. Doc. 1-1, ¶ 27.

- In approximately August 2013, Defendants announced that they were selling Monarch mining machines . . . . In fact, Defendants have yet to provide consumers with a single Monarch machine, despite Defendants' representation

5

that the machines should be delivered by the "end of the year [2013]." Months later, in approximately March 2014, Defendants stated that they would provide consumers with Monarch machines in April 2014. As of August 2014, Defendants had yet to ship a single Monarch machine. *Id.* at ¶¶ 30-31.

- In approximately December 2013, Defendants began offering mining services . . . whereby Butterfly Labs supposedly would use the Monarch mining machines to generate Bitcoins for the consumer . . . . Butterfly Labs stated that they would begin generating Bitcoins for consumers who paid for these services in the "March 2014 time frame." Defendants failed to do so. *Id.* at ¶ 34.

The quoted statements, standing alone, are precisely the sort of developmental-technology statements that courts have held are not material or misleading as a matter of law. In *Borow*, for example, the "nVIEW" company issued a series of press releases announcing and revising anticipated release/delivery dates for two new LCD technology products. 829 F. Supp. at 833. In an initial announcement dated December 17, 1991, nVIEW stated that it hoped to have one product, nSIGHT, on the market by January 1992 and another product, nLIGHTEN, on the market thereafter. *Id.* at 834. In February 1992, nNVIEW revised the delivery dates to the first quarter for nSIGHT and the second quarter for nLIGHTEN. *Id.* Similar revisionary statements were subsequently made. *Id.* Then, a May 1992 press release revised the nSIGHT delivery date to "late spring or early summer" and the nLIGHTEN delivery date to "the third quarter." *Id.*

Investors who purchased nVIEW stock in purported reliance on these statements sued nVIEW for securities fraud, alleging that the shipment and production dates were materially misleading. *Id.* at 833-35.[4] The *Borow* court dismissed the claim outright, holding that the representations amounted to "puffery" and thus lacked materiality as a matter of law. *Id.* at 835. The *Borow* court further stated that "[e]specially where, as here, a product is understood to be in

_____

[4] The securities-fraud context is a solid analogue in some respects to the context presented here. Actionable securities fraud claims are subject, for example, to a "materially misleading" standard just like the FTC Act standard. And to successfully assert a securities fraud claim, one has to have invested money as a result of a materially misleading statement.

development, plaintiff may not assert merely that, because the project did not come out when projected, plans for an earlier release were false." *Id*. at 834 (emphasis added).

Similarly, in *In re Number Nine*, an August 1995 press release noting that shipments of newly developed "graphics accelerator cards" were "currently anticipated to begin in September 1995" was not materially misleading as a matter of law, even though the products did not ship until November of that year. 51 F. Supp. 2d at 28. In support of its holding, the *In re Number Nine* court cited two other cases in which representations that projects were "on schedule" or "anticipated" to be completed by a certain date were held immaterial as a matter of law because any reasonable investor should have either anticipated "a possible delay" or should have known that projects "run into unforeseen problems and delays." *Id*. at 28-29 (citing cases).

As even Plaintiff acknowledges, Bitcoin-mining equipment is "cutting edge" technology that is in a constant state of development. *See generally* Doc. 1-1, ¶¶ 15-19. And even the representations cited in the Complaint – that the BitForce mining machine "is now in final stage development" and that "[i]nitial product delivery is scheduled for October 2012" (*i.e.*, four months away from the representation) – expressly disclose that the product's developmental status. Under *Borow* and *In re Number Nine*, because the BF Labs' product-line status was expressly disclosed (and thus understood by reasonable consumers), BF Labs' shipping-date and product-development representations were immaterial and not misleading as a matter of law.

