# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CV-0815-W-BCW** |
| | ) | |
| **BF LABS INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS BF LABS INC., SONNY VLEISIDES, DARLA JO DRAKE, AND NASSER GHOSEIRI'S SUBMISSION OF ADDITIONAL FACTUAL EVIDENCE, INCLUDING DECLARATIONS

James M. Humphrey        MO #50200
Michael S. Foster        MO # 61205
Miriam E. Bailey         MO # 60366
Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

James D. Griffin         MO # 33370
Lisa M. Bolliger         MO # 65496
Scharnhorst Ast Kennard Griffin, PC
1100 Walnut, Suite 1950
Kansas City, MO 64106
Telephone: (816) 268-9400
Fax: (816) 268-9409
jgriffin@sakg.com
lbolliger@sakg.com

Attorneys for Defendant Nasser Ghoseiri

Braden M. Perry          MO # 53865
Kennyhertz Perry LLC
420 Nichols Road, Suite 207
Kansas City, MO  64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendants BF Labs, Inc.
Sonny Vleisides, and Darla Drake

## <u>LIST OF EXHIBITS</u>

Exhibit A – Declaration of Jeff Ownby

Exhibit B – Declaration of Emilie Burdette

Exhibit C – Declaration of Bruce Bourne

Exhibit D – Declaration of David McClain

Exhibit E – Declaration of Ricardo Pena

Exhibit F – Blockchain.info showing network hash rate for last sixty days

Exhibit G – August 28, 2014 Jody Drake blog

Exhibit H – Bitcoin price chart

Exhibit I – Declaration of Rex Brocki

Exhibit J – Declaration of Robert Frankovic

Exhibit K – Declaration of Josh Zerlan

Exhibit L – Declaration of Linda Freeman

Exhibit M – Letter from Auggie Huber

The FTC's *ex parte* application for a Temporary Restraining Order stated that "[i]t is unclear whether [Defendants] are even developing products for consumers." Doc. 8, pp. 42-43.

This remarkable statement is set forth in the very same paper that admits that BF Labs delivered its Bitcoin mining machines to consumers. *See id.* at p. 5 (the FTC also asserted that the deliveries were made after significant delays). What is truly unclear is this: how is it that the FTC, robed with presumptions and supposedly subject to the added duty of candor required of it in an *ex parte* proceedings, is permitted to acknowledge in one breath that BF Labs delivered its products, yet also assert that "it is unclear whether Defendants are even developing products"?

Given the FTC's unfortunate approach, Defendants are forced to address here and in declarations not only the affirmative facts that demonstrate that no preliminary injunction should issue, but also to correct the errors and omissions on which the FTC's *ex parte* submissions, resulting in the Court's *ex parte* order, were ultimately based.

Defendants thus submit the following factual evidence to the Court not only to provide a clear picture of BF Labs Inc. and its operations, but also to note material errors and omissions[1]

---

[1] The FTC, through its officials and lawyers, had a heightened ethical duty to disclose material facts to this court when bringing its claims to the Court *ex parte*. *See* 5 C.F.R. § 2635.101(b)(5),(14); 16 C.F.R. § 5.1 (cross-referencing executive branch-wide standards of conduct). Federal lawyers with prosecutorial powers are to treat targets of government investigations fairly by providing a "more candid picture of the facts and the legal principles governing the case." *See, e.g.,* James E. Moliterno, *The Federal Government Lawyer's Duty to Breach Confidentiality*, 14 Temp. Pol. & Civ. Rts. L. Rev. 633, 639 (2006). This heightened duty required the FTC to conduct a detailed and diligent investigation before proceeding against Defendants. *See* 16 C.F.R. § 2.4 (the FTC's investigational policy mandates the "just . . . resolution of investigations").

ABA Model Rule of Professional Conduct 3.3(d) also provides that "[i]n an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, *whether or not the facts are adverse*." (emphasis added); *see also* Geoffrey C. Hazard, Jr, W. William Hodes, The Law of Lawyering, 3rd ed., § 29.3. (Aspen, 2003) ("since opposing counsel will not be present in *ex parte* proceedings, and will not be available to expose deficiencies in the proofs or present

made in the Federal Trade Commission's ("FTC") *Complaint For Permanent Injunction and Other Equitable Relief* ("Complaint") (Doc. No. 2) and *Suggestions in Support of its Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue* ("TRO"). (Doc. No. 8).

The following material matters were omitted from both the FTC's Complaint and its TRO application:

- That two District of Kansas lawsuits (one a putative class action filed almost six months before the FTC's action) were pending based on similar theories as the FTC. *See Meissner v. BF Labs Inc*., 2:13-cv-2617-RDR-KGS, Doc. 2; *Alexander et al. v. BF Labs Inc*., 2:14-cv-2159-KHV-JPO, Doc. 1.

- That BF Labs was in the middle of discovery in the two District of Kansas lawsuits and thus was already under an obligation to preserve and not destroy documents, data, etc. *See Meissner v. BF Labs Inc*., 2:13-cv-2617-RDR-KGS, Doc. 27; *Alexander et al. v. BF Labs Inc*., 2:14-cv-2159-KHV-JPO, Doc. 8.

- That the FTC visited the Wood Law Firm's website to collect information to file the FTC's *ex parte* motion, and that the FTC was therefore quite aware of the putative class action pending in the District of Kansas. *See Alexander v. BF Labs Inc*., 2:14-cv-2159-KHV-JPO, *Plaintiffs' Opposition to Temporary Receiver's Motion to Stay*, Exhibit 1 (Doc. No. 56).

---

countervailing considerations, the tribunal must be protected from making wrong decisions that it would not have made in an adversary proceeding. In subsection (d), therefore, the special duty of candor to the tribunal (and the public interest in the integrity of the process) once again outweighs advantage to an individual client.")

2

Exhibit 1 shows at least five visits to the Wood Law Firm's website between April 2014 and September 2014.

- That the FTC, having visited BF Labs' website in August and early September 2014 (Declaration of Jeff Ownby, ¶ 16, attached as Exhibit A), knew or should have known that BF Labs had already discontinued its preorder model as to *all* products.

- That the FTC, having visited BF Labs' website in August and early September 2014 (Declaration of Jeff Ownby, ¶ 16), knew or should have known that BF Labs was already refunding money to customers before the FTC's *ex parte* application was filed.

- That the Johnson County District Attorney's Office had investigated BF Labs and found no reason to enjoin the company or freeze its or its employees' assets. The FTC was made aware of the Johnson County investigation, yet never formally requested any documents resulting from or information regarding that investigation. *See* Declaration of Emilie Burdette, ¶¶ 19, 21, attached as Exhibit B.

- That the FTC previously told consumers that they needed to obtain their own attorneys to pursue relief from BF Labs, thus causing attorneys like Noah Wood and others to become involved and invest time, funds, and effort (likely diverting resources from other clients and causes), and only later decided (despite knowing the non-emergent nature of the action at this point) that, for some unknown reason, BF Labs should be shut down. *See Suggestions in Support of Emergency Motion to Intervene* (Doc. No. 44, p. 14).

- While the FTC represented to the Court that Butterfly Labs *induced* consumers to part with an alleged $50 million through the sale of bogus equipment *(see Complaint* and *TRO* (Doc. Nos., 2 and 8)), the FTC omitted evidence of repeat customer purchase statistics and the heavy customer demand for BF Labs' products.

