# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FEDERAL TRADE COMMISSION, )
                            )
        Plaintiff,           )
                            )
v.                          )   Case No. 14-CV-0815-W-BCW
                            )
BF LABS INC., et al.,       )
                            )
        Defendants.         )

### DECLARATION OF JEFF OWNBY

I, Jeff Ownby, hereby declare and state as follows:

1. I am the Vice President of Marketing and Ecommerce at BF Labs, Inc., and have worked in that capacity since 2012.

2. I have been doing online marketing since 1996 and was one of the first Search Engine Optimization professionals.

3. I was hired by one of the largest ad agencies in the world in 2000 because of this unique skill set.

4. I commute from Chicago to Kansas City to work at BF Labs which takes me away from my wife and four children. I miss choir concerts and soccer games to work at BF Labs, a company that I believe in and have put my all into.

5. It was BF Labs' official stance and practice at all times to *never* promise a return on investment.

6. BF Labs never made the representations, either expressly or implicitly, that "[c]onsumers will be able to use the machines or services . . . to generate a profitable or substantial amount of Bitcoins,…"

49186324.1

7. BF Labs has never represented how many Bitcoins a Monarch could possibly mine.

8. BF Labs advertised, in an instance referenced by the FTC on page 15 of its TRO Application, that the BitForce products would exceed hashing/power consumption specifications.

9. BF Labs never promised shipment dates, but rather estimated and projected shipping dates.

10. BF Labs did not "tout" the profitability of their machines through various press articles or in any other way.

11. BF Labs has not been able to locate a record of any link to the TP bitcoin calculator on BF Labs' weblog.

12. The TP bitcoin calculator link was only posted once to BF Labs' Facebook page and resulted in very little interaction. According to Facebook reach statistics, the post was displayed roughly 1,000 times (miniscule in relation to BF Labs' advertisements through Google that had more than 400,000,000 total advertisement impressions and that contained no profitability representations of any kind). The reach of the Facebook post is approximately 0.00025% relative to the total number of ad impressions that BF Labs has run.

13. BF Labs posted a hyperlink to the TP calculator; BF Labs did not itself post a calculator on its social media pages or in its web forum.

14. The first and second generation BF Labs BitForce devices were taken off BF Labs' website between November 25, 2012 and December 2, 2012.

15. BF Labs stopped its business practice of taking preorders for consumer purchases of all products on July 17, 2014. This fact was reflected on BF Labs webpages thereafter.

16. Based on my review of analytics from BF Labs' historical server data, the FTC accessed BF Labs' website, including product pages, several times between July 17, 2014 and September 19, 2014 (the date that BF Labs was served with the Court's *ex parte* order), including on July 30, August 5, August 12, August 20, August 21, August 27, August 28, September 4, September 8, September 9, and September 12.

17. For pre-Monarch product lines, Defendants provided consumers with either machines (approximately 45,000 were shipped in 2013) or properly and timely requested refunds.

18. BF Labs has provided cloud mining status updates since June 17, 2014.

19. BF Labs began providing temporary cloud mining services on or before June 23, 2014.

20. BF Labs' shipping blog, on September 10, 2014 and September 18, 2014, indicated dates of orders being processed.

21. On August 28, 2014, BF Labs alerted its cloud-mining customers that they would receive an email and have option of receiving additional hashing power.

22. Shipping of the Monarch line began on August 20, 2014. Some consumers have therefore received the Monarch. Others have been receiving temporary cloud mining in the interim.

23. BF Labs was in the process of providing refunds to those consumers who actually sought a refund rather than requesting product delivery when BF Labs was served with the Court's *ex parte* order. That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the

customer the choice of either a refund or product delivery. Whichever selection the customer made was fulfilled.

24. Delivery of Monarch units or refunds for Monarch pre-orders was ongoing when BF Labs was raided.

25. Monarch units were ready to be shipped on the date that the FTC raided BF Labs and stopped those shipments. Had the FTC not raided BF Labs, all shipments would likely have been now completed.

26. BF Labs began providing temporary cloud mining services on or before June 23, 2014.

27. In my opinion, the BF Labs asset freeze, receivership, and injunction, and the FTC's aggressive negative media campaign, are unnecessary and improper, and have materially and irreparably harmed BF Labs.

28. In my opinion, if the asset freeze, receivership, and injunction continue, BF Labs will be materially and irreparably harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on the 11th day of November, 2014.

_____
Jeff Ownby