UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 4:14-cv-00815-BCW |
| Plaintiff, | |
| v. | PLAINTIFF'S SUBMISSION OF SUPPLEMENTAL EVIDENCE |
| BF LABS, INC., *et al.* | |
| Defendants. | |

As authorized by Section XXIV.B of the Stipulated Interim Order (Dkt. No. 54), Plaintiff, the Federal Trade Commission ("FTC"), hereby submits supplemental evidence in support of its motion for preliminary injunction.[1] The evidence developed and discovered during the Interim Period described below provides further support for the FTC's argument that Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and that a preliminary injunction should issue to prevent additional misconduct and to preserve assets for consumer redress.

## I. Additional Evidence that the FTC is Likely to Succeed on the Merits

As the FTC has alleged in its prior submissions, Defendants have misrepresented material facts about their products, including (a) that their mining machines would produce profitable or

---

[1] In the interest of promoting the efficient determination of the issues before this Court, and because the Stipulated Interim Order did not authorize a second round of briefing on the merits, this submission is limited primarily to a description of the FTC's supplemental evidence. The FTC does not address every argument in Defendants' Submission of Additional Factual Evidence, Including Declarations (Dkt. No. 155), or the questionable credibility of the supplemental evidence submitted, except to the extent they bear on the FTC's request for a preliminary injunction. The FTC is prepared to address any other matters raised in Defendants' Submission that the Court wishes the FTC to address at the preliminary injunction hearing.

substantial numbers of Bitcoins and (b) that Defendants would timely deliver their mining machines and services. Supplemental evidence also indicates that Defendants misrepresented that they used consumers' machines to mine Bitcoins, which they kept, before delivering machines to consumers. Each of these misrepresentations relates to the monetary value of the products and therefore is materially misleading. The FTC's supplemental evidence for each category of misrepresentations follows.

### A. Defendants Misrepresented the Profitability or Yield of Their Machines

Evidence collected during the Interim Period demonstrates that Defendants made numerous profitability claims throughout their website regarding their products:

- Posts on the company web forum by corporate officers describe the company's mining machines as "money making machines." PX 1, ¶8, Att. F

- Post on the company web forum states that the Monarch line of machines will continue to be "profitable." PX 1, ¶7, Att. E

- Post on the company web forum states that the Monarch line will make "a profit over three to four months." PX 1, ¶7, Att. F

- Statement on the "FAQ" page of Defendants' website indicates that their products will continue to be "profitable." PX 1, ¶7, Att. C

Defendants' bare statement—supported only by a self-serving declaration—that it has "never made the representation" that its products would allow consumers to "generate a profitable or substantial amount of Bitcoins" does not refute the FTC's submissions. (Def. Supp. Evid. at 9, Ex. A, DE#155).

Further, Defendants' claim of profitability was false:

- The declaration of Dr. Arvind Narayanan, the FTC's expert, explains that the BitForce Jalepeno products Defendants ultimately shipped depreciated significantly, and could produce less than one Bitcoin by the time they shipped in November 2013, as compared to the 36 to 134 Bitcoins they would have been able to mine had they received the machines when initially promised in October, 2012. PX 16 at ¶15 – 20.

- Dr. Narayanan further explains that consumer who received a Monarch machine by the end of 2013, as promised, and who first operated it on January 1, 2014, would have be able to mine 15.6 Bitcoins. However, a consumer who received and switched on a Monarch machine on August 31, 2014, would receive less than one Bitcoin, representing a 20-fold depreciation. PX 16 at ¶23 – 25.

