# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CV-0815-W-BCW** |
| | ) | |
| **BF LABS INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS BF LABS INC., SONNY VLEISIDES, AND DARLA DRAKE'S BENCH BRIEF STATING REASONS WHY NO PRELIMINARY INJUNCTION OR ANCILLARY RELIEF SHOULD BE GRANTED

The Court cannot enter the preliminary injunction and ancillary relief sought by the FTC in this case without harming consumers and the public interest, and without causing further irreparable harm to BF Labs.[1] And if the Court were to enter the preliminary injunction that the FTC seeks, the Court would be the first in the nation, to the best of Defendants' knowledge, to prohibit a technology business from announcing its development of new (non-preorder) products and projecting those products' anticipated release dates to potential customers. No case has held that the sort of representations on which the FTC's case is purportedly based are actionable under the FTC Act.

BF Labs has already been irreparably harmed by the injunction and temporary receivership imposed thus far at the FTC's *ex parte* request. BF Labs' reputation and goodwill have been sullied internationally, BF Labs is prevented from communicating with its customers

---

[1] In considering the preliminary injunction, the Court should first consider whether the Complaint states a plausible claim for relief. Defendants urge the Court that it does not, for the reasons set forth in Defendants' Motion to Dismiss, Suggestions in Support, and Reply Suggestions in Support. *See* Docs. 80, 103, 104, and 148, and exhibits thereto. If the Complaint is dismissed, the Court would not need to reach the issue of preliminary injunctive relief.

1

to provide information and updates (as BF Labs always previously provided), and BF Labs is not able to continue negotiating to secure future business opportunities. And contrary to the Stipulated Interim Order, BF Labs has not been permitted to ship products—products that are ready for shipment, and for which shipment was requested by customers *instead of refunds* mere days before the FTC's raid. Late shipment of products is the problem from which the FTC's Complaint purports to seek relief, yet the injunction and receivership thus far have prevented shipment of products when it was both possible and imminent. No end to that delay is in sight unless the Court denies further injunctive measures.

Defendants are confident that they would ultimately prevail in a trial on the merits. This confidence assumes, however, that BF Labs survives to trial, and that assumption is nowhere near a safe one. A preliminary injunction and any continuation of the receivership—a receivership that is consuming prodigious assets, and that has deprived customers of equipment that is wasting on BF Labs' shipping docks—not only threaten BF Labs' very viability, but *guarantee* future customer harm.

Because the FTC is not likely to succeed on the merits of its claims, because the equities do not favor the imposition of a preliminary injunction and ancillary extraordinary relief here, and because the public interest would be harmed by any preliminary injunction, as set forth more fully herein, the Court should deny the FTC's request for a preliminary injunction and ancillary relief because they are not warranted under the law.

## I. Preliminary Injunction and Receivership Standards.

A preliminary injunction may only be granted under 15 U.S.C.A. § 53(b) where a person or entity "is violating, or is about to violate, a[] provision of law enforced by the Federal Trade Commission." 15 U.S.C.A. § 53(b)(1). Even where that threshold temporal standard is met, a preliminary injunction may still only be granted if the FTC makes "a proper showing that,

weighing the equities and considering the Commission's likelihood of ultimate success," a preliminary injunction "would be in the public interest." 15 U.S.C.A. § 53(b). The FTC's burden to establish these elements is heavy because "the granting of any injunction by a federal court is an extraordinary and drastic remedy." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980); *see also FTC v. Freeman*, 911 F. Supp. 1213, 1227 (W.D. Mo. 1995). The burden is even heavier where, as here, "granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

Further, "[t]he primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984). Where "the status quo is a condition not of rest, but of action, and the condition of rest . . . will cause irreparable harm," the status quo of action should be preserved to avoid "unnecessary economic waste until the case is adjudicated." *Id.* (preserving status quo of action, not rest, by mandatory injunction). Said another way, "[w]hen the status quo is one of business activity and the alternative of 'rest' causes irreparable harm," the United States Court of Appeals for the Eighth Circuit "ha[s] favored the activity." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 631-32 (8th Cir. 1991) (dissolving injunction and leaving parties to act lawfully and resolve conflicts either through trial or settlement "under the watchful eye of the district court").

The imposition of a receiver is also "an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993); *accord FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 326

3

(S.D.N.Y. 2001) (holding that the appointment of a receiver "is an extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective").

"Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Aviation Supply Corp*., 999 F.2d at 316-17.

## II. The FTC Cannot Establish that Defendants Were Violating, Are Violating, or Are About to Violate, Any Provision of Law Enforced by the FTC.

In its Reply in Support of its Motion to Present Live Testimony, the FTC asserted "that Defendants' illegal conduct continued up until the day that the FTC executed the Temporary Restraining Order and would likely recur in the future," and identified "refusing refunds" and "mining using customer equipment" as the purported continuing "illegal conduct." Doc. 163, p. 1.[2] There are several problems with the FTC's reliance on its "refund" allegations and "mining using customer equipment" argument to attempt to establish that Defendants were violating or were about to violate a law enforced by the FTC at the time the TRO was executed. Ultimately, the FTC cannot meet the threshold "is violating, or is about to violate" burden from 15 U.S.C.A. § 53(b)(1).

First, the FTC is incorrect that BF Labs refused to provide refunds. All BitForce and earlier-generation-product purchasers who wanted a refund received one if the customer was

---

[2] This assertion implicitly, but correctly, acknowledges that BF Labs had voluntarily discontinued its consumer-preorder business model months before the TRO was executed. And BF Labs' Business Plan, submitted to the Court, demonstrates that, while BF Labs continues to assert that its former preorder model was appropriate, legal, and standard within the industry, BF Labs has no intention of resuming that model for business reasons. *See* Business Plan, pp. 6, 15.

