**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CV-0815-W-BCW** |
| | ) | |
| **BF LABS INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS BF LABS INC., SONNY VLEISIDES, DARLA DRAKE,**
**AND NASSER GHOSEIRI'S PROPOSED ORDER,**
**FINDINGS OF FACT, AND CONCLUSIONS OF LAW**

Defendant BF Labs, Inc., one of the first developers and manufacturers of bitcoin mining hardware available to consumers, has developed and sold four generations of hardware. BF Labs experienced speed-to-market issues while developing two of its product generations at issue here. BF Labs advertised its products for sale on its website and projected anticipated shipping dates for each product, while stating that the products were in a "development phase." BF Labs accepted consumer payments for preorders of its development-phase product lines, but did not meet projections for the two generations at issue. Consumers complained to the FTC, with the overwhelming majority of complaints received in 2013, that BF Labs' products were not timely delivered and that BF Labs was not providing refunds.

On September 17, 2014, the FTC filed an *Ex Parte* Motion for Temporary Restraining Order with Asset Freeze, Appointment of Receiver, Limited Expedited Discovery, and Order to Show Cause Why a Preliminary Injunction Should Not Issue. Doc. 7. The Court granted the *Ex Parte* Motion on September 19, 2014 (Doc. 9), and the FTC executed the Court's Order that day. The Defendants' assets were frozen and a Temporary Receiver took control of BF Labs.

1

A hearing was scheduled for September 29, 2014. The parties appeared before the Court that day, but thereafter engaged in negotiations. A Stipulated Interim Order was entered by the Court on October 2, 2014 that provided for limited discovery, required BF Labs to prepare a proposed budget and business plan, provided for shipment of existing BF Labs products to consumers under certain conditions, and set deadlines for the exchange of additional evidence in advance of a rescheduled preliminary injunction hearing. Doc. 54.

The rescheduled hearing, in which the Court heard live testimony and received evidence and argument from the parties, was held on November 24 and 25, 2014. Under Fed. R. Civ. P 52(a), the Court now issues its findings of fact and conclusions of law in this matter.

## I.  FINDINGS OF FACT

After hearing evidence and considering the parties' proposed findings of fact and conclusions of law, the Court finds the following:

1.     The FTC alleges that Defendants represented, either expressly or implicitly, that: (a) consumers would be able to use BF Labs' bitcoin-mining "machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins," and that (b) "Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion." Doc. 2, ¶ 39.

2.     Bitcoin-mining equipment is "cutting edge" technology that is in a constant state of development. *See generally* Doc. 1-1, ¶¶ 15-19.

3.     BF Labs has not used a consumer-preorder business model since July 2014, and BF Labs has no intention of using that model in the future. *See* Draft Tr. at 146:2-18; 162:24-163:20), Doc. 155-2, ¶ 17, and BF Labs' Business Plan (submitted to the Court).

4.     BF Labs did not project precise delivery *dates*, but rather estimated delivery *ranges*, usually in terms of weeks or months. *See, e.g.*, Docs. 103-1, 103-5, p. 3, 103-9, pp. 2-3.

2

5.      While both the FTC and Defendants have offered declarations from consumers to assert that BF Labs' representations were or were not misleading, one of the FTC's own declarants described those representations as an "estimate." *See, e.g.*, Doc. 42-21, ¶ 4.[1] Declarations from other customers support that BF Labs' shipping projections were estimates concerning a development-phase product. *See* Doc. 155-9, ¶¶ 4-16; Doc. 155-10, ¶¶ 6-14.

6.      BF Labs' product-development and shipping-date projections were based on, among other things, information that BF Labs received from its suppliers.[2]

7.      BF Labs was shipping Monarch units and issuing refunds at the time that the FTC executed the TRO, and those shipments and refunds would have continued in all likelihood were it not for the TRO. Doc. 155-1, ¶¶ 22-25.

---

[1] The Court notes that the reliability of certain declarations offered by the FTC might reasonably be questioned. For example, while one declarant stated on September 25, 2014, that he had not received a refund or product shipment and that the machines "would be useless" and "obsolete" if shipped to him even on the date of his declaration (Doc. 42-21, ¶ 8), evidence at the preliminary injunction hearing showed that just days before the declarant executed his declaration for the FTC, he responded to an email from BF Labs informing him that Monarchs were available to fulfill his order and, that instead of opting for a refund—the option one would expect the declarant to have selected if the Monarch miners were "useless" and "obsolete" as he declared—the declarant opted for BF Labs to ship him two Monarchs plus a rebate.

In one additional example, a customer who stated that he ordered product from BF Labs in January 2013 declared that "the expected delivery date . . . was April 1, 2013" (Doc. 166-5, ¶ 2), yet in an email to BF Labs stated that his "reasonable expectation" was that his product "would ship in around 6 months [sic] time." *Id.* at p. 28. While these examples are not necessarily exhaustive, they give the Court reason to question the reliability of consumer declarations offered by the FTC.

