UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 4:14-cv-00815-BCW |
| Plaintiff, | |
| v. | [Proposed] FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER |
| BF LABS, INC., *et al.* | |
| Defendants. | |

| Exhibit No. | Description | Location |
|---|---|---|
| | **FTC Exhibits Previously Introduced** | |
| EX1 | Declaration of FTC Investigator Elizabeth Han | DE 8-1 Declaration, Att A – AK<br>DE 8-2 Att AL – AZ<br>DE 8-3 Att AAA – AAK |
| EX2 | Declaration of Gregory Bachrach | DE 8-4 |
| EX3 | Declaration of FTC Attorney Helen Wong | DE 8-5 |
| EX4 | Supplemental Declaration of FTC Investigator Elizabeth Han | DE 42-1 Declaration<br>DE 42-2 Att A – I<br>DE 42-3 Att J – M<br>DE 42-4 Att N – Q<br>DE 42-5 Att R – T<br>DE 42-6 Att U – W<br>DE 42-7 Att X |
| EX5 | Declaration of FTC Attorney Nikhil Singhvi | DE 42-8 |
| EX6 | Declaration of Digital Forensic Analyst Joseph Carbon | DE 42-9 |
| EX7 | Declaration of Digital Forensic Analyst Jason Sweeney | DE 42-10 |
| EX8 | Declaration of Computer Forensic Examiner Hugh Huettner | DE 42-11 |
| EX9 | Declaration of Former BFL Employee Brandon Bone | DE 42-12 |
| EX10 | Declaration of Former BFL Employee Samuel Johnston | DE 42-13 |
| EX11 | Declaration of Former BFL Employee Sabina Marsh | DE 42-14 |
| EX12 | Declaration of Consumer David Brodsky | DE 42-15 |
| EX13 | Declaration of Consumer Thomas Cetkowski | DE 42-16 |
| EX14 | Declaration of Consumer Chalmers Greenlee | DE 42-17 |
| EX15 | Declaration of Consumer Samuel Plainfield | DE 42-18 |
| EX16 | Transcript of Deposition of BFL Employee Josh Zerlan | DE 42-19 Transcript Part 1<br>DE 42-20 Transcript Part 2 |
| EX17 | Declaration of Consumer Eric Lefebvre | DE 42-21 |

i

| Exhibit No. | Description | Location |
|---|---|---|
| EX18 | Second Supplementary Declaration of FTC Investigator Elizabeth Han | DE 166-1 |
| EX19 | Declaration of FTC Paralegal Daniel Temkin | DE 166-2 |
| EX20 | Declaration of Consumer Jarrod Larocco | DE 166-3 |
| EX21 | Declaration of Consumer George Waggoner | DE 166-4 |
| EX22 | Declaration of Consumer Travis Crist | DE 166-5 |
| EX23 | Declaration of Consumer Yulin Shi | DE 166-6 |
| EX24 | Declaration of Consumer Alika Reppun | DE 166-7 |
| EX25 | Declaration of Consumer Kevin Lever | DE 166-8 |
| EX26 | Declaration of Consumer Jack Mamiye | DE 166-9 |
| EX27 | Declaration of Consumer Wesley Medford | DE 166-10 |
| EX28 | Transcript Excerpts of Deposition of Defendant Sonny Vleisides | DE 166-11 |
| EX29 | Transcript Excerpts of Deposition of David McClain | DE 166-12 |
| EX30 | Transcript Excerpts of Second Deposition of BFL Employee Josh Zerlan | DE 166-13 |
| EX31 | Transcript Excerpts of Second Deposition of Defendant Sonny Vleisides | DE 166-14 |
| EX32 | Deposition of Former BFL Employee Anthony Fast | DE 166-15 |
| EX33 | Declaration of Arvind Narayanan, Ph.D. | DE 166-16 |

| Exhibit No. | Description | Location |
|---|---|---|
| | **Defendants' Exhibits Introduced at PI Hearing** | |
| DX1 | Temporary Receiver Eric Johnson's First Report | Defendants' PI Exhibit 509 |
| DX2 | Temporary Receiver Eric Johnson's Second Report | Defendants' PI Exhibit 510 |
| DX3 | Defendant Business Plan | Defendants' PI Exhibit 511 |
| DX4 | 65 nm Production Lag Analysis: Chips & PCBs vs. Shipments | Defendants' PI Exhibit 507 |

