IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FEDERAL TRADE COMMISSION,          )
                                   )
          Plaintiff,               )  No.  14-CV-00815-BCW
                                   )       November 25, 2014
          v.                       )       Kansas City, Missouri
                                   )       CIVIL
BF LABS, INC., et al.,             )
                                   )
          Defendant.               )

TRANSCRIPT OF HEARING - DAY TWO
BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic voice writing
Transcript produced by computer

APPEARANCES

For Plaintiff:          MS. LEAH FRAZIER
                        MS. HELEN WONG
                        MR. GREG ASHE
                        Federal Trade Commission
                        600 Pennsylvania Avenue, NW
                        Mail Stop CC-10232
                        Washington, DC  20580

For Defendants:         MR. JAMES M HUMPHREY
                        MR. MICHAEL FOSTER
                        Polsinelli PC - KCMO
                        900 W. 48th Place
                        Kansas City, Missouri 64112

Denise Catherine Halasey, CVR, CCR #1257
US Court Reporter for The Honorable Brian C. Wimes

Denise C. Halasey, CVR, CCR
Certified Court Reporter

```
 1                    APPEARANCES

 2                    (continued)

 3  For the Receiver:  MR. ERIC JOHNSON
                       MR. BRYANT LAMER
 4                     Spencer, Fane, Britt & Browne
                       1000 Walnut Street, Ste. 1400
 5                     Kansas City, Missouri 64106

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Denise Catherine Halasey, CVR, CCR #1257
     US Court Reporter for The Honorable Brian C. Wimes
25                         2
```

1

2          (Proceedings began at 8:37 AM)

3          THE COURT:  Okay.  Good morning all.  I think what

4    we have left to do for accordance to the parties to argue

5    their position to the Court.  The Court may in all likelihood

6    have a few questions for the parties and then that'll conclude

7    this hearing on this matter.  And with that said, let's start

8    with the Federal Trade Commission.

9          MS. WONG:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MS. WONG:  First, I want to apologize.  I couldn't

12   get the technology to work this morning with PowerPoint.  So,

13   is it okay if I pass out my PowerPoint in paper form?

14         THE COURT:  Certainly.  Uh-huh.

15         MS. WONG:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MS. WONG:  Before we get started, I was thinking a

18   little bit more about your car analogy, yesterday.  And I was

19   wondering if it was okay for me to talk about that a little

20   bit more?

21         THE COURT:  Sure.  It may not have been the best

22   analogy, but we could work with it.

23         MS. WONG:  And I might have misunderstood it.  So

24   please correct me if I'm wrong.

25         THE COURT:  Okay.  Sure.

3

| | |
|---|---|
| 1 | MS. WONG: So your example was if someone on Monday |
| 2 | promised delivery on Thursday. And, on Monday, they had every |
| 3 | intention of doing the delivery on Thursday, and then their |
| 4 | car breaks down on Tuesday, so they can't make the delivery on |
| 5 | Thursday. And your question was if that would still be a |
| 6 | misrepresentation? |
| 7 | THE COURT: Right. |
| 8 | MS. WONG: So the FTC position is that, yes, because |
| 9 | intent doesn't matter. And even though they intended to |
| 10 | deliver it on Thursday, and their car broke down on Tuesday, |
| 11 | we look at it from the perspective of the consumer. A |
| 12 | consumer will still expect to receive it on Thursday, and, |
| 13 | therefore, they -- that would still be a misrepresentation. |
| 14 | THE COURT: Well, let me ask you, to me that would |
| 15 | seem that any time, any company or corporation says, "We'll |
| 16 | deliver this." And there's a certain level of expectation, |
| 17 | and, through for whatever reason, it doesn't get delivered, |
| 18 | that arguably they can have one, two, three, four times that |
| 19 | there are legitimate reasons. I guess here is the thing, and |
| 20 | I was talking -- me and my law clerk were talking about this, |
| 21 | and I think here's the framework, and we're seeing it as, as a |
| 22 | fraud case without the intent element. |
| 23 | MS. WONG: Uh-huh. |
| 24 | THE COURT: Because this case law seems -- and so we |
| 25 | are operating under that framework, and I need you to say: |

4

Case 4:14-cv-00815-BCW   Document 202   Filed 12/15/14   Page 4 of 81

1    Don't operate under that framework if the Court is incorrect.

2    Because what we're suggesting is this:  If, in fraud cases, if

3    you have the future like this delivery, you would have to make

4    some determination that when he made that statement about that

5    future of it, you were false.  So that is how the Court,

6    that's a legal construct.  Now, it is not on all fours but

7    that is how we are making, or, at least, how we are seeing

8    this analysis.  And what you need to, and if you say, "Well,

9    Judge, that's not how you should see it.  You should see it

10   this way."  I -- that would help the Court, because that is

11   how we are seeing it, but, okay,  we'll have to look at the

12   time they made the statement.  Was it false?  And that is a

13   fraud analysis.

14            MS. WONG:  Uh-huh.  Right.

15            THE COURT:  A legal construct.  Okay.

16            MS. WONG:  I think you have it right.  So, if you

17   look at it from the intent of the -- let's call them Merchant

18   A -- of motion A, and their intent on Monday, if they, even if

19   they intended to do it on Thursday, but their car broke down,

20   that would still be a misrepresentation, because we look at it

21   not from the intent of the Merchant A, but from the consumer

22   that is receiving the product on Thursday.  But there's few

23   more fine points that I think would help.  So, the difference

24   I think is Merchant A, any legitimate business, if your car

25   breaks down on Tuesday, what you would do is refund the

5

consumers money right away.  And then we won't bring this
case.  And --

        THE COURT:  Maybe, or maybe I just tell, "Hey, it
broke down, but I'll deliver it to him Friday."

        MS. WONG:  Again --

        THE COURT:  And, then I believe I can deliver it on
Friday, but then -- but I have another issue out of my
control, but I fixed my car, but then something else happened.
But I'm still trying to deliver this on Friday, and I have
every intent.  So if I have, when I make that statement, I
believe, and you're saying still, it could be seen, it's how
the consumer.

        MS. WONG:  Yes.  We look at it from the view of a
consumer.  And, again, going back to the example, if someone
-- the car breaks down on Tuesday, what any legitimate
business would do is just tell the consumer, "Hey, here's your
money back.  We can't make the delivery by Thursday."  Or any
other legitimate business, they would have contingency plans,
so if Amazon, for example, they need to make deliveries by
Christmas, and there is a huge snow storm.  And what Amazon
would do because they are a legitimate business, they would
have contingency plans to make sure those deliveries happen on
Christmas because that delivery date was material.

        THE COURT:  Well, and what if I didn't get it on
Christmas, which has been the case for companies, I have not

6

on Christmas, and Santa Clause didn't come to the house.  Now,
my kids are old enough where they know it's Mom and Dad, which
is good, but at some time it didn't come.  Then --

MS. WONG:  It's still the representation that you
made.  If you make the representations to the consumer, I
understand what you're saying with intent.  And we're not
looking at it from the intent of Merchant A on Monday.  We're
looking at from the expectation of the consumer on Thursday
when you represented to it -- to the consumer.  And, also,
here, there are also other distinctions that we see.  In
addition to providing -- so, going back to the analogy, other
things that Merchant A could do even though when they made the
representation on Monday, and then the car broke down on
Tuesday, in addition to immediately telling the consumer that
it's not going to happen, or having contingency plans to make
sure that the delivery does happen on Thursday, you could also
be truthful.  You can be like, "Hey, all the auto-shops in the
city is spoken.  We're not going to be able to make this
delivery."  And be truthful about that representation.  You
can say, "I'm going to make the delivery on Friday.  Yes, we
didn't on Thursday, but we can get to you by Friday," but then
you can't make that representation when you know that all the
auto-shops in the city are busy that are.

THE COURT:  And that's what I'm saying.  That goes
back to my point.  If you know all the auto-shops are busy,

7

```
 1   and, therefore, you make that you know that is a false

 2   statement.  Right?

 3          MS. WONG:  That's -- yes.

 4          THE COURT:  Therefore, we knew at the time you made

 5   that -- and I would agree, that is a misrepresentation and you

 6   know.  So that's --

 7          MS. WONG:  It's not just -- Sorry, Your Honor.  It's

 8   not just knowing that all of the auto-shops are broken.  It's

 9   -- as a legitimate business that brings in multi-million

10   dollars, you have to look around, and say it's your

11   responsibility to look around and be like, "Hey, there's a

12   snowstorm, so maybe we need to account for other

13   contingencies.  And, in addition, the reason that I wanted to

14   go back to the car analogy, is that here we don't even think

15   it applies, because we think that there was no car when they

16   made the representation.  Here we are saying that they made

17   representation on Monday, and then they promised delivery by

18   Thursday, but there was no reason to believe that there was a

19   car.

20          THE COURT:  No reason to believe that you can do

21   that.

22          MS. WONG:  Yes.  And there was no reason to believe

23   that there was a car and there was no reason to -- after the

24   first misrepresentation, you need to look around and say,

25   "Hey, what is the possibility of this happening again?"  And
```

8

1   make that representation to the consumer.  So, with the car

2   example, on Monday, you're like, "You know, it didn't work the

3   first time, it didn't work out the second time, I'm going to

4   represent that this is going to be four months from now.  And

5   in the interim, you can have your money back immediately.

6          THE COURT:  Okay.  Let me see if I am following.

7   Sorry we have to use my crude example of this car.  So what

8   you're saying is this:  "I don't have a car.  I promised to

9   deliver this on Thursday.  I don't have a car."  What if I

10  think, what if I think when I make this representation, I have

11  a car that I'm going to be able to do.  Okay.  I don't have

12  the car yet, but I think I have that car.

13         MS. WONG:  So --

14         THE COURT:  That seems to me, under my kind of

15  construct, you're okay.  Now, if I make that representation,

16  and I know there is no likelihood of me having that car

17  Monday, that's different.

18         MS. WONG:  Uh-huh.

19         THE COURT:  But if I think I'm going to have that

20  car to do what I said I'm going to do -- do you see that?

21         MS. WONG:  I do.  So --

22         THE COURT:  I'm not having that car, and haven't

23  even been constructed yet.  That car hasn't even been --

24         MS. WONG:  Right.  I hear you.  So, I'm going back

25  to the original position, the FTC's position is still, intent

9

does not matter. All that matters is the representation that
you make, and how the consumer receives that expectation. But
the reason I brought up the car example is I'm saying in this
situation, there was no car. I'm saying an even/if example.
I'm going above the standard. But again, the FTC Act does not
require intent, it goes back to the Monday example that if you
make a representation on Monday, that you're going to do
something by Thursday, there are other things you could do if
your car breaks down. You could call the consumer and let
them know immediately, and make the refund. You can have a
contingency plan to make sure that --

        THE COURT: But does it always require a refund?

        MS. WONG: No.

        THE COURT: Because it could -- could I say that if
I knew, couldn't I put something out on an email, "Hey, I'm
not able to do this. I'm not able to do this on this
particular day."

        MS. WONG: I would have to --

        THE COURT: You'd have to do -- well, what do I
have? I'm not able to do this, do you want a refund. Is the
refund the key? Hey, I'm not able to do this, the machine is
coming." Now we're getting a little more specific. I'm just
trying to find a scenario where, hey, maybe I'd be okay, if I
put out an email or blast, and sent it out to all of my
customers that, "Here's what's going on."

