UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>BF LABS, INC., *et al*.<br><br>    Defendants. | CASE NO. 4:14-cv-00815-BCW<br><br>**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its First Amended Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the marketing and sale of Bitcoin mining machines.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), (c)(3), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6. Defendant BF Labs, Inc., d/b/a "Butterfly Labs" (hereinafter, "Butterfly Labs"), is a Wyoming corporation with its principal place of business in Johnson County, Kansas. Butterfly Labs also has operated from Kansas City, MO and maintained a P.O. Box in Kansas City, MO.

7. Defendant Darla Drake, a/k/a Jody Drake (hereinafter, "Drake") is the General Manager at Butterfly Labs. Drake also serves as the Secretary and Treasurer at Butterfly Labs. At all times material to this complaint, Drake, individually, or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices set forth in this complaint. Drake, in connection with the matters alleged herein, transacts or has transacted business in this district.

2

8. Defendant Nasser Ghoseiri (hereinafter, "Ghoseiri") is the President and Innovation Officer/Chief Technology Officer at Butterfly Labs. At all times material to this complaint, Ghoseiri, individually, or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices alleged in this complaint. Ghoseiri, in connection with the matters alleged herein, transacts or has transacted business in this district.

9. Defendant Sonny Vleisides (hereinafter, "Vleisides") is a Founder and Innovation Officer at Butterfly Labs. At all times material to this complaint, Vleisides, individually or in concert with others, controlled the acts and practices of Butterfly Labs, including the acts and practices alleged in this complaint. Vleisides, in connection with the matters alleged herein, transacts or has transacted business in this district.

## COMMERCE

10. At all times material to this complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

11. Defendants operate Butterfly Labs, which sells Bitcoin mining machines and services that consumers purportedly can use to generate Bitcoins, a form of virtual currency worth hundreds of dollars per unit. Defendants have generally charged consumers thousands of dollars upfront for the machines and services. In many instances, after accepting consumers' payments, Defendants fail to provide the purchased machines or services.

12. In numerous other instances, even where Defendants have provided the machines or services, they have done so after significant delays. Late delivery of machines renders them obsolete or significantly depreciated in value. In some instances, the machines have arrived

3

damaged or defective or do not meet the specifications as stated. As a result, consumers have not been able to use the machines to generate a substantial or profitable number of Bitcoins.

13. In numerous instances, before delivering the machines to consumers, and without telling consumers, Defendants have used the machines to mine for Bitcoins for themselves. This practice reduces the number of Bitcoins available to be mined and, in many instances, increases the complexity of the computational puzzle the machines must solve to mine Bitcoins, making it more difficult for consumers to generate Bitcoins with the machines.

14. In numerous instances, after collecting consumers' upfront payments for machines and services, Defendants failed to provide the machines or services at all, provided them only after a substantial delay,, or provided machines that were damaged or did not meet the specifications Defendants promised, but then refused to return or return promptly consumers' upfront payments.

## Background on Bitcoins and Bitcoin Mining

15. Bitcoin is a payment system that is also referred to as a "virtual currency." Bitcoins can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other physical or virtual currencies. Bitcoin users can send payments to another for goods and services through online entities. Bitcoins have significant monetary value, and have reached as high as approximately one thousand dollars per Bitcoin at certain times.

16. The Internal Revenue Service has stated that Bitcoins are not currency, but rather, are taxable as valued property. Unlike traditional currency, Bitcoins are not created by a government or central bank, such as the Federal Reserve.

17. Because Bitcoins do not have a central bank for distribution, Bitcoins can only be generated through a process called Bitcoin "mining." Bitcoin "miners" are consumers who

4

receive transaction fees and newly minted Bitcoins in return for solving computational puzzles using their computers. Once a miner, via his computer, solves the computational puzzle, the Bitcoin network awards a specific number of Bitcoins to him.