**B.    The "Net Impression" of BF Labs' Representations, in Context, was not Materially Misleading as a Matter of law.**

Standing alone, the particular representations cited by Plaintiff's Complaint – that "product delivery is *scheduled*" or that "machines *should be* delivered by 'the end of the year'" or that mining services would begin in the "March 2014 time frame" – are simply not material or misleading as a matter of law. Perhaps recognizing this shortcoming, Plaintiff argued in its TRO

49054416.1

motion papers that, even though BF Labs couched its projections in qualifying language, the "net impression" of BF Labs' representations was misleading. *See* Doc. 8, p. 32. But even the selective exhibits that Plaintiff attached to its TRO papers don't support this conclusion.

The BF Labs website pages attached to Plaintiff's TRO pleadings instead show a pattern of consistently updated shipping projections, increasingly detailed production updates, and day-by-day shipping updates. They are even more detailed and frequently updated than the monthly to quarterly updates described in *Borow* that explained, for example, that shipping delays were due to "a delay in the Beta testing phase of product development" of the LCD units at issue there. 829 F. Supp. at 834. Consider, for example, the following representations concerning the BitForce SC from BF Labs' website:[5]

- The representations on which the Complaint's paragraph 27 is based, *i.e.*, that the BitForce SC was "now in final stage development" and that "[i]nitial product delivery [was] scheduled for October, 2012," was made from June through September 2012. (Ex. 1 (Att. K)[6], Ex. 2 (Att. M), Ex. 3 (Att. N)). In the text space immediately following both the June and September representations (which presumably existed in July and August, too), customers were referred to BF Labs' FAQ page and "release notes."

---

[5] In context and in their relevant entireties, without clever excerpting, BF Labs' statements are not materially misleading. Entire portions of exhibits that were attached to Plaintiff's TRO papers are therefore reproduced here to candidly place all the information – the good and (allegedly) bad alike – before the Court for review. BF Labs has nothing to hide.

[6] Plaintiff's Suggestions in Support of its Motion for Temporary Restraining Order (Doc. 8), and the exhibits to those Suggestions, are not publicly available on PACER. Defendants are therefore newly attaching the relevant exhibits to these Suggestions and labeling them with new exhibit numbers (beginning with Exhibit 1), yet retaining and also citing Plaintiff's original exhibit designations (*e.g.*, Att. K) for cross-referencing purposes. All "Att." references herein refer to the attachments to Plaintiff's Exhibit 1 ("PX1") to Doc. 8.

8

49054416.1

- The "release notes," set forth in Q&A format and available at least as early as July

2012 (Ex. 4 (Att. O)), stated in relevant part:

**So will the BitForce SC product line REALLY come out in October?**

This is a fair question. Let's review our track record. If you're not aware, our initial product, the BitForce Single had a slow delivery cycle. This was initially due to a last minute design change before initial product release. When we did release it, we weren't quite prepared for the explosive success we had. After several rounds of scaling, single delivery is in sufficient volume to catch up quickly.

The Mini Rig product release has followed it's [sic] development and release timeline pretty well. Initial deliveries aren't far from estimates and the speed of production is on pace to ensure most customers will get their Mini Rigs ahead of schedule.

The SC product line has been under development for quite some time and is not the result of an expedited development process. Although there are always issues during development, our team is highly experienced in exactly this field and we're currently ahead of our original timeline. Honest Abe, we're scheduling shipments for October of 2012.

- BF Labs' FAQ page (at least as it appeared in September 2012 (Plaintiff did not

attach the June 2012 version)) provided in relevant part:

**When will the ASIC (Single SC) ship?**

We plan on shipping the ASIC versions of our products by the end of October or early November [2012], depending on quantity of units available. Please see the FAQ with regards to 1/3 shipping plan.  . . . .

**Where am I in line and when will my order ship?**

We cannot disclose the number of orders we currently have. Shipping of new units is still anticipated to being [sic] late October or early November. We are unable to predict accurate wait times until shipping begins.

**Can I get a refund on my pre-order?**

Butterfly Labs, INC is accepting pre-orders for ASIC based products, expected to begin shipping in late October or early November 2012. Your pre-order with payment confirms your place in line for delivery once we begin shipping. Payments made for pre-orders of ASIC based products now under development should be considered non-refundable until products begin shipping or 1 January 2013, whichever is earlier.