3

- While the FTC represented to the Court that Defendants "often fail to deliver machines or provide services at all" and "have consistently refused to refund money to consumers" (TRO, pp. 5, 34), the FTC did not inform the Court that it had not conducted a thorough investigation (if any) of the 307 supposed consumer complaints made to the FTC's Sentinel reporting system. Had the FTC in fact conducted such an investigation, it would have learned that all but 57 of the complaints were made in 2013 (nowhere near the time that the FTC moved in secret for its supposedly urgent relief), that the 307 complaints related to 320 BF Labs customer orders, that 54 of the complaints were either duplicates or did not correlate with an actual BF Labs customer name, and that, of the remaining 266 (320 minus 54) orders:

  - 93% received either equipment, service, and/or a refund.

  - 3% pertain to Monarch orders for which customers are still waiting for their equipment or a refund (and will continue to wait, as a result of the FTC's ex parte actions); and

  - for the 9 orders that compose the remaining 4%:

    - two orders received a partial refund,

    - one order was shipped, but was returned because the customer refused to pay customs duties,

    - one order was canceled,

    - one order was settled with the customer after a demand letter, and

    - four orders require additional research at this time.

Declaration of Bruce Bourne, ¶ 24, attached as Exhibit C.

- Because the FTC did not conduct a thorough investigation (if any) of the Sentinel complaints, it also did not learn and failed to inform the Court of BF Labs' extensive efforts to

4

find solutions for its customers and to deal proactively with complaints. For example, one of the complaints submitted through the Sentinel system was from a Russian customer who ordered a 1,500 GH machine from BF Labs. Declaration of David McClain, attached as Exhibit D, at ¶ 21. BF Labs initially shipped one of the three 500 GH machines to him. *Id.* The machine was intercepted by Russian customs and returned to BF Labs. *Id.* BF Labs attempted to send the customer some smaller machines to try to fulfill his order. *Id.* BF Labs was able to coordinate someone locally to operate his machines for him while BF Labs investigated how to get the machines to clear Russian customs. *Id.* The customer eventually sold his machines on eBay and the bitcoins that were earned for and provided to the customer while the machines were operated locally were worth more than $20,000. *Id.*

**FTC Complaint (Doc. 2): FTC Errors and Related Evidence**

| Complaint Allegations by Paragraph | Facts |
|---|---|
| Paragraph 7 – "Defendant Darla Drake, a/k/a Jody Drake (hereinafter, "Drake") is the General Manager at Butterfly Labs. Drake also serves as the Secretary and Treasurer at Butterfly Labs." | Jody Drake is the Assistant Secretary and is not the Treasurer of BF Labs Inc. *See* Declaration of Bruce Bourne, ¶ 17. |
| Paragraph 11 – "Defendants operate Butterfly Labs, which sells Bitcoin mining machines and services that consumers purportedly can use to generate Bitcoins…" | Before being raided by the FTC, Butterfly Labs *did* sell mining machines and services that consumers *could* use to generate Bitcoins. *See* Declaration of Bruce Bourne, ¶ 4. |
| Paragraph 11 – "In many instances, consumers who have purchased the machines or services cannot use them to generate Bitcoins because Defendants never provide them with the machines or services." | For pre-Monarch product lines, Defendants provided consumers with either machines (approximately 45,000 were shipped in 2013) or refunds. Delivery of Monarch units or refunds for Monarch pre-orders were ongoing when BF Labs was raided. BF Labs began providing temporary cloud mining services on or before June 23, 2014. *See* Declaration of Jeff Ownby, ¶ 17, 19. |
| Paragraph 12 – "In numerous other instances, even where Defendants have provided the | The machines are not obsolete; secondary sales of BF Labs' machines on eBay and other sites |

5

| | |
|---|---|
| machines, they have done so after significant delays, resulting in machines that are obsolete or have depreciated significantly toward obsolescence, or the machines have arrived damaged or defective. As a result, consumers have not been able to use the machines to generate a profit or return on investment. Defendants also frequently have not provided refunds to consumers who have not received the machines or who have received the machines after a substantial delay." | demonstrate those machines' continued market value. *See* Declaration of Ricardo Pena, ¶¶ 5, 9, attached as Exhibit E.<br><br>Any damaged or defective products properly returned were replaced or repaired by BF Labs. *See* Declaration of Ricardo Pena, ¶ 10.<br><br>It was BF Labs' official stance to never promise a return on investment. *See* Declaration of Jeff Ownby, ¶ 5.<br><br>Finally, Defendants were in the process of providing refunds to those consumers who actually sought a refund rather than requesting product delivery when BF Labs was served with the Court's *ex parte* order. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made was timely fulfilled. Declaration of Jeff Ownby, ¶ 23. |
| Paragraph 17 – "As more miners have joined the Bitcoin network, it has become increasingly difficult to solve the computational puzzles before another miner and make a profit. Therefore, miners must seek faster and faster equipment, and must seek efficiencies to cut their operating costs, which includes high electricity bills and wear-and-tear of the mining machine." | Miners also leave the network, making it easier to solve computational puzzles. *See, e.g.,* Blockchain.info (network hash rate for last sixty days), attached as Exhibit F (The attached graph measures the total mining power on the network over the last sixty days. You can clearly see it is not linear. It is truly market driven and competitive). |
| Paragraph 19 – "With the development and release of each new generation of mining technology, previous generations become effectively obsolete and worthless…" | With each new generation of *any* technology product, the previous generation may diminish in value. BF Labs has information, however, that its earlier generation products remain in use to some extent. Declaration of Ricardo Pena, ¶ 5.<br><br>If the price of bitcoin rises high enough, all prior generations of mining equipment would be worth mining from because the number of bitcoins mined would be worth significant |

Case 4:14-cv-00815-BCW   Document 155   Filed 11/11/14   Page 8 of 33

| | value. Declaration of David McClain, ¶ 19. |
|---|---|
| Paragraph 20 – "Defendants purport to manufacture and sell Bitcoin mining machines and services that consumers can use to generate Bitcoins…." | Before being raided by the FTC, BF Labs *did* sell Bitcoin mining machines and services that consumers *could* use to generate Bitcoins. Declaration of Bruce Bourne, ¶ 4. |
| Paragraph 22 – "Links to the calculator have appeared in other Butterfly Labs social media pages (such as Twitter and Tumblr) and on its weblog, which is accessible from the company website." | BF Labs has not been able to locate a record of the calculator on its weblog. Declaration of Jeff Ownby, ¶ 11. |
| Paragraph 23 – "The calculator also requires consumers to input data points specific to the machine, such as the delivery date, power consumption, and processing power, all of which Defendants provided to consumers on their website." | The calculator referenced, but not developed by BF Labs and only one of many such calculators on the internet, does not have the delivery date as an input. *See* http://tpbitcalc.appspot.com. It instead uses "investment period" as an input, a factor ostensibly derived from a delivery date (assuming that a consumer begins operating his machine on the same date it is delivered). <br><br> This calculator was only posted once to BF Labs' Facebook page and resulted in very little interaction. According to Facebook-reach statistics, the post was displayed roughly 1000 times (miniscule in relation to BF Labs' advertisements through Google that had more than 400,000,000 total advertisement impressions and that contained no profitability representations of any kind). Declaration of Jeff Ownby, ¶ 12. |
| Paragraph 28 – "Many months later, as of September 2013, Defendants had failed to ship mining machines to more than 20,000 customers who had paid for the equipment in full." | By December 31, 2013, essentially all 65 NM mining machines were shipped or requested refunds provided. Declaration of Bruce Bourne, ¶ 6. Furthermore, BF Labs shipped 28,252 devices from October to December 2013. Declaration of Bruce Bourne, ¶ 7. <br><br> Preorder processes are neither illegal nor improper – Tesla and Apple both use preorder-sales models. |
| Paragraph 31 – "In fact, Defendants have yet to provide consumers with a single Monarch | The first Monarch was shipped on August 20, 2014. Declaration of Bruce Bourne, ¶ 8.The |