### B. Defendants Materially Misrepresented Delivery Dates

Evidence collected during the Interim Period further demonstrates that Defendants made misrepresentations regarding delivery, and that these misrepresentations were material:

- Declarations from additional consumers, establishing the following:

    o Consumers ordered Defendants' products in reliance on Defendants' represented delivery date, and had they known that delivery would be so delayed, they would not have ordered the products. PX 4 at ¶4; PX 5 at ¶4; PX7 at ¶3; PX 3 at ¶3; PX 8 at ¶8.

    o One consumer attempted to refuse delivery due to the long delay. Instead of granting this request, the consumer received an e-mail from Jody Drake that stated "we fulfilled our obligation to ship. We can reship it or you can abandon the unit." PX 7 at ¶ 14, Att. H.

3

- o Three consumers attest that delivery delays have so depreciated the value of the Defendants' products that they prefer monetary refunds to shipment of Defendants' machines. PX 4 at ¶10; PX 3 at ¶11; PX 6 at ¶14; PX 7 at ¶ 18

- Additional complaints from the FTC's Consumer Sentinel complaint database since September 2014 reflect consumers concerns about the continued delivery delays. PX 1, ¶5, Att. A.

- Some consumers posted on Defendants' website regarding their concerns about delivery delays. PX 2 at ¶9, ¶10, Att. D, ¶12, Att. F.

Defendants' assertion that their representations about delivery dates were actually "estimated" or "projected" dates does not rebut the FTC's submissions. Nor does it render unreasonable consumers' impression that Defendants were promising to deliver the products within a particular timeframe.

Supplemental evidence also indicates that Bitcoin mining becomes more difficult over time, further demonstrating that Defendants' delays in shipment was material to consumers:

- Multiple third party sources establish that Bitcoin mining gets more difficult over time, especially over periods as long as six months to one year. PX 1 at ¶10, Att. I – K.

- As noted above, Dr. Narayanan explains that by the time both the BitForce and Monarch products shipped, they could mine less than one Bitcoin. PX 16 at ¶15 – 20, 23 – 25. Further, he explains that miners are in a contest with each other to collect these rewards. PX 16 at ¶7 - 8. Thus, as more miners enter the network and as miners utilize more powerful hardware, the puzzles automatically become harder and harder to solve so that the mining reward can be issued at a constant rate. PX 16 at ¶7 - 8. Indeed, over the

4

course of 2013, bitcoin mining difficulty grew about five-hundred fold, representing a

doubling in difficulty every 41 days. PX 16 at ¶7 - 8.

Defendants' representation regarding bitcoin mining difficulty does not refute the FTC's

submissions. Defendants' exhibit F only displayed the difficulty for a 60-day period, which does

not reflect accurately the time period during which Defendants' products were actually delayed.

### C.  Material Misrepresentations About Using Consumers' Machines

As noted in its Reply in Support of the Preliminary Injunction, Dkt. No. 42, the FTC

uncovered evidence showing despite their representations that they do not use consumers'

machines, they do use the machines to mine bitcoins for themselves. Dkt. No. 42 at 5 – 6, and

PX6, PX 7, PX 8 to FTC Reply in Support of PI (numerous former employees stating that

Defendants mine for bitcoins using customers' equipment, and that they do so for profit, and that

they only stopped maintaining consumer machines on employees' desks for their employees to

mine when "a magazine writer was coming to the office to interview and take photos.").

Defendants have admitted in these proceedings that this representation was false, and that they

do indeed use consumers' machines to mine for Bitcoins which they keep.  Dkt. No. 42 at 5 – 6.

They claim, however, that they used consumers' machines for testing.  Supplemental evidence

demonstrates that although they are telling the Court that they were using the machines for

testing, they expressly told consumers that they were *not* using consumer machines for testing:

- Joshua Zerlan stated in a media interview with Bitcoin Talk in August of 2013 that the
  company tests the machines on the test net, which would involve testing the products
  without using the machines. PX 1, ¶11, Att. K.

- Another former employee stated that consumers' machines were being used to mine for
  Bitcoins for the company's profit. PX 15 at  ¶14 – 15.