4

qualified under the sale terms and timely and properly requested a refund. Doc. 155-3, ¶ 10. The FTC has cited no law stating that a business must provide a refund where none is provided for in the sale contract. But BF Labs even voluntarily liberalized its refund policy in 2014 to include customers who had agreed to a no-refund sales term. *Id.* at ¶ 14. And as to the Monarch line, Defendants were in the process of providing refunds in an orderly manner to those consumers who actually sought a refund rather than requesting product delivery when the FTC executed the TRO. *Id.* at ¶ 10. The only causes of any current failure to provide refunds are the FTC's actions and the receivership.

Second, the FTC has not alleged (nor can it) that any refusal to provide refunds or that BF Labs' burn-in testing of equipment before shipping[3] violates any law enforced by the FTC (or any other law). Instead, the FTC's Complaint alleges *only* that Defendants made "false and misleading" representations in violation of Section 5(a) of the FTC Act by allegedly representing, "expressly or by implication," that "[c]onsumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins," or that "Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion." Doc. 2, ¶¶ 39-41.

The FTC does not allege that any refusal to provide refunds violates any law enforced by the FTC, presumably because it cannot. Even more telling, the FTC's Complaint does not even *mention* burn-in testing (*see generally* Doc. 2), much less allege that burn-in testing violates any law enforced by the FTC. On these grounds alone, no preliminary injunction should be entered because the FTC cannot establish as a threshold matter that Defendants are violating, or are

---

[3] BF Labs assumes that the FTC is referencing burn-in testing when it refers to "mining using customer equipment," although the FTC's phrase is not factually or legally accurate. *See infra* at Part IV.C.

5

about to violate, *a law enforced by the FTC*. *See* 15 U.S.C.A. § 53(b)(1); *see also Redd v. Lutgen*, No. C11-3046-MWB, 2013 WL 5757864, at *3 (N.D. Iowa Oct. 23, 2013) (citing *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997), and holding that the plaintiff failed "first step" in preliminary-injunction analysis by basing motion for injunction on alleged facts that were outside the scope of his complaint because, even if preliminary injunction were granted, issues raised by those facts would not be resolved in a later trial on the merits).

## III.  The FTC Cannot Establish a Likelihood of Success on the Merits.

To demonstrate a likelihood of ultimate success, the FTC must present "reliable evidence" that demonstrates *more* than a "fair or tenable chance of ultimate success." *FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) (holding that FTC must raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals"). This "stringent standard" is necessary "[b]ecause Congress expect[s] courts to use independent judgment in reviewing preliminary injunction applications under Section 13(b)," and not merely to "rubber stamp . . . the FTC's decisions." *Id.*

The FTC has alleged here that, by making "[m]isrepresentations or deceptive omissions of material fact," Defendants violated section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." Doc. 2, ¶¶ 37, 38. More specifically, the FTC has alleged that Defendants represented, either expressly or implicitly, that: (a) consumers would be able to use BF Labs' bitcoin-mining "machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins," and that (b) "Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion." *Id.* at ¶ 39.

To prove a deceptive act or practice under section 5(a) of the FTC Act, "the FTC must show (1) a representation, omission, or practice that (2) is likely to mislead consumers acting

6

reasonably under the circumstances, and that (3) the representation, omission, or practice is material." *FTC v. Mallett*, 818 F. Supp. 2d 142, 148 (D.D.C. 2011). A representation or omission is "material" if it is "of a kind usually relied on by reasonable and prudent persons," if it is "widely disseminated," and if injured consumers actually purchased the defendants' products. *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991).

Under these standards, the FTC is not likely to succeed on the merits of either the "profitability" or the "timely delivery" aspects of its misrepresentation claim.

### A.    The FTC is not likely to succeed on the merits of its "profitability" claims.

The FTC is not likely to succeed on the merits of its "profitability" claims because the FTC's allegations on that point are inaccurate. Separately, the FTC cannot establish that BF Labs' posting of a link to a Bitcoin calculator—the single fact on which the FTC principally relies—was either material or likely to mislead consumers acting reasonably under the circumstances.

First, BF Labs *did* represent that its customers would be able to use BF Labs' products to generate Bitcoins. But nothing about this representation was untrue, deceptive, or likely to mislead consumers acting reasonably under the circumstances. Before being raided by the FTC, BF Labs *did* sell mining machines and services that consumers could use to generate Bitcoins. Doc. 155-3, ¶ 4. BF Labs has in fact shipped tens of thousands of devices since its inception in 2011, and orders for *all product lines* prior to the Monarch line have been either fulfilled or refunded. *Id.* at ¶ 5. The first Monarch was shipped directly to a customer on August 20, 2014, and BF Labs was in the process of fulfilling remaining Monarch orders when the FTC raided the company. *Id.* at ¶¶ 8, 13. Customers have been able to mine and generate Bitcoins with those products. *See* Declaration of Ricardo Pena, Doc. 155-5, ¶¶ 3-13 (describing successful mining

7

with different generations of BF Labs' products); *see also* Declaration of Rex Brocki, Doc. 155-9, ¶¶ 3-16; Declaration of Robert Frankovic, Doc. 155-10, ¶¶ 4-8.