[2] *See, e.g.*, Doc. 81-27, p. 4 (BF Labs' update to customers describing problem with Monarch chip and stating that "[t]he problem was positively identified and the fix is already in progress; however, it will take approximately 5 weeks before we get packaged chips in hand, meaning the deployment of the Monarch will be delayed about 5 weeks . . ."); Doc. 81-15, pp. 2-3 (BF Labs' update to customers stating that "[w]e had expected the bumping to be done now, as per the previous update(s)" but "[t]he bumping facility . . . did not complete the NRE on the timeline we had spoke to the packaging facility about").

While the FTC offered testimony from Anthony Fast, who worked for BF Labs for a few months in 2013 in a customer service role, stating that he did not "believe there was a good-faith answer [sic] there to give [a projection for shipping in] two months" (*see* Draft Tr. 37:21-39:3), the FTC did not establish how a customer-service employee like Mr. Fast might have sufficient information about BF Labs' product vendors and development to develop such a belief. Also, the Court does not give significant weight to Mr. Fast's testimony because Mr. Fast was not employed by BF Labs for long (and nowhere close in time to when the FTC sought and obtained the TRO) (Draft Tr. 47:21-48:4), Mr. Fast appears to hold grudges against and be suspicious of former employers (Draft Tr. 45:21-47:20), and Mr. Fast represents generally that he disapproves of BF Labs (Draft Tr. 48:5-16), yet continues to list employment with BF Labs on his LinkedIn profile and benefits from the positive recommendation provided by Mr. Ownby, but omits any mention of employment with Google, a tech-industry giant. *See* Doc. 166-15, pp. 36-42.

3

8.      Much of the consumer-complaint information on which the FTC relies is dated. The evidence shows that of the 307 alleged consumer complaints made to the FTC's Sentinel reporting system, all but 57 of the complaints were made in 2013. Doc. 155-3, ¶ 22-24. The evidence also shows that those 307 complaints related to 320 BF Labs customer orders, 54 of the complaints were either duplicates or did not correlate with an actual BF Labs customer name, and that, of the remaining 266 orders: (1) 93% received either equipment, service, and/or a refund; (2) 3% pertain to latest-generation product ("Monarch") orders for which customers are still waiting for their equipment or a refund; and that (3) of the remaining nine orders (*i.e.*, the remaining 4%), two were partially refunded, one was shipped but returned due to the customer's failure to pay customs duties, one was canceled, one was settled after the customer sent a demand letter, and four require further research at this time to ascertain their outcomes. *See id*.

9.      BF Labs has acknowledged that it often did not meet delivery projections and had speed-to-market issues. *See, e.g.*, Doc. 81-4, p. 3; Doc. 155-9, ¶¶ 10-14; *see also* Doc. 14, p. 2.

10.     But BF Labs has made significant efforts to find solutions for customers in the meantime and to deal proactively with complaints. The record reflects, for example, BF Labs helping a Russian customer whose bitcoin-mining machines were intercepted during shipment by Russian customs; BF Labs operated the customer's machines for him and sent him the bitcoin proceeds of those efforts. *See* Doc. 155-4, at ¶ 21. The record further reflects that BF Labs has provided trade-in credits, rebates, and additional equipment and upgrades to customers to attempt to accommodate shipping delays. *See, e.g.*, Doc. 103-4, p. 2l Doc. 103-27, pp. 4-5; Draft Tr. 165:17-166:25, 230:12-18; Doc. 155-5, ¶¶ 11-13; Doc. 155-9, ¶¶ 10-16.

11.     Before the TRO was executed, BF Labs had already collected ESI for pending litigation, and incurred more than $80,000 in doing so, and has continued preservation efforts.

*See* Modus Invoice (submitted to Court as attachment to BF Labs' Business Plan); *see also* Draft Tr. 178:2-179:1.

12.     While the Stipulated Interim Order permitted BF Labs to ship products to consumers under certain conditions (Doc. 54, p. 16; Draft Tr. 202:22-203:10), product shipment has not occurred under the temporary receivership. *See generally* Draft Tr. 202:13-18.

13.     Monarch units are currently available for shipment (Doc. 155-1, ¶ 22; Draft Tr. 167:1-13) and customers want Monarch shipments to continue. *See* Doc. 155-5, ¶¶ 14-15; Doc. 155-9, ¶¶ 16-17, 19-23. Certain customers—including repeat customers—view the FTC's actions as preventing them from receiving shipment of Monarch units or refunds. *See id.*

14.     BF Labs does not make representations that customers can use BF Labs' mining equipment to earn a certain number of bitcoins or to make a profit to induce consumers to purchase equipment, and has no intention of doing so in the future. *See* Draft Tr. 196:25-197:11, Hearing Ex. 504, Doc. 155-1, ¶¶ 5-6.