Plaintiff, Federal Trade Commission ("FTC"), commenced this action on September 15, 2014, seeking a permanent injunction and other equitable relief, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). On motion by the FTC, on September 18, 2014, this Court entered an *ex parte* temporary restraining order ("TRO") with asset freeze, appointment of a receiver, and other equitable relief against Defendants BF Labs, Inc., Darla Drake, Nasser Ghoseiri, and Sonny Vleisides. The parties entered into a Stipulated Interim Order on October 2, 2014, which among other things, kept the asset freeze and receiver in place. On November 24 and 25, 2014, this Court held a hearing on an order to show cause why a preliminary injunction should not issue against Defendants. The Court has jurisdiction over the subject matter of this case; there is good cause to believe it will have jurisdiction over all the parties hereto, and venue in this district is proper. The Court, having considered the complaint, exhibits, suggestions, declarations, other submissions, and the evidence and arguments presented by the parties, and otherwise being fully apprised of the premises, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Defendant BF Labs, Inc. d/b/a Butterfly Labs, markets and sells Bitcoin mining machines through its website, www.butterflylabs.com, and has done so since at least September 2011. EX1 ¶¶ 8, 11, Att. G.

2. Defendant Sonny Vleisides is a co-founder, majority owner, Innovation Officer, Vice President and director of Butterfly Labs. EX1 ¶¶ 5, 9, Atts. B, C, E & F. He has signed and filed corporate papers and is authorized to file and sign tax returns on the company's behalf. EX1 ¶ 5, Att. C. He is a signatory on company bank accounts, including its main operating account. EX1

1

¶ 72. He is also the registrant for its PayPal account, through which it received approximately $19 million in payments from customers and nearly 5,000 consumer complaints. EX1 ¶ 65.

3. Defendant Darla Drake held multiple roles at Butterfly Labs, including director, Secretary, Treasurer, and General Manager. EX1, Atts. A & B. She frequently represented Butterfly Labs on its online forum that it used as a channel of communication with customers. EX1, Att. E. She is a signatory on several of its financial accounts, including its main operating account. EX1 ¶ 72.

4. Defendant Nasser Ghoseiri co-founded and co-owns Butterfly Labs. Nasser Ghoseiri, *CTO at Butterfly Labs Inc*, LinkedIn, http://www.linkedin.com/pub/nasser-ghoseiri/a/419/940 (last visited Sept. 9, 2014). He holds several offices at the company, including CEO, President, Innovation Officer, Chief Technology Officer, and co-director, and serves as its authorized "communications contact person" with the Wyoming Secretary of State. EX 1, Atts. B & C. He is a recipient of a corporate credit card. EX1 ¶ 73.

**Misrepresentations regarding BitForce Delivery**

5. Defendants began selling the Bitforce, their first generation ASIC mining machine, in June 2012. EX1 ¶ 14, Att. K. Its website represented that "[i]nitial product delivery is scheduled for October 2012." *Id.*

6. The company answered the following question on its website: "So will the BitForce SC product line REALLY come out in October?" The response stated, "Although there are always issues during development, our team is highly experienced in exactly this field and we're currently ahead of our original timeline. Honest Abe, we're scheduling shipments for October of 2012." EX1 ¶ 18, Att. O.

2

7.   Defendants were not "ahead of [their] original timeline."  Indeed, the Bitforce product page represented in June 2012 that "the Bitforce SC chip is now in final stage development." EX1, Att. K.  In fact, Defendants did not have any of the chips necessary to produce the machines until at least April 2013.  DX4.

8.   Nevertheless, they represented (and failed to deliver on) shipping dates in November 2012, December 2012, February 2013, March 2013, and April 2013.  EX1 ¶¶ 22-32, Att. S, T, U, V, X, Y, AA, AB, AC, AD, AE & AF.  By September 2013, nearly a year after the represented initial delivery date, more than 20,000 orders remained backlogged.  EX29 at 63:10-13.  Some of the BitForce products were shipped more than one year after their initially promised shipment date of October 2012.  *Id.* at 63:10-19.

9.   Former employee Anthony Fast, who worked at the company from March to June 2013, testified that it was "company policy" to inform prospective customers that delivery was "two months away" and even sooner for existing customers, even though the two-month timeframe was not tied to supply chain or the engineering timeline and no final prototype for the machine existed.  EX32 ¶¶ 11-12; Preliminary Injunction Hearing Transcript ("Tr.") at 34:9 – 35:3; 40-43.

10. Mr. Fast wrote an e-mail that the company sent to customers in April 2013 stating that it was shipping machines when it was not yet actually doing so. EX15 ¶ 8.

11. Mr. Fast recommended to company management, including Defendant Vleisides, that consumers be provided with information about delivery delays.  EX32 ¶¶ 13.  His recommendation was dismissed, and the reason provided was that the company did not want consumers to know that they would have to wait so long for the machines.  *Id.*

12. Former employee Brandon Bone testified that the customer service department, which was tasked with communicating with consumers about delivery dates, was not apprised of the

3

delays. Mr. Bone eventually stopped working in customer service because he did not want to lie to customers about delivery dates. EX9 ¶¶ 4-6.

13. PayPal alone received nearly 5,000 complaints about Defendants' failure to meet promised delivery dates. EX1 ¶¶ 62, 88-90. Defendants received requests for refunds for approximately 50% of orders. DX3 at 19.