10

Case 4:14-cv-00815-BCW   Document 202   Filed 12/15/14   Page 10 of 81

```
1              MS. WONG:  A refund does not always carry the

2     initial misrepresentation.  It would be very fact specific,

3     depending on the situation.  But I'm using the example of the

4     car, because I know that that was a concern about -- that even

5     if someone had full intent on doing something on Monday, and

6     something unexpected happens, I think you're asking whether or

7     not that is still a misrepresentation; whether or not a refund

8     could carry that misrepresentation?  Does that help?

9              THE COURT:  Yes.

10             MS. WONG:  Okay.

11             THE COURT:  Yes.  Yeah, it helps.  Let me ask you,

12    I'm going back to my original, again, my legal framework that

13    I'm working in.

14             MS. WONG:  Uh-huh.

15             THE COURT:  Are you aware of any case in dealing

16    with this section that deal with future?

17             MS. WONG:  Actually, going back --

18             THE COURT:  Because we know those, there were a few

19    cases, I think, the copper.

20             MS. WONG:  Uh-huh.

21             THE COURT:  Well, I spoke about one that we saw,

22    maybe not cited where, "Hey, we know copper, let's say, and we

23    find out there is copper."

24             MS. WONG:  I --

25             THE COURT:  But you know that, and you know you made
```
                                   11

```
 1    that representation --

 2            MS. WONG:  Uh-huh.

 3            THE COURT:  Yeah, but here, we're dealing with a

 4    future date, so the analysis, although there's no intent

 5    required --

 6            MS. WONG:  Uh-huh.

 7            THE COURT:  The way I'm trying to see it as in fraud

 8    cases on future which requires you to analyze whether the

 9    statement made at the time was false.  And that's the way I --

10    I'm using that analogy for this case.

11            MS. WONG:  Uh-huh.

12            THE COURT:  Do you know of any cases that deal with

13    this section that dealing with these kind of future dates,

14    these future representations, or future representations that

15    are --

16            MS. WONG:  I do.  And I can get you the specific

17    case cites immediately afterwards.

18            THE COURT:  Okay.  That would be very helpful.

19            MS. WONG:  Going back to the Christmas example, and

20    the Macy's example.  The FTC did bring a series of cases in

21    2000 about delivery, date representation, about making orders

22    by Christmas, and then they were unable to meet that shipment

23    date.  There is another case in 2008, the name is slipping my

24    mind right now, but it is also about a future delivery that

25    they were unable to meet.
```
                              12

```
 1              THE COURT:  Now, that would be up for in terms of
 2    you guys just provide the Court with some case law with
 3    respect, because I think that's a critical question in which
 4    the Court has to address.
 5              MS. WONG:  Do you want me to get it now?  Or --
 6              THE COURT:  No.  No.  I think we can -- I'll let you
 7    continue on with your argument.
 8              MS. WONG:  Okay, but I hear what you're saying.
 9    You're saying that this is not about knowing, at the moment,
10    that this is a misrepresentation, this is about a future event
11    that happens.
12              THE COURT:  Right.  And again your position is there
13    is some level of expectation -- you have to maybe look at it
14    from a consumer's perspective with the level of expectat--
15              MS. WONG:  Right.  So when you make -- even if you
16    fully intended to do something, you still have to look at it
17    from the consumer's expectation.  You look at it that I made
18    this representation that it will be due on Thursday.  So I
19    have to look at what I have to do to make sure that the
20    consumer's expectations are met.  And intent matters, well,
21    intent doesn't matter.  You could fully be selling something
22    intending for this diet pill to work, but it doesn't.  You
23    have to look at it from what the consumer's expecting based on
24    the claims you made.
25              THE COURT:  Let's say I buy your argument, a
```
13

```
 1  likelihood of succes, the equities.

 2            MS. WONG:  Uh-huh.

 3            THE COURT:  What would you ask this Court to do?

 4  Would you asked me to keep going the way that we have been

 5  going with the receiver, and with -- what would your

 6  expectations be at this time?  If I, if I was with you in

 7  terms of your argument, what would ask the Court to do?

 8            MS. WONG:  We would ask for a preliminary injunction

 9  to issue for the receivership to continue, and asset freeze to

10  continue.  And I understand that defendants might have issues

11  about running the business, but our position is that there has

12  been a risk of dissipation of assets.  There has been $80

13  million --

14            THE COURT:  What is that risk?

15            MS. WONG:  Because there is --

16            THE COURT:  Is that lawsuits filed?  They've had

17  various things -- they've had the opportunity, because there

18  is no asset freeze.  There is no prior to this Court -- I

19  mean, what indication would suggest that they're trying to

20  dissipate their assets?  I mean, there's always a fear of that

21  ultimately; isn't there with any one?

22            MS. WONG:  Because there has been a history of it.

23  There's been money that went to a defendant's home.  Money

24  that went to defendant's daycare services.

25            THE COURT:  Okay.  In here we talked about that.
                              14
```

1    Should the Court say, say this, say they capitalize their

2    business through consumers preorders.  Say they split money

3    on, you know, a company home, company car, and the things you

4    -- is that of the Court's concern in making -- and not to

5    suggest -- if you believe there is something wrong, or if

6    there's something illegal, then someone else needs handle

7    that.  Is that going into my determination?  Does that -- you

8    know, I don't know.  If there's something -- and I don't want

9    to throw this word around, I really don't, but if it's

10   improper of some, isn't that for another action, or another

11   case, another agency to maybe take up?  How and why should I

12   consider?  Maybe it's not a good business plan, maybe there's

13   bad business, but that doesn't necessarily -- why should I

14   consider?  Okay.  I mean, I heard evidence yesterday.  Oh,

15   that's pretty legitimate, that happens, oh, that's maybe a

16   little different than normal, but is that really dissipating?

17   We got a house.  Freeze it.

18           MS. WONG:  It's not a corporate house.  It's a house

19   that's -- it's a personal residence.

20           THE COURT:  Okay.

21           MS. WONG:  And regarding your earlier question about

22   whether or not, if this Court's position -- we, the FTC's

23   concerned about preserving assets for consumers.  So to that

24   extent, we believe that under the preliminary injunction, the

25   Court can preserve assets to make sure that there is effective

                                  15

1   final relief for consumers.

2              THE COURT:  Right.  But can that be fashioned in

3   another way other than how we proceeded?  Can that be a

4   concern of the Court; i.e.,  here's this:  Say the Court

5   believes in its initial order that it maybe is a little

6   over-broad, maybe because that's why I asked the question of

7   Mr. Bourne, which I think was unfair to ask him kinda that,

8   but say I asked you that question.  Couldn't they operate in a

9   manner, couldn't they operate in a manner that they wanted to

10  operate, but, yet, still preserve -- and I don't know what

11  that would look like, necessarily.  I am going to have them

12  ask me that, if I do, what would that look like, but, yet,

13  preserve any refunds that would be owed?  And I know a part of

14  that is to make some determination of what?  I've seen numbers

15  in terms of refunds.  These numbers, that number, how much

16  that figure is, but can't they operate -- maybe not have a

17  receiver, but have, I don't know, maybe they report back to

18  the Court some things.  So I can ensure that, one, you know,

19  and I don't know, maybe we stop this proceeding for 90 days,

20  and send out a letter to consumers and see who, wants what and

21  what time, it helps see what they owe, but yet they can still

22  operate and run their -- couldn't we fashion some equitable

23  relief, other than maybe this receivership, which probably is

24  a little burdensome.

25             And I will say, for the record, I think, I went back

                              16

1  and I reviewed the interim order, and I don't think that order

2  precluded the company from doing any deliveries or shipment.

3  I think that was a business decision that was made not to do

4  some of those things.  That order in and of itself, did not do

5  that.  That is why I was a little -- I wanted to review that.

6  I just want to make that clear.  The receiver didn't put --

7  yes, they required some things before shipments were made,

8  before more production, but that order, in and of itself, did

9  not prevent that business from operating.  That was a business

10 decision, I respect that, but I just want to make that clear,

11 because I know that was part of my conversation on how

12 limiting, kinda, the sort.  Although, I still think it may be

13 a little limiting, because you have other people making

14 decisions about your business, and I see what your point is.

15 And I say that to the defense.

16        MS. WONG:  And we completely agree with that.  We

17 think that the interim order gave full control to the

18 receiver, and whether or not shipments took place is most

19 definitely a business decision.  And, then, sorry, just going

20 back to some of your earlier points, if this is not helpful,

21 please interrupt me.  I don't want to waste your time.

22        THE COURT:  No.  You've been very helpful.

23        MS. WONG:  Okay.  So, in addition to the assets,

24 part of the problems with looking at the numbers and the

25 assets, is that no one knows what the numbers are.  The books

17

have never been audited.  The receiver's report, and the

defendants -- the numbers that everyone's reporting are

varying widely.  There have been very few corporate controls

in place.  I hear what you're saying about dissipation of

assets, and we, the FTC, believes that we have shown that

through the past purchases that were not legitimate business

expenses.  But even aside from that, we just don't know.

There were hundreds of thousands of dollars in

shareholder loans that went out.  There are all these

purchases that went out, and the books just aren't clear.  And

this is not just the FTC's decision, this is the position of

Ruben Brown, a third-party accounting firm.  And going back to

a preliminary injunction about having the receiver in place,

we believe that the business could run with the receiver in

place.  Of course, Your Honor, it's up to you to fashion the

preliminary injunction, or if you want to do so or not, any

way you like.  Our position is that someone does need to be in

place.  Whether it be a receiver to oversee all these

different things -- there's just a lot of moving parts.  We

have seen evidence of dissipation of assets, and the entire

company is capitalized with consumer money.  We know that it

was only capitalized with $8,000, and they have since taken in

$80,000,000.  And --

THE COURT:  How do you want me to see that?  Say

it's, say it's, um, and I know -- how do you want me to see

18

1   that in the context of this case?  Say it is bad business

2   practice to do it, and say, let's just, for argument's sake,

3   you shouldn't do it.

4           MS. WONG:  Uh-huh.

5           THE COURT:  Doesn't make it illegal --

6           MS. WONG:  No --

7           THE COURT:  But you shouldn't do it.  Okay.

8           MS. WONG:  Uh-huh.

9           THE COURT:  How do you want me to see that in terms

10  of what decision I have to make because part of me says,

11  "Okay.  Maybe it's a bad decision.  Maybe you capitalized this

12  company in a way that you should not have."

13          MS. WONG:  Uh-huh.

14          THE COURT:  But how does that play out and how I

15  connect that to this case?  How do you want me to use that?

16  How should I see that bit of evidence that we know?

17          MS. WONG:  Uh-huh.

18          THE COURT:  No one disputes that.  Fit that in the

19  piece of this pie, this puzzle for me, where does that go?

20  And what does that go to?  Do you --

21          MS. WONG:  I think I understand.  So the FTC's

22  position is that this money is procured through deception.

23          THE COURT:  Oh, okay.

24          MS. WONG:  And, so that, whether or not is bad

25  business is irrelevant, because we believe that the money that

                                19

```
 1    was taken was procured through misrepresentations, and had

 2    consumers been properly informed, they wouldn't have spent the

 3    money.  And we have provided evidence of that.  That's --

 4              THE COURT:  That goes back to my initial

 5    determination of whether there was a misrepresentation?

 6              MS. WONG:  Yes.  And, which we believe should be

 7    viewed, not from the intent of Merchant A, but from the

 8    expectation of the consumer.

 9              THE COURT:  Okay.

10              MS. WONG:  I think some of this in the presentation

11    might be helpful.  Do you want to go through this first, and

12    ask --

13              THE COURT:  Yeah.  I mean, I think, you know, I was

14    going to let go through it and stuff --

15              MS. WONG:  Or, I don't have to.  Or I can just keep

16    answering questions.

17              THE COURT:  Well, you know, I've had a lot of my

18    questions answered.  I don't know, I may want to hear from the

19    defense, and may call you back up.

20              MS. WONG:  Okay.  Can I go through just a few

21    highlights?

22              THE COURT:  Yes.  If you want to highlight, yes.

23              MS. WONG:  Okay.

24              THE COURT:  Feel free.

25              MS. WONG:  And then, please interrupt me if you
                                  20
```

have, like, questions in the interim, too, because I want to
        be as helpful as possible.

                THE COURT:  I will.

                MS. WONG:  Okay.  Just quickly, I won't spend a long
        time on this.  We went over this briefly yesterday.  The FTC
        brought this case under Section 13B of the FTC Act, under the
        2nd proviso, and then moving onto the next page, Congress
        granted this Court's authority under the 2nd proviso of 13B,
        which provides the Court full authority to grant preliminary
        relief, temporary restraining order, including a preliminary
        injunction.  And under the 2nd proviso of Section 13B, the two
        factors that should determine whether a preliminary injunction
        should issue, is likelihood of success on the merits, and then
        balance of equities.  So, I'm going to go into a likelihood of
        success, and hopefully that helps flesh out some of the things
        that I'm trying to say.  I'm sorry I haven't been very clear.

                THE COURT:  No.  I think you have been fine.