18. Although the total number of Bitcoins is increasing through the mining process, the number is increasing at a reduced rate, and, at some point, Bitcoins will cease to be generated altogether. Specifically, roughly every four years that the Bitcoin network operates, half the amount of Bitcoins are created as compared to the prior four years. For example, a miner solving the computational puzzle could earn a reward of 50 Bitcoins in 2008, but that reward halved in 2012 to 25 Bitcoins, and it will drop to 12.5 Bitcoins in 2016. Thus, the total number of Bitcoins in existence will never exceed 21,000,000 and all Bitcoins are expected to be mined by 2140.

19. As more miners have joined the Bitcoin network, it has become increasingly difficult to solve the computational puzzles before another miner and make a profit. Therefore, miners must seek faster and faster equipment, and must seek efficiencies to cut their operating costs, which includes high electricity bills and wear-and-tear of the mining machine.

20. Initially, Bitcoin mining started as a process that miners could undertake using a personal computer. However, as more miners joined the network and the difficulty of Bitcoin mining increased, the computer hardware required to profitably mine Bitcoins evolved from general purpose CPUs (found in common desktop computers) to specialized computers and chips whose sole purpose is for performing the calculations necessary for Bitcoin mining.

21. With the development and release of each new generation of mining technology, previous generations become effectively obsolete and worthless. Given the finite number of Bitcoins being produced, the increasing number of miners and complexity of the computational

puzzles, and the introduction of faster and more specialized equipment, obtaining the most cutting-edge technology in a timely manner is paramount for any consumer to mine a profitable or substantial number of Bitcoins.

**Defendants' Sale of Bitcoin Mining Machines**

22. Defendants purport to manufacture and sell Bitcoin mining machines and services that consumers can use to generate Bitcoins. Defendants also purport to sell the latest generations of Bitcoin mining machines.

23. Defendants market their Bitcoin mining machines and services for sale on their website, www.butterflylabs.com, stating that "Butterfly Labs manufactures a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication and security applications." The website describes products for sale and their prices, delivery dates, and terms and conditions of sale. It touts the low power consumption and high efficiency and processing speed of Defendants' mining machines.

24. Defendants market their bitcoin miners as "high performance," "high speed," and the "fastest and most power efficient bitcoin miner yet."

25. Defendants also market their Bitcoin mining machines as allowing consumers to mine a substantial or profitable number of Bitcoins. Specifically, Defendants have directed consumers to calculators to allow consumers to determine the number of Bitcoins Defendants' machines would mine. For example, in November 2012, on the company Facebook page, Defendants stated that consumers could use a particular calculator application to calculate the return on investment, or ROI, for Defendants' Bitcoin mining machines. The post reads, "Measure your ROI with this cool Bitcoin mining calculator." The description of the calculator displayed on the page reads as follows: "Ultimate Bitcoin Calculator. Bitcoin Mining,

6

Profitability and Power Calculator. Calculate how much your shiny new rig is making you. Daily, weekly, monthly and annual net profit, power consumption cost, break even time. Everything you can ever need!. . ." Links to the calculator have appeared in other Butterfly Labs social media pages (such as Twitter and Tumblr) and on its weblog, which is accessible from the company website.

26.  The calculator, and any calculations to determine the profitability of a Bitcoin mining machine, requires consumers to input various data points, including the Bitcoin exchange rate, mining difficulty level, and cost of power. The calculator also requires consumers to input data points specific to the machine, such as the delivery date, power consumption, and processing power, all of which Defendants provided to consumers on their website. The calculator's output includes net hourly, daily, weekly, monthly, and annual profit, and the date by when the consumer could expect to break even on the machine and its operating costs.

### Defendants' Failure to Deliver Paid-For Bitcoin Mining Machines as Promised

27.  For all orders, Defendants have required consumers to pay upfront by PayPal, Bitcoins, or bank wire transfer the entire amount of an order at the time the order is placed.

28.  In June 2012, Defendants' website advertised its line of "BitForce SC chip" (hereinafter, "BitForce") mining machines. At the time, according to Defendants, the BitForce mining machines allowed consumers to use the latest technology for Bitcoin mining. Defendants' BitForce mining machines ranged in price from $149 for their lowest power machine to $29,899 for their highest power machine.