**What is your 1/3 shipping plan?**

Because of the potential for massive disruption that our ASIC units may cause to the mining ecosystem, we are instituting a 1/3 shipping method for our first shipment of products to individuals. So that no single person or handful of people are able to gain a material advantage over another, we will ship all our available units at the same time to as many customers as we can. This means we will likely delay shipping on our first units until we have accumulated enough stock to satisfy a significant portion of our initial orders. This ensures that as many people as possible who are early adopters are equally and fairly treated when receiving our product. To that end we will be shipping our first orders as such: 1/3 of each product line (Jalapeno, Single SC and Mining SC) will be shipping to new orders, 1/3 to upgrade orders and the final 1/3 will be shipped to a random selection of orders from the first two categories (both upgrade and new customers) received in the first month of orders (From 23 June 2012 to 22 July 2012). (Ex. 5 (Att. S)).

- In October 2012, BF Labs updated the BitForce SC product page to state that the

product "is now in final stage development" and "[i]nitial product delivery is scheduled

for November." (Ex. 6 (Att. Q), Ex. 7 (Att. U)).

- On October 2, 2012, Jody Drake posted on the Butterfly Labs blog that:

We have worked hard but we see no possibility of beginning to ship the SC's in October. Hang on to your trade-in units and keep mining… (Ex. 8 (Att. T)).

- On October 29, 2012, Josh Zerlan posted on the Butterfly Labs blog that:

We are not going to make the first half of November shipping goal. Right now, I want to say fourth or fifth week of November, but lots of little issues have cropped up, pushing the shipping date out a bit here and there. To be on the safe side, I would estimate the end of November/beginning of December as a likely ship date . . . . We are also still waiting on the HSF for the Single SC to show up – the factory has been a bit slow in that department, so that set things back a bit. We expect the final chip versions to be in our hands in ~25 days, with final assembly and shipping to begin a few days after that. (Ex. 9 (Att. V)).

- On November 27, 2012, Jody Drake posted on the Butterfly Labs blog:

That's right. No ASIC's for November. Customer Service left the building for a Thanksgiving holiday, but our team members kept answering emails from home. We were hoping to come back to work this week with good news of imminent production starting. Not happening this month. Although we see shipments of parts everyday, we kind of need ALL of them to make an SC. (Ex. 10 (Att. X)).

- In early December 2012, the BitForce Single "SC" pre-order form stated that

delivery was "currently scheduled for December." (Ex. 11 (Att. AA)). Later in December

2012, the pre-order form was updated to state that delivery was "currently scheduled for

January 2013." (Ex. 12 (Att. Y)). A separate December 2012 BitForce Single "SC"

product advertising page stated that "[i]nitial product delivery is scheduled for February,

2013." (Ex. 13 (Att. Z)).

- In late February 2013, a BitForce SC product page stated that:

BitForce SC (ASIC) products are in final stage development with initial shipping
scheduled for the last half of February 2013. Products are shipped according to placement
in the order queue. (Ex. 14 (Att. AB)).

- On February 25, 2013, Josh Zerlan posted on the Butterfly Labs blog that:

I know people have been waiting on an update for awhile. The simple fact of the matter is
there hasn't been any solid updates to offer. I know people are desperate and starving for
information and I wish I could provide new information every day, but some days there
just isn't new information. Luckily there is some new information today. It's not the best
information (such as we are shipping today!) but it is at least an update.

We had expected the bumping to be done by now, as per the previous update(s). That has
not been completed yet. There are a number of reasons why this is the case, and we are
not pleased with any of them. The bumping facility, which we have no direct contact
with, did not complete the NRE on the timeline we had spoke to the packaging facility
about. As I've written in previous posts, we are dealing with such an accelerated time
scale that all of these facilities simply aren't used to dealing with. It's been a learning
experience for both us and for the facilities we are using. The upside, such as it is, is that
going forward, we will have all the large, time sucking hurdles already out of the way and
the rest of the chips should breeze through without issue, as all the NRE, tooling, design,
panning and machines will already be configured for what we need.