| | |
|---|---|
| machine, despite Defendants' representation that the machines should be delivered by the "end of the year [2013]." Months later, in approximately March 2014, Defendants stated that they would provide consumers with Monarch machines in April 2014. As of August 2014, Defendants had yet to ship a single Monarch machine." | FTC's Complaint, filed on September 15, 2014 after the FTC had regularly monitored BF Labs' website and announcements (Declaration of Jeff Ownby, ¶ 16), failed to account for this material change.<br><br>On August 28, 2014, Jody Drake posted in BF Labs' shipping blog that the Monarch machines began shipping the prior week. *See* Exhibit G. |
| Paragraph 32 – "In numerous instances, consumers were not able to generate Bitcoins using the BitForce or Monarch Bitcoin mining machines because Defendants did not fulfill consumers' orders." | For pre-Monarch product lines, Defendants provided consumers with either machines (approximately 45,000 were shipped in 2013) or refunds. Temporary cloud mining services began on or before June 23, 2014. Delivery of Monarch units or refunds for Monarch pre-orders were ongoing when BF Labs was raided. *See* Declaration of Jeff Ownby, ¶¶ 17, 19. |
| Paragraph 33 – "In numerous instances, Defendants eventually delivered a BitForce that was either defective, obsolete, or mining far less Bitcoins than it would have had it shipped on the promised shipment dates." | If a BitForce was defective, the customer had the option to have the BitForce repaired or replaced even if the person was not the original purchaser. Declaration of Bruce Bourne, ¶ 9. BF Labs' customers have resold its equipment on eBay after mining with equipment (and profiting) for over two times what they paid. Declaration of Ricardo Pena, ¶ 5. The FTC's "obsolete" allegations are unsupportable.<br><br>BF Labs never promised shipment dates but rather estimated shipping dates. Declaration of Jeff Ownby, ¶ 9.<br><br>Further, the price of one bitcoin on January 1, 2013 was $13.51. On November 29, 2013, the price of one bitcoin was as high as $1242. Were the price of bitcoin to go up another 9000%, the absurdity of the FTC's "obsolescence" claim would be even more obvious. *See* Chart relating to the price of Bitcoin, attached as Exhibit H. |
| Paragraph 35 – "At times, Defendants have claimed that they would provide refunds; at other times, they have stated that they have a | All BitForce and earlier BF Labs' customers who wanted a refund received one if it was properly requested. As to the Monarch line, |

| | |
|---|---|
| no-refund policy. Regardless of which purported policy have in place at the time, Defendants have often failed to provide refunds to consumers, even though they have not provided consumers with promised products or services or consumers have not received products or services for many months." | Defendants were in the process of providing refunds to those consumers who actually sought a refund rather than requesting product delivery when BF Labs was served with the FTC's *ex parte* motion. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made was fulfilled. Declaration of Bruce Bourne, ¶ 10. |
| Paragraph 39 – "Defendants have represented, expressly or by implication, that: a. Consumers will be able to use the machines or services … to generate a profitable or substantial amount of Bitcoins,…" | BF Labs never made profitability representations, whether expressly or implicitly. Declaration of Jeff Ownby, ¶ 5. |

### FTC's *Ex Parte* Motion For TRO (Doc. No. 8): FTC Errors and Related Evidence

| FTC's *ex parte* Motion for TRO: | Facts: |
|---|---|
| "Defendants sell products and services that they claim consumers can use to "mine" or generate Bitcoins, a form of virtual currency worth hundreds of dollars per unit." Page 5. | Before being raided by the FTC, the Defendants sold products and services that consumers *could* use to "mine" bitcoins. Declaration of Bruce Bourne, ¶ 4. |
| "They represent that their Bitcoin mining machines and services use the latest technology, and that consumers will be able to use them to generate a substantial number of Bitcoins or make a profit." Page 5. | Defendants never represented that consumers would be able to use its mining machines and services to generate a substantial amount of bitcoins or make a profit. Declaration of Jeff Ownby, ¶ 6. |
| "Indeed, they often fail to deliver machines or provide services at all. In other instances, they have taken many months or even a year to deliver the machines, which arrive damaged or have depreciated so significantly due to the delay that consumers cannot generate a substantial or profitable amount of Bitcoins." Page 5. | BF Labs has shipped 58,391 devices since its inception in 2011. Orders for all product lines prior to the Monarch line have been fulfilled or refunded. Declaration of Bruce Bourne, ¶ 5. BF Labs has never represented that its products can generate a substantial or profitable amount of Bitcoins. Declaration of Jeff Ownby, ¶ 6.

Also, fewer than 2% of all products ever shipped by |

9

| | |
|---|---|
| | BF Labs were returned. Declaration of Josh Zerlan, ¶ 7. Any damaged or defective products properly returned were replaced or repaired by BF Labs. Declaration of David McClain, ¶ 13. |
| "Undaunted, they marketed another generation of Bitcoin mining machines, which they again failed to deliver timely or at all." Page 5. | BF Labs delivered all its second and third generation devices. *See* Declaration of Bruce Bourne, ¶ 15. |
| "Not long after, Defendants started marketing Bitcoin mining services, which thus far, they have failed to deliver at all." Page 5. | BF Labs began providing temporary mining services on or before June 23, 2014. Declaration of Jeff Ownby, ¶ 19. BF Labs started delivering "Nimbus Mining" – a predecessor to cloud mining – in conjunction with a partner (Coinware) in January 2014 and continued until June selling and delivering contracts. All sold contracts are still in force and are being delivered. Declaration of Bruce Bourne, ¶ 11. |
| "Defendant Sonny Vleisides (hereinafter, "Vleisides"), founded Butterfly Labs and is its majority owner." Page 7. | Sonny Vleisides owns 44% of the stock and is the largest shareholder but he does not own over 50% of the stock. Also, Mr. Vleisides is the co-founder of BF Labs. Declaration of Bruce Bourne, ¶ 18. |
| "In a winner-take-all approach, once one miner solves a puzzle, the Bitcoin network awards Bitcoins to that miner, and the other miners get nothing." Page 9. | This statement is only true if the miner does not participate in a "pool," which the majority of miners do. In a pool, miners all get a share of the bitcoins mined, proportional to the hashing power that they contributed. Declaration of Bruce Bourne, ¶ 12. |
| "Accordingly, the development and release of each new generation of mining technology substantially depreciates the value of the previous generation of mining technology." Page 11. | The development and release of any new technology product depreciates the value of older product lines. Declaration of Ricardo Pena, ¶ 5. (customer made a profit using BF Labs equipment and then later sold on eBay the same equipment for higher price than his purchase price) *See also* iPhone 5 prices after Apple opened preorders for the iPhone 6. |
| "By one estimate, the value of Bitcoin mining equipment depreciates 18% every 10 days." Page 11. | This is an estimate at a specific moment in time. Others have paid for equipment, profited, and then later sold the equipment for a profit. Declaration of Ricardo Pena, ¶ 5. |