## II.  Additional Evidence that a Preliminary Injunction Is Necessary

### A.  Defendants' Claims about Refunds Are Inaccurate and Do Not Undermine the FTC's Request for Relief

As discussed in FTC's TRO brief, thousands of consumers have sought refunds, and well-established case law holds that any refunds Defendants have granted do not cure their deception.[2] Dkt. No. 8 at 5. In addition, supplemental evidence indicates the following:

- When customers complained on Defendants' forum, rather than granting them refunds or otherwise addressing their concerns, Defendants' employees have disparaged them.  PX 2 at ¶ 13; ¶15, Att. H.

- Consumers who have received refunds have not received them from Defendants, but from third parties such as PayPal, or have received them after threatening legal action.  PX 5 at ¶12, ¶7, Att. E; ¶9, Att. G, ¶11 Att. I; PX 6 at ¶ 5, Att. C, ¶6.

- A former employee stated that consumers received refunds not because the Defendants were voluntarily providing them, but because Paypal was processing payment reversals against the company. PX 15 at  ¶18.

- Defendants have destroyed additional evidence of consumers requesting refunds.  PX 2 ¶7, Att. B1; ¶15, Att. H.

### B.  Evidence of Violations of this Court's Order

---

[2] *See e.g., FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201-02 (9th Cir. 2006); *FTC v. Pantron*, 33 F.3d 1088, 1103 (9th Cir. 1994)("the existence of a money-back guarantee is insufficient reason as a matter of law to preclude a monetary remedy [for a § 5 violation]"); *FTC v. Affiliate Strategies, Inc*., 849 F. Supp. 2d 1085, 1119-20 (D. Kan. 2011) (injunctive relief entered despite company's argument that it should not be enjoined because it, among other things, refunded over $1 million).

6

Defendants have violated this Court's order requiring the preservation of evidence. Dkt. No. 54 at Section VIII. Supplemental evidence gathered during the Interim Period shows:

- Defendants have deleted forum posts since entry of the order. PX 2 ¶6, Att. B; ¶8, Att. C.

Given that they are not only violating the FTC Act, but this Court's order as well, it is necessary to continue the preliminary relief that is in place, including by maintaining a Receiver over the business to ensure that it acts lawfully.

### C. Defendants Diverted Consumer Funds for Personal Uses

In addition to the evidence the FTC submitted with its motion for a temporary restraining order, Dkt. No. 8, supplemental evidence shows that Defendants used consumer funds for personal and other non-business uses.

- Defendants used consumer funds for Defendant Sonny Vleisidies' personal expenses, including, but not limited to, money for Mr. Vleisides' mother and father, money to purchase his personal vehicle (an Audi), and money to purchase and renovate his private residence:
  - Multiple checks totaling over $18,000 have been made out to "Vleisides Photo Studio," a business owned and operated by his Defendant Vleisides' father. PX 11 at 82:1-25.
  - Multiple checks totaling almost $20,000 to Defendant Vlesidies' mother. PX 11 at 84:20-25; 85:1-23.
  - Mr. Vleisides' residence was purchased with "consumer" money and it is occupied exclusively by Mr. Vleisides, his girlfriend and their children. PX 11 at 19:10-25; 20:1-25; 21:1-4; PX 14 at 89:25; 90:1-10.

7

- A check in the amount of $66,171.27 for a 2013 Audi A8 came from a Butterfly Labs account. In his deposition, Dave McClain explained that the person who shopped for this car and served as the "primary driver" of the vehicle was Mr. Vleisides. PX 12 at 30:2-7.

- Multiple checks for home renovations, including for work on a sauna. Mr. Vleisides confirmed that these were payments for "an exhaustive list" of improvements that Mr. Terry, a handyman, was making to Mr. Vleisides' residence. PX 11 at 79:16-25 and 80:1-8.

- Mr. Vleisides explained that generally "the company has covered the maintenance of the home." PX 11 at 78:12-13.