Second, the FTC's profitability and "substantial amount of Bitcoins" allegations are incorrect. Because of BF Labs' stance that it would never promise a return on investment, BF Labs has *never* represented, either expressly or by implication, that consumers would be able "to generate a profitable or substantial amount of Bitcoins," and has never represented how many Bitcoins a Monarch could possibly mine. *See* Doc. 155-1, ¶¶ 5-7. Indeed, despite BF Labs' more than 400-million ad impressions through Google, the FTC has been unable to provide evidence of a *single* representation in which BF Labs stated that consumers could use BF Labs' products "to generate a profitable or substantial amount of Bitcoins." The FTC is unable to do so because no such representation exists.

The FTC's only basis for its "profitability" allegation is the so-called Bitcoin calculator to which BF Labs posted a link on its Facebook page in November 2012. *See* Doc. 2, ¶¶ 22-23. In contrast to BF Labs' more than hundreds of millions of ad impressions (not one of which contained any profitability representations of any kind), Facebook-reach statistics show that the calculator-link post was only displayed approximately 1,000 times, hardly "widely disseminated" for materiality purposes. Doc. 155-1, ¶ 12-13.

But even if the calculator link were widely disseminated, the calculator cannot be used to make profitability projections (much less representations); rather, it can only measure past or present performance of a Bitcoin-mining machine based on variable inputs. *See* Doc. 103, pp. 16-17; Doc. 148, pp. 7-10 (calculator discussions incorporated herein by reference). The FTC

8

has not presented evidence that any reasonable consumer would rely on the calculator to project return-on-investment, and simply cannot do so.[4]

Beyond its evidentiary failures, the FTC has not cited any case suggesting that BF Labs' linking to a calculator, in which *consumers* entered information about their costs of power, the Bitcoin exchange rate, and the mining difficult level (among other variables), and then obtained a calculator output (which may have been a negative, and not positive, number), can constitute a "profitability" representation actionable under section 5(a) of the FTC Act.

In the absence of evidence of any actual profitability representations, in the absence of evidence that any reasonable consumer would rely on the Bitcoin calculator as a profitability representation (assuming that, based on the variables entered, a positive figure was yielded by the calculator), and in the absence of any authority suggesting that the calculator—*or anything like it,* as opposed to actual dollar-figure or percentage-based return-on-investment representations—could constitute an actionable representation, the FTC cannot establish a reasonable (or any) likelihood of success on the merits on its "profitability" claim.

BF Labs is committed to its practice of never promising return on investment or making profitability representations of any kind. The FTC's inability to produce any contrary evidence is not only fatal to its profitability claims on the "likelihood of success" inquiry, but is fatal to its argument—based merely on the FTC's speculation—that any alleged wrongs are "likely to recur." On such a record, no preliminary injunction can be entered. *See FTC v. Evans Prods. Co.*,

---

[4] That a "reasonable" consumer would be misled is critical to the Court's analysis. It is well settled that the Section 5(a) standard to determine whether a representation is misleading "has not been applied to protect those few people whose misunderstanding . . . is unreasonable. These unfortunate few represent 'an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.'" Jack E. Karns, *The Federal Trade Commission's Evolving Deception Policy*, 22 U. Rich. L. Rev. 399, 410-11 (1988) (footnote omitted).

775 F.2d 1084, 1087-88 (9th Cir. 1985); *see also Hudson v. Sch. Dist. of Kansas City*, 578

S.W.2d 301, 312 (Mo. App. 1979) (to obtain a preliminary injunction restraining future action,

"the threatened action must be based upon a real apprehension that the acts for which the

injunction are sought are not only threatened but will in all probability be committed"); *St. Louis*

*221 Club v. Melbourne Hotel Corp.*, 227 S.W.2d 764, 769 (Mo. App. 1950) (stating that an

injunction "is never granted to allay fears and apprehensions of any one, but only for an actual

and threatened wrong").

**B.    The FTC is not likely to succeed on the merits of its "timely delivery" claims.**

Again, and as an initial matter, BF Labs has voluntarily ceased using a consumer-sales

preorder model for business reasons (even though that model was legal and appropriate), and has

no intention of resuming that model. The FTC therefore has no basis to seek a preliminary

injunction on the "timely delivery" prong of its claims, because it cannot establish any likelihood

of recurrence, *i.e.*, that Defendants "are violating, or are about to violate" a law that the FTC has

authority to enforce. *See id.*

Beyond that, as BF Labs' Suggestions and Reply Suggestions in Support of Defendants'

Motion to Dismiss makes clear, the FTC has not cited a single case establishing that a company's

projections concerning anticipated product-development and product-shipment dates are

"material" or representations "of a type usually relied on by reasonable and prudent consumers."

*See* Docs. 103, 148. Rather, the only close-to-analogous case law, concerning stock purchases

made in purported reliance on anticipated product-release dates, states that product-development

and release projections are immaterial as a matter of law. *See* Doc. 103, pp. 5-16, Doc. 148, pp.

3-7 (materiality discussions incorporated herein by reference).

While the FTC purports to rely on the "net impression" of BF Labs' product-

development and shipment-date representations to support its claim, the "net impression" of BF

10

Labs' projections and representations was neither misleading nor deceptive. Defendants set forth those representations nearly in full in their motion to dismiss papers for the Court's review (*see* Doc. 103, pp. 8-17, and exhibits thereto), so that the Court could glean from those representations what everyone else did: that BF Labs' products were in the development phase and that persons who could not wait in the product queue should not order the product. No reasonable consumer would be confused by the sum total of the communications and information provided by BF Labs, including that provided by BF Labs' prominently featured FAQ section.