15.     While the FTC—which has the burden here—has presented evidence of bitcoin calculators and isolated references to profitability made by various persons (*see* Doc. 166-1, p. 50 (isolated October 2012 reference to profitability, in context of machines *already purchased*), pp. 53, 60 (the FTC has not even attempted to establish that either "Inaba" or "SLok" speak on behalf of BF Labs), including one web-forum reference to "money-making machines" (Doc. 166-1, p. 63), the FTC has presented no substantial evidence that any calculators or isolated references were widely disseminated or made systematically to all or even most consumers.

16.     In contrast, BF Labs presented evidence that it has published more than 400 million ad impressions through Google that advertise hashing speeds and power efficiency of BF Labs' products, but do not mention profitability. Doc. 155-1, ¶ 12; Draft Tr. 142:23-144:15.

5

17. The FTC admits, and the evidence further shows, that bitcoin calculators require inputs, including the Bitcoin exchange rate and network difficulty, which constantly and widely fluctuate. Doc. 2, ¶¶ 13, 18, 23, Doc. 155-4, ¶¶ 17-18.

18. After the FTC did nothing in response to the vast majority of complaints made in 2013, some customers filed civil lawsuits in the United States District Court for the District of Kansas, which are presently stayed. *See Meissner v. BF Labs Inc.*, 2:13-cv-2617-RDR-KGS, Docs. 2, 43, 44; *Alexander et al. v. BF Labs Inc.*, 2:14-cv-2159-KHV-JPO, Docs. 1, 59.

19. The evidence shows that, a result of the injunctive measures entered, BF Labs and its employees have suffered reputational injury, the individual defendants subject to the asset freeze have endured hardship, and BF Labs has suffered losses of key employees, losses of vendors due to perceived stigma of working with a company being sued by a government agency for fraud, the economic waste of unique technology sitting idle while competitive windows narrow, and the public disclosure of social security and other identifying information of a key BF Labs employee, among other things. *See* Doc. 155-3, ¶¶ 25-38.

20. The loss or compromise of future business opportunities is likely if further injunctive measures are ordered. *See* Draft Tr. 178:2-179:1, 183:22-194:14, 195:17-197:16, and exhibits cited therein.

21. $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. Doc. 155-3, ¶ 21. Contrary to FTC claim, this is a standard corporate finance practice. *Id.*

22. The evidence also shows that MarksNelson, BF Labs' accounting firm, has worked extensively with BF Labs and has "not witnessed any activity consistent with a risk of

6

concealment or dissipation of assets, or the destruction of company records," and is "not aware of any factual basis to support any such representation to the Court." Doc. 155-12, ¶ 19.

23.     The record supports the conclusion that most of the purchases referenced in the FTC's TRO Application as purported dissipation were valid business expenses, and those that weren't were generally properly accounted for as amounts repayable to the company, not as business expenses. *See generally* Doc. 155-3 at ¶¶ 19, 20; Doc. 155-12, ¶ 17. The record further supports the conclusion that, before the TRO was executed, BF Labs was working to improve its accounting procedures concerning expenditures, and otherwise improve recordkeeping. *See* Doc. 155-12, ¶¶ 8-17.

24.     The Temporary Receiver and his counsel and consultants recently submitted an application for fees for the months of September and October that totaled $662,799.18 in fees and $12,900.32 in expenses. Doc. 173, p. 9. These sums do not include fees and expenses for the month of November.

## II.     CONCLUSIONS OF LAW

A preliminary injunction may only be granted under 15 U.S.C.A. § 53(b) where a person or entity "is violating, or is about to violate, a[] provision of law enforced by the Federal Trade Commission." 15 U.S.C.A. § 53(b)(1). Preliminary injunctive relief under section 13(b) is "precluded" if alleged violations have ceased and are not "likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1088 (9th Cir. 1985). As the *Evans* court explained:

> Evans' view that section 13(b) cannot be used to remedy past violations is supported by the statutory language. The FTC may only seek a temporary restraining order or a preliminary injunction when it believes a person "is violating, or is about to violate" any law enforced by the FTC; the statute does not mention past violations. 15 U.S.C. section 53(b)(1). The sparse legislative history also indicates that Congress only contemplated ongoing or future violations which required the "quick handling" that an injunction could provide. . . . The legislative history is silent about the use of section 13(b) to preserve remedies for a past violation of the law.

7

> As a general rule, "[p]ast wrongs are not enough for the grant of an injunction"; an injunction will only issue if the wrongs are ongoing or likely to recur.