**Misrepresentations Regarding Monarch Delivery.**

14. In August 2013, Defendants began soliciting pre-orders for its second generation ASIC machine, the Monarch, and represented that initial shipments would occur by the end of 2013. EX1 ¶ 41, Att. AO. At that time, Defendants had a backlog of at least 20,000 orders for the Bitforce. EX29 at 63:10-13.

15. On multiple occasions, Defendants represented that shipment for the Monarch would occur by the end of 2013, including on its website and through a detailed timeline for development, production, and shipping. EX1, Att. AO. Defendants told consumers that Butterfly Labs had resolved the production delay issues it experienced with the Bitforce and that the promised delivery date was "solid." *Id.* Defendants did not ship any Monarchs in December 2013. *See* EX ¶ 45, Att. AR.

16. Defendants were months behind on their timeline for development, production, and shipping, yet did not revise the promised shipping date and even misrepresented development status. For example, as early as September 2013, Defendants represented on their website that they were in the final testing phases, and would complete a part of the testing phase known as "taping out" within one week. EX1, Att. AO. However, internal communications as late as November 2013 reflect that Defendants had not come close to the "tape out" phase. EX4 ¶ 21, Att. Y.

4

17. In November 2013, Defendants circulated marketing emails promising delivery in "early 2014." EX1 ¶ 52, Att. AY.  In fact, they did not deliver the Monarch in early 2014, but nonetheless continued taking preorders for the product.  *See* DX3 at 15.

18. In March 2014,  Defendants promised that Monarch deliveries would begin within five weeks.  EX1 ¶ 42, Att. AP.  After missing that deadline, Defendants represented in May 2014 that shipments would begin in one week.  EX1 ¶ 52, Att. AZ.

19. Defendants did not begin shipping the Monarch until August 2014, eight months after its initial represented shipping date.  EX1 ¶ 45, Att. AR.

20. In addition to the nearly 5,000 PayPal complaints, there is additional evidence that consumers complained about Defendants' misrepresentations.  Consumers have submitted over 300 complaints to the FTC's Consumer Sentinel Database about Butterfly Labs.  The complaints reflect a common consumer experience: consumers were told that their product would be delivered within anywhere from a few weeks to a few months, but instead have experienced continual delays and received little information from Butterfly Labs.  EX1 ¶¶ 82-84; EX18 ¶5, Att. A.  Further, consumers also complained on Butterfly Labs' web forums. EX19 ¶9,10, Att. D.

**Misrepresentations Regarding Cloud Mining Delivery**

21. In December 2013, the same month in which Defendants failed to meet their initial Monarch delivery date, Defendants began taking pre-orders for cloud mining service contracts.  EX1 ¶ 46, Att. AS.  Under those contracts, Defendants claimed they would use Monarch machines to mine on consumers' behalf.  *Id.*  Defendants told consumers that under these contracts, they would start generating bitcoins in March 2014.  *Id.*  Defendants did not begin generating bitcoins for consumers in March 2014. On June 17, 2014, Defendants told consumers that they would begin the services later that month.  EX1 ¶ 44, Att. AQ.  When the

FTC filed this lawsuit in September 2014, however, Defendants had approximately $1.3 million in unfulfilled mining contracts. Tr. at 223:21 to 224:11.

**Misrepresentations Regarding Profitability**

22. Defendants marketed their machines and services as a means to turn a profit or mine a substantial number of Bitcoins.

23. Defendants represented on numerous areas of their website that their products would continue to be "profitable," and would make "a profit over three to four months." EX1 ¶ 18, Atts. C, E & F. They stated that their "objective is to make sure you can recover your investment whether you wish to continue mining or not." EX1 ¶ 18, Att. O.

24. Defendants represented on their web forum that the company's mining machines are "money making machines." EX1 ¶ 18, Att. G.

25. Defendants represented on their Facebook and Twitter pages that consumers could use a Bitcoin calculator located at http://tpbitcalc.appspot.com/ to determine the profitability and return on investment of their Bitcoin mining machines. The post read, "Measure your ROI [return on investment] with this cool Bitcoin mining calculator." EX1 ¶ 53. Consumers could use the mining calculator by entering data specific to the machine at issue, such as machine cost, power consumption, and processing speed – all provided by Defendants in their advertising. EX1 ¶¶ 54-56.

26. Former employee Anthony Fast stated that Butterfly Labs asked their employees to provide another bitcoin mining calculator, bitcoinx.com, to any inquiring customers who asked about the profit that they could expect to earn from Defendants' products. Tr. at 41:12-18. Bitcoinx.com is a Bitcoin mining calculator owned by Butterfly Labs which also displays the

return on investment a consumer can expect based on certain data points provided by Butterfly Labs.  Tr. at 41:25 to 42:2.