                MS. WONG:  Okay.  So going back to basic FTC Act.  A
        representational practice is deceptive if it is material and
        likely to mislead consumers acting reasonably under the
        circumstances.  Express representations are presumed material,
        and the FTC doesn't need to prove that defendants acted with
        intent to defraud, or in bad faith, but a showing of intent is
        powerful evidence, that they're allowed to claim, in fact, was
        good faith to the consumers, just like you were pointing out.

                                    21

```
 1  A --

 2          THE COURT:  Your point is you don't have to?

 3          MS. WONG:  Right.

 4          THE COURT:  Okay.

 5          MS. WONG:  And then we have, if it's helpful, we

 6  listed a series of cases where it talked about how under

 7  Section 5, you could still be liable, even if you acted in

 8  good faith.  And there's a few cases there that might be

 9  helpful.  And I will also sent you the one we talked about,

10  about the future delivery.  And, then, in terms of the bit

11  force delivery representations, I want to go into a little bit

12  about what the defendants were expressly representing.

13          So, they represented that the bit-force money

14  machine would begin shipping in October of 2012.  They had

15  release notes that said that Honest Abe was scheduling

16  shipments for October of 2012.  They made this -- they delayed

17  their delivery, and made four more false representations in

18  November, February, March, and April.  And going through in

19  this light, Your Honor, this is where we think that there was

20  no car when they made the representations.

21          If you look at the chart, Defendant's Exhibit 507,

22  that they presented yesterday, it's a little small, but I

23  think it says between March and June, I think, early May, the

24  graph shows that there were no ships that were received.  So

25  at the time that defendants were making these representations,
```
                                  22

that they were going to do shipment in October, November,
February, March, and April, during that whole time period,
there were no chips received.  And we believe that that's an
example, that there's no car.  They're making a representation
that they're shipping out these products when they don't even
have the chips yet.  And --

        THE COURT:  It doesn't matter if they thought they
had the chips at some point?

        MS. WONG:  Well, but they don't.

        THE COURT:  Okay.  Fair enough.

        MS. WONG:  This is the even/if standard, so --

        THE COURT:  All right.  I got you.

        MS. WONG:  Here we have a chart that shows that they
don't have them.  And they were representing to people that
they could deliver them when they had no chips.

        We also have a unrebutted testimony from a former
employee that said that he always told consumers that delivery
was two months away, even when there was no prototype.  He
also testified that defendant's management was against more
transparency, because they did not want consumers to know that
the products were so delayed.  And he also testified that he
sent out e-mails to consumers about product shipment updates
even when that was not true.  And we also have a few more
declarations in our papers.

        And then going to the Monarch delivery

23

misrepresentations. Defendants first announced that shipment
would occur in December of 2013, and they provided a timeline
for why this delivery would occur. And then the FTC's reply
in support of our preliminary injunction, we submitted
evidence showing that defendants were chatting among
themselves, saying that this timeline wasn't true. That it
was unrealistic, but, yet, even when they knew that they could
not meet that timeline, they kept that representation on their
website.

     And during that same time period, when they were
expressing doubts about whether or not the shipment could be
made, they sent out emails promising delivery in early 2014.
And this email had no qualifiers or additional warnings about
when it may or may not deliver. And, I know yesterday
defendants showed us banner ads that had no representations on
delivery date, but if you click on it, it takes you to the web
page, which does lead you to the representations as well.

     And defendants failed after they, for the Monarch,
after they failed to meet the December 2013 delivery date, the
then revised it four more times to April, May, June, and
August, and were told that the first products didn't finally
ship out until August 2014.

     Defendants don't deny making at least four false
delivery representations for the Bit-force mining machine, and
at least for the Monarch. So, going back to the car example,

Denise C. Halasey, CVR, CCR
Certified Court Reporter

1    this is something that -- this is not promising on Monday to

2    ship on Thursday, and then you deliver it on Friday.  This

3    happened over and over and over again.

4         And then, going to the profitability representations

5    --

6         THE COURT:  Isn't that tied to the delivery dates?

7    Let me ask you, if I don't find for you all with respect to

8    the delivery dates, doesn't that second argument fall?  Or no?

9    Can that stand on its own?

10        MS. WONG:  No, you are correct.  The profitability

11   is tied to delivery.

12        THE COURT:  Okay.

13        MS. WONG:  And as part of the profitability

14   representations, those are the calculators that they posted.

15   And Mr. Fast, yesterday, testified that in addition to the

16   profitability calculator, on their website, they also passed

17   out another website, bitcoinx.com, that was owned by Butterfly

18   Labs, so that they could calculate profitability.

19        And then I have just a couple of charts about, had

20   delivery been on time, the number of bitcoins that a consumer

21   would have been able to mine, versus the number of bitcoins

22   that they were actually able to mine when the products were

23   finally shipped.

24        THE COURT:  Okay.  Let me -- Ms. Frazier, do you

25   want to whisper in her ear about something?  I saw your

                                25

1  response to my question with regard to the second prong, does

2  it fall, and I don't know --

3          MS. FRAZIER:  Oh, no.  Our position would be that it

4  wouldn't because even aside from the delivery date, there's an

5  implied claim without profitability with respect to the

6  machine.  So we would say that even if we didn't prevail on

7  the delivery date claim, we would still be able to prevail on

8  the profitability claim.

9          THE COURT:  Because why?

10         MS. FRAZIER:  They're inter-related in some way,

11  because deliver, delivery date relates to profitability.  But

12  it was also represented -- we're saying that there were also

13  claims and that consumers had the take-away that the machines

14  would be profitable.  And that that could be independent of

15  the delivery date.  So we --

16         THE COURT:  Continuous --

17         MS. FRAZIER:  They're related, but that they're not

18  totally dependent.

19         THE COURT:  Okay.  All right.  Anything else, Ms.

20  Wong?

21         MS. WONG:  Um.  Would it be helpful for me to

22  continue with the balance of equities?  If not, I can --

23         THE COURT:  Yes, yes.  You know, I do want you to go

24  there and then I'll have Mr. Humphrey, uh, address the Court.

25         MS. WONG:  Okay.  So before getting to the balance

                              26

of equities, I want to point out why the delivery date
representation was so material here.  So defendants knew that
mining gets harder over time.  And everyone knows that that's
why delivery date representations are so important.  And the
reason why they kept making delivery date representations is
so that they could lock in customers.  Even -- they were
making these representations even while they had no chips.

So even though intent doesn't matter, we would argue
that here we've even shown intent.  That they did not have the
chips, but were still making representations that they
couldn't deliver this product by a certain time.  And it's not
just once with the bitforce, this happened again with the
Monarch, where they made representations that they could not
meet three or four times.  This is not a case where someone
made some representation and missed it by a few weeks, and
never did it again.  This is a case where misrepresentations
were made over and over and over again.  And while they were
missing delivery dates, they were spending money on
non-business expenses, and continuing to take orders from
consumers based on those misrepresentations.

And, then, finally, for the balance of equities, in
balancing public and private interests, public equities
received far great weight, and this principle is especially
important in the context of consumer protection laws.  I know
that defendants have raised a lot of issues about whether or

27

```
 1    not their misrepresentations have stopped, because they set

 2    this up under the old business model.  And --

 3            THE COURT:  Well, let me ask you if it stopped, and

 4    I think that's kinda what we talked about --

 5            MS. WONG:  Uh-huh.

 6            THE COURT:  Kinda informally with respect to kinda

 7    this future conduct.

 8            MS. WONG:  Uh-huh.

 9            THE COURT:  Didn't you believe that wasn't

10    applicable, or that Mr. Humphrey may have been looking at the

11    wrong portion of that section?  Didn't you suggest that?

12            MS. WONG:  I'm saying that that's not the only

13    standard, but that weighs into the balance of equities.

14            THE COURT:  Okay.

15            MS. WONG:  So our standard is likely of success and

16    balance of equity.

17            THE COURT:  Right.

18            MS. WONG:  And as part of the balance of equities,

19    we do consider whether or not the misrepresentations have

20    stopped.  And the position is that voluntarily cessation of

21    allegedly illegal conduct does not render a preliminary

22    injunction moot.  And, some factors to consider in determining

23    whether or not -- I'm sorry, Your Honor.  I have a really bad

24    cold.

25            THE COURT:  Oh, that's fine.
```

28

```
 1          MS. WONG:  Some factors to look into are there --
 2    whether or not a preliminary injunction should issue even if
 3    conduct might have ceased is the degree of consumer harm, and
 4    here the FTC contends that all the money has been procured
 5    through deception; and, whether the defendants are positioned
 6    to commit future harm.  So they're representing that they've
 7    stopped doing business under the old business model, and that
 8    they're moving on.  But they're sitting on millions of dollars
 9    of consumer funds, and they have no additional sources of
10    revenue.
11          Further, the temporary receiver has determined that
12    the business plan is not realistic, and does not adequately
13    protect consumers' interests.
14          Finally, Your Honor, our position is that assets
15    need to be preserved for consumers, and receivership needs to
16    stay in place if there is a likelihood of success.  In
17    addition, we believe the defendants did not adequately provide
18    refunds.  And that refund liability is unclear.  And there are
19    no additional sources of revenue.  And that current expenses,
20    at about $1,000,000 a month, is unsustainable to both start
21    the business up, doing everything in the business plan, and
22    preserve assets for consumers.  And our, my final point and
23    then I promise I'll leave --
24          THE COURT:  You're fine.
25          MS. WONG:  Providing refunds does not cure initial
```

                                    29

misrepresentations. And under the defendant's policy, even if
they are providing refunds of -- there are six -- after
consumers have to wait at least six months. That, that is
taking interest-free loans from consumers that is procured
through misrepresentations.

           THE COURT: Let me ask you this, you said just the
fact that they refund, what more do we -- what more would
want? We want them to stop the conduct, which you suggest
violates the statute, in terms of misrepresentation, and the
refund. What more, what more would we want to do in this
instance?

           MS. WONG: Well, defendants have not provided
refunds to any of the bitforce consumers. And that's, I think
that's part of the issue here.

           THE COURT: Okay. Refunds in general, I thought you
said something with respect to notwithstanding the refunds --

           MS. WONG: We're saying that that does not mean that
they weren't making misrepresentations. We're saying
providing refunds doesn't mean that there was no Section 5
misrepresentation to begin with.

           THE COURT: All right. Okay. But, ultimately,
that's what we want.

           MS. WONG: Yes, that's ultimately what we want. But
I don't think that goes toward whether or nor, their
likelihood of success prong.

                            30

```
 1              THE COURT:  Mr. Goshery (SIC) doesn't appear to have
 2    any signatory authority.  So why is it he be enjoined in terms
 3    of injunctive relief?
 4              MS. WONG:  I'm sorry, Your Honor?
 5              THE COURT:  Mister -- who is it?
 6              MR. GRIFFIN:  Ghoseiri.
 7              THE COURT:  Ghoseiri, I apologize.
 8              MR. GRIFFIN:  I think I'm mispronouncing it too,
 9    actually.  But that's what we say --
10              [laughter]
11              THE COURT:  Is he present?
12              MR. GRIFFIN:  No.
13              THE COURT:  Okay.  We'll use it for the purposes of
14    this.  What evidence would there be with respect to him, that
15    he should be subject to this relief?
16              MS. WONG:  Well, Mr. Ghoseiri has been with the
17    company and is one of the co-founders, and he would have
18    control over the finances of the company.  And, further, he is
19    the receiver of shareholder loans that -- I don't know the
20    exact amount, but it's part of the hundreds of thousands of
21    dollars in shareholder loans that he's received that's all
22    consumer money.
23              THE COURT:  Okay.  All right.  Thank you.
24              MS. WONG:  Thank you.
25              THE COURT:  Mr. Humphrey?
                                31
```

1          MR. HUMPHREY:  Your Honor, if it's acceptable to the

2    Court, Mr. Griffin prepared an argument on Rule 13B which, if

3    it's okay with you he speak to the standard.

4          THE COURT:  Okay.

5          MR. HUMPHREY:  And it's an important issue that he

6    be able to address that, and then I will make my presentation.