29.  Beginning in June 2012, Defendants informed consumers that the BitForce mining machine "is now in final state development. Initial product delivery is scheduled for

7

October 2012." However, Defendants did not deliver any BitForce mining machines to its customers in October 2012. Indeed, by April 1, 2013, Defendants still had not delivered a single BitForce mining machine to their customers.

30. In fact, Defendants acknowledged in September 2013, that they had failed to ship mining machines to more than 20,000 customers who had paid for the equipment in full.

31. On November 28, 2013, Defendants posted on their website that all the orders for the BitForce mining machines had been shipped. However, consumers continued to file complaints about not receiving their prepaid BitForce mining machine.

32. In approximately August 2013, Defendants announced that they were selling Monarch mining machines, which Defendants claimed possessed greater mining power than any of the previous mining machines in the market. Butterfly Labs stated that the Monarch is the "fastest and most power efficient Bitcoin miner yet." Defendants required consumers to pay $2,499 to $4,680 upfront to purchase the machines.

33. Defendants' website represented that the Monarch would begin shipping by the end of 2013 and provided a manufacturing and development timeline, characterizing the December 2013 delivery date as "solid." Defendants claimed that the final phase of manufacturing (known as "taping out") would be complete by August 2013.

34. In internal discussions in November 2013, Defendants admitted that they were not close to finishing the taping out process. As one employee put it, "Honestly, if we haven't even taped out at this point, I don't see us shipping a product until the very end of January at the earliest, more like middle of February."

35. Defendants did not deliver the Monarch machines as promised, despite their representation that the machines should be delivered by the "end of the year [2013]." Months

8

later, in approximately March 2014, Defendants stated that they would provide consumers with Monarch machines in April 2014. Defendants did not ship a single Monarch machine until at least August 2014. In numerous instances, consumers were not able to generate Bitcoins using the BitForce or Monarch Bitcoin mining machines because Defendants did not fulfill consumers' orders.

36. In numerous instances, Defendants eventually delivered a BitForce that was either defective, obsolete, or mining far less Bitcoins than it would have had it shipped on the promised shipment dates.

37. In numerous instances, Defendants eventually delivered a Monarch that was either defective, obsolete, or could mine far fewer Bitcoins than it would have had it shipped on the promised shipment dates.

38. In numerous instances, Defendants eventually delivered machines that did not meet the size and performance specifications promised to consumers.

**Defendants' Failure to Provide Paid-For Bitcoin Mining Services as Promised**

39. In approximately December 2013, Defendants began offering mining services whereby Defendants supposedly would use the Monarch mining machines to generate Bitcoins for the consumer. Defendants have claimed the service would allow consumers to "harness the power of the latest Bitcoin mining technology" without specialized knowledge.

40. Defendants' mining services generally cost consumers an upfront sum of thousands of dollars.

41. Defendants stated that they would begin generating Bitcoins for consumers who paid for these services in the "March 2014 time frame." Defendants failed to do so. As of

9

Case 4:14-cv-00815-BCW   Document 274-1   Filed 03/13/15   Page 9 of 16

August 2014, Defendants still had not provided these services to many consumers who paid for them.

**Defendants' Undisclosed Use of Consumers' Machines to Mine for Bitcoins for Themselves**

42. Through its website and various marketing materials, Defendants represent that they manufacture and sell Bitcoin mining machines for consumers to use to mine Bitcoins.

43. In many instances, however, after manufacturing Bitcoin mining machines ostensibly for consumers, Defendants have pooled hundreds of machines together in multiple storehouses to mine for Bitcoins for their own use before shipping them to consumers.

44. Defendants' use of consumers' Bitcoin mining machines has decreased the number of Bitcoins available for consumers to mine using the purchased machines and often has increased the complexity of the computational puzzle to be solved to obtain Bitcoins.

45. Notwithstanding these practices, Defendants have represented that the company does not mine for Bitcoins using any machines, much less machines designated for consumers. On their website, for example, Defendants have represented that the company does not mine for Bitcoins because it "would be a conflict of interest" and hardware, not mining, is the "focus of [their] passion."