Since Friday we have been, in a word, agonizing over how to make up for lost time.
[describing plan to minimize time issues going forward] . . . .

We expect at least some of the chips to be on their way to Chicago by Tuesday, where
they will be mounted and sent out to our engineers and KC for testing and final MCU
programming. At that point, once the MCU programming is confirmed we'll begin
assembling the units. Right now, I'm planning on a week from Friday to be the day, but
I'm just gonna say that's subject to change at the moment, although I don't anticipate a
change right now.

The ASIC team has promised me pictures of the wafer tomorrow, Tuesday the 26th. As
soon as I get those, I will be posting them. "As soon as I hear something with regards to
the chip testing, I will be posting that as well. If I'm not posting an update, it's because
there's nothing new to report. (Ex. 15 (Att. AC)).

49054416.1

- On March 15, 2013, Josh Zerlan posted an update on the BF Labs blog:

It's been a long couple days here at the labs! Trying to test the chip in the test rig has been exceptionally trying and it turns out it's due to a bad socket on the tester. Initially we were concerned there might be a problem with the bumping or substrate, but fortunately we had tested the chips prior with the wire bonding technique, so we knew they worked. Getting the test boards made proved to be fortuitous as well, since we were able to bypass the test right completely and bring the chips up on the board. By doing so, we were able to finally identify that the problem was related directly to the test rig and not any intermediate process or step.

Bringing a chip to life in situ on a board is not the easiest thing, so it has been slow going. The chip was responding properly on the board late this afternoon and we will be picking up the process in the morning. We hope to have a more complete test by Saturday night or Sunday sometime. Meanwhile, we will also be hard soldering a chip into place for use in the test rig and replacing the socket to allow the bulk testing to finish. In some other positive news, we've not found a single bad chip yet, which could mean our yield rate will be exceptionally high…maybe we just got lucky out of the 50 chips we have available on boards so far, but it seems unlikely. So that may mean the vast majority of our chips will be usable. . . .

So the good news is the boards work, the chips work, the bumping works, the substrate works. We just need to nail down a bit more with the firmware and we should be able to conduct a full test and start shipping. I will be posting another update as soon as I have more information. Needless to say it's been a pretty busy and stressful last few days here, and some script kiddie deciding to DDoS our sites this morning didn't help matters. All connectivity problems should be resolved now and we will keep people updated as time allows. (Ex. 15 (Att. AC), Ex. 16 (Att. AE)).

- On March 28, 2013, Josh Zerlan posted an update on the BF Labs blog:

I had wanted to post a video tonight, but wasn't able to make that happen, so let me apologize for that in advance. As some of you may know from the chatbox, we have been working diligently to get these ASICs out the door. We've been tracking down a power issue these last few days and have it isolated to a few key systems. In the interest of time, we are planning on potentially scaling back units hashing speed as required to accommodate the extra power and shipping multiple units to those that want their units right now. If would would [sic] prefer to wait for a unit after we've made some changes to the systems that need a bit of tweaking, we will be happy to put your shipment on hold. However, if you'd rather have the units right now at an increased power usage, we will ship you as many units as required to get you to the hashrate your [sic] purchased, if we need up having to scale back any given class of unit to fit within the power envelope of the current board design.

We have the current design hashing, and as I said, I had hoped to have a video of a unit hashing here in KC, but I wasn't able to bring that all together tonight, but hopefully I

can get it posted up tomorrow or by this weekend. I will update as soon as I have more news to share, with a video.

If you absolutely do not want a unit that is consuming more power than expected, you can let us know you'd like to wait for a revised unit or you are welcome to request a refund. If you'd rather have your units shipped regardless of increased power usage, we will still guarantee your hashrate by shipping you however many units are required to achieve your purchased hashrate. There is no need to contact us right now if you are not concerned about the power usage and just want your units shipped ASAP. Even with the increased power demand on these first units, they will still out perform any competing products by a very wide margin in terms of power and megahash/J. (Ex. 16 (Att. AE)).

- In April 2013, a BF Labs product page stated that:

BitForce SC (ASIC) products are in final stage development with initial shipping scheduled for the last half of April 2013. Products are shipped according to placement in the order queue, and delivery may take 2 months or more after order. All sales are final. (Ex. 17 (Att. AF)).

- In April 2013, the BF Labs FAQ page provided:

**When will you start shipping machines?**

We plan on shipping the ASIC versions of our products by the end of April. We have orders that date back to June of 2012. Those are the orders that will be delivered first. Orders placed now will not ship until the month of July. . . . .

**Where am I in line and when will my order ship?**

We cannot disclose the number of orders we currently have. Shipping of new units is still anticipated to begin by the end of April, 2013. We are unable to predict accurate wait times until shipping begins. . . . .

**Where am I in line and when will my order ship? [this question appears twice on the FAQ page]**

We currently do not have the ability to easily disclose the number of orders we currently have. Shipping of new units is expected to begin soon. It is unknown at this time when we will complete the shipping of our pre-orders. Even though we should start shipping soon, orders placed now will be shipped at a later time. Our orders date back to June, 2012. All of those orders and those placed since then will be shipped before new orders.

**What is your 1/3 shipping plan?**

Because of the potential for massive disruption that our ASIC units may cause to the mining ecosystem, we are instituting a 1/3 shipping method for our first shipment of products to individuals. So that no single person or handful of people are able to gain a material advantage over another, we will ship all our available units at the same time to

49054416.1

as many customers as we can. This means we will likely delay shipping on our first units until we have accumulated enough stock to satisfy a significant portion of our initial orders. This ensures that as many people as possible who are early adopters are equally and fairly treated when receiving our product. To that end we will be shipping our first orders as such: 1/3 of each product line (Jalapeno, Single SC and Mining SC) will be shipping to new orders, 1/3 to upgrade orders and the final 1/3 will be shipped to a random selection of orders from the first two categories (both upgrade and new customers) received in the first month of orders (From 23 June 2012 to 22 July 2012). (Ex. 18 (Att. AG)).

- On April 19, 2013, Jody Drake posted on the BF Labs blog that:

I said I would post everyday we ship an ASIC. I saw 2 Jalapenos leave the plant today. The first ones go to developers/reviewers. You have to have software to run them so don't cry because they get them first. I expect to see several more leave next week. It's very exciting for our employees to see units ship even though they are not yet bound for true customer homes. (Ex. 19 (Att. AH)).

- On June 14, 2013, Jody Drake posted on the BF Labs blog that:

We shipped Jalapenos through august 25 and into August 26 today.

No Singles.

I said complaining doesn't help because we can't ship any faster just because we hear that you are not happy about it. Do you think we are sitting around BFL with shelves full of miners until we get an email that says, 'Darn it, I am upset because you haven't shipped'? Our lives would be different if all the miners were shipped, but the reality is, they are not all shipped yet, but we are doing our best to change that.

Thanks to all our customers, who have made this job a great joy. (Ex. 20 (Att. AI)).

- On July 1, 2013, Josh Zerlan stated on the BF Labs blog: "Yes, I still expect us to

be through the back orders by the end of August." (Ex. 21 (Att. AK)).

- Jody Drake's blog updates dated August 29, 2013 (Ex. 22 (Att. AL)), October 29,

2013 (Ex. 23 (Att. AM)), and November 28, 2013 (Ex. 24 (Att. AN)): identifying by

order/pay dates which units were shipping.

The above-quoted BF Labs updates were the updates that Plaintiff apparently thought

might be helpful to its arguments, but are not the only updates posted. *See, e.g.*, (Ex. 15 (Att.

AC) (referencing additional updates)). BF Labs' updates provided more detail and information

than even those "Beta testing delay" updates approved of in *Borow*, where updated product-delivery dates were found not materially misleading as a matter of law. *See* 829 F. Supp. at 834.

BF Labs' pattern of consistent and detailed updates was not limited to the BitForce SC product line. Even more extensive shipping updates, and additional cautionary, qualifying language, were provided for the subsequent Monarch line. In September 2013, for example, the Monarch product page stated:

> This is a Pre-Order product which is not yet shipping. If you're uncomfortable waiting until the development is complete and the product is shipped, do NOT pre-order this product. Perhaps undesirable, but this is a pre-order market. Customers flatly demand to get in line for the new technology before it's finished development. This has created a lot of drama for the manufacturers but it's something we simply have to deal with. All manufacturers in this space have experienced some degree of delay with their first generation ASIC. Every last one of them, so we're reluctant to give a specific delivery date. However, this is our second generation, so we have much greater clarity on the process and we feel our timeline to begin shipments towards the end of the year is solid.
>
> Here's a breakdown of the timeline.
>
> We're now in at the final stage of development (Tapeout) and are sending wafers into production at the foundry in the next few weeks
>
> Foundry production takes 10 weeks
>
> Bumping, Slicing & BGA packaging takes approximately 2 weeks
>
> Initial shipments begin and ramp up to full capacity over the following 3 weeks
>
> Since this is our 2nd generation ASIC chip, we're free from the pitfalls sometimes associated with a first generation design. Testing systems, Bumping masks, Substrates, & under fill engineering are all carryovers from our last version of the chip, so they're ready for high volume production once the wafers are ready. The importance of this can't be overstated when considering schedule certainty. Nevertheless, please do not purchase this product if you are unwilling to wait for the product to complete its development. . . . .
>
> Pre-Order Terms: This is a pre-order. 28 nm ASIC products are shipped according to placement in the order queue, and delivery may take 3 months or more after order. All sales are final. (Ex. 25 (Att. AO)).

Virtually identical cautionary language was used to describe product roll-out projections for mining hosting services. *See* (Ex. 26 (Att. AS)). Also, beginning in at least February 2014

49054416.1

and continuing through at least August 15, 2014, Josh Zerlan posted detailed production and testing updates for the Monarch line, just as he had for the BitForce SC. *See* (Ex. 27 (Att. AP), Ex. 28 (Att. AQ), Ex. 29 (Att. AR)).

Development and production of the BitForce SC and Monarch lines took far longer than BF Labs anticipated or hoped. But to the extent BF Labs' representations projected an anticipated shipping date, the representations were mere "puffery." *See Borow*, 829 F. Supp. at 835. And to any further extent, no reasonable consumer could read BF Labs' updates to suggest anything more than that the wait for BF Labs' much-anticipated products would continue a bit longer still. BF Labs' shipping-date and product-development representations were therefore not materially misleading as a matter of law, and Plaintiff's Complaint should be dismissed to the extent it is based on those representations, at the very least.

### C. Plaintiff's Profitability Allegations Also Fail as a Matter of Law.

Plaintiff's Complaint also alleges that BF Labs misrepresented that "[c]onsumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins," yet only delivered machines "after significant delays, resulting in machines that are obsolete or have depreciated significantly . . ." Doc. 1-1, ¶¶ 12, 39(a). "As a result," Plaintiff alleges, "consumers have not been able to use the machines to generate a profit or return on investment." *Id.* at ¶ 12. On this point, the silence of BF Labs' website pages is deafening. *See, e.g.*, Exs. 1-29. The representations just don't exist.

Plaintiff further alleges that BF Labs made profitability representations to consumers by posting on its Facebook page and other social media outlets a link to a Bitcoin calculator. *See* Doc. 1-1, ¶¶ 22-24. According to Plaintiff, "[t]he calculator's output includes net hourly, daily, weekly, monthly, and annual profit, and the date by which the consumer could expect to break even on the machine and its operating costs." *Id.* at ¶ 23. Yet Plaintiff admits that the calculator's

output is dependent on two things (among others): (1) a Bitcoin miner's delivery date, and (2) the Bitcoin exchange rate. *Id*. at ¶ 23. The delivery-date dependency admission reveals that Plaintiff's Bitcoin-production allegation is nothing more than an extension of its production- and shipment-delay argument, which fails as a matter of law as set forth above.

Further, Plaintiff's admission that the anticipated profitability of any Bitcoin-mining machine is dependent on the Bitcoin exchange rate renders any profitability representation created by a third-party's Bitcoin "calculator" immaterial as a matter of law. A bit of additional background is needed to bring this point full circle. Plaintiff alleged – and it happens to be true – that "Bitcoins have significant monetary value that constantly fluctuates" and that "from November 2013 to May 2014, an individual Bitcoin's value has fluctuated from a high of over $1000 to a low of $400." *Id*. at ¶ 13. Given this known and considerable fluctuation, any reasonable Bitcoin-mining-equipment customer is aware that profitability "projections" dependent on a static Bitcoin exchange rate are inherently tenuous and should viewed more as "what-if scenarios" rather than as true expected outcomes.

As this Court's Senior Judge Sachs previously observed, variables like "international currency exchange rate fluctuations . . . are hazards of business apparent to all serious observers and most casual ones." *In re Marion Merrell Dow Inc., Secs. Litig. II*, No. 93-0251-CV-W-6, 1994 WL 396187, at *6 (W.D. Mo. July 18, 1994). For this reason, to the extent that outcome projections are dependent on variables like the Bitcoin exchange rate, the projections are not considered "material" as a matter of law. *See id*. The Bitcoin-generation and profitability prong of Plaintiff's Complaint should therefore be dismissed.

## CONCLUSION

Defendants request that the Court dismiss the Complaint in its entirety and with prejudice.

49054416.1

Respectfully submitted,


/s/ James M. Humphrey
James M. Humphrey                    MO # 50200
Michael S. Foster                    MO # 61205
Miriam E. Bailey                     MO # 60366
Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri  64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com


Braden M. Perry                      MO # 53865
Kennyhertz Perry, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com


Attorneys for Defendants BF Labs Inc.,
Sonny Vleisides, and Darla Drake.

49054416.1

## CERTIFICATE OF SERVICE

I hereby certify that on October 21st, 2014, a true and correct copy of the foregoing was served by the Court's ECF system on the following:

| | |
|---|---|
| Helen Wong<br>Teresa N. Kosmidis<br>Leah Frazier<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W.<br>Mail Stop CC-10232<br>Washington DC 20580<br>202-326-3779 (Wong)<br>202-326-3216 (Kosmidis)<br>202-326-2187 (Frazier)<br>hwong@ftc.gov<br>tkosmidis@ftc.gov<br>lfrazier@ftc.gov<br><br>Charles M. Thomas<br>Assistant United States Attorney<br>Charles Evans Whittaker<br>Courthouse<br>400 East Ninth Street, Room 5510<br>Kansas City, MO 64106<br>816-426-3130<br>charles.thomas@usdoj.gov<br><br>Attorneys for Plaintiff | Bryant T. Lamer<br>Kersten L. Holzhueter<br>Andrea M. Chase<br>Katie Jo Wheeler<br>Spencer Fane Britt & Browne LLP<br>1000 Walnut Street, Suite 1400<br>Kansas City MO 64106<br>816-474-8100<br>blamer@spencerfane.com<br>kholzheuter@spencerfane.com<br>achase@spencerfane.com<br>kwheeler@spencerfane.com<br><br>Attorneys for Receiver Eric L. Johnson |
| James D. Griffin<br>Lisa M. Bolliger<br>SCHARNHORST AST<br>KENNARD GRIFFIN, PC<br>1100 Walnut, Suite 1950<br>Kansas City, Missouri 64106<br>Tel: (816) 268-9400<br>Fax: (816) 268-9409<br>jgriffin@sakg.com<br>lbolliger@sakg.com<br><br>Attorneys for Defendant Nasser Ghoseiri | |

  /s/ James M. Humphrey
Attorney for Defendants

19

49054416.1