10

| | |
|---|---|
| "Defendants have induced consumers into parting with up to $50 million for Bitcoin mining machines and services that have yet to materialize or have arrived so late or defective that consumers cannot use them to generate a substantial number of Bitcoins or make a profit." Page 12. | Many customers have profited from using mining equipment purchased from BF Labs. *See* Declaration from Ricardo Pena ¶ 5 . Declaration of Rex Brocki, ¶ 8, attached as Exhibit I. Declaration of Robert Frankovic, ¶ J. And many customers are repeat customers and were induced to made additional purchases from BF Labs by their favorable past experience(s). *See* Declaration from Ricardo Pena ¶ 6; *See* Declaration from Rex Brocki ¶ 9 . *See* Declaration from Robert Frankovic ¶ 8. |
| "Defendants have marketed and sold two generations of Bitcoin mining machines." Page 12. | Defendants have marketed, sold, and delivered (or were delivering prior to being raided) four generations of Bitcoin mining machines. Declaration of David McClain, ¶ 11. |
| "The first generation is the BitForce SC Chip ("BitForce"), which began selling in June 2012 and is still available on Butterfly Labs' website." Page 12. | BF Labs' first generation product was the BitForce Single (FPGA). The second generation was the BitForce MiniRig (FPGA). The BitForce SC Chip (65 NM ASIC) is its third generation product. Declaration of David McClain, ¶ 12.<br><br>The first and second generation BitForce devices were taken off BF Labs' website between November 25, 2012 and December 2, 2012.  Declaration of Jeff Ownby, ¶ 14. |
| "The second generation is the Monarch Mining Card ("Monarch"), which consumers could purchase from August 2013 to July 2014." Page 12. | The second generation BF Labs product was the BitForce MiniRig (FPGA). The Monarch is BF Labs' fourth generation product.  Declaration of David McClain, ¶ 12.<br><br>Given the FTC's end date here (July 2014), they imply that they actually knew BF Labs stopped taking preorders in July but failed to disclose that explicitly in their *ex parte* TRO motion. |
| "PayPal received nearly 5,000 complaints requesting refunds for Butterfly Labs purchases because of non-delivery issues." Page 13. | The FTC fails to provide support for this statement. Furthermore, it is BF Labs' understanding that the PayPal issue resulted from an orchestrated campaign.<br><br>A person's complaint goes through two or three levels in PayPal to request a chargeback; the FTC is likely counting two or three levels within their claim that PayPal received 5,000 complaints. *See* Declaration of David McClain, ¶ 20. |

11

| | |
|---|---|
| "For the Monarch, very few, if any, consumers have received the Monarch." Page 13. | The FTC's acknowledgment here that some consumers (even if very few) received the Monarch is contrary to the allegation in paragraph 31 of the Complaint that "Defendants have yet to provide consumers with a single Monarch machine …."<br><br>Also, shipping of the Monarch line started on August 20, 2014, so some consumers have received the Monarch. Others have been receiving temporary cloud mining. More Monarchs were ready to be shipped on the date that the FTC raided BF Labs and stopped those shipments. Had the FTC not raided BF Labs, all shipments would have like been now completed. Declaration of Jeff Ownby, ¶¶ 22, 25. |
| "They state that their 'objective is to make sure you can recover your investment whether you wish to continue mining or not.'" citing PX 1 ¶ 18, Att. AO. Page 14. | The FTC has cited the statement—which BF Labs did make—out of context, and therefore in a materially misleading manner. *See* Att. O (also filed as Doc. 103-4). More specifically, the FTC does not explain that the statement was made in the context of an offer for full-purchase-price credits for trade-in units. *See, e.g.,* Declaration of Rex Brocki, ¶¶ 10, 13. |
| "In fact, shortly before failing to meet their initial delivery deadline, Defendants bolstered their profitability claims by representing that the advertised BitForce products would exceed the product specifications released three months earlier." Page 15. | BF Labs advertised in this instance that the BitForce products would exceed hashing/power consumption specifications. BF Labs never even initially made any profitability claims, much less bolstered them. Declaration of Jeff Ownby, ¶¶ 5,8. |
| "Defendants also touted the profitability of their mining machines through various press articles." Page 15. | BF Labs did not "tout" the profitability of their machines through various press articles or in any other way. Declaration of Jeff Ownby, ¶ 10.<br><br>Independent journalists, over whom BF Labs exercises no control, "touted" the profitability of the machines. BF Labs cannot be held responsible for journalists' observations. |
| "Because Defendants were unresponsive, their customers complained to Paypal, a payment processor that Defendants used for BitForce transactions. Paypal received nearly 5,000 complaints regarding the non-delivery of the BitForce." Page 18. | A person's complaint goes through two or three levels in PayPal to request a chargeback; the FTC is likely counting two or three levels within their claim that PayPal received 5,000 complaints. *See* Declaration of David McClain, ¶ 20. |

12

| | |
|---|---|
| "A gigahash is a measure of computation power in Bitcoin mining, one mining service company estimates that in order to generate a significant amount of Bitcoins, a consumer would need to purchase 1000 GH per year." *See generally*, *How to Value a Mining Contract*, NimbusMining, http://www.nimbusmining.com/wp-content/uploads/2014/06/HowToValueAMiningContract.pdf (last visited September 1, 2014). Page 22. | This article does not state anywhere that 1000 GH is needed to generate "a significant amount of bitcoins." The article merely uses 1000 GH as an example of a contract and how to value it. And again, a "significant" amount of Bitcoins for one person may be insignificant to another who invested in a greater amount of hashing power. *See* Article cited by FTC. |
| "However, at the time of this filing, Defendants have not started providing the services or providing additional status updates." Page 22. | BF Labs has provided cloud mining status updates since June 17, 2014. On or before June 23, 2014, BF Labs started providing these services to customers. BF Labs' shipping blog, on September 10 and 18, 2014, indicated dates of cloud-mining orders being processed. On August 28, 2014, BF Labs alerted its cloud-mining customers that they would receive an email and have the option of receiving additional hashing power.  Declaration of Jeff Ownby, ¶¶18-21. |
| "To the extent consumers have received the any machines, it is either defective or have significantly depreciated in value to the point that consumers can no longer use it to generate a significant amount of Bitcoins or earn a profit" Page 23. | Defendants never represented that consumers would be able to use its mining machines and services to generate a substantial amount of bitcoins or make a profit. Declaration of Jeff Ownby, ¶ 6.<br><br>In any event, many customers have profited from using mining equipment purchased from BF Labs. Declaration of Rex Brocki, ¶ 8. Declaration of Ricardo Pena, ¶¶ 5, 9.<br><br>Also, fewer than 2% of all products ever shipped by BF Labs were returned. Declaration of Josh Zerlan, ¶ 7. Any damaged or defective products properly returned were replaced or repaired by BF Labs. Declaration of David McClain, ¶ 13.<br><br>The machines received were not obsolete; secondary sales of BF Labs' machines on eBay and other sites demonstrate those machines' continued market value. *See* Declaration of Ricardo Pena, ¶¶ 5, 9. |
| "One of the Defendants' own employee admitted that the passage of time has rendered the BitForce as 'useful as a room | This statement was made by David McClain, account manager at BF Labs, to the FTC in an undercover setup on June 21, 2014, well after all deliveries of all preorders for the BitForce were sent. The first |

| | |
|---|---|
| heater.'" Page 23. | BitForce SC (65 NM ASIC) was shipped on April 24, 2013. The BitForce miners were certainly not room heaters when consumers received and used the equipment. Declaration of David McClain, ¶ 15.<br><br>By the time the FTC's undercover agent talked to McClain, however, "room heater" was an accurate description, and McClain *tried to discourage* the agent from buying the product. If BF Labs were a "bogus" or "scam" company, it stands to reason that McClain would have attempted to persuade the undercover agent to buy the product.<br><br>The FTC failed to inform the Court that when the FTC's agent asked Mr. McClain when she could recoup her costs for buying BF Labs' products, Mr. McClain answered "it's absolutely impossible to know exactly or even have an idea… ." *See* PX 1, Att. AAB, at 7:2-3. |
| "The profitability calculator provided by Defendants illustrates the effects of delivery delays on the machines' yield. Per the calculator, a 4.5 GH/s BitForce machine (Jalapeno) that shipped as promised in October 2012 would have mined up to 43 Bitcoins in 30 days." Page 23. | This calculator was only posted once to BF Labs' Facebook page and resulted in very little interaction. According to Facebook-reach statistics, the post was displayed roughly 1000 times (miniscule in relation to BF Labs' advertisements through Google that had more than 400,000,000 total advertisement impressions and that contained no profitability representations of any kind). Declaration of Jeff Ownby, ¶ 12.<br><br>This profitability calculator ignores the critical fact that had consumers received the miners when any consumer asserted that it should have, so would have all other consumers in the queue who were awaiting devices. The resulting influx of additional miners would dramatically change any earnings calculations. Declaration of David McClain, ¶ 18.<br><br>And the calculator is intended only for use by people who have already obtained mining equipment. The calculator page states "[c]alculate how much your shiny new rig is making you" (emphasis added)— present tense, not future. Past or present tense is the only way the calculator could work because the calculator requires a user to input the applicable Bitcoin exchange rate, among other variables. |

14

| | |
|---|---|
| | Declaration of David McClain, ¶ 17. |
| "Even if some consumers have recently received a Monarch, they will only be able to mine a fraction of the Bitcoins that Defendants originally represented was possible." Page 24. | BF Labs has never represented how many Bitcoins a Monarch could possibly mine. Declaration of Jeff Ownby, ¶ 7. |
| "Further, Defendants posted a calculator on various social media pages and on its web forum to allow consumers to 'measure your ROI [return on investment] with this cool Bitcoin mining calculator.'" Page 29 | BF Labs posted a hyperlink to a third-party calculator, BF Labs did not itself post a calculator on its social media pages or in its web forum. Declaration of Jeff Ownby, ¶ 13. |
| "Additionally, Defendants' express claims that consumers could use the machines to mine for Bitcoins and claims about yield and profitability were false, and therefore likely to mislead reasonable consumers." Page 30. | BF Labs' devices *can* mine for Bitcoins. BF Labs never made claims regarding yield and profitability. *See* Declaration of Jeff Ownby, ¶ 6. |
| "For most consumers who purchased the Monarch, representations that consumers could use the machine to mine for Bitcoins at all is false. As discussed, it is unlikely that Defendants delivered the Monarch machines to many consumers." Page 30. | BF Labs' Monarch device *can* be used to mine for Bitcoins. Shipping of the Monarch line started on August 20, 2014, so some consumers have received the Monarch. More Monarchs were ready to be shipped on the date that the FTC raided BF Labs and stopped those shipments. Declaration of Jeff Ownby, ¶¶ 22, 25. Declaration of Bruce Bourne, ¶ 4.

The FTC's acknowledgment here that some consumers received the Monarch is contrary to the Complaint's paragraph 31 allegation that "Defendants have yet to provide consumers with a single Monarch machine…." |
| "Consumers can only mine a fraction of the Bitcoins that Defendants originally represented with the initial shipment date and Bitcoin mining calculator." Page 30. | BF Labs, again, never represented how many Bitcoins its devices could mine. Declaration of Jeff Ownby, ¶¶ 6, 7.

The calculator was intended for use by people who already had received delivery of mining equipment. The calculator page states "[c]alculate how much your shiny new rig *is making* you"—present tense, not future. (emphasis added). Declaration of David McClain, ¶ 17. |
| "Consumer complaints show and the | The "room heater" statement was made by David |

15

| | |
|---|---|
| Defendants themselves admit that the machine is currently as useful as a room heater." Page 30. | McClain, account manager at BF Labs, to the FTC in an undercover setup on June 21, 2014, well after all deliveries of all preorders for the BitForce were sent. The first BitForce SC (65 NM ASIC) was shipped on April 24, 2013. The BitForce miners were certainly not room heaters when consumers received and used the equipment. Declaration of David McClain, ¶ 15. |
| | By the time the FTC's undercover agent talked to McClain, however, "room heater" was an accurate description, and McClain *tried to discourage* the agent from buying the product. If BF Labs were a "bogus" or "scam" company, David McClain certainly would have attempted to persuade the agent to buy the product. |
| | The FTC failed to inform the Court that when the FTC's agent asked Mr. McClain when she could recoup her costs for buying BF Labs' products, Mr. McClain answered "it's absolutely impossible to know exactly or even have an idea… ." *See* PX 1, Att. AAB, at 7:2-3. |
| "The balance of equities favors the relief sought because the public interest in halting Defendants' unlawful conduct and in preserving assets to redress consumers far outweighs any interest Defendants may have in continuing to operate their illegal business or in continuing to control consumer funds." Page 33. | There is nothing illegal about BF Labs' business or conduct. BF Labs told customers that it used a preorder process. *See* Doc. 103-25, p.6-7. Preorder sales models are used not only by startups but by established companies like Apple and Tesla. If the price of Bitcoin went down, no one would want the goods. It is not the FTC's job to protect the Bitcoin-exchange-rate-based risk that consumers took. |
| "Defendants, through deception, have taken up-front payments up to $50 million from thousands of consumers, and in exchange have either shipped obsolete and worthless merchandise up to one year late or failed to fulfill orders at all, while ignoring or refusing requests for refunds." Page 33. | Many customers have profited from using mining equipment purchased from BF Labs. *See* Declaration of Rex Brocki, ¶ 8. Declaration of Ricardo Pena, ¶¶ 5, 9. And many customers are repeat customers and were induced to made additional purchases from BF Labs by their favorable past experience(s). Declaration of Rex Brocki, ¶ 9. Declaration of Robert Frankovic, ¶ 8. Declaration of Ricardo Pena, ¶ 6. |
| | The equipment was not obsolete and worthless when delivered. Declaration of Rex Brocki, ¶ 8. Declaration of Robert Frankovic, ¶ 7. Declaration of Ricardo Pena, ¶¶ 5, 9. |
| | BF Labs either shipped or refunded all BitForce |

16

| | orders, and was in middle of doing the same with respect to the Monarch line when the FTC raided the company. Declaration of Bruce Bourne, ¶ 13. |
|---|---|
| | BF Labs would only refuse a request for a refund if the refund was not properly or timely requested, or if the refund was requested before the requesting consumer became refund-eligible under BF Labs' policy, which was appropriately disclosed as a term of sale. BF Labs even voluntarily liberalized its refund policy at a certain point to include customers who had agreed to a no-refund sales term. Declaration of Bruce Bourne, ¶ 14. |
| | Each one of BF Labs first three generation of products were delivered within six months of projections. No hardware was ever shipped one year late. Declaration of Bruce Bourne, ¶ 15. |
| "Defendants have consistently refused to refund money to consumers even after they have provided nothing in return for the money." Page 34. | All BitForce and earlier BF Labs' customers who wanted a refund received one if the customer was qualified under the sale terms and timely and properly requested it. As to the Monarch line, Defendants were in the process of providing refunds to those consumers who actually sought a refund rather than requesting product delivery when the FTC brought its *ex parte* motion. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made was timely fulfilled. Declaration of Bruce Bourne, ¶ 10. |
| "Similarly, Drake's job functions demonstrate participation in and knowledge of the company's illegal conduct. She administers the company's web forum and frequently posts on it." Page 37. | Jody Drake does not administer the company's web forum. Josh Zerlan administers the web forum with a non-employee administrator. Declaration of Bruce Bourne, ¶ 16. |
| "Courts have held, and experience has shown, that defendants who engage in deceptive practices or other serious law violations are likely to waste assets prior to resolution of the action." Page 39. | Delays in manufacturing are not law violations, serious or otherwise. Furthermore, there is no evidence that BF Labs wasted any assets at any time, including since a putative class action was filed in April 2014. As counsel for *Alexander et al*. argued in their *Suggestions in Support of Emergency Motion to* |

17

| | |
|---|---|
| | *Intervene*, BF Labs had actually been refunding customers who wanted a refund prior to this action being filed *ex parte*. *See* p. 10-11 (Doc. No. 44). |
| Large amounts of Butterfly Lab's corporate funds are going to non-business purposes such as: department stores (including Nordstrom, Bed, Bath, & Beyond, Restoration Hardware, and Hobby Lobby), massages, auto maintenance, day care services, gun stores, hunting stores, and sporting event tickets. Page 39. | Most of these purchases were valid business expenses and any non-business expenditures were properly accounted for. For instance, the massages that Jody Drake paid for were for fifteen minute chair massages to all requesting employees at their desks in the headquarters during the peak of the shipping and manufacturing period. Declaration of Bruce Bourne, ¶ 19. |
| | The so-called "large amounts" from expenditures made from March 2013 to November 2013 totaled $14,714.26 across all corporate credit card transactions referenced in the FTC's TRO Application. Declaration of Bruce Bourne, ¶ 20. Furthermore, of the "[l]arge amounts" of Butterfly Labs' funds that the FTC asserts "went to non-business purposes," $6,440.01 went to purchases of hardware to build out equipment, leaving approximately $8275 of allegedly personal expenses. As a point of comparison, just the shipping costs for delivery of products to customers during this period exceeded $1,000,000. Declaration of Bruce Bourne, ¶ 20. |
| "Bank records indicate that once consumer funds enter into Defendants' bank accounts, they are quickly dissipated. Despite receiving large sums of money each time consumers place orders, Defendants never leave more than around $2 million in bank accounts. Instead, funds are diverted to other accounts almost as quickly as consumers place their orders" Page 39. | The FTC had access to BF Labs' BMO bank records. The FTC failed to disclose what was obvious and completely legitimate; that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. This is a standard corporate finance practice, and was not dissipation of assets. Declaration of Bruce Bourne, ¶ 21. |
| "Defendants have taken in tens of millions of dollars from consumers, and in many cases, have provided nothing in return." Page 42. | BF Labs shipped approximately 45,000 different devices to consumers in 2013. Declaration of Jeff Ownby, ¶ 17. |
| "It is unclear whether they are even developing products for consumers." Pages 42-43. | To make this type of allegation *ex parte* is unfathomable. The FTC acknowledged throughout its Motion for TRO that BF Labs was late in shipping products, yet stated to the Court that it is "unclear |

18

| | |
|---|---|
| | whether they are even developing products for consumers." |
| "Defendants are misusing corporate funds, immediately transferring consumer funds to different accounts, and spending money on marketing new products rather than developing and delivering products consumers have purchased." Page 43. | The FTC had access to BF Labs' BMO bank records. Had the FTC examined those records closely, it would have observed that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. This is a standard corporate finance practice, and was not dissipation of assets. Declaration of Bruce Bourne, ¶ 21. |
| "The record shows that once Defendants take possession of consumer funds, they quickly exit company accounts, and that Defendants, in many instances, have diverted them to personal use." Page 44. | The FTC had access to BF Labs' BMO bank records. Had the FTC examined those records closely, it would have observed that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account, which is also obviously a company account. This is a standard corporate finance practice, and was not dissipation of assets. Declaration of Bruce Bourne, ¶ 21. |

BF Labs submits these additional facts and evidence to provide the Court an accurate context in which to decide this matter.

### Facts and Evidence Concerning Burn Testing

BF Labs also submits facts and evidence to provide the Court with additional information concerning burn testing. BF Labs notes that burn testing is not a subject of the FTC's Complaint (*see generally* Doc. 2), and BF Labs thus objects to any extent to which burn testing may be a basis for any decision the Court has made or may make in this case. Without waiving its objections, however, BF Labs submits the following facts and evidence to the Court:

Burn testing is an industry-standard practice conducted by hundreds of thousands of electronics companies since the first assembled electronics rolled off the line for consumers. Josh Zerlan Declaration, attached as Exhibit J, at ¶ 4. All electronics design and manufacturing companies, large and small, conduct burn testing in one form or another. *Id.* at ¶ 5.

19

Without burn testing, devices would have a much higher failure rate and a much higher incidence of underperformance, resulting in an inferior, undesirable product. *Id.* at ¶ 6. With burn testing, BF Labs' failure rate in the field is less than 2%. *Id.* at ¶ 7. Without burn testing, BF Labs' failure or underperformance rate in the field would be closer to 40%. *Id.* at ¶ 8. This means 40% of BF Labs' customers would receive undesirable products, necessitating their return under RMA, costing both the consumer and the company time and money, thereby increasing prices and reducing customer satisfaction. *Id.* at ¶ 9.

Burn testing on "testnet" is not suitable due to the nature of testnet. *Id.* at ¶ 10. Testnet is designed to test protocol changes and new software. *Id.* at ¶ 11. Testnet is designed primarily to test software. *Id.* at ¶ 12. Using it to test hardware would make it unusable to those wishing to use it to test software and thus is not suitable for even regular brief testing of hardware, much less a sustained testing of new hardware. *Id.*

Also, Testnet-in-a-box is not suitable for modern hardware because it relies on directly communicating with bitcoind, which is unable to issue work fast enough to keep new hardware busy, resulting in incomplete and inaccurate testing of new hardware. *Id.* at ¶ 13.

A large number of BF Labs' customers purchase BF Labs' hardware with the intentions of operating it on the bitcoin network. *Id.* at ¶ 14. BF Labs would therefore be negligent not to test the hardware on the very network that many customers wish to operate it on. *Id.* at ¶ 15. Not doing so risks the chance that the hardware would operate properly on a test network but fail to perform properly on a live network. *Id.* at ¶ 16.

The live network is a complex interaction of many different parts, the majority of which BF Labs has no control over. *Id.* at ¶ 17. As such, BF Labs' hardware absolutely *must* accommodate for the vagaries and unexpected inputs of an uncontrolled network. *Id.* at ¶ 18.

Utilizing a testnet allows one to control all variables and eliminates the possibility of unexpected input or responses, making any testnet testing dissimilar to the livenet and as such is not an accurate representation of what BF Labs' customers would be utilizing BF Labs' hardware for in the real world. *Id.* at ¶ 19. BF Labs' burn testing is an insignificant portion of the network and it has always been company policy to not allow BF Labs to become a risk by accumulating a large portion of the bitcoin network's hashing power. *Id.* at ¶ 20.

Any entity accumulating a significant portion of the network hashing power puts the network at risk by offering a central point of failure and also by giving the accumulating entity the ability to perform fraudulent transactions. *Id.* at ¶ 21. As such, BF Labs has always intended to keep its hashing power on the network at a minimum and limited to the least amount as necessary to conduct proper testing. *Id.* at ¶ 22.

The intent of the original policy was to prevent BF Labs from obtaining a sizable or even a majority portion of the network hashing power, and for no other reason. *Id.* at ¶ 23. Since that risk is no longer valid or possible, the reasons for not using the live network have been eliminated. *Id.* at ¶ 24.

### Facts and Evidence Demonstrating BF Labs' Appropriate Accounting and Recordkeeping Policies and Practices and Concerning BF Labs' Financial Stability

BF Labs also submits facts and evidence demonstrating BF Labs' appropriate accounting and recordkeeping policies and practices, and concerning BF Labs' financial stability, as stated by Linda M. Freeman, a member of MarksNelson and a Missouri- and Kansas-licensed CPA:

Ms. Freeman, along with Lindsey A. Downey of MarksNelson, has worked with BF Labs, Inc. since the end of May 2013. Declaration of Linda M. Freeman, attached as Exhibit L, at ¶ 3. The MarksNelson work with BF Labs has involved a number of BF Labs executives and

employees, including but not limited to Bruce Bourne, Dave McClain, Josh Zerlan, Sonny Vleisides, Jeff Ownby, and Justin Rowden. *Id.*

Ms. Freeman has found BF Labs to be completely transparent with MarksNelson and Ms. Downey, and herself during the engagement. *Id.* at ¶ 4. At all times, BF Labs has timely produced any and all records requested, and has never refused a request for records. *Id.* If Ms. Freeman had witnessed any sign of wrongdoing or fraud, MarksNelson would have unquestionably ended the engagement with BF Labs. *Id.* at ¶ 5. Ms. Freeman has affirmatively stated that she has not witnessed any such signs. *Id.*

When the MarkNelson engagement with BF Labs began, BF Labs was in a start-up phase. *Id.* at 6. MarksNelson has experience working with start-up companies, and its experience in working with BF Labs was not at all uncommon. *Id.* For example, from the outset, BF Labs was focused on sales generation and order fulfillment. *Id.* at ¶ 7. This is common for a start-up company like BF Labs. *Id.* BF Labs was behind on recordkeeping, which is also common for a start-up. *Id.*

The MarksNelson team witnessed BF Labs get past many of its growing pains in a short amount of time. *Id.* at ¶ 8. In addition, 2013 involved a period of explosive growth for BF Labs, and the volume of detail associated with recordkeeping increased by at least eight to twelve times. *Id.* During 2013-2014, MarksNelson was involved in BF Labs' catching up on two full years and an additional three quarters of a year of accounting. *Id.* at ¶ 9. This was a major undertaking for BF Labs, and demonstrated a real commitment to full and accurate financial reporting. *Id.*

MarksNelson has witnessed BF Labs implement multiple controls to facilitate full and accurate financial reporting and accounting, including:

- Hiring additional key internal personnel to work on accounting and financial practices (e.g., Justin Rowden);

- Increased effort on monitoring daily details of operations;

- Adding Bruce Bourne to the management of the Company;

- Additional personnel assigned to recordkeeping;

- BF Labs increased effort to record daily bank activity and is working to become current on all financial reporting going forward;

- Tracking of accounts receivable;

- Linda Freeman and/or Lindsey Downey with a presence at BF Labs on average several times a month over the course of 2013 and 2014;

- Instituting periodic physical counts of inventory;

- Improved internal reporting and credit card expenditure controls.

*Id.* at ¶ 10.

Ms. Downey and Ms. Freeman have had a significant presence at the BF Labs office and have found that the Company has encouraged and facilitated MarksNelson's involvement in all facets of Company operations to fulfill our engagement. *Id.* at ¶ 11. In Ms. Freeman's opinion, BF Labs is a very real company with real products, repeat orders, and controls being added on an ongoing basis. *Id.*

As part of MarksNelson's work, very few returns of BF Labs products were noted in the ledgers. *Id.* at ¶ 12. MarksNelson did note a few returns, but the information provided indicated that the equipment was repaired or replaced and returned to the customer. *Id.*

MarksNelson assisted the Company in completing all bank reconciliations through the current period and assisted the Company in filing its income tax returns for 2012 and 2013. *Id.* at ¶ 13. All indications are that recordkeeping will be current in order to file the Company's 2014 tax returns in due course. *Id.*

23

BF Labs utilizes software that tracks shipping information, order information, and customer information. *Id.* at ¶ 14. Efforts were made to track each customer to ensure that each customer received what had been paid for. *Id.* This is true as to both preorders and in-stock orders. *Id.*

BF Labs recorded customer prepayments as a liability in connection with preorders. *Id.* at ¶ 15. From an accounting standpoint, this is the conservative route – the Company is acknowledging the potential to repay these deposits up until the time that they fulfill the order, and income is then recognized at that time. *Id.* Moreover, from an accounting standpoint, Ms. Freeman did not have a concern with Butterfly Labs' preorder model because orders were being fulfilled and in certain industries a preorder model is commonly used. *Id.*

In Ms. Freeman's experience, from an accounting and financial reporting standpoint, BF Labs has made every effort at generating complete and accurate financial information. *Id.* at ¶ 16. These efforts have come at a cost, with internal labor and extensive involvement of outside consultants. *Id.* The company has worked to ensure that personal expenditures are properly recognized and given appropriate tax and accounting treatment. *Id.*

BF Labs has gone to lengths to capture all bitcoin transaction and wallet activity. *Id.* at ¶ 18. Rather than witnessing attempts to conceal bitcoin-related activity, BF Labs has done the opposite and has provided any and all information we have requested related to bitcoin mining, holdings, and daily transactions such as customer payments, account transfers and other operational activities. *Id.*

Ms. Freeman has not witnessed any activity consistent with a risk of concealment or dissipation of assets, or the destruction of company records, and is not aware of any factual basis to support any such representation to the Court. *Id.* at ¶ 19.

24

MarksNelson has worked since September 2014 to assist BF Labs in bringing its internal accounting records for 2014 current. *Id.* at ¶ 20. Marks Nelson has been able to accomplish the following since that time:

- Completed almost all bank reconciliations through the current period, including bitcoin wallet activity.

- Updated fixed assets and related depreciation calculations.

- Reconciled credit card liabilities.

- Updated any activity in the shareholder loan accounts.

- Calculated realized and unrealized gains and losses related to the bitcoins in the Company wallet accounts.

- Recorded equipment sales revenues.

- Recorded other fee revenues.

- Begun to review the general ledger for any account coding errors or other analytical review needed.

> *Id.*

In Ms. Freeman's view, the need to update accounting records for 2014 has nothing to do with a risk of concealment or dissipation of assets. *Id.* at ¶ 21. Rather it is part of the ongoing process by BF Labs to bring its accounting current. *Id.*

Ms. Freeman would not be surprised to find that the FTC's lawsuit and this Court proceeding will increase the Company's refund liability and harm the Company's financial viability due to these proceedings and receivership causing further delays in shipping, difficulty in responding to customer inquiry, and delays in processing payments to Company vendors. *Id.* at ¶ 22.

**Facts and Evidence Demonstrating Irreparable Harm to BF Labs as a Result of
Asset Freeze, Injunction, and Receivership**

BF Labs also submits facts and evidence demonstrating that BF Labs has been irreparably harmed by the asset freeze, injunction, and receivership to date, and will continue to incur irreparable harm so long as those conditions are in place, and even thereafter.

The FTC's decision to pursue an *ex parte* TRO, compounded by its media campaign (including press releases, interviews, and a Twitter "town hall" used to interactively and publicly embarrass the company), has caused irreparable harm to BF Labs, its employees, and its customers. Declaration of Bruce Bourne, ¶ 25. While the FTC has professed not to be intent on shutting the company down, its actions to date are effectively bleeding BF Labs to death. *Id.* at ¶ 26.

With respect to its reputation, BF Labs has been labeled as a bogus company, as scammers, and has been accused of defrauding customers by a powerful Federal regulatory agency. *Id.* at ¶ 27. The distribution of coverage that these comments received was international in scope. *Id.* Even if the FTC published a full retraction, the reputational hit to BF Labs will never go away. *Id.* Once something is on the internet, it is there forever and cannot be rectified. *Id.*

In terms of cost, BF Labs has incurred literally hundreds of thousands of dollars in additional costs to pay for attorneys to defend it, accountants to examine it, and a Receiver and his extensive team to oversee it. *Id.* at ¶ 28. These are costs that the company would not have incurred and will never recoup. *Id.* The company's shareholders bear that cost. *Id.*

As a result of the asset freeze, injunction, and receivership, BF Labs has lost some of its best human talent. *Id.* at ¶ 29. BF Labs' lead Assembly supervisor, lead Shipping Clerk, only Purchasing Manager, and lead Account Manager all sought and found other employment during

26

the five weeks the entire company was shut down and people were thrown out of work. *Id.* BF

Labs may actually have lost more people, but cannot know for sure yet because not all staff has

been recalled to work even after almost 8 weeks. *Id.* BF Labs cannot get these people back, nor

can it hire new staff under the cloud of suspicion that the FTC has placed over it. *Id.*

In terms of product value, and with the passage of time, the future date on which some

competitor will release a newer, more competitive product draws closer. *Id.* at ¶ 30. BF Labs is

currently prevented from competing to be the first to develop and release anything new, and is at

risk of seeing its entire investment in the current technology destroyed due to its current inability

to ship units to customers who are waiting for them. *Id.* Once a new product is out, customers

will surely want refunds instead of the "older" products. *Id.* There is no way to turn back the

clock on this passage of time, so the damage here is truly irreparable. *Id.*

With respect to vendor relations, BF Labs' payment accounts are frozen and the Receiver

makes all disbursements as and when he deems it appropriate. *Id.* at ¶ 31. Vendors went weeks

without any payments or communication. *Id.* Many have issued late notices, and some have

even issued disconnect notices. *Id.* More than one supplier has now refused to do business with

BF Labs until all past due invoices are paid and future goods or services are paid in advance. *Id.*

One contract software engineer has refused any further work with the company due to the

perceived stigma of working with a company being sued for fraud by the government. *Id.* Even

if BF Labs is eventually able to replace some vendors, they may not be as good as the ones the

company had been using, and certainly any new vendor will not have the depth of experience in

working with the company. *Id.*

BF Labs' employees have been seriously harmed by the asset freeze, injunction, and

receivership. *Id.* at ¶ 32. Approximately 75% of BF Labs' workforce are paid hourly rates

ranging from $12-$14 per hour. *Id.* Due to being barred from the building and unable to work, a number of these people were forced to seek public assistance. *Id.* Without paychecks, those people had difficulty making rent and car payments, which would likely result in damage to their personal credit ratings. *Id.* At least one employee who received utility disconnect notices. *Id.*

BF Labs' employees have also been subjected to stigma. *Id.* at ¶ 33. Having one's name associated with an employer accused of criminal activity is embarrassing at best, and could lead to future employment issues for the more senior members of BF Labs' management. *Id.*

Two of BF Labs' key managers are named defendants and have had their assets substantially frozen for over two months. *Id.* at ¶ 34. One of these two individuals indicated that he had to pull his son from preschool because he could no longer pay the tuition. *Id.* Prior to a partial release, the other person indicated she may need to sell her car to cover basic living expenses. *Id.* These people and their families will not ever be able to wipe this stain from their experience. *Id.*

One of BF Labs' key managers was deposed by the FTC early in this action. *Id.* at ¶ 35. Inexplicably, the FTC then published this person's deposition on the internet without redacting his social security number, his address, or other personal identification information. *Id.* This manager has a family, including young children, and has received death threats, been subjected to ridicule on the internet, and has had to install a sophisticated home security system at his own expense. *Id.* This is harm that could have far-reaching, long term, and potentially horrible personal results. *Id.*

As a result of the asset freeze, injunction, and receivership, BF Labs' customers who had come up in the order queue and elected to receive their product instead of a refund have not been able to receive product for eight weeks now. *Id.* at ¶ 36. This prevents them from mining, which

is what the FTC accused BF Labs of doing. *Id.* The FTC is irrefutably doing to these people the very thing BF Labs was trying not to do by shipping its product. *Id.*

On the date of this filing, BF Labs learned of two customers who previously wanted their products but who, due to the now eight week delay, have opted to instead receive refunds. *Id.* at ¶ 37. Refunds are much more costly than shipping product; thus, the FTC's action has caused an increase in refund liability and caused irreparable harm to BF Labs. *Id.* at __.

Customers who had been waiting in the refund queue have continued to wait for the last 8 weeks while no refunds were processed. *Id.* at ¶ 38. BF Labs does not know when or if it will be able to resume paying these customers. *Id.*

The current asset freeze, injunction, and receivership were unwarranted and improperly obtained from the start, are not serving the consumers' interests, and are irreparably harming an innovative company that has operated ethically and appropriately and that, but for the asset freeze, injunction, and receivership, would at this very moment be providing jobs to local employees, revenue to the economy, and *desired products (or refunds) to waiting customers.* If the asset freeze, injunction, and receivership are permitted to continue in any form, irreparable harm to BF Labs will continue to be incurred, and customers will continue to be deprived of desired products and refunds.

Ultimately, the Court should deny the FTC's request for preliminary injunction and dismiss the case with prejudice.

Respectfully submitted,

/s/ James M. Humphrey
_____

| James M. Humphrey | MO # 50200 |
| Michael S. Foster | MO # 61205 |
| Miriam E. Bailey | MO # 60366 |

Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

Braden M. Perry                    MO # 53865
Kennyhertz Perry, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendants BF Labs Inc.,
Sonny Vleisides, and Darla Drake.

/s/ James D. Griffin
_____

| James D. Griffin | MO # 33370 |
| Lisa M. Bolliger | MO # 65496 |

Scharnhorst Ast Kennard Griffin, PC
1100 Walnut, Suite 1950
Kansas City, Missouri 64106
Tel: (816) 268-9400
Fax: (816) 268-9409
jgriffin@sakg.com
lbolliger@sakg.com

Attorneys for Defendant Nasser Ghoseiri

30

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2014, a true and correct copy of the foregoing, along with its exhibits, was served by the Court's ECF system on the following:

Helen Wong
Teresa N. Kosmidis
Leah Frazier
Gregory Ashe
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Mail Stop CC-10232
Washington DC  20580
202-326-3779 (Wong)
202-326-3216 (Kosmidis)
202-326-2187 (Frazier)
hwong@ftc.gov
tkosmidis@ftc.gov
lfrazier@ftc.gov
gashe@ftc.gov

Charles M. Thomas
Assistant United States Attorney
Charles Evans Whittaker
Courthouse
400 East Ninth Street, Room 5510
Kansas City, MO  64106
816-426-3130
charles.thomas@usdoj.gov

Attorneys for Plaintiff

Bryant T. Lamer
Kersten L. Holzhueter
Andrea M. Chase
Katie Jo Wheeler
Lucinda H. Luetkemeyer
Spencer Fane Britt & Browne LLP
1000 Walnut Street, Suite 1400
Kansas City MO  64106
816-474-8100
blamer@spencerfane.com
kholzheuter@spencerfane.com
achase@spencerfane.com
kwheeler@spencerfane.com
lluetkemeyer@spencerfane.com

Attorneys for Receiver Eric L. Johnson

 /s/ James M. Humphrey
Attorney for Defendants BF Labs Inc., Sonny Vleisides, and Darla Drake.

31