- Mr. Bourne himself stated that approximately $8,275 in "allegedly personal expenses" were made using corporate cards. (Dkt. No. 155, Ex. C)

Defendants' claim that they kept appropriate accounting and other records (Dkt. No. 155 at 21-25; Dkt. No. 155-12) is dubious, and in any event, irrelevant. As with much of their supplemental evidence, their argument is based on the self-serving affidavit of their accountant. Further, Mr. Bourne testified under oath that any sort of personal purchases on corporate credit cards are improper[3] and, as noted above, has stated that personal expenses were put on corporate credit cards. In any event, the basis for an asset freeze is not whether a defendant has good books. Instead, an asset freeze is appropriate "to ensure that . . . assets . . . [are] available to make restitution to injured customers." *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988). This is especially so where there is a likelihood of dissipation of assets. *See, e.g., Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

---

[3] PX 14 at 91:2 – 91:4.

### III.    Response to Defendants' Arguments

Defendants' Submission raises a number of immaterial arguments that do not bear on whether a preliminary injunction should issue. Below, the FTC rebuts two of these arguments, given that Defendants have raised these arguments several times.  In addition, as noted above, the FTC is prepared to address any of Defendants' other arguments at the preliminary injunction hearing if the Court so desires, or in a supplemental briefing on the merits, if such a briefing would be beneficial to the Court.[4]

#### A.  Defendants are the Subject of Numerous Lawsuits

Defendants' primary argument for why the FTC should not have taken action against Butterfly Labs is that they have been the subject of numerous lawsuits for their illegal conduct and that they have also been the target of an investigation by another law enforcement agency for consumer protection violations.  As indicated by evidence filed in prior submissions as well as described above, even after Defendants have been sued and investigated, they continued making misrepresentations to consumers about profitability, timing, and using consumers' machines, and continued diverting corporate funds for personal use rather than refunding consumers.  Thus, far from showing that the FTC's action was unnecessary, Defendants continued law violations and asset dissipation in the face of these multiple actions, not to mention Defendants violations of this Court's order (*see supra* II.B), underscore the need for preliminary relief in this action.  This

---

[4] Many of the "facts" that Defendants cite in their papers are misleading and incorrect.  For example, Defendants allege that the FTC was incorrect to state that Defendant Drake serves as the Treasurer of Butterfly Labs.  (Dkt. No. 155 at 5 citing to Bruce Bourne's declaration.)  But, as previously discussed in the FTC's suggestions in support of a temporary restraining order, Defendants' own documents demonstrate the accuracy of the FTC's statements.  (See TRO Ex. 1 Att. B (BF Lab's application for certificate of authority for a foreign for-profit corporation signed by Drake as "Sec/Treas."), Att. E (Butterfly Lab's website's Management page states that Drake "is also Secretary/Treasurer of the Corporation").)

9

is particularly true given the amount at stake in this federal agency enforcement action – up to $50 million dollars. FTC Sugg. in Support of TRO, Dkt. No. 8.

### B. Defendants' Poor Reputation Among Consumers

Defendants also argue, based on a self-serving affidavit, that this FTC action and its announcement of the case have caused Defendants "irreparable harm." (Dkt. No. 155 at 26.) The record, however, does not support Defendants' assertions. First, there is nothing improper with the FTC announcing or discussing its law enforcement activities with the press and public; in fact, the FTC is expressly authorized to do so. *See, e.g., FTC v. Cinderella Career & Finishing Schools, Inc.*, 404 F.2d 1308, 1314 (D.C. Cir. 1968) ("[T] here is in fact and law authority in the Commission, acting in the public interest, to alert the public to suspected violations of the law by factual press releases whenever the Commission shall have reason to believe that a respondent is engaged in activities made unlawful by the [FTC] Act which have resulted in the initiation of action by the Commission. The press releases predicated upon official action of the Commission constitute a warning or caution to the public, the welfare of which the Commission is in these matters charged."); *Trudeau v. FTC*, 384 F. Supp. 2d 281, 295 (D.D.C. 2005); *FTC v. Freecom Communications, Inc.*, 966 F. Supp. 1066, 1067, 1070-71 (D. Utah 1997) (noting that 15 U.S.C. § 46(f) authorizes the FTC to issue press statements).

Moreover, evidence shows that Defendants had a poor reputation prior to FTC action, and as a direct result of their business practices. For example, in January 2014, this court found that Defendant Vleisides violated the terms of probation due to his activity with Butterfly Labs, and Judge Kays indicated that there was a "stench coming from Butterfly Labs."[5] Further, the byline of one of the first media articles to report the FTC's action reads "FTC shuts down

---

[5] *United States v. Vleisides,* Case No. 4:11-cr-00125, Dkt. No. 31, Transcript at 114:25 – 115:4 (W.D. Mo. Jan. 28, 2014).

Butterfly Labs, the second-most hated company in Bitcoinland."  Other articles that pre-dated the

FTC action are equally unflattering of their opinion of Defendants' practices.  (*See,* PX 1, Att. B,

May 14, 2014 article on technologytell.com "Bitcoin miner maker Butterfly Labs receives

hundreds of complaints" ("During an April 2014 probation hearing, documents reveal that a

Kansas federal judge told Butterfly co-founder Sonny Vleisides that the company has a 'strong

smell' of fraud about it.");  April 24, 2014 article on cointelegraph.com "Butterfly Labs loses

wings in court over more Bitcoin fraud";  July 16, 2014 article on coinreport.net "'A Strong

Stench of Fraud': Butterfly Labs Allegedly Buys Buttcoin.org"; September 15, 2013 article on

coindesk.com "Butterfly Labs COO responds to detractors amid company struggles"; February

6, 2014 article on coindesk.com "Butterfly Labs Faces $5 Million Lawsuit Over Unfulfilled

Order"; April 8, 2014 article on coindesk.com "Butterfly Labs Faces Class Action Suit Over Pre-

Pay Orders"; September 9, 2013 article on igotbitcoin.com "Butterfly Labs Shipping Still A Year

Behind, Broken Promises"; April 22, 2014 on arstechnica.com "Digging for answers: The

'strong smell' of fraud from one Bitcoin miner maker"; July 20, 2014 article on panture.com

"Should You Trust Butterfly Labs for Bitcoin Mining Hardware?"; May 15, 2014 article on

cryptocoinsnews.com "We Need to Talk About Butterfly Labs" ("Butterfly Labs is a problem.

Not only because of an overarching plan to fleece Bitcoin users with empty promises but the

audacity to proudly represent leading cryptocurrency entrepreneurs with an unprofessional

attitude.").).


Respectfully submitted,

                                JONATHAN E. NUECHTERLEIN
                                General Counsel

Dated:  November 19, 2014

/s/ Helen Wong
Helen Wong, DC Bar # 997800
Teresa N. Kosmidis, NY Bar# 4533824
Leah Frazier, DC Bar# 492540
Gregory A. Ashe, VA Bar #39131
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Mail Stop CC-10232
Washington, D.C. 20580
202-326-3779 (Wong)
202-326-3216 (Kosmidis)
202-326-2187 (Frazier)
202-326-3719 (Ashe)
Facsimile: 202-326-3768
hwong@ftc.gov
tkosmidis@ftc.gov
lfrazier@ftc.gov
gashe@ftc.gov

TAMMY DICKINSON
United States Attorney

Dated: November 19, 2014

/s/ Charles M. Thomas
Charles M. Thomas, MO Bar #28522
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, MO  64106
Telephone: (816) 426-3130
Facsimile:  (816) 426-3165
E-mail:  charles.thomas@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on N o v e m b e r  1 9 ,  2014, a true and correct copy of the foregoing was filed electronically with the United States District Court for the Western District of Missouri using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ Helen Wong
Attorney for Plaintiff Federal Trade Commission

12