Further, the FTC has not met its burden of showing that a reasonable person would rely on the "scheduled for shipment" projections alone in light of the clear cautionary statements that accompanied those projections. Even customers whose declarations were offered *by the FTC* acknowledged that the delivery date projections on BF Labs' website were "estimated" (*see, e.g.*, Doc. 42-21, ¶ 4)—not, as the FTC has argued, "promised." *See, e.g.*, Doc. 8, pp. 5, 18.

In addition to the clarity of and disclosures within BF Labs' representations themselves, declarations of BF Labs' customers strongly support the view that BF Labs' shipping projections were estimates concerning a development-phase product. *See* Doc. 155-9, ¶¶ 4-16 (describing understanding of preorder process, and that "Butterfly Labs kept me apprised of all developments related to the development of the Jalapeno and the preorder process," and "made no false promises, no exaggerated claims"); Doc. 155-10, ¶¶ 6-14 (describing customer's understanding based on BF Labs' "open, transparent communication style that puts its customers first"). BF Labs also provided regular and detailed updates. *See, e.g.*, Doc. 103, pp. 8-16 (incorporated herein by reference).

It is ironic indeed that the FTC, purportedly so worried about the timing of BF Labs' product shipments, did not timely respond to purported consumer complaints that it received and

thus came to the Court seeking *ex parte* relief and now, a preliminary injunction, on the basis of stale information. Of the 307 supposed consumer complaints made to the FTC's Sentinel reporting system, all but 57 of the complaints were made in 2013 (nowhere near the time that the FTC moved in secret for its supposedly urgent relief). Doc. 155-3, ¶ 22; *see also generally id.* at ¶¶ 22-24 (describing that 93% of the non-duplicate, actual customer complainants actually received either equipment, service, and/or a refund and other related statistics). On this record, any case the FTC may have thought it had utterly unravels.

The FTC is thus left to rely on declarations from people like Eric Lefebvre. *See* Doc. 42-21 (Lefebvre Declaration, attached to FTC Reply). On September 25, 2014, Mr. Lefebvre declared under penalty of perjury that in September and October 2013, he preordered two Monarch mining machines, that "to date" he had "received neither a refund nor the two Monarch mining machines [he] ordered," and that "[e]ven if either or both bitcoin mining machines [he] ordered came to [him] they would be useless to [him] because they are so obsolete by now and they would not be worth the cost of electricity to turn on . . ." *Id.* at ¶ 8.

What Mr. Lefebvre neglected to disclose, however, is that on September 18, 2014, just days before he executed his declaration for the FTC on September 25, 2014, Mr. Lefebvre responded to an email from BF Labs informing him that Monarchs were available to fulfill his order, and that Mr. Lefebvre could request either product shipment and a rebate, or a full refund.[5] Curiously, instead of opting for a refund—the option one would expect Mr. Lefebvre to have selected if the Monarch miners were "useless" and "obsolete" as he declared—Mr. Lefebvre opted for BF Labs to ship him two Monarchs for 1,000 GH/s of hashing power plus a $2,710 rebate. The inventory was pulled from BF Labs' shelves and sent to the shipping dock and, were

---

[5] Defendants intend to offer evidence of the facts stated in this paragraph in the preliminary injunction hearing.

it not for the FTC's raid of BF Labs, Mr. LeFebvre's product would have been shipped on September 19, 2014 and his rebate processed.

In light of the FTC's investigatory and disclosure failures with respect to the Sentinel complaints and Mr. Lefebvre's disingenuous-at-best declaration, not to mention the catalogue of FTC factual errors pointed out in BF Labs' additional evidence submission (*see* Doc. 155), it is clear that the so-called evidence proffered by the FTC cannot be reasonably relied on.

From a legal perspective, even if BF Labs still used a preorder model (it does not), if the Court were to enjoin BF Labs, a technology company that develops cutting-edge products, from making any projections concerning anticipated product-development and product-shipment dates, it would be doing so without any case law support for its decision. *See generally* Docs. 103, 148. The FTC has certainly not cited any. In the absence of any such authority, the FTC has not met its heavy burden of establishing a likelihood of success on the merits on its "timely delivery" theory.

A final note on this point: if the Court were to enjoin BF Labs from making product projections *in the absence of a preorder model*, as was the status quo when the FTC executed its TRO, it would do so not only without case law support, but would set unprecedented and harmful business policy and law. The effect of such an order would be to state that a business that sells fully-developed products somehow violates the FTC Act when it makes announcements about products that it is developing and anticipates one day selling to customers off the shelf. Surely the reach of the FTC Act does not extend so far. The FTC is therefore not likely to prevail on the merits of either its "profitability" or "timely delivery" theories.

## IV. The Balance of Equities Requires that No Preliminary Injunction Be Granted.

One need look no further than the fact that the FTC and Temporary Receiver have not permitted the shipment of Monarch units that are sitting idle on BF Lab's shipping dock (with

13

packing slips ready) to conclude that a preliminary injunction and continuation of the receivership will harm consumers and the public interest. What is more, the tremendous assets being consumed by the Temporary Receiver and his small army of counsel and consultants are not being preserved for potential consumer redress, despite the fact that the FTC has made no actual showing of risk of dissipation of assets. *See* Part V, *infra*.

The law is clear that "Section 13(b) requires the FTC to demonstrate that the harm to the parties and the public that would flow from an injunction is outweighed by the harm" that would otherwise "occur in the period between the injunction's denial and a final judgment on the merits." *Freeman*, 911 F. Supp. at 1227. While public equities are generally given greater weight in the balance (*Freeman*, 69 F.3d at 272), here even those equities weigh against any further injunctive measures. Further, where "the party moving for preliminary injunctive relief has failed to adequately show a likelihood of success on the merits," as the FTC has failed to do here, "it faces a particularly heavy burden of demonstrating that the equities nevertheless militate in favor of granting the requested relief." *Id.*

Because both the public and private equities weigh against any further injunctive measures, no preliminary injunction should be granted, and the asset freeze and receivership should be discontinued.

A.     **The public equities weigh against any further injunctive measures.**

The FTC did not come to this Court with full or accurate information. *See generally* Doc. 155. While Defendants have been irreparably harmed by the FTC's *ex parte* actions, as set forth in Part IV.B., *infra*, the FTC's approach has also harmed and is harming consumers each day. Any further injunctive measures will only exacerbate this problem.

14

As Ricardo Pena, a repeat[6] customer of BF Labs, declared, "[t]he lawsuit from the Federal Trade Commission actually makes things worse for consumers like me as I want my Monarch now and understand that [BF Labs] began shipping Monarchs to customers." Doc. 155-5, ¶¶ 14-15 (further stating that he "see[s] no benefit to any consumer by the Federal Trade Commission's actions"). Another repeat customer, Rex Brocki, made a similar but even more extensive declaration, describing his receipt of four Monarch cards the day before BF Labs was shut down and the fact that he was supposed to receive an additional four Monarch cards on September 23, 2014 (four days after BF Labs was raided by the FTC). *See* Doc. 155-9, ¶¶ 16-17. In Mr. Brocki's view, the FTC's actions have done nothing more than cause local residents to become unemployed, disrupt BF Labs' important work in a high-tech world market, and prevent a large number of customers from obtaining mining machines. *See* Doc. 155-9, ¶¶ 19-23.

Defendants do not deny that BF Labs did not get its products to market as quickly as it anticipated and reasonably projected, and acknowledge that not all customers were content to wait for product shipment (like Messrs. Pena and Brocki) as they had contracted to do. Thus some customers—after the FTC refused to respond to complaints made in 2013—filed civil lawsuits in the United States District Court for the District of Kansas. But now, as a result of the FTC's actions, not only are customers who honored their contracts like Messrs. Pena and Brocki unable to obtain product, but other customers who filed lawsuits are not able to pursue the path that they chose to attempt to obtain relief,[7] because that litigation has been stayed. *See Meissner*

---

[6] The very fact of repeat business not only supports Defendants' arguments against further injunctive measures from an equitable perspective, but constitutes evidence that BF Labs' representations were not misleading for purposes of the Court's "likelihood of success on the merits" analysis. *See* Karns, *supra* note 4, at 411 ("[s]ellers want repeat purchases and to the extent that they make false claims about the product they will lose repeat purchases").

[7] Defendants deny any wrongdoing and disagree with the Kansas-case plaintiffs that BF Labs did anything that would subject it to liability in the *Meissner* and *Alexander* litigation.

15

*v. BF Labs Inc.*, 2:13-cv-2617-RDR-KGS, Docs. 2, 43, 44; *Alexander et al. v. BF Labs Inc.*, 2:14-cv-2159-KHV-JPO, Doc. 1.

Finally, Defendants have not yet been provided with the Temporary Receiver's first application for fees. In light of the extensive activities of the Temporary Receiver and his counsel and consultants since the inception of this matter, and the Temporary Receiver's in-person or constant multi-party representative presence at BF Labs' office, however, Defendants can only reasonably conclude that BF Labs' assets are being prodigiously consumed by the Temporary Receiver's activities. The FTC cannot reasonably claim that its efforts to secure continued receivership control of BF Labs' assets are actually preserving assets for potential consumer redress. The public equities thus weigh collectively and heavily against any further injunctive measures here.

### B. The private equities also weigh against any further injunctive measures.

The FTC did not tell the Court anything close to whole story when it rushed to the courthouse *ex parte* in September. While the FTC represented to the Court that Defendants "often fail to deliver machines or provide services at all" and "have consistently refused to refund money to consumers" (Doc. 8, pp. 5, 34), the FTC did not inform the Court that of the 260 complaints that the FTC received that (1) were not duplicates and (2) were made by an actual customer, 93% of the complainants received either equipment, service, and/or a refund, another 3% relate to Monarch orders for which customers are still waiting for their equipment or a refund (now as a result of the FTC's *ex parte* actions); and the remaining approximately 4%— nine complaints—were anomalous. *See* Doc. 155-3, ¶ 24.

As a result of the FTC's incomplete investigation, the FTC similarly failed to inform the Court of BF Labs' extensive efforts to find solutions for its customers and to deal proactively with complaints. *See, e.g.*, Doc. 155-4, at ¶ 21 (describing BF Labs' efforts to help Russian

16

customer whose machines were intercepted by Russian customs). These "good facts" do not exist in isolation, but have been offered as examples to attempt to paint for the Court an accurate picture of the kind of company BF Labs is and how it operates.

The FTC's decision to pursue an *ex parte* TRO, compounded by its media campaign (including press releases, interviews, and a Twitter "town hall" used to interactively and publicly embarrass the company), in addition to the manner in which the FTC and the Temporary Receiver have implemented the Stipulated Interim Order, has caused BF Labs, its employees, and its customers irreparable harm in its most classic forms. *See generally* Doc. 155-3, ¶¶ 25-38 (describing, among other things, reputational injury to BF Labs and its employees, loss of key employees, loss of vendors due to perceived stigma of working with company being sued by government for fraud, the economic waste of unique technology sitting idle while competitive window narrows, the public disclosure of social security and other identifying information of a key BF Labs employee, resulting in death threats and ridicule, etc.).

Injury to reputation or goodwill is not readily measurable in monetary terms, for example, and is generally viewed as irreparable harm. *See, e.g.*, *Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009). While the FTC has professed not to be intent on shutting the company down, its actions to date are effectively bleeding BF Labs to death. Doc. 155-3, ¶ 26. Potential economic losses that threaten the existence of a business are a classic form of irreparable harm. *See Brady v. Nat'l Football League*, 640 F.3d 785, 794-95 (8th Cir. 2011); *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Signature Flight Corp. v. Landow Aviation Ltd P'ship*, 442 Fed. Appx. 776, 784-85 (4th Cir. 2011) (irreparable harm found where permanent loss of customers or goodwill threatened).

17

Further, the injunctive relief that the FTC seeks will keep BF Labs in a condition of rest, as opposed to a period of business activity, causing significant economic waste—not least of all with respect to Monarch units that are sitting inactive on BF Labs' shipping dock—contrary to law and public policy. *See Hill*, 939 F.2d at 631-32 (holding that "[w]hen the status quo is one of business activity and the alternative of 'rest' causes irreparable harm," the United States Court of Appeals for the Eighth Circuit "ha[s] favored the activity"); *accord O.D.F. Optronics Ltd. v. Remington Arms Co., Inc.*, No. 08 Civ. 4746(DLC), 2008 WL 4410130, at *7 (S.D.N.Y. Sept. 26, 2008) (citing *Tom Doherty Assocs. Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995 and noting that "[t]he cases involving irreparable harm from a loss of goodwill or business relationships typically involve a situation in which a dispute between parties leads to the inability of one party to provide its product or products to the market or its customers"); *Pontone v. York Group, Inc.*, No. 08 Civ. 6314(WHP), 2008 WL 4539488, at *3 (S.D.N.Y. Oct. 10, 2008) (holding that "[t]he loss of 'prospective goodwill,' that is, the potential benefits to a business from selling an essential or unique product can be irreparable harm").

These harms will only continue if further injunctive measures are ordered. Here, just as was true in *FTC v. Freeman*, "[i]f the Court issues an injunction, it is likely that [BF Labs] will no longer be in business by the time that the FTC gets around to conducting a hearing on the merits of this dispute." 911 F. Supp. at 1227-28. This fact "must be balanced against the FTC's desire" for an injunction, "so as to avoid having to 'unscramble the eggs' later." *Id*. There can be no "unscrambling" of time-sensitive lost business opportunities and the ultimate demise of a company; separately, the very real and acute damage of BF Labs' employees' losses of work cannot be disregarded. *See, e.g.*, *Atari Corp. v. Sega of Am. Inc.*, 869 F. Supp. 783, 792 (N.D. Cal. 1994) (considering harm from laying off employees in balancing equitable interests).

The private equities, like the public equities, thus weigh heavily against further injunctive measures.

### C.  Burn-in testing provides no basis for granting injunctive relief.

Because burn-in testing is not referenced *anywhere* in the FTC's Complaint (*see generally* Doc. 2), it cannot be a basis for preliminary injunctive relief because it bears no relation to the merits of claims that will ultimately be tried. *See Redd*, 2013 WL 5757864, at *3 (citing *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997). But even if the Court considers burn-in testing while balancing the equities, facts concerning burn-in testing weigh against further injunctive measures because burn-in testing is legal, necessary to ensure the quality and reliability of BF Labs' products, and desired by BF Labs' customers.

### 1.  Burn-in testing is necessary to ensure the quality and reliability of BF Labs' products and is desired by BF Labs' customers.

The FTC's outside-the-Complaint argument against burn-in testing is in fact an argument that BF Labs should be prevented from testing its products before it ships those products to customers. But if BF Labs had sent faulty equipment to customers before confirming that the equipment worked, the FTC would have filed a complaint against BF Labs for selling defective products.

Burn-in testing is an industry-standard practice conducted by all electronics-design and manufacturing companies in one form or another to ensure quality and reliability of products. Doc. 155-11, ¶¶ 4-6. With burn-in testing, BF Labs' failure rate in the field is less than 2%; without it, BS Labs' failure rate would be closer to 40%. *Id.* at ¶¶ 7-8.

Burn-in testing on "testnet" is not an acceptable substitute for many reasons. *See id.* at ¶¶ 10-19. Perhaps one of the more important of those reasons is the fact that any testnet (in which variables are controlled and the possibility of unexpected input or responses is eliminated) is

dissimilar to the livenet and therefore is not an accurate representation of the environment in which BF Labs' hardware would be used by customers in the real world. *Id*. at ¶¶ 4-22.

Customers of BF Labs agree with BF Labs' assessment of burn-in testing. Customer Rex Brocki declared, for example, that he has developed his own bitcoin mining equipment in the past and attempted to test that equipment on "testnet." Doc. 155-9, ¶¶ 24-25. While the equipment that Mr. Brocki developed "was able to mine on 'testnet,' it was unable to mine bitcoins on the live network." *Id*. at ¶ 26. Mr. Brocki reports that he has "talked to well over one hundred customers (although less than two hundred customers) about Butterfly Labs testing of products on the live network before sending the final product to customers and we have all agreed that Butterfly Labs absolutely did the right thing by testing the equipment on the live network." *Id.* at ¶ 27. In fact, Mr. Brocki "would pay more for equipment that has been tested on the live network than for equipment tested on 'testnet.'" *Id*. at ¶ 28.

Viewed in context, the FTC's argument that BF Labs manufactured products "to mine Bitcoins for themselves under the guise of testing" could not be further from the truth.

### 2. Burn-in testing is legal.

In addition to the practical necessities of burn-in testing, the practice is legal and appropriate because the customer (even a pre-paying customer) does not own an interest in the mining equipment (or bitcoin earned from it) until that equipment is "identified." Where a contract is "for the sale of future goods,"[8] and in the absence of explicit agreement otherwise,

---

[8] Goods that "are not both existing and identified" at the time of a contract "are 'future' goods." U.C.C. § 2-105(2).

Case 4:14-cv-00815-BCW   Document 172   Filed 11/21/14   Page 20 of 28

identification only occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." *See* U.C.C. 2-501. [9]

In BF Labs' case, products are not identified to particular customers during the production process. Rather, products are produced in bulk, ultimately to be shipped to different people. Even during burn-in testing, the products are not designated to any particular customer. BF Labs fulfills its orders in the order that they were received. If, during burn-in testing, a product error is found, that error is engineered and fixed. But the next customer in the queue does not have to wait for that particular unit to be re-engineered and fixed. Instead, the first available successfully burn-in-tested product is sent to the next customer in line. And whenever the product that had the error is fixed and successfully burn-in tested, it is sent to the next customer in line.[10] *See also generally* Doc. 155-3, ¶ 10.

These facts stand in stark contrast to facts under which identification was found in other cases. As the Missouri Court of Appeals, Eastern District, described:

> Identification occurred here because the goods (games) were designated. The completed games were finished, packaged, and shrink wrapped; they were ready for shipping. Producer did not fill orders for the games from any company other than Distributor. All goods were designated for shipping pursuant to Distributor's orders.

*First Tenn. Bank, Nat'l Ass'n v. Graphic Arts Centre, Inc.*, 859 S.W.2d 858, 864 (Mo. App. 1993); *see also Reeves v. Pillsbury Co.*, 625 P.2d 440, 445 (Kan. 1981); *Hold-Trade*

---

[9] U.C.C. § 2-501 states: (1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs . . . (b) if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers. . . .

[10] Defendants intend to offer evidence of the facts stated in this paragraph in the preliminary injunction hearing.

Case 4:14-cv-00815-BCW   Document 172   Filed 11/21/14   Page 21 of 28

*Intern., Inc. v. Adams Bank and Trust (In re Quality Processing, Inc.)*, 9 F.3d 1360 (8th

Cir. 1993) (buyer's failure to prove identification in prepaid contracts precluded

recovery for unjust enrichment); *First Nat'l Bank & Trust Co. of Augusta v. McElmurray*,

169 S.E.2d 720 (Ga. App. 1969) (holding that a lease for an automobile that refers to no

specific automobile passes no property interest until the lessor acquires a particular

automobile and delivers it to the lessee).

      As a hypothetical, imagine that BF Labs (located in Kansas) developed and sold drills

intended for use in gold-mining operations during the 1850s Gold Rush. People from the United

States' eastern coast pre-ordered drills from BF Labs and picked them up on their way to

California. The drills were not identified to specific customers and were made in bulk. During its

manufacturing process, BF Labs drilled into the ground at its facility to ensure that each drill

worked. Some drills did not work and changes to those drills had to be made. Other drills

worked, however, and a small amount of gold was found by BF Labs in Kansas.

      Thereafter, the customers arrived in Kansas on their way to speculate for gold in

California. In the meantime, the price of gold rose. Does the gold that BF Labs found in Kansas

belong to BF Labs? Or should BF Labs be required to give up the gold it found in the

manufacturing process to the customers along with the drill that was used when the gold found?

Gold, like bitcoin, is a finite resource. Yet the law of identification is crystal clear. Any

incidentally mined gold belongs to BF Labs.

      BF Labs has nothing to hide, and has not kept the fact of its burn-in testing and incidental

Bitcoin mining secret. The CPA who works with BF Labs declared that, "[r]ather than

witnessing attempts to conceal bitcoin-related activity, Butterfly Labs has done the opposite and

22

has provided any and all information we have requested related to bitcoin mining, holdings, and daily transactions . . ." Doc. 155-12.

Not only is burn-in testing appropriate and legal, it should cause the Court no discomfort going forward because BF Labs has committed to donating all net burn-in mining proceeds to charity, as stated in its Business Plan. For this reason, and for all the public- and private-equity reasons stated above, the balance of the equities heavily disfavors the imposition of any further injunctive measures here.

## V. The Court Should Lift the Asset Freeze (and Receivership) Because the FTC Has Not Demonstrated a Possibility That Defendants Will Dissipate Assets.

In determining whether to lift an asset freeze, the Court must carefully "weigh the deleterious effects" the freeze may have on BF Labs' business and the individual Defendants' needs against "the considerations indicating the need for such relief." *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992). An asset freeze "must be supported by a showing of fraud, mismanagement, or other reason to believe that, absent the freeze order, the assets would be depleted or otherwise become unavailable. *U.S. Dep't of Housing & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 927 (4th Cir. 1995).

The only permissible purpose of an asset freeze in a case brought by the FTC under Section 5 of the FTC Act is to prevent the dissipation of assets that may be used to redress consumers, if the FTC is ultimately successful. *See FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). "Freezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such a disruption of defendants' business affairs that they would be financially destroyed." *Id.* (internal citation omitted). Thus the "possibility" of asset dissipation by any defendant must be based on more than mere conjecture. *See FTC v. Debt Solutions, Inc.*, Civ. A. No. C06-298JLR, 2006 WL 1041996, at *7

23

(W.D. Wash. Apr. 3, 2006). The FTC must produce factual evidence specific to *each defendant* subject to the freeze demonstrating a possibility that, absent an asset freeze, *that defendant* will dissipate assets. *See id.*

Further, the Court may not properly freeze a defendant's assets without tracing them to illegal activity. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987-88 (11th Cir. 1995). Here the FTC has relied only on generic allegations that "Defendants have operated a pervasive and deceptive scheme that has affected thousands of consumers" and that "defendants who engage in deceptive practices or other serious law violations are likely to waste assets prior to resolution of the action." Doc. 8, p. 39. Attempting to make a more particular allegation, the FTC stated that "[b]ank records indicate that once consumer funds enter into Defendants' bank accounts, they are quickly dissipated" and that "Defendants never leave more than around $2 million in bank accounts." *Id.*

The FTC's assertions are incorrect and ignored material facts. The FTC had access to BF Labs' BMO bank records, yet failed to disclose that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. Doc. 155-3, ¶ 21. This is a standard corporate finance practice, not dissipation of assets. *Id.* Linda Freeman of MarksNelson, a CPA who works with BF Labs, reports that she has "not witnessed any activity consistent with a risk of concealment or dissipation of assets, or the destruction of company records," and is "not aware of any factual basis to support any such representation to the Court." Doc. 155-12, ¶ 19. Further, most of the purchased referenced in the FTC's TRO Application as purported dissipation were valid business expenses, and any non-business expenditures were properly accounted for. *See generally* Doc. 155-3 at ¶¶ 19, 20; Doc. 155-12, ¶ 17.

24

The FTC has simply not met its burden to show that, without the asset freeze, BF Labs', or Defendants Vleisides or Drake's assets would dissipate, or that the extraordinary measure of an asset freeze should continue. Any continuation of the current asset freeze is unconscionable in light of the fact that the FTC rejected consumer's calls to action back in 2013, then inexplicably rushed before this Court in late 2014 to seek *ex parte* relief on the basis of stale and often incorrect information, and omitted from its *ex parte* papers any mention of the pending District of Kansas cases, the fact that BF Labs had discontinued its preorder model for all products, the fact that BF Labs was already refunding money to customers, and the fact that the Johnson County District Attorney saw no need to impose any asset freeze or other injunctive measures during its investigation—all facts about which the FTC had knowledge. *See* Doc. 155, pp. 2-3.

Armed with these facts that are clearly material to an asset-freeze and receivership analysis, and with access to BF Labs' bank records that reflected common corporate finance practices, it is truly incredible that the FTC thought it appropriate to seek an asset freeze and the imposition of a receiver. The FTC has not come close to making the required and difficult showing that either an asset freeze or receiver is necessary to prevent dissipation of assets.

**CONCLUSION**

If the Court does not grant Defendants' Motion to Dismiss, it has an opportunity at the preliminary-injunction hearing to begin remedying the acute, significant, and unjustified harms that the FTC's actions have caused not only BF Labs and Defendants Vleisides and Drake, but consumers and the public interest itself. Those harms should not continue, but are *certainties* if any further injunctive measures are ordered.

Despite urging the Court to enter an order that would be truly unprecedented on both policy and law, the FTC is unable to offer reliable and significant evidence in support of its

25

claims—nothing that demonstrates that Defendants "are violating, or are about to violate" laws enforced by the FTC. Nothing that meets the FTC's heavy burden of establishing a likelihood of success on the merits. Nothing that supports the FTC's vague and generic claims that consumers will be misled if injunctive measures are not ordered. Nothing to *even suggest* that assets are in danger of dissipation or to justify the expenditure of huge sums on Receiver fees (particularly if the end goal is truly to preserve assets for consumer redress). And nothing to establish that the *certain* outcomes of continued injunctive measures—the economic waste of Monarchs sitting idle on a shipping dock, the loss of jobs by BF Labs' employees, the reputational damage to the company and its employees, the loss of future unique business opportunities, and perhaps even the death of BF Labs itself—are outweighed by some unidentified "public equity" (an "equity" that denies customers Monarchs and refunds).

The FTC was and is wrong about BF Labs. BF Labs isn't perfect, but it has worked hard to develop and deliver quality products to its customers in as timely a manner as possible, and with regular and informative updates. Defendants were not afforded the opportunity to tell the real story to the Court to prevent the injunctive measures imposed *ex parte.* It's time for that to be remedied. Defendants respectfully request that the Court deny the FTC's request for a preliminary injunction, asset freeze, and continued receivership, and that the Court grant Defendants such other and further relief as the Court deems just and equitable.

Respectfully submitted,

/s/ James M. Humphrey

| James M. Humphrey | MO # 50200 |
| Michael S. Foster | MO # 61205 |
| Miriam E. Bailey | MO # 60366 |

Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

| Braden M. Perry | MO # 53865 |

Kennyhertz Perry, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendant BF Labs Inc., Sonny
Vleisides, and Darla Jo Drake.

27

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21st day of November 2014, a true and correct copy of the foregoing was filed electronically with the United States District Court for the Western District of Missouri using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

 /s/ James M. Humphrey
Attorney for Defendants BF Labs Inc., Sonny Vleisides, and Darla Jo Drake.

28