*Id*. at 1087 (internal citations omitted).[3]

Even if the threshold "likely to recur" standard is met, a preliminary injunction may only be granted if the FTC makes "a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success," a preliminary injunction "would be in the public interest." 15 U.S.C.A. § 53(b). The FTC's burden to establish these elements is heavy because the granting of a preliminary injunction "is an extraordinary and drastic remedy." *FTC v. Freeman*, 911 F. Supp. 1213, 1227 (W.D. Mo. 1995), *aff'd* 69 F.3d 260, 267 (8th Cir. 1995) (rejecting the "fair and tenable chance" standard because it "reduces the judicial function to a mere 'rubber stamp' of the FTC's decision," and declaring that the standard is "more stringent"). The burden is even heavier where, as here, "granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

---

[3] The Ninth Circuit's approach, based on a well-reasoned analysis of Congressional intent and the principle that district courts must independently examine alleged bases for FTC requests for preliminary injunctions, is consistent with Eighth Circuit preliminary-injunction principles. *See FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) (holding that "Congress expected courts to use independent judgment in reviewing preliminary injunction applications under Section 13(b)"); *see also FTC v. Simeon Mgmt. Group*, 532 F.2d 708, 713-14 (9th Cir. 1976) (district courts are compelled to make an "independent determination" as to whether a defendant "is violating, or is about to violate" a statute within the FTC's enforcement jurisdiction; *FTC v. Merchant Servs. Direct, LLC*, 2013 WL 4094394, at *1 (E.D. Wash. Aug. 13, 2013) (holding that "[i]n deciding whether the FTC has made a 'proper showing' of entitlement to injunctive relief, a court must independently assess whether violations are imminent").

The Court thus applies the "is violating, or is about to violate" standard here as a threshold inquiry, and concludes that the FTC has not met its burden of establishing that Defendants are violating or are about to violate any law enforced by the FTC. *See infra* at Part II.A. Preliminary injunctive relief is thus precluded. But even if the Court did not apply that standard as a threshold inquiry, it would still be required to evaluate the "is violating, or is about to violate" standard in its "likelihood of success on the merits" analysis. Ultimately, the FTC seeks a permanent injunction in this case. *See* Doc. 2, p. 1. Consequently, the Court must consider whether the FTC would likely succeed in securing a permanent injunction. Because a permanent injunction will only issue in those situations involving "a cognizable danger of recurrent violations," the "is violating, or is about to violate" inquiry is relevant to the FTC's likelihood of success on the merits. *See FTC v. Security Rare Coin & Bullion Corp.*, Civ. A. No. 3-86-1067, 1989 WL 134002, at *19 (D. Minn. Sept. 11, 1989), *aff'd* 931 F.2d 1312 (8th Cir. 1991); *see also infra* at Part II.B. The "is violating, or is about to violate" inquiry is also relevant to the balancing of equities inquiry. *See FTC v. Home Assure, LLC*, No. 8:09-cv-547-T-23TBM, 2009 WL 1043956, at *20-21 (M.D. Fla. Apr. 16, 2009) (balance of equities did not favor FTC where no likelihood of recurrence shown); *see also* Part II.C., *infra*.

### A. Preliminary Injunction: "Is Violating, or Is About to Violate"

The FTC failed to meet its burden to establish the basic threshold requirement for a preliminary injunction under 15 U.S.C.A. § 53(b)(1) that Defendants "[are] violating, or [are] about to violate" a law that the FTC enforces.

With respect to the FTC's "delivery" allegations, the evidence establishes that BF Labs has not used a consumer-preorder business model since July 2014, and that BF Labs has no intention of using that model in the future. Finding of Fact ("FF") 3. Without deciding whether the preorder model was appropriate, because that model is no longer being used, any statements that BF Labs may make about new products cannot cause consumers to purchase those products until the products are manufactured and available for shipment. The Court therefore finds that, with respect to the FTC's "delivery" allegations, the FTC has not established that any alleged section 5(a) violations are occurring or are likely to recur.

Similarly, BF Labs does not make representations that customers can use BF Labs' mining equipment to earn a certain number of bitcoins or to make a profit, and has no intention of doing so in the future. FF 14-16. The Court therefore finds that the FTC has not established that Defendants are violating, or are about to violate, any law that the FTC enforces by making "profitability" representations.

### B. Preliminary Injunction: Likelihood of Success on the Merits.

To prove a deceptive act or practice under Section 5(a) of the FTC Act, "the FTC must show (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and that (3) the representation, omission, or practice is material." *FTC v. Mallett*, 818 F. Supp. 2d 142, 148 (D.D.C. 2011). A representation or omission is "material" if it is "of a kind usually relied on by reasonable and prudent persons," if it is

9

"widely disseminated," and if injured consumers actually purchased the defendants' products. *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991).

Further, the FTC ultimately seeks a permanent injunction in this case. *See* Doc. 2, p. 1. Because a permanent injunction will only issue in those situations involving "a cognizable danger of recurrent violations," the "is violating, or is about to violate" inquiry is relevant to the FTC's likelihood of success on the merits. *See FTC v. Security Rare Coin & Bullion Corp.*, Civ. A. No. 3-86-1067, 1989 WL 134002, at *19 (D. Minn. Sept. 11, 1989), *aff'd* 931 F.2d 1312 (8th Cir. 1991). For the reasons set forth in Part II.A., *supra*, the Court concludes that the FTC has failed to establish any cognizable danger of recurrent violations and that this factor thus weighs against the FTC's likelihood of success on the merits.

This conclusion is reinforced by the fact that much of the consumer-complaint information on which the FTC relied when it came to the Court *ex parte*, and on which the FTC now relies to seek a preliminary injunction, was dated, did not reflect cessation of the preorder model or that Monarch shipments and refunds were being made when the TRO was executed, and therefore does not establish or even suggest a present need for injunctive relief. *See* FF 3, 7-8; *see also FTC v. Merchant Servs. Direct, LLC*, 2013 WL 4094394, at *3 (E.D. Wash. Aug. 13, 2013) (holding that, where "much of the evidence submitted in support of the instant motion[] is substantially outdated . . . there is little to suggest that the violations . . . are likely to recur," particularly where defendants "appear to have taken meaningful steps toward" remedying causes of consumer complaints). On this record, the Court cannot conclude that future violations are likely to occur.

The FTC has also otherwise failed to establish more than a "fair and tenable" chance that it is likely to succeed on the merits of its misrepresentation claims. First, the FTC has not

10

established a likelihood of success on its "profitability" theory. The FTC has presented no evidence that any bitcoin calculator can be used to make profitability projections on which a reasonable consumer would rely. The FTC's own allegations admit and the evidence shows that bitcoin calculators require inputs, including the Bitcoin exchange rate and network difficulty, that constantly and widely fluctuate. FF 17. The evidence also showed that BF Labs did not project precise delivery *dates*, but rather projected delivery *ranges*, usually in terms of weeks or months. FF 4. Because of the difference that a month can make in light of Bitcoin exchange rate and network difficulty volatility, the Court concludes that the FTC is unlikely to establish that any reasonable consumer would rely on the calculator to project profits. The FTC has also not established that any bitcoin calculator was "widely disseminated." FF 15.

Separately, the FTC did not establish that BF Labs ever represented, either expressly or by implication, that consumers would be able "to generate a profitable or substantial amount of Bitcoins," or how many Bitcoins a Monarch could possibly mine, in order to induce consumers to purchase mining equipment. FF 14-16. While BF Labs—the party with no burden of proof—presented evidence that it has published more than 400 million ad impressions through Google that advertise the hashing speed and power efficiency of BF Labs' products (*id.* at 16), the FTC made no showing that those ads, *or any other ads*, made profitability representations.

Further, the Court has found no case law establishing, let alone even suggesting, that BF Labs' limited linking to or even publishing a calculator, in which *consumers* enter information about their powers costs, the Bitcoin exchange rate, and network difficulty level (among other variables), and then obtain a calculator output (which may be a negative, and not positive, number), can constitute an actionable "profitability" representation under the FTC Act.

Second, with respect to its "delivery" theory, the FTC has not established that it is likely to succeed in establishing that BF Labs' product-development and product-shipment projections were either "false" (and thus "likely to mislead") or "material." While the FTC has provided the Court with citations to several cases holding that the FTC need not prove "intent to deceive"—a standard that is not disputed—the FTC has not provided the Court with authority establishing that representations about *anticipated future events* that turn out to be incorrect but that were supported by a reasonable basis at the time the representations were made are "false" in the same sense as are *present-tense representations* that are untrue when made. Authorities and case documents cited by the FTC actually suggest the opposite conclusion. *See, e.g.*, *In re Jay Norris Corp., et al.*, 91 F.T.C. 751, 1978 WL 206483, at *56, 65-67 (1978) (enjoining "unqualified" guarantees of "immediate" product delivery and requiring defendants to have a "reasonable basis" to make representations "relating to the availability of merchandise advertised for sale"); *see also In re Apple Computer, Inc.* – C3763 – Complaint, at Paragraph Eleven, *available at* www.ftc.gov/sites/default/files/documents/cases/1997/08/c3763cmp.htm (the FTC alleged that "at the time" Apple made representations concerning the availability of a computer upgrade, Apple "did not possess and rely upon a reasonable basis that substantiated such representations" and "[t]herefore, the representation . . . was, and is, false and misleading").

The evidence submitted to the Court, including evidence offered by the FTC, tends to show that BF Labs' product-development and shipping-date projections were based on, among other things, information that BF Labs received from its suppliers. FF 6. Without deciding at this time whether BF Labs reasonably based its projections on information from suppliers, the Court concludes that the FTC has not made any properly supported showing that BF Labs lacked a reasonable basis for its projections at the time they were made.

12

Even setting aside the "reasonable basis" inquiry, the Court concludes that the FTC has not otherwise established more than a fair and tenable likelihood of success of demonstrating that BF Labs' product-development and shipping-date projections were "likely to mislead" reasonable consumers, particularly in light of the fact that the FTC has argued that the "net impression" of BF Labs' representations were misleading.

The Court has reviewed the full texts of many of BF Labs' representations as attached to the FTC's application for TRO and as cited in Defendants' motion to dismiss, including BF Labs' website's product pages, FAQ pages, and forum updates. *See generally FTC v. Gill*, 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999) (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) and holding that court may examine representations "to determine whether the net impression is such that the representation would be likely to mislead reasonable consumers"). The "net impression" of BF Labs' representations as viewed by the Court is that BF Labs' product-development and shipping-date projections were estimates, not firm delivery dates.

Even one of the FTC's own declarants described BF Labs' representations as an "estimate." FF 5. Declarations from other customers strongly support the view that BF Labs' shipping projections were estimates concerning a development-phase product. *Id.* The FTC has failed to show a more than fair and tenable likelihood of success of establishing that BF Labs' projections were likely to mislead customers to believe that those projections *concerning a development-stage product* were firm delivery dates.

Further, the FTC has not cited a single case establishing that a company's projections concerning anticipated product-development and product-shipment dates are "material" or "of a type usually relied on by reasonable and prudent consumers." The only analogous authorities

13

presented to the Court are SEC securities-fraud cases that apply a "materially misleading" standard where stock purchases were made in reliance on anticipated product-release dates.

In *Borow v. nVIEW Corp.*, 829 F. Supp. 828, 834-35 (E.D. Va. 1993), for example, a company called nVIEW issued a press releases announcing and then revising anticipated release and delivery dates for two new technology products. 829 F. Supp. at 833. In an initial announcement in December 1991, nVIEW stated that it hoped to have one product, nSIGHT, on the market by January 1992 and the other product, nLIGHTEN, on the market sometime thereafter. *Id*. at 834. In February 1992, nVIEW revised the delivery dates to the first quarter for nSIGHT and the second quarter for nLIGHTEN. *Id*. Similar revisionary statements were subsequently made. *Id*. Then, on May 28, 1992, a press release revised the nSIGHT delivery date to "late spring or early summer" the nLIGHTEN delivery date to "the third quarter." *Id*.

Investors who purchased nVIEW stock between December 1991 and July 1992 in purported reliance on these statements sued nVIEW for securities fraud, alleging that the shipment and production dates were materially misleading. *Id*. at 833-35. The *Borow* court held that the representations amounted to "puffery" and thus lacked materiality as a matter of law. *Id*. at 835. The *Borow* court further stated that "[e]specially where, as here, a product is understood to be in development, plaintiff may not assert merely that, because the project did not come out when projected, plans for an earlier release were false." *Id*. at 834 (emphasis added).

Similarly, in *In re Number Nine*, an August 1995 press release noting that shipments of newly developed "graphics accelerator cards" were "currently anticipated to begin in September 1995" was not materially misleading as a matter of law, even though the products did not ship until November of that year. 51 F. Supp. 2d at 28. In support of its holding, the *In re Number Nine* court cited two other cases in which representations that projects were "on schedule" or

14

"anticipated" to be completed by a certain date were held immaterial as a matter of law because any reasonable investor should have either anticipated "a possible delay" or should have known that projects "run into unforeseen problems and delays." *Id*. at 28-29 (citing cases).

As even the FTC acknowledges, Bitcoin-mining equipment is "cutting edge" technology that is in a constant state of development. FF 2. The very first BF Labs representations cited in Plaintiff's Complaint—that the BitForce mining machine "is now in final stage development" and that "[i]nitial product delivery is scheduled for October 2012"—expressly disclose that the product was still in development. Doc. 2, ¶ 27.

With *Borow* and *In re Number Nine* as guidance, with declarations of questionable reliability offered by the FTC, and without any other evidence establishing that BF Labs' shipping-date and product-development projection representations were material or misleading, the Court concludes that the FTC has not established a more than fair and tenable likelihood of success on the merits of its "delivery" theory.

### C.    Preliminary Injunction: Balance of Equities

"Section 13(b) requires the FTC to demonstrate that the harm to the parties and the public that would flow from an injunction is outweighed by the harm" that would otherwise "occur in the period between the injunction's denial and a final judgment on the merits." *Freeman*, 911 F. Supp. at 1227. Public equities are generally given greater weight in the balance. *Freeman*, 69 F.3d at 272. Where "the party moving for preliminary injunctive relief has failed to adequately show a likelihood of success on the merits," as the Court concludes that the FTC has failed to do here, "it faces a particularly heavy burden of demonstrating that the equities nevertheless militate in favor of granting the requested relief." *Id*. Both public and private equities weigh against any further injunctive measures here.

15

While the Stipulated Interim Order permitted BF Labs to ship products to consumers under certain conditions, product shipment has not occurred under the temporary receivership. FF 12. This is true even though Monarch units are available for shipment, and customers want Monarch shipments to continue. FF 13. Certain customers—including repeat customers—view the FTC's actions as preventing them from receiving shipment of Monarch units or refunds. *Id*. If the purpose of the FTC's lawsuit is to provide consumers with a solution to alleged shipping delays in a context in which timely delivery is important, that purpose is not served by continued injunctive measures that prevent product shipments here.

Further, some customers—after the FTC did nothing in response to complaints made in 2013—filed civil lawsuits in the United States District Court for the District of Kansas. FF 18. Injunctive measures prevent those customers, however, from pursuing the path that they chose to attempt to obtain relief,[4] because that litigation has been stayed. *Id.*

The Temporary Receiver recently submitted an application for fees for the months of September and October that totaled $662,799.18 in fees and $12,900.32 in expenses. FF 24. These sums do not include fees and expenses for the month of November. *Id.* While the FTC has presented the Court with customer declarations describing dissatisfaction with BF Labs or its products, it is not at all clear—based on only the initial application for Temporary Receiver fees—that continued receivership control of BF Labs' as sought by the FTC would actually preserve assets for potential consumer redress if the FTC ultimately prevails.[5]

Again, the FTC has not established any likelihood of recurrent violations that might cause consumer harm. *See* Part II.A., *supra*. Perhaps realizing that it could not do so, the FTC accused

---

[4] Defendants deny any wrongdoing that would subject BF Labs to liability in *Meissner* and *Alexander*.

[5] After November, temporary receiver fees (covering a period of approximately two months and two weeks total) are expected to be in excess of $1 million. By contrast, BF Labs' payroll for *all of 2013* was $1.7 million. Draft. Tr. 157:5-12.

Defendants of violating the Court's Order concerning preservation of evidence. Doc. 166, p. 7 (stating that Defendants have deleted forum posts). But nothing in the record establishes that these forum posts were destroyed and not preserved. This claim is also contrary to the Court's understanding that, even before the TRO was executed, BF Labs had preserved ESI including web-forum content, incurring in excess of $80,000 in doing so. FF 11. The public equities thus weigh collectively and heavily against any further injunctive measures here.

As to private equities, the evidence shows that BF Labs acknowledged that it often did not meet its delivery projections and had speed-to-market issues. FF 9. BF Labs has also made significant efforts to find solutions for customers in the meantime and to deal proactively with complaints by, for example, providing trade-in credits, rebates, and additional equipment and upgrades to customers to attempt to accommodate shipping delays. *See* FF 10. These positive equities (which also benefit the public) weigh against further injunctive measures.

Negative private equities also weigh against further injunctive measures. Immediately after obtaining and executing the *ex parte* TRO, for example, the FTC pursued a media campaign (including press releases, interviews, and a Twitter "town hall") against Defendants, labeling— on an international scale—BF Labs as "bogus" and the Defendants "scammers." The entry of further injunctive measures here may appear to validate those assertions, and cause further injury to Defendants' reputation and goodwill. Such injuries are not readily measurable in monetary terms and are generally viewed as irreparable harm. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

Similarly, potential economic losses that threaten the existence of a business are a classic form of irreparable harm. *See Brady v. Nat'l Football League*, 640 F.3d 785, 794-95 (8th Cir. 2011); *see also Signature Flight Corp. v. Landow Aviation Ltd P'ship*, 442 Fed. Appx. 776, 784-

17

85 (4th Cir. 2011) (irreparable harm found where permanent loss of customers or goodwill threatened). To date and as a result of the injunctive measures entered thus far, BF Labs and its employees have suffered reputational injury, and BF Labs has suffered losses of key employees and vendors, and the economic waste of unique technology sitting idle while competitive windows narrow, among other things. FF 19-20. While the FTC cites *articles* to suggest that BF Labs already had a poor reputation with consumers (Doc. 166, pp. 10-11), consumers *themselves* tell a different story. *See, e.g.*, Doc. 155-5, ¶¶ 3-10; 155-9, ¶¶ 21-22, 27; Doc. 155-10, ¶¶ 13-14.

Further injunctive relief will also keep BF Labs in a condition of rest, as opposed to a period of business activity, causing significant economic waste—not least of all with respect to Monarch units that are sitting on BF Labs' shipping dock—contrary to law and public policy. *See Hill v. Xyquad, Inc*., 939 F.2d 627, 631-32 (8th Cir. 1991) (holding that "[w]hen the status quo is one of business activity and the alternative of 'rest' causes irreparable harm," the United States Court of Appeals for the Eighth Circuit "ha[s] favored the activity"); *accord O.D.F. Optronics Ltd. v. Remington Arms Co., Inc.*, No. 08 Civ. 4746(DLC), 2008 WL 4410130, at *7 (S.D.N.Y. Sept. 26, 2008) (noting that "[t]he cases involving irreparable harm from a loss of goodwill or business relationships typically involve a situation in which a dispute between parties leads to the inability of one party to provide its product or products to the market or its customers"); *Pontone v. York Group, Inc.*, No. 08 Civ. 6314(WHP), 2008 WL 4539488, at *3 (S.D.N.Y. Oct. 10, 2008) (holding that "[t]he loss of 'prospective goodwill,' that is, the potential benefits to a business from selling an essential or unique product can be irreparable harm").

As was true in *FTC v. Freeman*, if the Court issues a preliminary injunction, it is likely that BF Labs will no longer be in business by the time that the merits of this dispute are resolved. *See* 911 F. Supp. at 1227-28. This fact "must be balanced against the FTC's desire" for an

18

injunction because there can be no undoing of lost business opportunities and a company's demise. *Id*. The private equities, like the public equities, thus weigh heavily against further injunctive measures.

### D.     Asset Freeze and Receivership

In determining whether to lift an asset freeze, the Court must carefully "weigh the deleterious effects" the freeze may have on BF Labs' business and the individual Defendants' needs against "the considerations indicating the need for such relief." *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992). The only permissible purpose of an asset freeze in a case brought under Section 5 of the FTC Act is to prevent the dissipation of assets that may be used to redress consumers, if the FTC is ultimately successful. *See FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). "Freezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such a disruption of defendants' business affairs that they would be financially destroyed." *Id.* Thus the "possibility" of asset dissipation must be based on more than mere conjecture. *See FTC v. Debt Solutions, Inc.*, Civ. A. No. C06-298JLR, 2006 WL 1041996, at *7 (W.D. Wash. Apr. 3, 2006).

The Court finds that the FTC has not established a risk of dissipation of assets. Instead, the funds regularly transferred out of BF Labs' checking account (cited by the FTC as purported dissipation) were merely moved to BF Labs' savings account. FF 21. The evidence supports that this is a standard corporate finance practice, not dissipation of assets. *Id.* MarksNelson, BF Labs' accounting firm, also reported that it has "not witnessed any activity consistent with a risk of concealment or dissipation of assets, or the destruction of company records," and is "not aware of any factual basis to support any such representation to the Court." FF 22.

While the Court questions BF Labs' classification of certain expenditures as "business expenses," the record supports the conclusion that most of the purchases referenced in the FTC's

19

TRO Application as purported dissipation were valid business expenses and that, before the TRO was executed, BF Labs was working to improve its accounting and recordkeeping procedures overall. FF 23. The lack of any evidence of asset dissipation is particularly telling in light of the fact that, before the FTC filed its lawsuit, BF Labs had been investigated by the Johnson County, Kansas Attorney General's office for more than a year, and was defending two civil lawsuits. If Defendants did not dissipate assets in those circumstances, the Court finds it highly unlikely that they would do so here. Given that the record is utterly lacking in evidence of dissipation with respect to any Defendant, and in light of the clear hardship imposed by the freeze on all Defendants—not least of all the individual Defendants whose daily lives and ability to buy food, and pay for housing, child care, etc. are impacted—the FTC has not met its burden to show that the extraordinary measure of an asset freeze should continue.

The imposition of a receiver is also "an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993). "[F]actors typically warranting appointment are . . . the probability that fraudulent conduct has occurred or will occur . . . ; imminent danger that property will be concealed, lost, or diminished in value; . . . lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Id.* at 316-17. Under these standards, and for reasons previously stated in the preliminary injunction and asset freeze analyses, the FTC has not established that continuation of a receivership is appropriate here.

For the reasons discussed above, the Court DENIES the FTC's Motion for Preliminary Injunction, Appointment of a Receiver, and Asset Freeze. **IT IS SO ORDERED.**

20

Respectfully submitted,

/s/ James M. Humphrey

| James M. Humphrey | MO # 50200 |
| Michael S. Foster | MO # 61205 |
| Miriam E. Bailey | MO # 60366 |

Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jhumphrey@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

Braden M. Perry          MO # 53865
Kennyhertz Perry, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendant BF Labs Inc., Sonny
Vleisides, and Darla Drake.

/s/ James D. Griffin

| James D. Griffin | MO # 33370 |
| Lisa M. Bolliger | MO # 65496 |

Scharnhorst Ast Kennard Griffin, PC
1100 Walnut, Suite 1950
Kansas City, Missouri 64106
Tel: (816) 268-9400
Fax: (816) 268-9409
jgriffin@sakg.com
lbolliger@sakg.com

Attorneys for Defendant Nasser Ghoseiri

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 3rd day of December 2014, a true and correct copy of the foregoing was filed electronically with the United States District Court for the Western District of Missouri using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

 /s/ James M. Humphrey
Attorney for Defendants BF Labs Inc., Sonny Vleisides, and Darla Drake.