27. Defendants misrepresented the power consumption and hash rate of their products. For example, the Bitforce had less hashing power and consumed more electricity than advertised, EX10 ¶ 16, which meant that it produced fewer Bitcoins per dollar than advertised.

**Defendants' Mining Machines Were Effectively Obsolete**

28. Because Bitcoin mining gets more difficult over time, especially over periods as long as six months to one year, untimely delivery causes machines to substantially depreciate. EX18 ¶ 10, Atts. I-K.

29. The FTC's expert, Arvind Narayanan, testified that as more miners enter the network and as miners utilize more powerful hardware, Bitcoin mining becomes more difficult. EX33 ¶¶7-8. Indeed, over the course of 2013, Bitcoin mining difficulty grew about five-hundred fold.    EX33 ¶7.

30. Dr. Narayanan testified that the BitForce machines[1] depreciated significantly as a result of the delay.  The BitForce could produce less than one Bitcoin by the time it shipped in November 2013, as compared to the 36 to 134 Bitcoins consumers would have been able to mine had they received the machines when initially promised in October 2012.  EX33 ¶¶15-20.

31. Dr. Narayanan testified that Monarch products ultimately shipped also depreciated significantly as a result of the delay.  The Monarch could mine less than one Bitcoin by the time it initially shipped on August 31, 2014, as compared to the 15.6 Bitcoins consumers would have been able to mine had they received the machines when initially promised by the end of 2013. Cite.  This represents a 20-fold depreciation.  EX33 ¶¶23-25.

---

[1] These calculations were done for the BitForce Jalepeno products which advertised a speed of 4.5 GH/s.

32. The FTC submitted declarations from numerous consumers who stated that they would not have purchased Butterfly Labs' products had they known that delivery would be so delayed. EX21 ¶4; EX 22 ¶4; EX24 ¶3; EX20 ¶3; EX 25 ¶8.

33. The FTC submitted declarations from numerous consumers who stated that the delivery delays have so depreciated the value of Defendants' products that they prefer refunds to order fulfillment. EX21 ¶10; EX20 ¶11; EX23 ¶14; EX24 ¶ 18.

34. Former employee Sabina Marsh testified that numerous customers who waited a long time for their machines no longer wanted them because they were no longer effective for mining bitcoins. EX11 ¶ 10. Ms. Marsh further testified that consumers were unable to obtain a refund even if they refused delivery. *Id.* In instances in which the consumer refused shipment or returned a machine, Ms. Marsh observed that the company, at Defendant Drake's instructions, would keep both the machine and consumers' funds. *Id.*

**Defendants have used corporate assets for personal expenses.**

35. Defendants have used consumer funds for the individual benefit of Butterfly Labs' officers and shareholders. The company purchased a home that Defendant Vleisides uses as his primary residence in December 2012, two months after it failed to meet its initial projected shipping date and did not yet have a final working prototype of its BitForce mining machine. Tr. at 215:4-18; *see* 35:3, 38:16-22.

36. Corporate funds of $66,171.27 were used to purchase an Audi A8 for Defendant Vleisides' use on March 31, 2014, three months after Butterfly Labs failed to meet its initial end-of-2013 projected shipping date for Monarch. The purchase also occurred after the company became aware of the Johnson County District Attorney's investigation, and after this Court found Defendant Vleisides to be in violation of the conditions of his supervised release by

8

receiving loans from Butterfly Labs without the approval of his probation officer. EX1 ¶¶ 42, 76, Att. AO; EX29 at 29:4 to 30:11.

37. Shareholder loans for just 2014 funded by consumer payments are outstanding to Jeff Ownby and Defendants Vleisides and Ghoseiri in the amounts of $98,607.54, $327,945.97, and $232,863.96, respectively. DX2, Exh. 2, Sched. 1; Tr. at 241:20 to 215:3.

**Defendants Lack Adequate Controls To Ensure That Assets Are Protected**

38. Butterfly Labs took in nearly than $80 million dollars from consumers. Aside from that, Butterfly Labs had only $8,000 in initial capital. Tr. at 214:11-16; DX1 at 17.

39. Aside from the court-ordered Temporary Receiver, Butterfly Labs has no controls in place to reserve funds for refunds or to prevent further use of corporate assets for the benefit of shareholders. The company admits that its management team "does not have extensive experience in establishing management control systems and operating in a formalized corporate fashion" and has proposed establishing a Chief Executive Officer position. DX3 at 25. However, the company does not appear to have sufficient assets to implement further controls. DX2 at 18.

40. While Linda Freeman testified that she has not witnessed any risk of concealment or dissipation of assets, she did not conduct an audit or do a compilation of the company books and records, nor did she perform an internal control review. Tr. at 211:24 to 212:15. She also did not provide services to Defendants for much of 2014, and therefore lacks personal knowledge to provide an opinion on existing corporate controls. Further, her testimony about Butterfly Labs' implementation of controls to ensure full and accurate financial reporting stands in contrast to the assessment of the Temporary Receiver's accountants, who determined that the company's books and records are inconsistent. DX2, Exh. 2, at 3.

9

41. Butterfly Labs' financial reporting systems show inconsistent figures for outstanding consumer liability. DX2, Exh. 2, at 5. According to the Temporary Receiver, the company's total amount of consumer liability remains unknown and may exceed amounts reported in the balance sheet and the company's Business Plan. DX2, Exh. 2, at 2.

42. In any event, Defendants' Business Plan estimates liability at $14 million, approximately $5.49 million of which accounts for refunds requested, but not yet paid. DX3 at 19. Based on past experience, which indicates a 50% refund rate, the Business Plan projects that refund liability could increase by an additional $3.55 million, which would amount to a minimum of over $9 million. DX3 at 19.

43. To cover these conservatively estimated cash liabilities, the company has $10,946,217 in liquid assets. DX2 at 15. Further, these cash liabilities do not take into account that Butterfly Labs' refund liability would be much higher should the FTC prevail on its claim that consumers received severely depreciated merchandise.

44. Butterfly Labs is not projected to generate revenue until mid to late 2015, but would incur expenses of at least $1million per month. DX2 at 13. It has proposed self-mining in order to generate revenue, but admits that this would result in competition with its customers. DX3 at 22.

**Defendants' Additional Misrepresentations And Violation Of This Court's Order Show That They Are Unlikely To Operate Lawfully.**

45. In addition to making the misrepresentations described above, Defendants have expressly represented to their customers that they do not use the bitcoin mining machines prior to shipment. EX18 ¶11, Att. K, EX4 ¶11, Att. H. They have stated in these proceedings, however, that they do use consumers' machines to mine for Bitcoins. EX16 at 33:9 to 34:5. Although they now claim that they use the machines to test the products, DX3 p. 15-16, the evidence shows that they used the machines to mine for Bitcoins for profit for themselves. EX 9 ¶¶7-9; EX 10 ¶¶ 5 -

10

15; Tr. 42:10 to 43:10.

46. Despite being subject to litigation holds and the Stipulated Interim Order, Defendants have failed to preserve records on at least two known occasions in which postings on Butterfly Labs' web forums critical of the company have been concealed.  EX19 ¶¶ 6 & 8, Atts. B & C.

## CONCLUSIONS OF LAW

### Legal Standard For Obtaining Preliminary Relief

1.  Section 13(b) of the FTC Act authorizes the FTC to seek, and this Court to issue, temporary, preliminary, and permanent injunctions.  *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1026 (7th Cir. 1988); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432-34 (11th Cir. 1984); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-13 (9th Cir. 1982).  The second proviso of Section 13(b),[2] under which the FTC brings this action, states that "the Commission may seek, and after proper proof, the court may issue, a permanent injunction" against violations of "any provision of law enforced by the Federal Trade Commission."  15 U.S.C. §53(b); *see also FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314 (8th Cir. 1991).  By enabling the courts to use their full range of equitable powers, Congress also gave them authority to grant preliminary relief, including a temporary restraining order, preliminary injunction, and asset freeze. *World Travel Vacation Brokers*, 861 F.2d at 1026; *U.S. Oil & Gas*, 748 F.2d at 1432-34; *H.N. Singer*, 668 F.2d at 1110-13.

2.  Where, as here, statutory enforcement is at issue, the typical standard governing issuance of a **preliminary injunction** pursuant to Fed. R. Civ. P. 65 does not apply.  *See, e.g., FTC v.*

---

[2] Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso.  *U.S. Oil & Gas*, 748 F.2d at 1434 ("Congress did not limit the court's powers under the [second and] final proviso of § 13(b) and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief").

11

*Mallett*, 818 F. Supp. 2d 142, 146 (D.D.C. 2011) ("the FTC generally is not held to the same

'high thresholds' that apply to private parties seeking preliminary relief."). Instead, only two

factors determine whether preliminary injunctive relief should issue under Section 13(b): (1) the

likelihood of success on the merits; and (2) the balance of equities. [3] *See FTC v. Affordable

Media*, 179 F.3d 1228, 1233 (9th Cir. 1999); *FTC v. Univ. Health*, 938 F.2d 1206, 1217 (11th

Cir. 1991); *World Travel Vacation Brokers*, 861 F.2d at 1029; *FTC v. Your Yellow Book, Inc.*,

2014 U.S. Dist. LEXIS 116524, at *11 (W.D. Okla. Aug. 21, 2014); *FTC v. Bus. Card Experts,

Inc.*, 2007 U.S. Dist. LEXIS 31366, at *10 (D. Minn. Apr. 27, 2007); *Mallett*, 818 F. Supp. 2d at

146; *Ameridebt*, 373 F. Supp. 2d at 563; *FTC v. Seismic Entm't Prods.*, 2004 U.S. Dist. LEXIS

22788, at *7-8 (D.N.H. Oct. 21, 2004); *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d

311, 319 (S.D.N.Y. 2001).

3.   To demonstrate a likelihood of success on the merits, the FTC must show that it will

likely prevail and need not present evidence to justify a "final determination" that Defendants

violated the law, although the record abounds with such evidence. *Univ. Health*, 938 F.2d at

1218; *see also World Wide Factors*, 882 F.2d at 346 (FTC need only demonstrate "some chance

of probable success on the merits"). Further, in considering this motion, the Court "may rely on

affidavits and hearsay materials" if appropriate. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,

51 F.3d 982, 985 (11th Cir. 1995).

**Legal Standard For Showing Deception Under The FTC Act**

4.   A representation or practice is deceptive under Section 5(a) of the FTC Act, 15 U.S.C.

§45(a), if it is material and likely to mislead consumers, acting reasonably under the

---

[3] Irreparable injury need not be shown because its existence is presumed in a statutory
enforcement action. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989); *Univ.
Health*, 938 F.2d at 1218.

12

circumstances. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *FTC v. Real Wealth Inc.*, 2011 U.S. Dist. LEXIS 52566, at *6-7 (W.D. Mo. May 17, 2011) (*citing FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006)). A representation is material if it is one upon which a reasonably prudent person would rely in making a purchase decision. *Sec. Rare Coin*, 931 F.2d at 1316; *Real Wealth Inc.*, 2011 U.S. Dist. LEXIS 52566, at *7. The FTC need not prove actual reliance to establish materiality. *Sec. Rare Coin*, 931 F.2d at 1316; *Real Wealth Inc.*, 2011 U.S. Dist. LEXIS 52566, at *7. Express claims are presumed material. *FTC v. SlimAmerica,* 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).

5. In proving whether a claim is deceptive, the FTC can (1) allege that the claim is false, (2) allege that the defendant did not have a reasonable basis for asserting the claim at the time the claim was made, or (3) both. *See, e.g., Pantron I*, 33 F.3d at 1096; *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958-59 (N.D. Ill. 2006). Here, the Court notes that the FTC is *not* alleging that Defendants lacked a reasonable basis for their claims (for example, like the FTC did in the *QT* case); rather the FTC is alleging that Defendants' deliverability and profitability claims were false. (See Complaint at 10 ¶ 43.)

6. In proving that a claim is false, the FTC need not show that defendants acted in bad faith or with an intent to deceive. *See, e.g., FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005) ("Because the primary purpose of § 5 is to protect the consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation. Instead, the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer."); *Removatron Int'l Corp. v. FTC*,

13

884 F.2d 1489, 1495 (1st Cir. 1989); *World Travel Vacation Brokers*, 861 F.2d at 1029; *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C. Cir. 1977) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations"); *Mallett*, 818 F. Supp. 2d at 148. Therefore, a claim can be deceptive even if it only later is established that it is false. *See, e.g., FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012) (deceptive to represent that virtually all customers would obtain mortgage modifications but it turned out later that only about 29% to 48% did); *FTC v. Dinamica Financiera LLC*, Case No. CV 09-03554, 2010 U.S. Dist. LEXIS 88000, at *33 (C.D. Cal. Aug. 19, 2010) (deceptive to represent that virtually all consumers would obtain mortgage modifications but only about 16.5% did); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267-68 (S.D. Fla. 2007) (deceptive to represent consumers would earn substantial income from business opportunity but it turned out later that few consumers did so); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1074-75, 1081 (E.D. Mo. 2007) (finding Defendant in contempt for violating prior court order prohibiting misrepresentations where Defendant made earnings claims regarding his business opportunity that turned out to be untrue); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1012 (N.D. Ind. 2000) (deceptive to represent that consumers would obtain specific scores on the Postal Service entrance exam and get jobs when, in fact, few consumers ended up obtaining such results); *FTC v. Jordan Ashley, Inc.*, 1994 U.S. Dist. LEXIS 7494, at *7 (S.D. Fla. Apr. 5, 1994) (finding deception where defendants' claims regarding income potential of business opportunity "later proved to be false"); *In re Jay Norris Corp.*, 91 F.T.C. 751, 835 (1978) (deceptive to promise timely delivery but not ship product until many months after receipt of order and payment).

7.   The FTC need not prove reliance by each purchaser misled by Defendants. *FTC v.*

14

*SlimAmerica,* 77 F. Supp. 2d at 1275. "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]." *Figgie Int'l*, 994 F.2d at 605 (citations omitted). Rather, a "presumption of actual reliance arises once the FTC has proved that the Defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the Defendant's product." *Id*. at 605-6; *Sec. Rare Coin*, 931 F.2d at 1316; *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

8.   The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, "may be resolved by the terms of the ad itself or by evidence of what consumers interpreted the advertisement to convey." *FTC v. Nat'l Urological Group, Inc.*, Case No. 1:04-CV-3294, 2008 U.S. Dist. LEXIS 44145, *40 (N.D. Ga. June 4, 2008). When the challenged claims are express or virtually express, extrinsic evidence is not necessary to find that the challenged claims were made. When presented with an ad in which an implied message is clearly conveyed on its face, courts routinely rely on their own fact-finding ability to determine the "net impression" of an ad and decide what messages the ad conveys to consumers. *FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999). Nevertheless, "[a]ny doubt that consumers were misled is dispelled by the number of consumer complaints." *FTC v. Bay Area Bus. Council, Inc*., 423 F.3d 627 (7th Cir. 2005).

9.   Vague or contradictory disclaimers do not cure deception; the Court should consider the "net impression" created by the representation. *Cyberspace.com*, 453 F.3d at 1200; *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("the Court must consider the misrepresentations at issue, by viewing [them] as a whole without emphasizing isolated words or phrases apart from their context"). "Disclaimers or qualifications in any particular ad are not

15

adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron*, 884 F.2d at 1497; *FTC v. AMG Servs., Inc.*, 2014 U.S. Dist. LEXIS 12524, at *36 (D. Nev. Jan. 28, 2014) (finding net impression misleading because of "vague," "uncertain," and "contradictory" provisions).

**Legal Standard For Balancing Equities**

10. In balancing public and private interests, "public equities receive far greater weight." *World Travel Vacation Brokers*, 861 F.2d at 1030; *see also FTC v. Warner Comms., Inc.,* 742 F.2d 1156, 1165 (9th Cir. 1984); *World Wide Factors*, 882 F.2d at 347. This principle is especially important in the context of enforcement of consumer protection laws. *Mallett*, 818 F. Supp. 2d at 149 ("The public interest in ensuring the enforcement of federal consumer protection is strong."). "There is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment." *World Wide Factors*, 882 F.2d at 347; *see also FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) ("Obviously, the public interest in preserving the illicit proceeds . . . for restitution to the victims is great."); *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) (court has no obligation to protect ill-gotten profits or illegal business interests).

11. Voluntary cessation of activity, especially in light of potential law enforcement scrutiny or action, does not obviate the need for permanent injunctive relief. *See Affordable Media*, 179 F.3d at 1237. An action for an injunction does not become moot merely because a defendant voluntarily ceases the complained of conduct unless recurrence is not possible, since otherwise the defendant would be free to return to his old ways. *Id.*; *see also FTC v. Accusearch*, 570 F.3d

16

1187, 1202 (10th Cir. 2009) (injunctive relief appropriate where defendant "had the capacity to engag[e] in similar unfair acts or practices in the future") (internal quotation marks omitted).

**Legal Standard For Individual Liability**

12. An individual defendant faces liability for injunctive relief for corporate practices if: (1) the individual participated directly in the challenged conduct or (2) had the authority to control it. *Affordable Media*, 179 F.3d at 1234; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *Amy Travel*, 875 F.2d at 573; *FTC v. Kitco*, 612 F. Supp 1282 (D. Minn. 1985). An individual may be held liable for monetary relief for corporate practices if he or she knew or should have known of the illicit conduct, showed reckless indifference to the truth or falsity of a representation, or had an awareness of a high probability of falsity with an intentional avoidance of the truth. *Affordable Media*, 179 F.2d at 1234; *Gem Merch.*, 87 F.3d at 470; *Amy Travel*, 875 F.2d at 574. The knowledge element, however, need not rise to the level of subjective intent to defraud consumers. *Affordable Media*, 179 F.2d at 1234; *Amy Travel*, 875 F.2d at 574.

**Legal Standard For Ancillary Relief, Including An Asset Freeze**

13. In addition to permanent injunctive relief, the FTC's Complaint also seeks additional relief in the form of consumer redress and a disgorgement of profits, which Section 13(b) of the FTC Act empowers this Court to enter. *See Sec. Rare Coin*, 931 F.2d at 1314-15; s*ee also Pantron I*, 33 F.3d at 1102; *Amy Travel*, 875 F.2d at 572; *U.S. Oil & Gas*, 748 F.2d at 1433–34. Where a district court has determined that there is a likelihood that the FTC will prevail in a final determination of the merits and thus restitution would be an appropriate remedy at the conclusion of the proceedings, the court has "a duty to ensure that the assets of the corporate defendants [are] available to make restitution to the injured customers." *World Travel Vacation Brokers*, 861 F.2d at 1031. Thus, this Court can order a freeze of Defendants' assets. *U.S. Oil & Gas*,

748 F.2d at 1434; *Real Wealth*, 2010 U.S. Dist. LEXIS 5884, at *3-4 (ordering asset freeze); *Bus. Card Experts*, 2007 U.S. Dist. LEXIS 31366 at *17-19 (same).

14. Similarly, the appointment of a receiver is a sound equitable remedy in cases involving deception, *In re. McGaughey*, 24 F.3d 904, 907 (7th Cir. 1997), and is within the equitable powers of this Court. *See U.S. Oil & Gas*, 748 F.2d at 1432; *Bus. Card Experts*, 2007 U.S. Dist. LEXIS 31366 at *25; *FTC v. Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *23-24 (N.D. Okla. Aug. 2, 2001). Where the evidence establishes a substantial likelihood that a court will find the defendants' conduct deceptive and the consumer injury substantial, to allow the defendants "to control their frozen assets and to operate their deceptive scheme would create an unreasonable risk that effective relief would be frustrated." *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175 at *24.

### Application Of Legal Standards To Facts

15. Here, based on the findings of fact and legal standards discussed above as well as the record developed in connection with the request for preliminary injunctive relief, the Court concludes that the FTC has demonstrated a likelihood of success on the merits. Specifically, the Court concludes that Defendants have violated Section 5 of the FTC Act by misrepresenting material facts about their Bitcoin mining machines, including (a) that their mining machines would produce profitable or substantial numbers of Bitcoins and (b) that Defendants would timely deliver their Bitcoin mining machines. Any vague and contradictory statements Defendants made about shipment dates being projected dates fail to overcome the net impression created by their continuing statements that they would ship products by particular timeframes. *See infra* Findings of Fact ¶¶ 14-19 (Defendants stated that the delivery date was "solid" and that they had resolved production delay issues with the BitForce").

16. It was reasonable for consumers to rely upon Defendants' representations regarding

18

profitability and delivery, particularly in this highly technical market. As the Eighth Circuit explained in *Security Rare Coin,* it was "reasonable for consumers entering this specialized and technical market to rely on the representations of an apparently reputable firm." 931 F.2d at 1316. Indeed, the FTC has presented evidence showing that thousands of consumers were misled by Defendants' claims. *See infra* Findings of Fact ¶¶ 13, 20. In the face of such evidence, the existence of some satisfied consumers or some refunds to consumers does not insulate Defendants from liability. *See Amy Travel*, 875 F.2d at 572; *SlimAmerica*, 77 F. Supp. 2d at 1272.

17. The FTC is not required to prove intent. Nonetheless, the Court finds it telling that Defendants made their initial shipment claims and continued to make revised shipment claims despite not even having the necessary components (such as chips) in their possession and that they acknowledged in internal communications that they would not be able to meet the promised delivery date for the Monarch. The Court also finds it telling that an employee suggested providing more transparency about delivery delays, but Defendants refused because they did not want consumers to know they would have to wait so long for the machines. *See infra* Findings of Fact ¶¶ 7-11, 16.

18. Taking into account the testimony of the witnesses and all of the evidence submitted by the parties, there is good cause to believe that consumers will suffer immediate and continuing harm from Defendants' violations of Section 5(a) of the FTC Act unless Defendants are restrained and enjoined by order of this Court. Thus, the Court concludes that the balance of equities in this case clearly tips in favor of the FTC and the granting of preliminary injunctive relief.

19. The Court further concludes that the FTC has shown a likelihood that Defendants

Vleisides, Drake, and Ghoseiri are liable for injunctive and equitable monetary relief. They all have control over the business operations of Butterfly Labs, and knew of or directly participated in making the misrepresentations.

20. The record also establishes that, should the FTC prevail on the merits, consumer injury would be well into the tens of millions of dollars and that Defendants' assets fall far short of that amount. Defendants were capitalized with only $8,000 and the subsequent tens of millions that they have since acquired came from consumers. Further, the record demonstrates a pattern of diverting corporate assets for personal use, and that adequate controls do not exist to prevent it. Thus, the Court concludes that there is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final monetary relief will occur from the transfer, use, dissipation, or concealment by Defendants of their assets.

21. Further, even while under this Court's Stipulated Interim Order, Defendants altered or concealed internet posts on the their website forum. Therefore, preliminary injunctive relief is necessary to ensure that no further concealment of business records occurs. In addition to violating this Court's order, evidence that Defendants made misrepresentations not only about delivery and profitability, but also about whether they were using machines to mine Bitcoins for themselves before delivering such machines to consumers, demonstrates that they have not been operating lawfully. Good cause exists for continuing the receivership over the Corporate Defendant, and continuing the asset freeze over Defendants' assets.

22. Weighing the equities and considering the FTC's likelihood of ultimate success, the entry of a preliminary injunction is in the public interest. No security is required of any agency of the United States for issuance of a preliminary injunction, Fed. R. Civ. P. 65(c).