7          THE COURT:  Okay.  That's fine.

8          MR. GRIFFIN:  Starting at 8:15 this morning, I

9    became an expert on the interpretation of 15 U.S.C. 53B.  And

10   if you can pull that up, Your Honor.  I don't -- I have one

11   copy, but it's really badly marked up.  I think it would be

12   very helpful.  This is pretty important stuff, because this is

13   the fundamental standard.  And the FTC has made it easy for

14   us, because in their Powerpoint, they say that they're seeking

15   this preliminary injunction under 13B of the FTC Act.  So this

16   is -- this governs what we're here about.  The title of --

17   it's 15 U.S.C. 53B or Section 13B of the FTC Act is temporary

18   restraining orders; preliminary injunctions.  This tells you,

19   authorizes the FTC to seek these things.

20         And you can see at the beginning of the statute,

21   there are two subsections that are prerequisites to -- meaning

22   these are prerequisites that must be met before the FTC, or

23   the Court, can grant a preliminary injunction or TRO -- a TRO

24   or preliminary injunction.  First, that any person,

25   partnership, or corporation is violating or is about to

                                   32

violate any provision of the FTC Act. And that's a -- that must be shown under a law, you can't rubber stamp, you have to make your own independent decision about whether that exists before a TRO or preliminary injunction can issue.

And, then, the second prerequisite before this section applies, is that in joining, the enjoining of this or the issuance would be in the interest of the public. And that's the last words of one and two. So if a person is violating, or is about to violate a provision of the FTC Act, and it would be in the interest of the public, only then, may the commission bring suit to District Court to enjoin any act or practice.

And, then, the next sentence says that after making the proper showings, a TRO and preliminary injunction may be granted. Thus, it is a prerequisite under the clear meaning wording of this statute that there must be a finding that the defendants are violating or are about to violate before a preliminary injunction can issue. Otherwise, we just fight about it later at the trial on the merits.

Now, if you look at the PowerPoint presentation that the FTC gave us, in the very first substantive slide, they say they are relying on the quote, "second proviso" of 13B, which apparently is the sentence which says, "Provided further, that in proper cases, the commission may seek, and after proper proof, the Court may issue a permanent injunction." So the

33

```
 1   FTC's argument is that sentence, which addresses permanent
 2   injunctions, says you can also get a permanent injunction,
 3   wipes away the clear prerequisite of what the FTC would say is
 4   the first proviso of 13B.  It's not the first proviso, Your
 5   Honor.  It is 13B telling you what you must find in order to
 6   issue a preliminary injunction.  So the FTC is -- its
 7   interpretation is strained to say the least.
 8           THE COURT:  So how should I interpret it?
 9           MR. GRIFFIN:  You should interpret it that you must
10   show -- Are you asking them?
11           THE COURT:  No, I'm asking you.
12           MR. GRIFFIN:  You should interpret that, that -- you
13   could also issue a permanent injunction.  That that's what
14   that sentence means.
15           THE COURT:  How do want to interpret -- so you bring
16   this point to say what?
17           MR. GRIFFIN:  That, they must show --
18           THE COURT:  Should have issued the TRO initially?
19           MR. GRIFFIN:  No, no, no.  I'm not saying -- we're
20   here on a preliminary junction.  That's all we're here about.
21   And the evidence that's been presented.
22           THE COURT:  Right.
23           MR. GRIFFIN:  That you must find for a preliminary
24   injunction issues so that, that, that the defendants, each of
25   the defendants individually, must be a showing that they are
```
34

violating or are about to violate the FTC Act.

 THE COURT: So are you suggesting that now that they
have stopped, the Court should issue PI?

 MR. GRIFFIN: Well, no, there are certain
circumstances in which, if it's been voluntarily stopped, but
there is a showing of likelihood of recurrence that has to be
made, that under those circumstances, it could still issue --
and there's case law out there -- I haven't read all of the
cases --

 THE COURT: Well, say I don't think you're going to
continue it. Say they have stopped, and I don't think they're
going to continue in the future?

 MR. GRIFFIN: Well, then they have to show that.

 THE COURT: But, can I make some determination with
respect to the likelihood access, because what their conduct
was -- doesn't this Court still have equitable authority under
the second prong, because of the refunds they failed to give
them, and the damage they did -- just the fact that they are
not going to do it in the future, doesn't necessarily mean
this Court can't still find the likelihood of success, and
then the second prong to redress any past harm.

 MR. GRIFFIN: Well, I think that we're talking about
-- if you think that there is a likelihood of success based on
things that occurred in the past, that is fine. It's, it
doesn't justify the issuance of a preliminary injunction. All

35

```
 1   that it does is it says that there is a factual issue to be
 2   tried out as the case progresses.  And because --
 3           THE COURT:  So you're still saying that I shouldn't.
 4   That with the plain reading of that, the Court should not
 5   issue?
 6           MR. GRIFFIN:  Yes.  And I --
 7           THE COURT:  Based upon present or future?
 8           MR. GRIFFIN:  Right.  Right.
 9           THE COURT:  It's that alone and I need to go no
10   further.
11           MR. GRIFFIN:  And the FTC pretty clearly recognizes
12   this, because they strained mightily to read a second proviso
13   into 13B that would basically wipe out the first, those
14   explicit requirements for issuing a TRO, or preliminary
15   injunction.  And there is a 9th Circuit case, there are some
16   other cases -- actually, I was reading some cases while this
17   was going on.  But that's FTC versus Evans.
18           THE COURT:  What circuit is that?
19           MR. GRIFFIN:  9th Circuit, Your Honor.  There's no
20   8th Circuit case, directly at one point.  775 F.2nd 1084.
21   Although, the Freeman case in the 8th Circuit does -- is
22   consistent with this.  It says you can't, you're not supposed
23   to rubber stamp the FTC, which I don't think you were
24   intending to do in any event.  In this cite to the Freeman
25   case, is 69 F.3rd 260, so I'm going to let Mr. Humphrey
```
                                    36

Denise C. Halasey, CVR, CCR
Certified Court Reporter

```
 1   continue with his argument.  I just want to address the

 2   standard issue, because we're sort of dividing up -- to where

 3   I had intended to keep a lower profile, but we -- there's just

 4   too much work.

 5             THE COURT:  All right.  Any follow up I'll go to Mr.

 6   Humphrey about because -- well, let me, since you're sitting

 7   down, I -- if you want to respond to that directly, Ms. Wong?

 8             MS. WONG:  Your Honor, I'd be happy to provide

 9   further briefing on that, but this is well-settled case law.

10   Every circuit has read the 2nd proviso of the FTC Act the way

11   that you've read it.  And, actually, Your Honor, you have it

12   exactly right.  It's in the FTC presen -- PowerPoint

13   presentation, but as part of being able to grant permanent

14   injunction, you're given the full range of equitable relief.

15   Again, I'm happy to provide case law supporting this.  But

16   every circuit that has looked at the second proviso of 13B of

17   the FTC Act, has interpreted it this way.

18             And, further, defendants' reliance on its violating,

19   or about to violate is still misplaced.  I have looked at FTC

20   versus Evans Products.  And, in that case, they did look at

21   whether or not the conduct was likely to continue, but as part

22   of the balance of equities just like we discussed earlier.

23             And, in addition to that case, they said that the

24   conduct was not likely to continue because the company was

25   bankrupt.  So there was no further action that was going to
```

37

continue. And here we still have $15-17,000,000 in consumer

funds that are still sitting in their bank account. And, I

don't want to waste your time, but if it would be instructive,

I can just send over like a list of case law from every

circuit if you like about the second proviso of 13B.

THE COURT: Yeah. Let's start with the 8th Circuit,

first, and we'll --

MS. WONG: Okay. I'll start with the 8th Circuit,

and I'll have all the other Circuits, if it's helpful.

THE COURT: Okay. All right. Thank you. Mr.

Humphrey?

MR. HUMPHREY: Your Honor, on that point, we are --

we have some things to say. I think at this point it seems

like a significant issue. If it's acceptable we would like to

plan on doing that same thing. I think there are some

arguments to be made. I think the bottom line, Your Honor, is

that even if you get beyond those issues, and you look at just

the standards that apply to the injunction relief. and the

inquiry and likelihood of success on the merits on the winning

of equities, which I encourage the Court to do.

I think even if you go down that road, this is just

not the case for preliminary injunctive relief. I mean, this

is a case where there are some serious arguments about -- down

the road arguing about permanent injunctive relief. And that

plays into the issue of the preorders, and that that's not a

                                    38

1    model that's used.

2            And I think it is notable, before I start into my

3    presentation, Your Honor, that when I listen to the FTC's

4    argument, a well done argument, but the argument is focused on

5    the past business model.

6            And it's not that the company is trying to escape

7    liability through a change in their business model, I think it

8    is worth appreciating that they just realize that this is a

9    huge headache.  It is a huge headache to have a preorder model

10   for a number of reasons.  But it's a huge headache because the

11   people that are involved as customers in this industry, they

12   are attuned to profitability.  They are attuned to making

13   money.  That's what they are attuned to, they want a machine

14   so they can mine bitcoins, and make money.  Make bitcoins,

15   make money.  That's the type of consumer we're looking at, and

16   I think that cannot be lost on the Court, and it cannot be

17   lost in this proceeding, that that's the type of consumer

18   we're talking about.  That imposes a special kind of

19   requirement on a manufacturer that you have to acknowledge.

20           It's not just, you deliver a product, and the

21   product dries your hair, and you're good to go, these people

22   want a product to go out and play a market.  That's something

23   that company can't predict, nobody can predict that.  Nobody

24   can predict that.  That makes it hard for everybody.  And I

25   just want that point to be noted in the context of how do you

                                39

1   view this case, how do you view the consumer.  And, I'll tell
    2   you, Your Honor, if we're talking about what proof is needed
    3   today for a preliminary injunction, you've got to look at what
    4   proof is needed on the consumer issue.
    5        If the FTC is focused on a consumer, if they're
    6   talking about intangible, and they're talking about you don't
    7   know what the defendant's doing, look at the consumer.  Well,
    8   what do we know about the consumer?  We have some computer
    9   declarations, but we don't know what the consumer -- we don't
    10  have any expert testimony on what the consumer thinks in this
    11  area, or what reasonable expectation should be.  We're talking
    12  about a consumer who is betting on a market, and we've heard
    13  the term -- the term "buying a lotto ticket."  What's the
    14  consumer's expectation in that scenario?  They buy a lottery
    15  ticket in an office pool?  Can they make $10 million?  Sure,
    16  they might.  Could they end up with zero?   Yeah, they might.
    17       So I don't know what it looks like, but I'll tell
    18  you that I think that is a fight for the merits, and it's a
    19  fight for the permanent injunction that you're about -- we can
    20  have our competing experts come in; we'll get an expert,
    21  assuming we have the funds to do it, and ability to do it;
    22  and, we'll get an expert and put him on the stand; and, we'll
    23  talk about those consumer expectations.  I just think that
    24  this is -- this case was brought -- and I don't mean this in a
    25  disrespectful way, but it was brought in an ill-advised
                                    40

1  manner, in terms of the timing of it. And it's not the right

2  timing. It should have been brought as one where we decide

3  this case on the merits. It's too early to make those

4  determinations.

5          We ought to be able to fight that fight, and give

6  the Court our best, and our full position on it. And that's

7  why I think this case is not one appropriate for preliminary

8  injunctive relief, and it's more than further than preliminary

9  injunction. Let me get to my presentation, and move quickly

10 through it, Your Honor. I don't want to take too much of the

11 Court's time on this, but -- you heard from Mr. Griffin's.

12 Obviously, it's important to know the standard that's going to

13 apply. And we will brief that fully, and we have some

14 significant arguments about that, but we need to remind the

15 Court, and keep in mind what this case is about, it's even

16 stipulated in the order. Your Honor, on that order, I will

17 tell you I think it's important because the Court brought it

18 up, the issue of do we think the Court enter an order that

19 kept us from operating? We're not accusing that in anyway.

20 What happened is, the structure of that is such --

21          THE COURT: Well, he said, he did testify that

22 that -- that Aaron Moore, the parties agreed to handcuffed you

23 from doing it, and I would take a look. So, I didn't say it.

24          MR. HUMPHREY: Okay. You know what, he --

25          THE COURT: The witness said it.

                              41

1          MR. HUMPHREY:  The witness said it, and that is the

          2   witness --

          3          THE COURT:  I just want to make it very clear what

          4   the Court signed off on agreed upon, agreed upon, what the

          5   Court signed off on, was not that.  And I just want to make

          6   clear now, and that we don't misrepresent what the Court

          7   signed off on.

          8          MR. HUMPHREY:  And, we're not in the interested in

          9   misrepresenting that.  And I want --

         10          THE COURT:  Okay.  I just wanted to make the record

         11   real clear with respect to that, because I knew, and that's

         12   why my questioned followed.

         13          MR. HUMPHREY:  Okay.  So we're talking about, in

         14   this case, what is this case about?  It's about the amount of

         15   bitcoins, and that goes to the issue of market volatility.

         16   The amount of bitcoins profitability, we've talked a little

         17   bit about that already when I touched on it with the issue of

         18   what is a consumer expecting when you're talking about the

         19   amount of bitcoins.  Then we're talking about the second prong

         20   of preorders, something they do not currently have in stock.

         21   That is how the stipulated interim order is structured.  That

         22   is what the FTC is concerned about in this case.

         23          And my point to you is that in terms of the concern

         24   about profitability or of the number of bitcoins, this isn't a

         25   case where you need injunctive relief to deal with that,

                                        42

```
 1   certainly not preliminary injunctive relief.  And you don't
 2   need preliminary injunctive relief to deal with the issue of
 3   preorders, because, as you know, the company is not doing
 4   that, and they don't intend to do it.  And I --
 5              THE COURT:  So can I enjoin you from doing that?
 6   Can't I enjoin you from doing that from this preorder system?
 7   But, yet, on the other end, freeze or have you preserve
 8   certain assets for the consumers on their returns?  Couldn't I
 9   in a very limited way?  Can I do that?  Let me see.  I'm going
10   to enjoin you from doing that.  What does that hurt?  I'm
11   enjoining you from doing something, but you said you're not
12   going to do it.  But, yet, on the other end, I have the
13   ability to, through my equitable authority, if I do that, to
14   freeze out.  And I don't know how we arrive at that, but some
15   number that would insure this Court that the return to the
16   consumers would be present, then allow you to run your
17   company.  I don't want -- and you know, somehow have some
18   monitoring system that would suggest, "Hey, here's how it is,
19   Judge."  But, yet, I don't know the FTC would be happy about
20   that, but I'm asking you that question.
21              MR. HUMPHREY:  Absolutely.  I think that's going to
22   go to the core legal issue that has to be briefed, and we
23   don't -- I'll tell you that I think we've come to the end of
24   the road on that you won't have -- and I don't say this in a
25   threatening way -- but I don't think you're going to have a
```

43

```
 1   basis under the law to do that, if you haven't had the
 2   required showing on injunctive relief.  But I will say this --
 3            THE COURT:  Respective to the likelihood of success?
 4            MR. HUMPHREY:  Likelihood of success, even the
 5   violations or, you know, violating, or about to violate, all
 6   of those inquiries.  If the standard hasn't been met, then I
 7   think your effort to try and craft some ability to retain an
 8   equitable measure in place to oversee assets, I think that's
 9   troubling, I do.  And I'll tell you --
10            THE COURT:  And I agree with you, if I don't have
11   it, I don't have it, I don't have it.  I don't even need to go
12   to try and find the equity.  If they haven't met their
13   standard, it's a done deal.
14            MR. HUMPHREY:  And, Your Honor, we're not trying to
15   run.  They're not trying to run from you.  I'll tell you, and
16   you'll look, even if you say, "You know, you haven't met the
17   standards.  You don't have an equitable basis to keep a
18   receiver in place, and you don't have an equitable basis to
19   oversee assets."  They're not looking to run.  You know that
20   bitcoin wallet that you have right now, that bitcoin wallet
21   it's not consumer money.
22            What happened is, the full story has to be told on
23   that.  Consumers pay in bitcoin, and when the price goes up,
24   they're mad because they paid in bitcoin at a lower price, and
25   they want their bitcoin back.  That bitcoin, I don't know.  I
```
                                    44

don't want to make a misrepresentation, certainly, but I'm
talking a substantial percentage of what's in the wallet is
money that was paid in bitcoin that appreciated in value, and
the company made a profit off of that bitcoin.  But you know
what?  Just as easily, that price could have gone like that,
and then they have zero in that wallet.  So that's the risk
the company took on, so that's not exactly -- it's not fair to
say it's on the back of consumers.

The point to your point, I can tell you, I have
people over here telling me, if we can get back in business,
if we can operate, you know what?  We'll tell the Court --
we'll give the Court that wallet.  We'll let him keep that
wallet.  We'd come to you directly, and say, "Your Honor,
first of all, we try and operate without going to the wallet."
You know we try that, and we've got in place, down the road,
but there could be, I'm seeing some logistical issues with,
"Can we do business?  What do we need to do?  Do we need to
get this done?  Do we need money from that wallet to make that
happen?"  That could happen.  That is a bit of a logistical
nightmare.  I know you don't want us over here knocking on
your door weekly, or monthly.  I mean, I understand that, and
that's not ideal.  But I'm telling you, there could be a way
for us, and we're willing to say, not injunctive relief.

You know the reason we just can't come in here and
agree to those types of things is because we have to

45

Denise C. Halasey, CVR, CCR
Certified Court Reporter

Case 4:14-cv-00815-BCW   Document 202   Filed 12/15/14   Page 45 of 81

acknowledge they were called scammers. And they were called

bogus. And that happened. That was in a press release.

That's out there, it's in The Washington Post -- the whole

world -- they called them scammers and bogus to the whole

world. So when they agreed -- when I -- when they looked me

in the eye and say, "Can we -- what do we do here?" And I'm

saying, "Well, do you agree to what the FTC is wanting? Do

you agree to say you don't, you're not going to represent the

amount of bitcoins, and you're not going to represent that

you're not going to make shipments, and what have you?" It's

hard for me to do that, Your Honor, because I'm telling them

that maybe the things they don't do, and agree to relief that

isn't necessary, and agree to things that makes the FTC go out

and say, "We got the relief we sought. We got what we

wanted." And that's hard to do when you've been put in that

position.

They're fighting for their existence. They're here

fighting, and they're going to continue to fight, and that's,

you know, they have been some -- they have blocked some

obstacles, and, you know, look, there have been some, however

that war is played out, I know we have people on this side

that want to make things work. I'll say that, all right? Let

me try and move through this. This may not work, Your Honor,

because I think the questions you're asking are so astute,

that I'd rather address those, but let me try and move through

46

this, and you tell me -- you kick me to the curb at any point in time.

All right. So look, this is the market volatility issue, Your Honor. You got to take this into account when you're considering consumer expectations. Nobody knows what's going on here. We've seen it as high as $1200, we've seen it as low as -- well, look where it started out, Your Honor. Nobody knows the future of this. And when you're talking about expectations, you got consumers who want a bitcoin money machine because they see this spike here, and they want to play the market. I just -- this slide is in here so you can appreciate that this is the perspective.

THE COURT: Let me ask you, what -- and that goes to, again, and let's go back and you kinda heard the framework in which the Court is seeing whether there was a misrepresentation. You know, I see it as, you know, this future that, and I know the FTC is going to provide the Court with some case law, which suggests how the Court may should rule. And maybe I need to look at the expectations of the consumer, as opposed to looking at the time, because, you know, I look at this as a fraud case without the intent element. I have to look at the time you made that statement about this future event. I've got to, at least, what I was saying is, you got to show that it was false at the time it was made. Is that the way I should look at what they, what

47

```
 1    the FTC has to show this Court?  Or did that make --
 2              MR. HUMPHREY:  Well, it makes sense, Your Honor.  I
 3    think that you do have to look at the time it was made,
 4    whether it was false.  Now, how we go about doing that in
 5    terms of, you know, the consumer, I'll tell you.  Their, you
 6    know, in our motion to dismiss we attached what the company is
 7    saying to the consumer.  They put it out there.  They're not
 8    trying to hide it, certainly.  They're trying to give an
 9    update on the status.  And there are a few pieces of this that
10    have to fit in to what's going on.  When they get chips, you
11    know, it's not realistic to say that they can just ship
12    everything out the door instantaneously.  I mean, it's a
13    process.  And that chart we have submitted showed it's
14    two-week lag, but they get it done.  They get shipped, chips,
15    they ship.  So I think the point is when they're making the
16    representations, is it false when it's made?  I think that's
17    where -- I think you have to look at the circumstances.  But
18    you also have to consider in the backdrop of this type of case
19    we're dealing with.  Do we have people that are scammers that
20    are making the machine for a penny and then selling it for a
21    thousand dollars, and duping customers?  Or do we have a
22    company that's making machines that have a significant cost to
23    the company to make them, technology behind it to get it done;
24    to create that machine; to ship all that product to the
25    customer, to do all those things to get it to the customer.
                                 48
```

1   You have to keep that in mind, too, when you're talking about
2   the consumer and what's going on with this company, and the
3   perspective from this case, what the FTC is supposed to be
4   doing, and what they're doing in this case.

5            Okay.  So let's get past this issue, and I'll tell
6   you that, quickly, we put this up over here, so I'm not going
7   to waste the Court's time on it, but this goes to the issues
8   I'm talking about, Your Honor.  The company's not out there
9   trying to dupe customers into buying equipment.  They're not
10  out there making profitability, touting profitability, or, you
11  know, leading people into buying equipment that they can't
12  deliver.  That was a problem of the preorder model.  It was.
13  And it created a lot of problems.  And it's got headaches that
14  are going to go on with the punitive class action, and the
15  individual lawsuit seeking $5 million and Johnson County DA,
16  those are going to go on.

17           If we walk away with a denial of preliminary
18  injunctive relief, Your Honor, we don't go Scott free.  We're
19  going to be here, dealing with this case, and we're going to
20  be dealing with those cases.  That's an absolute fact.  But
21  they're not out there doing that.  These are the impressions
22  that are going out there, the, you know, million -- the $400
23  million of this going to consumers saying, "Here's the
24  equipment, and here's its speed, and here's Butterfly Labs.
25  Over and out."  That's what the case is about.  That's what

                                49

Certified Court Reporter

Case 4:14-cv-00815-BCW  Document 202  Filed 12/15/14  Page 49 of 81

they're representing. You have heard, you know, look, they've gone from scammers to bogus to now we're having a pretty healthy fight in here about things. And the problem I have is, you know, the FTC throws up a calculator here, or a representation here about a money making machine, and that doesn't get it done. That's isolated. That's not the picture of the company, that's not an accurate picture of the company. This is the more accurate picture of what they're doing, and what they're out there representing to customers. And I think that needs to be kept in mind.

You know, the public interest issue that you have to balance, you know, we don't have extensive evidence on customers, and what they're thinking, and what it is going on in their head, and what they want to know. But we know some of what they are saying, yeah. I mean, we have some input. They've been interacting with the temporary receiver. We have had our efforts, they've had their efforts. But, I think you have to keep in mind, let's just look a little bit at that, okay?

The public interest. The public interest, what is the consumer? What is a customer saying? All right. So when you look at that issue, we have a declaration of, this is our declaration of Ricardo Pena. Okay. This is in the record, Your Honor, 3 through 6 -- I'll skip over to the back, Your Honor, for the Court, but number 14. Paragraph 14, Your

50

Honor. "The lawsuit from the Federal Trade Commission
actually makes things worse for consumers like me. As I want
my Monarch now, and understand that they began the shipping
Monarchs to customers when the Federal Trade Commission
brought its claims against BF Labs." That's a consumer saying
that the Federal Trade Commission is making things worse.

There's another declaration, Robert Frankovic,
paragraph 15, "I believe that the Federal Trade Commission's
lawsuit is hurting the consumer." Look, we're not making this
up, Your Honor, these are real consumers. They're saying
this. They don't like this. They want their product. If it
was a scam, or bogus, they don't want their product. That's
what the FTC states when it is the market and protected
consumers from that, but there are consumers out there that
want their product, and there are consumers that want their
refund, and the company wants to help them.

THE COURT: But arguably, I'm sure, the FTC can
bring up others that think the opposite?

MR. HUMPHREY: And they do, Your Honor, they do.

THE COURT: I understand. I think it's on both
sides.

MR. HUMPHREY: It does. Look, they are consumers --
we have the FTC complaints in the Sentinel database. The
company knows they're out there, and that's, that's a symptom
of the preorder model. It is. But you know what, that

51

preorder model is going to be litigated extensively in the

other similar litigation. And it can be even litigated here,

if we want to talk about it going forward. But for

preliminary injunctive relief -- and you're right, they have

theirs, we have ours -- but I think it has to be, at least you

have to balance that and consider it in weighing the public

interest. But there are customers that want equipment, and

they want their refunds.

        And, Your Honor, whatever has happened with the

order of the temporary receiver -- it's, I think, you have to

look at the past as an indication of the future. We're not

laying blame anywhere, on anybody's doorstep, but it hasn't

worked out. It just hasn't worked out. Mr. Johnson is

tremendously talented, he is. I'm not criticizing what he has

done during this proceeding. But, I'll tell you what, there

are so many checklists that he has to go through to figure out

if he's done all the steps. And he's got a lot of reporting

to the Court. He's got a lot of things to track down. It's

amazing, right? He's sending e-mails late at night, but you

know what? In terms of trying to figure out how to get this

done, to work with consumers, and issue refunds, it's too much

to ask for any one person. And even working with Mr. Bourne,

Mr. Bourne, I'll tell you, you talk about a talented man, and

an impressive man, that's me talking, but I'm telling you,

even if you put these two together, and try and get to these

issues, and figure this out, and get the consumer --
communicate with the consumer, and the products that are
sitting there ready to be shipped, it's just not working.
It's not working, and it's not going to work going forward, I
just don't see it.  I don't see any method for it to happen.

            All right.  So, and that brings me to my next slide:
Will the receiver do more good than harm?  That's a case site
from the 8th Circuit.  That's an inquiry that you have to
make.

            THE COURT:  What if we don't have a receiver?  If I
find --

            MR. HUMPHREY:  If you --

            THE COURT:  Okay.  What if we don't have a receiver,
if I find, I'm just saying --

            MR. HUMPHREY:  I understand.

            THE COURT:  What if we don't have a receiver, but
we're just -- the Court will construct this in a way which
will give Mr. Bourne and those doing the ability to do what
they do to but yet give some assurances that these returns to
these consumers.  Receiver gone.

            MR. HUMPHREY:  You know what Your Honor?

            THE COURT:  How would that look like?  What would
that look like? is part of my question that, you know, that I
can address Mr. Bourne.  And I'm asking you, but I'm sure he'd
would be the expert of what I can do that, or I didn't do it.

                              53

```
 1   Or, or --

 2          MR. HUMPHREY:  And I'll tell you --

 3          THE COURT:  We don't have the receiver.  We just

 4   have some reporting mechanism to the Court to ensure that

 5   consumers are, you know, those who want refunds are getting

 6   theirs taken care of, ultimately.

 7          MR. HUMPHREY:  I hear you loud and clear.  I think

 8   we ought to explore it with everything we've got.  But, I tell

 9   you one of the reasons we're in the courtroom today and

10   yesterday is because there's no way real way to sit down and

11   talk that through and figure it out without the FTC wanting

12   injunctive relief.  And the receiver, with their position of

13   things going forward, that makes it difficult.  But, I'll tell

14   you what, there's a willingness on this side of the room to

15   explore that.  And, I'll tell you, you know, the problem is

16   when we sit down and talk about it -- I know that the problem

17   is going to be the FTC is going to say they want that in the

18   form of injunctive relief.  That's where I see the real fall

19   back.

20          We can agree to keep -- I guess the simplest, and

21   the purest way to try and do that is say, "You know what, if

22   we're interested in consumer redress, and we're interested in

23   there being money there at the end of the day, the company

24   ought to be able to operate and try and generate additional

25   funds going forward."  That's one thing, and that's not
```
54

happening today.  The goodwill value is being crushed.  I

mean, it's turning into a liquidation process.  I mean, I

don't want to overstate it, but that's what this is -- that's

what the writing on the wall, when you're headed down the

road.

So in terms of keeping the company alive, and

letting it operate and generate additional revenue for

potential customer redress, that's one thing.  You ought to

let them do their thing and see what they can make happen

under that business plan.  But in the meantime, is there a

healthy amount of funds out there?  We know the wallet's out

there, right?  So I think there is something to that notion.

That's what seems to be some mechanism for the Court to say,

"Look, I -- this is the major asset.  This is X percentage of

the assets.  This wallet represents this, and I have control

over that wallet.  And I'm going to go ahead," and they

voluntarily agree, no injunctive relief, but they voluntarily

agree for Court oversight of that amount.  And that's how we

structure it, something along those lines.

I don't think you need to worry yourself about any

dissipating assets, running off, absconding.  In any event the

action is still pending, so if you want to bring the hammer

down, I mean, you're still overseeing the action, we're going

forward.  So, they're not worried about that.  I'm not worried

about that.  So, if it's about preserving for consumer

redress, they're upset because that's where I see the
problems, trying to negotiate with them on that. It just
hasn't happened, and we can't get there. So that's why we're
here today, because we're saying, "You know what? Let's go
through this. Let's see where we end up after we argue the
law, which we think is in our favor, and there's no basis for
injunctive relief, and then we go back to operating, and we
don't -- it's gotten messy, Your Honor, is the problem. It's
gotten so messy, because the receiver has a position on the
business, now. And we don't think that is right, we think
they're off the mark. We disagree with it, and it's caused a
lot of strain. It has. It's an emotional issue for everyone.
So that's a problem, it's a logistical problem, but I think
the issue of how we get through it? One proposal is that you
have the wallet, we move forward, we do our thing. The action
is still pending, we still gotta live with it, but we have a
fighting chance, at least, going forward.

So, in terms, quickly, because we've already
addressed this subject, the Court is on this issue. I mean,
look, these $80,000 to mow this for discovery services;
identifying custodians. That was for the two civil actions.
That's a preservation. We gotta make sure we got all those
records taken care of, making sure we're preserving emails,
forms, everything. They've made those efforts, they're going
to continue to make those efforts. I tell them to preserve

56

records going forward. You know, look, that is there. Okay?

Linda Freeman. They dismissed it as the company's accountant, and she's on the company payroll. She's not on the payroll, but she's being paid by the company, so clearly she had a vested interest. I don't think it's that simple, Your Honor. Linda Freeman is highly qualified, well respected. I think you got a look at what she's saying here. She's worked closely with this company. She has worked extensively with them, they've opened up to her. That's what her declaration says. I'd encourage you to take a close look at what she says. That's an impressive woman, and she's got a lot to say about how they've opened up all the books and records. They're working hard to account for everything. They know, they know, she's around accounting for bitcoin for tax purposes as well. Everybody wants to do the right thing. They have an accountant involved to make that happen. She has some things to say here that I think you ought to look at in particular.

Were there some personal expenditures? Well, yes, there were, Your Honor. While I'm on that point, let me tell you this, the house was appraised. The company had the house appraised. There's a lis pendens on the house that was filed in the Mizener case. The attorney in the Mizener case filed the lis pendens on the house, which arguably would reduce the value of that house, if you tried to sell it. I know the

57

company has made efforts at selling that house to Mr.
Vleisides. That's, that's -- let me restate that. If seeking
an appraisal is making an effort at it, that's right. But
they want to sell the house to Mr. Vleisides. They want to
get it off the company books. That's something they want to
do. And I, you know, I'll just tell you right now, we've
talked about it. Can they do that? Yeah, they can do that,
and would they discount it because of that lis pendens when
they sell it to him? I told them no, don't do that. We've
disagreed with that lawsuit. We disagree with it. We think
we're going to win that lawsuit. So, that is something that
is recognized. I want the Court to be aware of that, but
we'll -- they track their personal expenditures. They track
them, they don't hide them. They're out there. They're
living with them. They recognize they've got issues to deal
with going forward. And they're going to do it, and Ms.
Freeman has been involved in that process.

Capture all bitcoin transaction and wall activity.
We showed that. They've gone to lengths to do that. If the
Court's concerned about that, I will tell you Ms. Freeman's
gone to great lengths, and she will continue to do so. The
company wants her to do that. They embrace it.

This is important, Your Honor, paragraph 19. "I
have not witnessed any activity consistent with the risk of
concealment or dissipation of assets or the destruction of

58

company records. I am not aware of any factual basis to support any such representation to the Court." Well, she is in a good position to know that, Your Honor. Does she know everything? No, she doesn't. But she's in a darn good position with the recordkeeping, and her involvement in their finances and accounting to make that statement. And, you know, the tenor of her declaration. Just read that in total, and you'll see, Your Honor. She's -- there's nothing to hide. There's no concern about these assets being lost or absconded with. It's just not there, Your Honor. Their need for the injunctive relief on that is not present.

Emilie Burdette, she was in the court yesterday, she's the assistant District Attorney of Johnson County. This issue was probably fair to say was more acute when we first arrived in the courtroom when we were going to have a hearing the first time around, because we were criticized yesterday for putting this out there. There was a confidential investigation and it wouldn't have been made known public, unless we made it known. Well, in the position the company was in, being called bogus and scammers, they felt like they had to get out there and tell a message about how they have been working with the Johnson County D.A. I mean that's an interesting perspective to think about it in those terms. That is where the company is at. And they're running out there to tell the world, yeah, we were working with the

59

Johnson County D.A, who by the way, as it's shown in this
affidavit, they could've sought a Temporary Restraining Order.
They could have sought a receiver. They had been working with
the company for months and months, asking lots of questions,
serving subpoena, having documents produced to them, and had
their investigator on the case. They had meetings. The
company had meetings with them. I think it just puts it in
perspective about how this was playing out, what happened on
September 19th, and the need for injunctive relief.

And I don't want to look backwards. If it has
something to do with whether I've cited here that they could
have signed a TRO, and the FTC did. I don't want to look
backwards, let's just look forward. Is there a need for
preliminary injection, no. They're going to have to go back
to deal with the Johnson County D.A., they're not running from
that, and they don't want to run from it.

I've got a few slides here on -- this is the
receiver issue still, I think it's, it touches on, you know,
we have the receiver in place, no criticism to the receiver,
just what are the customers saying about this, how has this
all played out, and what's happened here? How this is
actually unfolding as we move forward. We got one here, to
ELJ receiver. This is a memo to the Butterfly Labs
receivership. "I am a customer of Butterfly Labs, and I'm
awaiting shipment of product." I've highlighted a couple of

60

portions here. "Customers of Butterfly Labs are not better off because of the FTC action, in fact, they are worse off. Please stop the lawsuit and receivership." And another one here, this was approached from a consumer. "FTC, get out of the way and let us start receiving the products we've ordered. I really don't see how this is helping consumers at all. EFL has been delivering and providing refunds, and on top of it, we might not even get our refunds, full refunds, if the FTC manages to spend enough of it on their own expenses before giving what's left back to the consumers."

Look, I'm not trying to dramatize this, but it is an issue about, you know, that's something we need to keep in mind. Customers are in tune to that issue, and we are as well. There was an email that we sought leave to submit, Stewart Steven, one of the customers that was in supplemental evidence, Your Honor, that we submitted. And then the FTC, they kindly agreed, they didn't fight it, they submitted it. You know, He sends his email to the FTC, knowing that -- he forwarded to us because he never got a word from the receiver or the FTC. And he wanted a voice. And in his email he's mentioning about the web-page, and the entrant's costs, and he says, "This is reducing the customer's likelihood of getting anything back at the end of this process. And it's highly frustrating when the chance of receiving the product from BFL was very high." Then at the bottom, it says, "It is my

opinion that the FTC is punishing customers, and not

protecting them. The only winners from this process," he

says, "are the lawyers and those providing service to the

FTC."

Mr. Vleisides, he was mentioned yesterday during Mr.

Born's testimony, and, you know, look, the FTC, they put it in

their final brief that they filed with their supplemental

evidence. They mentioned the fact that Judge Kays had a

hearing on revocation, and made a comment about a stench. And

that's been, let me tell you what, that comment has been run

with in the media, and there are plenty of articles about it,

but the FTC, they ran with that article in their final filing,

and that's unfortunate because I think we have to put it in

proper perspective.

And, this, look, this is no disrespect to Judge Kays

because what I'm going to tell you is what else did Judge Kays

say in that proceeding? What else did he say when he was

hearing the evidence? And, by the way, Judge Kays didn't hear

all this evidence. He was focused on the issue of Mr.

Vleisides' revocation, so he didn't have all this before him

when he made that comment. But he's trying to do the right

thing. Judge Kays is trying to do the right thing, and he's

looking at Mr. Vleisides in the eye and he's telling him, you

know, "Hey, listen to me." All right.

Here's what he says, you need to keep this in

62

context, The Honorable Judge Case.  "I hope this is successful

for you Mr. Vleisides.  I'm pulling for you.  I know Butterfly

Labs is a legitimate company that enjoys success."  He's

sending a message to Mr. Vleisides.  He's not in the judging

the company about the stench that he's seeing the evidence

that's coming out of there.  I just think it needs to be put

in proper perspective.  And when you see a soundbite like

that, you have to have the full picture.  And, Mr. Vleisides,

you know what?  Judge Kays is pulling for him.  I'm pulling

for him.  Mr. Born is pulling for him.  The people in the

courtroom are pulling for him.  There are a lot of people

pulling for him.  He's trying to pick himself up and move

forward.  And that is what Judge Kays was recognizing.  I

think that needs to be mentioned as well.

          All right.  I'm almost done, Your Honor.

          THE COURT:  All right.

          MR. HUMPHREY:  This is the Washington Post article I

referenced.  This is the type of media that came out, after

the filing of this lawsuit.  Okay.  So, they file their

lawsuit, the Washington Post, national, international

coverage.  What did they say at the time?  They filed the

lawsuit ex parte, and the headline is -- this is the FTC's

first ever bitcoin case, and it's winning.  Well, goodness

gracious, of course, they're winning.  We haven't had a chance

to fight yet.  And you will see this article.  There are a

63

couple references here I just want point out. It says that a
federal judge has shut down Butterfly Labs.

THE COURT: Well, they didn't write it, did they?

MR. HUMPHREY: I know they didn't. They didn't
write it. But you know what, they set the stage for it, Your
Honor. They set the stage for it. They set it up, and then
the Washington Post knocked it down. That's -- I think that's
a fair statement.

THE COURT: Okay. Fair enough. All right. I
haven't seen it.

MR. HUMPHREY: They shut down scammers, it's in
here. They didn't write it. They didn't, fair enough, but
they set the stage for an article that talks about shutting
the company down, and that it's scammers.

And that brings me to my next slide. So we have
this, one of the hearings we've had in front of Your Honor on
the telephone. And this is not meant to be critical of Ms.
Wong. We've got lots of moving parts around here, and she's
just trying to be candid with the Court, but she says at the
time -- this is later on in the proceeding, when I think some
clarity arrives, "We are not trying to shut the company down."
I compliment her for it, but I say, you know, that's easier
said than done. Once you shut it down, and now you say you're
not shutting it, and it is shut down, and the company, what
are they? They're trying to get back up. They are shut down

64

right now.  They are shut down.  If they're not trying to shut the company, they shouldn't have brought this lawsuit the way they did.  They should've brought it, and had a fair fight on fair terms, and not done it this way.  So, look, it is shut down.  And it shouldn't be.  I think it's a telling statement, because the company shouldn't be shut down.

All right, Your Honor.  Look, the FTC cited a number of articles in their final brief, I don't know what articles have to do with the Court proceeding.  I can make an argument that I probably shouldn't put the Washington Post article, or the Kansas City Star article in here, but I tell you it give perspective so I put it in there.  Bitcoin is big.  It's getting a lot of publicity.  It's getting a lot of publicity in nationally, internationally, it's getting a lot of publicity in Kansas City.  At a time when it gets front page coverage in the Kansas City Star, when we have a company in Kansas City, in our hometown, Butterfly Labs, trying to make things happen, and do things -- nobody knows what the future is; nobody knows what they can do, or accomplish.  What is being said about Butterfly Labs?  Well, in the bitcoin world, however, Kansas City is still better known for what's become a courtroom battle.  And that is unfortunate.

It is also interesting in this article, you know, we've heard about this case, and what the comp -- you know, look, it is just one person making a statement in an article,

65

Case 4:14-cv-00815-BCW   Document 202   Filed 12/15/14   Page 65 of 81

1  Your Honor.  But, Butterfly Labs, the Overland Park company

2  fighting the FTC in court became widely known in the bitcoin

3  community for the money machines it sold.  One of their most

4  popular products was the Jalapeno.  Los Jalapenos, everybody

5  wanted a BFL Jalapeno, they said.  Look, you didn't order it,

6  he said it, this isn't our guy.  It's a guy saying it in an

7  article in this here report, presumably he's trying to present

8  and accurate story about the industry.  So these products,

9  everybody wanted one.  Is that a scam?  Is that someone that's

10 bogus and trying to trick customers?  There's customer demand

11 right there.  Everybody wanted one.

12          All right, Your Honor.  I'm going to -- I'm done

13 with my slides.  Let me just, in closing, I want to make a

14 couple final comments.  As it stands, we have an asset freeze

15 on the company, on Mr. Vleisides, and Ms. Drake, and Mr.

16 Ghoseiri.  Mr. Vleisides and Ms. Drake, they've -- I represent

17 them.  They sought leave for additional funds as we've gone

18 along here.  They're here to fight.  They're going to keep

19 doing what they're doing, but I'll tell you what, Mr.

20 Vleisides submitted to a deposition.  Mr. McClain submitted to

21 a deposition.  Mr. Bourne submitted to I think six

22 depositions.  We submitted to having an expert called into the

23 courtroom, and we haven't really had an expert taken any

24 depositions.  I understand the process.  We deal with the

25 process, and we have.  And when I am working on this case, I'm

                              66

not working alone. I have a team that works with me late into the night, and that's the BF Labs team. And they're here to fight, and they're here -- they're here to operate their company. And they're here to do whatever they can to repair their name, and on an ongoing basis, on a going full base. They recognize it isn't perfect. There are complaints out there. There are people that are very upset with them. They have name calling, problems, customer problems. But you know what? They want to serve customers, and they want to make things right going forward. And they're going to do it right. And they have a lot of potential, and they're fighting for that. And I think it's telling that they're here to fight.

If you move the injunctive measures in place for a preliminary injunction, it's a, it's arguably it's a preordained conclusion that things aren't going to work well. We don't know if the company can survive that. We don't. We don't know if the company can survive. Again, no criticism to the receiver, but we don't know if the company can survive a receiver going forward. And we don't know if the company can survive without being able to communicate to customers, and without being able to service customers, and without being able to provide product, and without being able to issue refunds. They were doing those things: Delivering product, and issuing refunds. They were. It may not be perfect, it may be subject to criticism; but, by golly, they were doing

67

it, and it was serving the consumer.  It is in the public
interest, Your Honor.  There's a lot before the Court, a lot
of facts, a lot of data, a lot of briefs, a lot.  But I think
you've got to hold on to this:  They came to the Court.
When this started out, they said, "Bogus and scammers."  That
is what they said.  We've been working hard since that.  And
we've come a long way.  I think they'd even admit that.  But,
I'll tell you what, trying to overcome that when you've got an
injunction on your hands, that's this.  I mean, you've got
your hands tied behind your back, and you're trying to fight.
And we'll fight them, but it ought to be in the context of no
preliminary injunctive relief, the standards having been met.
It ought to be in the context of let's have a fair fight.
Let's fight this out on a preliminary injunction basis, we'll
do discovery, you'll do discovery.  Let's do this the old
fashioned way.  Let's do it the right way, and let's see what
ends up here.  I don't think, and I'm not just saying all
that.

         It's not just me saying it because I'm trying to
persuade you emotionally to do it.  I don't think the law
supports an injunction here, a preliminary injunction.  I
think there are a number of reasons why.  Including the fact
that when you look at these types of representations, the
misrepresentations they're relying on, this isn't the right --
this is an opportunity for them to make bad law is what it is.

                              68

And they can, and they might.  And that's their own problem,

but I -- we can do our part to try and show that this is not

the instance where you impose that kind of -- you got other

people out there that are taking preorders, bigger names than

us:  Virgin Galactic.  There will be some people upset with

how this gets handed down, if they push it the way they're

pushing it.

So all I'm saying is, Your Honor, there is not a

legal basis, or a factual basis as shown through the evidence

presentation yesterday to support a preliminary injunction.

The company just wants to fight.  They want to do it.  They

will do it.  They're not running away.  They'll be here.  This

case, you should not grant a preliminary injunction.  You

should deny the motion for a preliminary injunction.  Thank

you, Your Honor.

THE COURT:  Okay.  Thank you.  Well, this is a good,

probably a jump off point.  We've been at it for a little

while, to where that very reason the Court does want this

post-trial brief, as we call it, goes with these direct

issues, and point to the evidence that support your positions.

Whether it be -- I know initially, Mr. Griffin judged by the

own words of 13B, the Court -- I think your argument was, the

Court shouldn't grant a preliminary injunction.

MR. GRIFFIN:  Right.  Well, I've got some follow up

to that, but at the appropriate time.

69

```
 1              THE COURT:  Well, the time is right.

 2              MR. GRIFFIN:  I was just trying to focus on just the

 3  standard issue.

 4              THE COURT:  Yeah, yeah.

 5              MR. GRIFFIN:  I didn't talk about Mr. Ghoseiri yet.

 6  I have a few comments about --

 7              THE COURT:  Oh, do you?  Okay.  Well --

 8              MR. GRIFFIN:  It will be 5 minutes or less.

 9              THE COURT:  I would have cut Mr. Humphrey off a long

10  time ago, if I had known that.  Okay.  Just a few comments

11  there.  And I apologize too, and I'll let you --

12              MR. GRIFFIN:  We were tag-teaming.  So, what the FTC

13  is saying is that they are actually not relying on, on Section

14  13B.  They're still relying on general standards for granting

15  preliminary injunctions, which 13 B allows them to not have to

16  show irreparable harm to the FTC, for example.  So if they are

17  saying that the --

18              THE COURT:  I think they're right with their

19  technique they are just suggest the law doesn't suggests what

20  you say.  They say case law doesn't support what you're

21  saying.  --

22              MS. WONG:  That's correct, Your Honor.

23              THE COURT:  Yeah.  And, so --

24              MR. GRIFFIN:  But, but, but what they're saying is

25  they're relying on the general standards for issuing the
```

70

preliminary injunction.  Okay.  And they say 13B allows that,
and maybe we're somatic, semantic difficulty.

       THE COURT:  Okay.

       MR. GRIFFIN:  And so Mr. Ghoseiri is an engineer.
He lives in France.  That's why he's not here.  And we have to
look all the -- let's just take the FTC at their word, that
they're looking at, that they have to meet all four -- you
have to make a finding for all four standards necessary to
grant a preliminary injunction against Mr. Ghoseiri.

       One of those is the balance of the harms.  And I'd
ask you to look at the scope of the asset freeze order against
Mr. Ghoseiri.  It is breath-taking what it does.  It's
onerous.  And they simply bend no basis in the record for the
Court to make any findings that Mr. Ghoseiri has any
ill-gotten gains, or has -- is likely to dissipate any assets.
He is not a signatory on any of the corporate accounts.  And,
again, I just ask you to look at the breadth of that, balance
the harms and the lack of evidence to support a basis for the
asset freeze against Mr. Ghoseiri, I think weighs definitely
against granting it.

       Now, if they have -- if they are going under what
they would call the first proviso with 50, uh, 13B, they have
to show that Mr. Ghoseiri is violating, or is about to violate
the law.  If they're not, if they're going under general,
equitable principles, they still have to show a threat of

71

irrevocable harm to the FTC, which I would argue has got be
the same thing. They've got to show that Mr. Ghoseiri is
about to violate, or is likely to violate the law in order to
justify, to show you that the FTC has any irreparable harm.
And there's simply no evidence of that. They're -- they put
on no evidence about Mr. Ghoseiri being involved in any of the
things that they complain about. But there is some evidence
in the record, Your Honor.

          I don't know -- attachment X to the original FTC
reply brief, in connection with the original hearing that we
had, is a Skype log. And on page 9 of 34, of that Skype log,
attachment X, there is a discussion between Mr. McClain and
Mr. Ghoseiri about return on investment. And Mr. Ghoseiri
says, and this is on October 9, 2013, at 4:16 p.m. Mr.
Ghoseiri, "Did you make it clear that we only sell hardware,
and can't guarantee a return on investment, as it depends on
infinite factors." Mr. McClain says, "Exactly." There is
additional evidence about -- that goes directly to what
they're complaining about in this case. On page 16 of 34 of
attachment X is Mr. Ghoseiri is discussing with Mr. McClain,
again. And they're discussing issues about delay. And Mr.
Ghoseiri says, "And having no delay is nearly impossible."
And this was at 2:45 p.m. on page 16 of 34, "Having no delay
is nearly impossible. Not only in our particular industry,
look at Microsoft, Intel, AMP so we must make it clear to

everyone, so they can be clear on their expectation." So not
only is there no evidence that Mr. Ghoseiri did or
participated in controlled any of the things that the FTC is
complaining about. The only evidence that has been submitted
is, that actually he was arguing internally about how they
needed to be clear on their representations on these issues.

        And so whether you look at proviso 1, or proviso 2
of Section 13B, there is no evidence of irreparable harm to
the FTC. And they do make a -- that's making a really broad
argument, which is that -- I heard today, every single dollar
that has ever been received by Butterfly Labs, even from
customers who bought, paid for, and are happy with their
machines is ill-gotten gains. So, therefore, any penny that
any employee ever received is ill-gotten gains, which should
be subject to an asset freeze. That's breathtakingly
overbroad, and there's no evidence for that in the record.
And, so, again, another reason why there is no support for an
asset freeze. Thank you, Your Honor, very much.

        THE COURT: All right. Thank you. As the Court was
mentioning, this post-trial brief needs to just go to the
questions, and they don't need to go beyond, they need to be
very contained to what the issues are, and as it relates to
likelihood of success, as with respect -- give me the law and
what you believe in terms of delivery, and what you have to
show and support it with your record, the papers, and point

                            73

1  specifically.

2          You did a job Ms. Wong.  You thought these things

3  showed intent.  You believe, hey, we don't even have to do

4  this, Your Honor, but look here, here, here supports our

5  position.  I need to you to do that in your argument, to

6  support your positions with regard to that.  And let's keep it

7  to the facts that support what this Court ultimately has to do

8  to decide.

9          Now, with respect to 52C, the oral motion that's

10  under advisement.  With respect to doctor who testified, and

11  their objection to that, assume the Court is going to consider

12  that.

13          Now, ultimately, now there's -- I think there needs

14  to be some limitation on your briefs to the Court.  And part

15  of this is just to get to the issues.  My thought was ten

16  pages, as a maximum, in terms of that.  I think the other

17  thing we have to discuss is time frame.  I know time is of the

18  essence.  So I don't know.  I'm open to -- I don't want to put

19  unreasonable expectations on parties, but I just don't know.

20  I need your input with respect to what you all think, knowing

21  that holiday -- you know, all the things that are coming up.

22  And you guys tell me a reasonable expectation, ten days, seven

23  days, I don't -- two weeks, I don't know.

24          In the interim, we have to have the order, you know,

25  that's another question, how we're going to treat in this

                                    74

```
 1    interim period before the Court can rule?  So these are just
 2    my thoughts.  These are -- and we do have, again -- you know,
 3    again, my first priority is to rule here.  We have those
 4    outstanding motions to dismiss, which the Court will rule on
 5    after I resolve this issue, and, then, move forward from
 6    there.  Comments specific to expectations of the Court in
 7    terms of a brief back that goes directly to the issues.
 8               MS. WONG:  Sorry.  I just have one quick follow up
 9    about the brief.
10               THE COURT:  Uh-huh.
11               MS. WONG:  So do you want a post-trial brief?
12               THE COURT:  Well, you know, I propose a proposed
13    order.
14               MS. WONG:  Findings of fact.
15               THE COURT:  You know, yeah, proposed whatever your
16    findings and support it.  That's how I would -- you know, I
17    wasn't really caught up unnecessarily.  That's what I
18    initially said, and I think that's fine with the Court.  Just
19    proposed order of the Court, with findings of fact that
20    support your position -- you know, ultimately I just want to,
21    just highlight this to what, you know, sometimes we get this
22    other evidence which may -- which, kind of termed gently, but
23    if I don't find out with success, I'll go no further; correct?
24               MR. HUMPHREY:  Right.
25               MS. WONG:  Ten pages, and then you want citations?
                                   75
```

1     I just want to make sure I give you exactly what you want.

2            THE COURT:  If you believe this Court -- you

3     presented evidence to support a preliminary injunction, you

4     need to give me the law, and then support it with the facts.

5     Not only what happened in this hearing, but everything that

6     will point specifically supporting your position for it.  I

7     don't know what more --

8            MS. WONG:  Crystal clear.

9            THE COURT:  Just follow my order.  Proposed order to

10    the Court.

11           MS. WONG:  Okay.

12           THE COURT:  If you were the court Judge, this is

13    what I would do, and this is how I would support my position

14    in doing it.

15           MR. HUMPHREY:  Judge, one clarification, Your Honor.

16    Since you adopt our findings, you would also request

17    preliminary injunction.  The proposed preliminary injunction,

18    itself, which we have drafted, is -- well exceeds ten pages.

19    We will commit that, the proposed findings, and concluding

20    will be the ten pages.  The actual order that we would ask to

21    be entered, the injunction to that is much longer.  Is that

22    okay, as long as our findings are the ten pages?  Is it -- the

23    findings may be --

24           THE COURT:  Yeah.  The finding itself.  You know,

25    that's what I want to know.  What supports the issue.

                                76

MR. HUMPHREY:  The whole thing including the order

2    wasn't just --

3          THE COURT:  My thing is what supports the issue.

4    And it's your burden.

5          MR. HUMPHREY:  Well, while we're in there, and we're

6    all together, I thought I'd raise this.  You know, look, we

7    could go back and we could put this ten page proposed order

8    together, and we could have it to you by tomorrow.  I want to

9    say this, we have an urgency.  We want, you know, we

10   understand that there is a holiday coming up.  And we also

11   know that the FTC they have to fly back to Washington DC.  So

12   I don't know that what that looks like.  We haven't -- and I

13   don't know, Your Honor, what it looks like in the interim,

14   exactly.  But we, our hope would be that we have met the

15   requirements.  And, we, as soon as possible, we could get that

16   to you.  And we would like to try to do it, try to do it

17   tomorrow.  We probably should talk with the FTC and Ms. Wong,

18   and see what they would expect.  But our expectation, Your

19   Honor, in terms of seven to ten days.  We don't want to ruin

20   anybody's Thanksgiving.  We're not interested in that, but we

21   do want a ruling as soon as possible.  So I don't know if that

22   is any help at all, but that's how we feel.

23          THE COURT:  Yeah.

24          MS. WONG:  And I understand that, but we are

25   traveling, and Ms. Frazier and I are both very sick.  So we

                              77

1  would request a little bit more time.  But I understand his

2  position, and we're happy to work out a schedule.

3          THE COURT:  Well, the point is, obviously, the Court

4  has some thoughts of its own with respect to this case.  I

5  just want to get the positions, so we could get as finalized,

6  and the Court issue its order with respect to its ruling on

7  this preliminary injunction.

8          MR. HUMPHREY:  Well, we'll do this.  We'll go back.

9  We'll do our work, and we'll get it to you as soon as

10  possible, knowing that the FTC will come to us with a

11  proposal.  We'll work with them.

12          MS. WONG:  There are dates that you would like it,

13  Your Honor?

14          THE COURT:  That's what I was asking you all.  I

15  mean --

16          MS. WONG:  Can we do next Tuesday or Wednesday?

17          THE COURT:  That's fine.

18          MS. WONG:  Probably Wednesday.

19          THE COURT:  That's fine with the Court.  You know,

20  and I understand, and I know you guys are, at least it appears

21  you're sensitive to the issues that the Court has to rule.

22  And I understand that.  I think Wednesday is fine.  I think

23  there will be -- again, the Court will, you know, the Court

24  has some ideas of, of the facts and circumstances.  And I hope

25  that once I get that, to move as quickly as reasonable to get

78

```
 1   out an order.

 2              MR. GRIFFIN:  Your Honor.

 3              THE COURT:  Mr. Griffin?

 4              MR. GRIFFIN:  May I -- I think Mr. Ghoseiri's issues

 5   are very narrow.  And I -- unless you really want it, my

 6   suggestion is that I'm happy to rest on what has been done,

 7   and not provide any post-trial briefing.

 8              THE COURT:  Yeah, I don't need anything from you.

 9              MR. GRIFFIN:  Okay.

10              THE COURT:  If that's it, you're fine.

11              MR. GRIFFIN:  Yeah.  Thanks.

12              MR. HUMPHREY:  I do -- let me just say, I don't mean

13   to make this difficult.  You know, the offices are closed this

14   week, and then next week.  So Wednesday we'll work with that

15   deadline knowing that we might, may get it to you earlier than

16   that.  We proposed this order and we will get it to you as

17   early as we can get it to you knowing that you have to do your

18   job.

19              THE COURT:  Is there any -- let me ask for the

20   receiver, any thoughts?  Do you see what we're facing, Mr.

21   Johnson?   In terms of -- it's probably as good time as any

22   for you to make some suggestions to the Court on maybe the

23   path -- how we continue until such time the Court -- I believe

24   the interim order provides for that, correct?  Or no?

25              MR. JOHNSON:  The, I think the interim order does,
                               79
```

1   but the more, I think, pressing is, I don't have budget

2   authority to do various ongoing operations.  And I'm not sure

3   if Mr. Humphrey will stay in the office for next week.  I

4   don't know if he was going to that point.  But the office is

5   closed this week.  You know, whether or not we ramp up, and

6   there is work to be done come Monday, I think that might be

7   something I can address with the company, and bring a proposal

8   to the parties.  That is my kind of thought on the timing.

9   What we do in this kind of gap period from the receivership.

10         THE COURT:  Right.  Mr. Humphrey, I --

11         MR. HUMPHREY:  Well, we're happy to work with Mr.

12   Johnson on that.  The office is closed this week.  Talking

13   about ramping things up next week.  I know I have people who

14   want to go to work.  So if there's a way to do that, we should

15   do it.  We should explore it.  We should get people going on

16   Monday.  I don't know what all can be done, but we should do

17   that while we're waiting for an order.  That would be my

18   position, and we can talk to Mr. Johnson.

19         THE COURT:  Yes.  And that's it, until we meet

20   again, the Court is aware of all the circumstances, and I

21   think the FTC, they'll present.  The Court has again some

22   ideas and thoughts on just what has been presented.  And so

23   that may supplement, or I may look at it and not supplement,

24   and be able to issue, and then we move from there.

25         MR. HUMPHREY:  Okay.

Denise C. Halasey, CVR, CCR
Certified Court Reporter

```
 1          MR. JOHNSON:  And, Your Honor, I'll get something to

 2   the parties and stuff to figure out what we can do come

 3   Wednesday.

 4          THE COURT:  Okay.  Fair enough.  Anything else for

 5   the record, from the other side?  FTC, Ms. Wong?  Okay, from

 6   the defense?

 7          Well, I appreciate you all in terms of the evidence,

 8   and entertaining the Court in terms of arguments today.  I

 9   think it's very helpful, and the Court really narrowed the

10   issues and what the Court needs to rule on, so I certainly

11   appreciate it.  I look forward to you all filing what you will

12   with the Court.  And the Court certainly recognizes the

13   essence of time, and the Court will move just as expeditiously

14   as it can with the Court's ruling.  All right.

15          MS. WONG:  Thank you, Your Honor.

16          MR. HUMPHREY:  Thank you, Your Honor.

17          MS. BALDWIN:  All rise.  Court is in recess.

18   (THEREUPON, the following proceedings were adjourned.)

19                           CERTIFICATE

20          I certify that the foregoing is a correct transcript

21   from the record of the proceedings in the above-entitled

22   matter.

23          December 12, 2014

24                   /s/ Denise C. Halasey
                     Denise C. Halasey, CVR, CCR
25                   U.S. Court Reporter
                     81
```