**Defendants' Failure to Provide or Provide Promptly Paid-For Bitcoin Mining Machines or Services While Refusing to Return or Promptly Return Consumers' Payments**

46. Defendants have taken consumers' upfront payments in exchange for Bitcoin mining machines and services that Defendants have failed to provide, or for machines that are damaged, do not meet the specifications Defendants promised, or are delivered so late that the value of the machines are less than they would have been had Defendants delivered them as promised.

10

47. Defendants nonetheless often have refused to refund or refund promptly consumers' payments. Thousands of consumers have complained that they requested but did not obtain refunds from Defendants, even though they did not receive any products or services, received them months after they expected them, or received machines that were damaged or did not match the specifications of the machines they had ordered.

48. Consumers who unsuccessfully attempt to seek a refund from Defendants often spend considerable time doing so. Some consumers have complained that after unsuccessful attempts to obtain a refund from Defendants, they have sought recourse from their credit card company or other payment company, spending a month or more recovering their payments.

49. Defendants' collection of consumers' upfront payments in exchange for products or services that Defendants fail to provide or do not provide as promised is a net loss for consumers. Consumers who have paid for machines or services that Defendants have not provided, or machines that are damaged or do not meet the specifications promised are out hundreds or thousands of dollars, depending on the cost of the machine or services, or do not have the machine for which they paid. Consumers who have paid for machines or services that Defendants have not provided by the promised timeframe have not received the product they paid for—a Bitcoin mining machine capable of mining Bitcoins at the rate Defendants described at the time of purchase. Defendants also did not timely provide the Bitcoin mining services that consumers had purchased.

## **VIOLATIONS OF THE FTC ACT**

50. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

51. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

52. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

53. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Bitcoin mining machines and services, Defendants have represented, directly or indirectly, expressly or by implication, that:

   a. Consumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins, or

   b. Defendants will deliver Bitcoin mining machines or services to consumers in a timely fashion.

54. In truth and in fact, in numerous instances, the representations set forth in paragraph 53 above are false or misleading or were not substantiated at the time the representations were made.

55. Therefore, the making of the representations set forth in paragraph 53 above constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

56. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Bitcoin mining machines and services, Defendants represent directly

12

or indirectly, expressly or by implication, that Defendants manufacture and sell Bitcoin mining machines for consumers to use to mine Bitcoins for themselves.

57. In numerous instances in which Defendants make the representation in paragraph 56, Defendants fail to disclose or disclose adequately to consumers that Defendants use the machines to mine for Bitcoins for themselves before delivering them to consumers. This information would be material to consumers in deciding whether to purchase the machines.

58. Defendants' failure to disclose or disclose adequately the material information described in paragraph 57, in light of the representation set forth in paragraph 56 above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT III**

59. In numerous instances, Defendants have failed to provide Bitcoin mining machines or services at all, or have delivered machines only after a substantial delay, or have delivered machines that were damaged or did not meet the specifications Defendants promised, yet have refused to return or return promptly consumers' upfront payments for the machines and services.

60. Defendants' actions have caused or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by any countervailing benefits to consumers or competition.

61. Therefore, Defendants' practices as described in paragraph 59 constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

62. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

63. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: March 13, 2015  Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel


/s/ Helen Wong
HELEN WONG, DC Bar # 997800
hwong@ftc.gov
LEAH FRAZIER, DC Bar # 492540
lfrazier@ftc.gov
GREGORY A. ASHE, VA Bar #39131
gashe@ftc.gov
JASON M. ADLER, IL Bar #6295738
jadler@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave., N.W., Mail Stop-CC 10232
Washington, D.C. 20580
202-326-3779 (Wong)
202-326-2187 (Frazier)
202-326-3719 (Ashe)
202-326-3231 (Adler)
Facsimile: 202-326-3768



TAMMY DICKINSON
United States Attorney

Dated: March 13, 2015  /s/ Charles M. Thomas
Charles M. Thomas, MO Bar #28522
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510

Kansas City, MO 64106
Telephone: (816) 426-3130
E-mail: charles.thomas@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION