**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 14-CV-0815-W-BCW** |
| | ) |
| **BF LABS INC., et al.,** | ) |
| | ) |
| **BF Labs.** | ) |

**BF LABS INC.'S ANSWER AND AFFIRMATIVE DEFENSES**
**TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS**

Defendant BF Labs Inc., by and through undersigned counsel, hereby files its answer and affirmative defenses ("Answer") to the Plaintiff Federal Trade Commission's ("FTC") First Amended Complaint for Permanent Injunction and Other Equitable Relief ("Complaint"). BF Labs also alleges two Counterclaims against the FTC. In support, BF Labs states as follows:

1.      The allegations in paragraph 1 of the Complaint assert a legal conclusion as to which no response is required. To the extent a response may be required, BF Labs denies those allegations.

### JURISDICTION AND VENUE[1]

2.      BF Labs admits the allegations contained in paragraph 2 of the Complaint, although BF Labs denies that the Plaintiff asserts any cognizable or viable claims.

3.      BF Labs admits the allegations contained in paragraph 3 of the Complaint, although BF Labs denies that the Plaintiff asserts any cognizable or viable claims.

---

[1] The headings used in Plaintiff's Complaint are set forth in this Answer for the convenience of the reader only. To the extent any of the headings are construed to contain any allegations, they are denied.

1

**PLAINTIFF**

4.      Insofar as paragraph 4 of the Complaint asserts a legal proposition, no response is required. To the extent a response may be required, BF Labs is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the Complaint.

5.      Insofar as paragraph 5 of the Complaint asserts a legal proposition, no response is required. To the extent a response may be required, BF Labs is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Complaint.

**DEFENDANTS**

6.      BF Labs admits the allegations contained in paragraph 6 of the Complaint.

7.      BF Labs admits that Darla "Jody" Drake is the General Manager at Butterfly Labs, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, therefore, denies the remaining allegations contained in paragraph 7 of the Complaint.

8.      BF Labs admits that Nasser Ghoseiri is the President and Chief Technology Officer at Butterfly Labs, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and, therefore, denies those allegations, and denies the remaining allegations contained in paragraph 8 of the Complaint.

9.      BF Labs admits that Sonny Vleisides is a founder and Innovation Officer at Butterfly Labs, but is without knowledge or information sufficient to form a belief as to the truth

Case 4:14-cv-00815-BCW   Document 324   Filed 06/05/15   Page 2 of 29

of the remaining allegations and, therefore, denies those allegations, and denies the remaining allegations contained in paragraph 9 of the Complaint.

## COMMERCE

10.     Paragraph 10 of the Complaint asserts a legal proposition to which no response is required.  To the extent a response may be required, BF Labs denies the allegations in paragraph 10 of the Complaint.

## DEFENDANTS' BUSINESS PRACTICES

11.     BF Labs admits that it sells Bitcoin mining machines and services but denies the remaining allegations contained in paragraph 11 of the Complaint.

12.     BF Labs denies the allegations in paragraph 12 of the Complaint.

13.     BF Labs admits that it tested machines which resulted in mined Bitcoins but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 of the Complaint, and, therefore, denies those allegations.

14.     BF Labs admits that it took prepayments for a time, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14 of the Complaint, and, therefore, denies those allegations.

## Background on Bitcoins and Bitcoin Mining

15.     BF Labs admits the allegations contained in paragraph 15 of the Complaint.

16.     BF Labs admits the allegations contained in paragraph 16 of the Complaint.

17.     BF Labs denies that all Bitcoin "miners" are consumers but admits the remaining allegations contained in paragraph 17 of the Complaint.

18.     BF Labs admits the allegations contained in paragraph 18 of the Complaint.

3

19.     BF Labs lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint, and, therefore, denies those allegations.

20.     BF Labs admits the allegations contained in paragraph 20 of the Complaint.

21.     BF Labs denies the allegations contained in paragraph 21 of the Complaint.

**Defendants' Sale of Bitcoin Mining Machines**

22.     BF Labs admits that Butterfly Labs manufactures and sells the latest generation of Bitcoin mining machines and provides services to consumers but denies the remaining allegations in paragraph 22 of the Complaint.

23.     BF Labs denies that the butterflylabs.com website describes delivery dates but admits the remaining allegations contained in paragraph 23 of the Complaint.

24.     BF Labs admits the allegations contained in paragraph 24 of the Complaint.

25.     BF Labs admits that BF Labs, Inc. posted a link to a calculator on its Facebook, Twitter, and Tumblr social media pages and that on its Facebook page it posted a link to a calculator that read "Measure your ROI with this cool Bitcoin mining calculator" but denies the remaining allegations in paragraph 25 of the Complaint.

26.     BF Labs denies that the calculator required a delivery date as an input data point but admits the remaining allegations contained in paragraph 26 of the Complaint.

**Defendants' Failure to Deliver Paid-For Bitcoin Mining Machines as Promised**

27.     BF Labs denies the allegations contained in paragraph 27 of the Complaint.

28.     BF Labs admits the allegations contained in paragraph 28 of the Complaint.

29.     BF Labs admits the allegations contained in paragraph 29 of the Complaint.

30.     BF Labs denies the allegations contained in paragraph 30 of the Complaint.

4

31.     BF Labs admits that on November 28, 2013, BF Labs Inc. posted on its website that all the orders for BitForce mining machines had been shipped but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 of the Complaint, and, therefore, denies those allegations.

32.     BF Labs admits the allegations contained in paragraph 32 of the Complaint.

33.     BF Labs denies that its website represented that the Monarch would begin shipping by the end of 2013 but admit the remaining the allegations contained in paragraph 33 of the Complaint.

34.     BF Labs admits the quoted portion of the allegation appears in a Skype log but denies the remaining allegations contained in paragraph 34 of the Complaint.

35.     BF Labs admits it did not ship a Monarch machine until at least August 2014, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 of the Complaint, and, therefore, denies those allegations.

36.     BF Labs denies the allegations contained in paragraph 36 of the Complaint.

37.     BF Labs denies the allegations contained in paragraph 37 of the Complaint.

38.     BF Labs denies the allegations contained in paragraph 38 of the Complaint.

**Defendants' Failure to Provide Paid-For Bitcoin Mining Services as Promised**

39.     BF Labs denies that in approximately December 2013, BF Labs began offering mining services. BF Labs admits the remaining allegations in paragraph 39 of the Complaint.

40.     BF Labs deny the allegations contained in paragraph 40 of the Complaint.

41.     BF Labs denies the allegations contained in paragraph 41 of the Complaint.

**Defendants' Undisclosed Use of Consumers' Machines to Mine for Bitcoins for Themselves**

42.     BF Labs admits the allegations contained in paragraph 42 of the Complaint.

5

43.     BF Labs denies the allegations contained in paragraph 43 of the Complaint.

44.     BF Labs denies the allegations contained in paragraph 44 of the Complaint.

45.     BF Labs admits that the quote "[h]ardware is the focus of our passion" appears on its website but denies the remaining allegations contained in paragraph 45 of the Complaint.

### Defendants' Failure to Provide or Provide Promptly Paid-For Bitcoin Mining Machines or Services While Refusing to Return or Promptly Return Consumers' Payments

46.     BF Labs denies the allegations contained in paragraph 46 of the Complaint.

47.     BF Labs denies the allegations that they often have refused to refund or refund promptly consumers' payments but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47 of the Complaint, and, therefore, denies those allegations.

48.     BF Labs lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Complaint, and, therefore, denies those allegations.

49.     BF Labs lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Complaint, and, therefore, denies those allegations.

### VIOLATIONS OF THE FTC ACT

50.     Paragraph 50 of the Complaint asserts a legal proposition to which no response is required.  To the extent a response may be required, BF Labs denies the allegations in paragraph 50 of the Complaint.

51.     Paragraph 51 of the Complaint asserts a legal proposition to which no response is required.  To the extent a response may be required, BF Labs denies the allegations in paragraph 51 of the Complaint.

6

52.     Paragraph 52 of the Complaint asserts a legal proposition to which no response is required.  To the extent a response may be required, BF Labs denies the allegations in paragraph 52 of the Complaint.

## COUNT I

53.     BF Labs denies the allegations in paragraph 53 of the Complaint.

54.     BF Labs denies the allegations in paragraph 54 of the Complaint.

55.     BF Labs denies the allegations in paragraph 55 of the Complaint.

## COUNT II

56.     BF Labs denies the allegations in paragraph 56 of the Complaint.

57.     BF Labs denies the allegations in paragraph 57 of the Complaint.

58.     BF Labs denies the allegations in paragraph 58 of the Complaint.

## COUNT III

59.     BF Labs denies the allegations in paragraph 59 of the Complaint.

60.     BF Labs denies the allegations in paragraph 60 of the Complaint.

61.     BF Labs denies the allegations in paragraph 61 of the Complaint.

## CONSUMER INJURY

62.     BF Labs denies the allegations in paragraph 62 of the Complaint.

## THIS COURT'S POWER TO GRANT RELIEF

63.     Paragraph 63 of the Complaint asserts a legal proposition to which no response is required. To the extent a response may be required, BF Labs denies the allegations in paragraph 43 of the Complaint.

BF Labs denies all allegations contained in the Complaint that is not expressly admitted herein, including without limitation those made in unnumbered headings.

7

## PRAYER FOR RELIEF

BF Labs denies that the FTC is entitled to the relief set forth in the Prayer for Relief and its subparts.

## AFFIRMATIVE DEFENSES

BF Labs states the following for its affirmative defenses to Plaintiff's Complaint:

1.      Plaintiff's Complaint fails to state a claim upon which relief can be granted under Section 5 of the FTC Act, 15 U.S.C. § 45.

2.      BF Labs acted in good faith and in a lawful manner in all of its business practices and took affirmative steps to inform consumers with regular shipping-date updates and extensive product-detail updates.

3.      At all relevant times, BF Labs acted in good faith toward consumers and in conformity with all applicable laws and regulations.

4.      BF Labs is entitled to set-off, contribution, and/or indemnity should any damages or other financial liabilities be awarded against it in this case, in the amount of settlement amounts or damages received by consumers with respect to the same alleged injuries giving rise to private causes of action.

5.      The Complaint, or part thereof, fails because this Court lacks personal jurisdiction over some or all of the Defendants.

6.      Each and every one of the consumers' alleged rights, claims, and obligations that the FTC seeks to enforce against BF Labs is barred by the consumers' conduct, agreement, or otherwise barred by the doctrine of estoppel.

7.      Plaintiff's claims, in whole or part, must be dismissed on constitutional grounds because they infringe on First Amendment rights.

8

8.      Plaintiff's claims for injunctive relief is barred by BF Labs' voluntary cessation – before the Complaint was filed – of any complained-of conduct. Cessation of allegedly wrongful activities counsels against the imposition of an injunction.

9.      Plaintiff's claims are barred because consumers expressly agreed to and accepted the terms of pre-order sales and understood that all sales were final, that there was a backlog of orders, and that production and delivery of any order may take two months or longer.

10.      Plaintiff's claims are barred because BF Labs' "FAQ" website page states that BF Labs reserves "the right to handle refund requests on a case by case basis" and that pre-ordered products are non-refundable, as is also clearly stated at the time of purchase.

11.      Plaintiff unjustifiably delayed in commencing this action against BF Labs, which prejudiced and harmed BF Labs. Plaintiff's claims are therefore barred by the doctrines of estoppel, laches, and waiver.

12.      Plaintiff's alleged damages and financial requests are unconscionable and cannot be sustained.

13.      Plaintiff's claims are barred by a prior settlement and/or release of those claims or are barred to the extent some consumers have entered into an accord and satisfaction or otherwise compromised their claims.

14.      Plaintiff's claims are barred to the extent consumers prevented BF Labs from performing.

15.      Plaintiff's claims are barred based on consumers' rejection of goods, as well as consumers' revocation of acceptance of goods.

9

16.     Plaintiff's damages should be reduced as an offset by any amount received by any other payment to mitigate damages, including any profit a consumer made from BF Labs' mining devices.

17.     Plaintiff's claims are barred because there is no danger of recurrence of the alleged violations.

18.     To the extent delays or product defects existed, which BF Labs denies, those delays or product defects were caused by persons outside the control of BF Labs and their conduct caused or contributed to cause the allegations and alleged harm.

19.     BF Labs reserves the right to amend their Answer to assert additional defenses, affirmative or otherwise, that may arise or become known through the course of further investigation or discovery.

WHEREFORE, having fully answered Plaintiff's Amended Complaint, BF Labs respectfully requests that this Court enter judgment in its favor and against Plaintiff's relief requested in the Amended Complaint.  BF Labs further demands that it be awarded any damages it incurs as a result of any temporary restraining order or preliminary injunction entered in this matter which is subsequently found to have been improvidently granted or which is otherwise vacated.  Such damages include compensatory damages, legal fees and costs, and consequential damages.

## **COUNTERCLAIMS**

Counterclaim Plaintiff BF Labs Inc. ("BF Labs") for its Counterclaims against Counterclaim Defendant Federal Trade Commission ("FTC") alleges as follows:

### **Parties, Jurisdiction and Venue**

10

1.      BF Labs Inc. is Wyoming corporation with its principal place of business in Johnson County, Kansas.

2.      The Federal Trade Commission is an agency of the United States Government.

3.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 57b.

4.      This Court has supplemental jurisdiction over the counterclaims under 28 U.S.C. § 1367(a) on the basis that this claim arises out of the same set of facts and "form[s] part of the same case or controversy" as the other claims asserted in this action.

5.      Venue in this district is proper under 28 U.S.C. § 1391(b) and (e).

### Background

6.      BF Labs manufactures a line of high speed encryption processors for use in Bitcoin mining, research, telecommunication, and security applications.

7.      Bitcoin mining is a relatively new endeavor – Bitcoin came into existence in 2009.

8.      Two years later, in 2011, BF Labs was incorporated.

9.      Bitcoin was initially mined with the central processing unit (CPU) in laptop or desktop computers, and subsequently with the more powerful graphics cards (GPU) in these types of computers.

10.     In 2012, BF Labs introduced FPGA technology that was approximately two times faster than graphics cards, which were in turn hundreds of times faster than the original CPUs.

11.     Then in 2013, BF Labs introduced ASIC 65nm technology that was approximately 80 times faster than its FPGA technology.

11

12.     The ASIC 28nm technology (the "Monarch") that BF Labs began rolling out to the market in August 2014 is approximately 10 times faster than the ASIC 65nm technology.

13.     At this point, speeds of the ASIC 28nm technology are 1600 times faster than the GPUs and many thousands of times faster than the original CPUs.

14.     Each succeeding generation of technology introduced by BF Labs has required less and less technical knowledge on the part of the miner, thus making mining accessible to more people.

15.     The Monarch line was preceded by eight lines: BitForce Single, BitForce Mini-Rig, Jalapeno, Super Jalapeno, 30gH Single, 60gH Single, ASIC Mini-Rig, and 230gH Rackmount.

16.     As of December 31, 2013, BF Labs believe that full product shipment had been made or a refund given for every single order of one of these eight pre-Monarch product lines.

17.     Because the CPU/GPU miners were a relatively small group and had the space to themselves, the introduction of specialized mining chips that made mining possible for non-technical consumers disrupted the mining industry status quo and upset the apple cart for many of the original miners.

18.     While the majority of these miners accepted the new development, they now had to be willing to invest money in specialized equipment in order to compete with thousands of new entrants into "their" industry, or they risked not being able to keep pace.

19.     Miners desire faster, more powerful, more energy efficient devices as soon as they can get them, in order to get a perceived "jump on the other guy." As soon as a new product is announced, some miners insist on queuing up to be as near the front of the line as possible, and these miners have been willing to put down deposits of up to 100% to secure a delivery slot.

12

20.     Another reason for a fully prepaid pre-order process for bitcoin mining equipment is that the market price of bitcoin fluctuates up and down, making more miners want either to join the race or drop out of it. Some miners even try to arbitrage the market fluctuation by placing, canceling, and reinstituting orders as the price of bitcoin rises, falls, and rises again. This practice creates havoc for the manufacturer, who is trying to forecast demand, buy parts with long lead times in order to meet the demand, and hire staff to assemble the orders. The financial risk in this situation is shifted to the manufacturer, who runs the risk of getting stuck with obsolete inventory if a competitor announces a product that is promised for future delivery but seems more attractive, and customers in the queue shift their orders over to the competitor.

21.     The above factors, which reflect industry standard practices and are consistent with significant competing manufacturers of similar equipment, led BF Labs to previously use a fully prepaid pre-order process where the funds paid by a customer are applied to pay for the purchase of parts and labor used in the manufacturing process, making it impractical to reverse an order.

22.     BF Labs' pre-order model, including the fact that pre-order funds may be used to complete the development, and manufacture of the products, was fully disclosed to its customers.

23.     Despite clear and unequivocal warnings that consumers were entering into a pre-order arrangement for undeveloped products and that a delivery timeframe could not be assured, consumers voluntarily chose to complete their orders.

24.     Like every other bitcoin mining manufacturer, BF Labs unquestionably experienced growing pains – particularly speed-to-market issues – in this rapidly developing market.

13

25.     But when consumers placed pre-orders for products other than the FPGA generation with BF Labs, consumers accepted terms of purchase including that the shipping range for the ordered product was "two months or longer."

26.     At times, BF Labs' website even instructed customers who could not tolerate a two-month or longer waiting period for the ordered product, that they should "NOT preorder this product."

27.     BF Labs consistently updated its shipping projections, provided increasingly detailed production updates, and gave day-by-day shipping updates.

28.     BF Labs never promised shipping dates for its products, but rather estimated and projected shipping dates.

29.     At each and every time that BF Labs posted, cited, or stated an anticipated shipping range, it had a reasonable basis to expect that it would be able to ship any ordered merchandise to the buyer within the anticipated time frame.

30.     BF Labs' product-development and shipping-date projections were based on, among other things, information that BF Labs received from its suppliers.

31.     BF Labs never made representations, either expressly or implicitly, that consumers will be able to use its machines or services to generate a profitable or substantial amount of bitcoins.

32.     BF Labs has published more than 400 million ad impressions through Google that advertise hashing speeds and power efficiency of BF Labs' products, but do not mention profitability.

33.     It was BF Labs' official stance and practice at all times to never promise a return on investment.

14

34.     In April 2014, a putative class action concerning BF Labs' speed-to-market issues was filed in the United States District Court for the District of Kansas. *See Alexander et al. v. BF Labs,* 2:14-cv-2159-KHV-JPO (D. Kan. Apr. 4, 2014).

35.     The Johnson County District Attorney also began investigating BF Labs because of consumer complaints based on speed-to-market issues in early fall 2013, and subsequently worked with BF Labs to revise and enhance its policies and practices without need for an injunction or restraining order, or to resort to an asset freeze or heavy-handed efforts to shut the business down.

36.     BF Labs has fully cooperated with the inquiries of the Johnson County District Attorney and has worked to address the concerns expressed by it to comply with state laws. BF Labs has similarly acted in good faith and cooperated with plaintiffs in the putative class-action matter.

37.     In 2013, BF Labs shipped approximately 45,000 devices.

38.     Since at least June 23, 2014, BF Labs has been providing free cloud-based mining services to customers in the sequence and quantity that their orders were received for the Monarch product line. Although BF Labs was under no obligation to take any such action, it did so as a business decision intended to demonstrate BF Labs' commitment to customer satisfaction and to reward its current customers for their loyalty and patience.

39.     On July 17, 2014, BF Labs voluntarily ended its preorder sales for bitcoin mining equipment.

40.     On August 20, 2014, the Monarch line began to ship.

41.     At the time that the FTC's action was filed, BF Labs was continuing to provide refunds to its customers who actually sought a refund rather than requesting product delivery.

That is, when a Monarch unit passed quality-control tests and became ready for shipment, the next customer in the pre-order queue was sent an email that offered the customer the choice of either a refund or product delivery. Whichever selection the customer made was fulfilled.

42.     BF Labs has provided trade-in credits, rebates, and additional equipment and upgrades to customers to attempt to accommodate delays in the manufacturing process.

43.     On September 2 and 3, 2014, Modus, a data management company, came to BF Labs' headquarters and imaged key custodians' hard drives and captured their emails for purposes of the putative class action lawsuit filed in the District of Kansas.

44.     Modus' effort to collect and preserve electronically stored information cost BF Labs more than $80,000.

### The FTC's *Ex Parte* Action

45.     The FTC is presently involved in similar actions in which the FTC sought and was granted an *ex parte* TRO, asset freeze, and receivership but was later denied a preliminary injunction and continuation of asset freezes and receivership.   National legal and news publications have criticized the FTC's role in these actions, noting that the FTC has caused other businesses severe harm by securing improvidently-granted *ex parte* orders. *See, e.g.,* Jenna Greene, *Asset Seizures Gone Wrong*, The National Law Journal, Dec. 22, 2014.

46.     On September 15, 2014, the FTC filed a Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") in the United States District Court for the Western District of Missouri against BF Labs BF Labs Inc., Darla Drake, Nasser Ghoseiri, and Sonny Vleisides, alleging violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 (a). *See* Complaint, Doc. 2.

47. The Complaint specifically alleged that "BF Labs have represented, expressly or by implication, that:

    a. Consumers will be able to use the machines or services to generate Bitcoins, or to generate a profitable or substantial amount of Bitcoins, or

    b. BF Labs will deliver Bitcoin mining machines or services to consumers in a timely fashion." *See* Complaint, ¶ 39.

48. The Complaint also asserted that "[i]n truth and in fact, in numerous instances, consumers have not been able to use the machines or services to generate Bitcoins at all or have only been able to generate a fraction of the Bitcoins represented because they have not received the machines or services, or in a timely fashion." *See* Complaint, ¶ 40.

49. On September 17, 2014, the FTC filed its Motion for *Ex Parte* Emergency Temporary Restraining Order, With Asset Freeze, Appointment of Receiver, Limited Expedited Discovery, And Order to Show Cause Why a Preliminary Injunction Should Not Issue along with its Suggestions in Support of that Motion ("TRO Suggestions"), restating the same allegations and claiming that "BF Labs collected up to $50 million up front from consumers in exchange for these products and services, but have failed to deliver on their promises. Indeed, they often fail to deliver machines or provide services at all." The TRO Suggestions sought a Temporary Restraining Order ("TRO") "enjoining the deceptive and illegal conduct described herein, freezing BF Labs' assets, appointing a temporary receiver, granting immediate access to BF Labs' business premises, providing for other ancillary relief, and ordering BF Labs to show cause why a preliminary injunction should not issue." *See* TRO Suggestions, p. 5, 24-25 (Docs. 7 and 8).

17

50.     Nowhere in the FTC's Complaint and its *Ex Parte* TRO Suggestions did the FTC inform the Court that:

a.  The FTC was aware that two District of Kansas lawsuits were pending based on similar theories, and the FTC in fact visited the website for the District of Kansas putative class action's counsel to collect information for the FTC's *ex parte* action. *See Meissner v. BF Labs Inc.*, 2:13-cv-2617-RDR-KGS, Doc. 2 (filed Dec. 3, 2014); *Alexander et al. v. BF Labs Inc.*, 2:14-cv-2159-KHV-JPO, Doc. 1 (filed April 4, 2014, brought by the Wood Law Firm).

b.  BF Labs was in the middle of discovery in these two District of Kansas lawsuits and thus was already under an obligation to preserve and not destroy documents, data, etc.

c.  The FTC, having visited BF Labs' website in August and early September 2014, knew or should have known that BF Labs had already discontinued its preorder model as to all products.

d.  The FTC, having visited BF Labs' website in August and early September 2014, knew or should have known that BF Labs was already refunding money to customers who actually wanted a refund rather than equipment before the FTC's *ex parte* application was filed.

e.  The Johnson County District Attorney's Office had investigated BF Labs and found no reason to enjoin the company or freeze its or its employees' assets. The FTC was aware of the Johnson County investigation, yet never formally requested any documents resulting from or information regarding that investigation.

18

f. The FTC previously told consumers that they needed to obtain their own attorneys to pursue relief from BF Labs, thus causing attorneys like The Wood Law Firm and others to become involved and invest time, funds, and effort (likely diverting resources from other clients and causes), and only later decided (despite knowing the non-emergent nature of the action) that, for some unknown reason, BF Labs should be shut down.

g. BF Labs had significant repeat customer purchasers and heavy customer demand for its products.

h. BF Labs had gone to extensive lengths to find solutions for its customers and to deal proactively with complaints.

i. The FTC had not conducted a thorough investigation (if any) of the 307 supposed consumer complaints made to the FTC's Sentinel reporting system. Had the FTC in fact conducted such an investigation, it would have learned that all but 57 of the complaints were made in 2013 (nowhere near the time that the FTC moved in secret for its supposedly urgent relief), that the 307 complaints related to 320 BF Labs customer orders, that 54 of the complaints were either duplicates or did not correlate with an actual BF Labs customer name, and that, of the remaining 266 (320 minus 54) orders: (1) 93% received either equipment, service, and/or a refund; (2) 3% pertain to latest-generation product ("Monarch") orders; and that (3) of the remaining nine orders (i.e., the remaining 4%), two were partially refunded, one was shipped but returned due to the customer's failure to pay customs duties, one was canceled, and one was settled after the customer sent a demand letter.

19

51.     In the FTC's *ex parte* TRO Suggestions (Doc. 8) the FTC made statements that were not true and that the FTC had no reasonable basis to make. *See generally* Doc. 155.

52.     For instance, the FTC's TRO Suggestions claimed that "[o]ne of the BF Labs' own employees admitted that the passage of time has rendered the BitForce as 'useful as a room heater.'" *See* p. 23. But this statement was made by BF Labs' account manager to the FTC in an undercover setup on June 21, 2014, well after all deliveries of all preorders for the BitForce were sent. The first BitForce SC (65 NM ASIC) was shipped on April 24, 2013. The BitForce miners were certainly not room heaters when consumers received and used the equipment. By the time the FTC's undercover agent talked to BF Labs' account manager, however, "room heater" was an accurate description, and the account manager tried to discourage the agent from buying the product. The FTC failed to inform the Court that when the FTC's agent asked BF Labs' account manager when she could recoup her costs for buying BF Labs' products, BF Labs' account manager answered "it's absolutely impossible to know exactly or even have an idea…."

53.     The FTC also made outrageous statements in its TRO Suggestions, including that "BF Labs have taken in tens of millions of dollars from consumers, and in many cases, have provided nothing in return," and "[i]t is unclear whether they are even developing products for consumers," yet also asserting that BF Labs shipped products late.

54.     The FTC's TRO Suggestions also represented that:

- "Bank records indicate that once consumer funds enter into BF Labs' bank accounts, they are quickly dissipated. Despite receiving large sums of money each time consumers place orders, BF Labs never leave more than around $2 million in bank accounts. Instead, funds are diverted to other accounts almost as quickly as consumers place their orders."

- "BF Labs are misusing corporate funds, immediately transferring consumer funds to different accounts, and spending money on marketing new products rather than developing and delivering products consumers have purchased."

- "The record shows that once BF Labs take possession of consumer funds, they quickly exit company accounts, and that BF Labs, in many instances, have diverted them to personal use."

55. But the FTC had access to BF Labs' BMO bank records. The FTC failed to disclose what was obvious and completely legitimate: that $2.5 million was regularly kept in BF Labs' checking account and that amounts in excess of the $2.5 million were automatically transferred to BF Labs' savings account. This is a standard corporate finance practice, and was not dissipation of assets.

56. On September 18, 2014, at the FTC's request and without notice to BF Labs, based on the TRO Suggestions that misrepresented or omitted critical facts, the Court entered a TRO, which halted BF Labs' business activities, froze the BF Labs' assets, appointed a temporary receiver, and ordered BF Labs to show cause why a Preliminary Injunction should not be entered. *See* Order Granting Motion for TRO (Doc. 9).

57. On September 19, 2014, the FTC and Temporary Receiver took over BF Labs' facilities.

58. Monarch units were in the process of being shipped on the date that the FTC raided BF Labs and stopped those shipments.

59. Had the FTC not raided BF Labs, all shipments of the Monarchs would likely have been completed by November 2014.

21

60.     After the Court's entry of its *ex parte* Order, on September 23, 2014, the FTC published a press release titled "At FTC's Request, Court Halts Bogus Bitcoin Mining Operation" (the "Release").  *See* Release, attached hereto as **Exhibit A**.

61.     The Release included quotes from Jessica Rich, director of the FTC's Bureau of Consumer Protection, referring to BF Labs as "scammers" who received "ill-gotten gains."

62.     National and international news sources, including *The Wall Street Journal* and *The Washington Post*, published articles quoting from the Release and repeating the terms "bogus," "scammers," and "ill-gotten gains."  *See, e.g.,* Paul Vigna, *FTC Shuts Down Bitcoin-Mining Company*, Wall Street Journal, Sept. 23, 2014, *available at* http://blogs.wsj.com/moneybeat/2014/09/23/ftc-shuts-down-bitcoin-mining-company-butterfly-labs/; Brian Fung, *This is the FTC's first-ever Bitcoin Case. And it's winning.*, The Washington Post, Sept. 23, 2014, *available at* http://www.washingtonpost.com/blogs/the-switch/wp/2014/09/23/this-is-the-ftcs-first-ever-bitcoin-case-and-its-winning/

63.     On or about September 25, 2014, BF Labs' Operations Manager Marc Goodpasture met with a Temporary Receiver staff member to discuss the rough manner in which the Temporary Receiver staff was handling BF Labs' equipment and inventory.  The staff member responded to Mr. Goodpasture's concerns by opining that the inventory likely would be liquidated because no federal judge would return control of the company to its owners.

64.     A hearing was scheduled for September 29, 2014. The parties appeared before the Court that day, but thereafter engaged in negotiations. A Stipulated Interim Order was entered by the Court on October 2, 2014 that provided for limited discovery, required BF Labs to prepare a proposed budget and business plan, provided for shipment of existing BF Labs products to

consumers under certain conditions, and set deadlines for the exchange of additional evidence in advance of a rescheduled preliminary injunction hearing. Doc. 54.

65.    For approximately the first three weeks of the interim period, no operations took place.

66.    The Temporary Receiver spent most of his time questioning and revising BF Labs' proposed budget.

67.    Shipping of BF Labs' products was only permitted if allowed by the Temporary Receiver.

68.    No BF Labs' products were shipped during the interim period.

69.    The rescheduled hearing, in which the Court heard live testimony and received evidence and argument from the parties, was held on November 24 and 25, 2014.

70.    The Court also accepted post-hearing briefs from the FTC and BF Labs.

71.    After the rescheduled hearing and post-hearing briefing, the Court denied the FTC's motion for preliminary injunction, asset freeze, appointment of a receiver, and other equitable relief. *See* Doc. 201, p. 1.

72.    The Court found that the FTC had not shown that it was likely to succeed on the merits of either its delivery date or its profitability representations.  *See id*., pp. 5, 11.

73.    The Court also found the FTC had not demonstrated that the equities weighed in favor of issuing a preliminary injunction. *See id*., p. 10.

74.    By denying the FTC's request for an asset freeze and imposition of a receiver, the Court rejected the FTC's claim that dissipation of assets was occurring or was likely to continue.

75.     The FTC had no grounds for seeking to enjoin BF Labs' business operations, freeze its assets or to have a temporary receiver appointed to take control of its assets or business.

76.     BF Labs at all times had the right to continue their business operations and to have complete control of their assets, free of any control or interference by a temporary receiver or the FTC.

77.     In seeking an overly-broad and ultimately improper TRO by omitting critical facts, using imprecise and misleading pleadings and motions papers, the FTC interfered with BF Labs' business using improper means.

78.     The FTC also had an improper purpose. Based on the way the FTC announced the entry of the TRO, and based on the inflammatory language included in its press release, the FTC's purpose was to discredit BF Labs and to injure its ability to operate a successful business well in advance of ever proving the claims asserted in the Complaint. Such actions illustrate the FTC's animus toward and efforts to discredit BF Labs and the bitcoin industry generally.

79.     Because of the entry of the TRO on September 18, 2014, BF Labs has suffered significant damages, including the possibility that it will be required to pay the Temporary Receiver's fees and expenses.

80.     For work done from September 18, 2014 through January 31, 2015, the Temporary Receiver and his counsel and consultants have billed $1,074,111.77 for their time and requested reimbursement of $20,706.12 for their expenses.

81.     BF Labs has objected to the invoices of the Temporary Receiver and other firms engaged by him on numerous grounds and has asserted that such invoices, if permitted, should be allocated to the FTC for payment due to the aforementioned events and circumstances.

82. BF Labs also incurred significant legal fees to defend itself and the individual BF Labs' employees against the FTC's pursuit for a preliminary injunction.

83. By halting BF Labs' operations for more than three months, the FTC also unquestionably caused BF Labs' refund liability to its customers to significantly increase and substantially impacted BF Labs' ability to make refunds.

84. As a result of the injunctive measures entered, BF Labs and its employees have suffered reputational injury, and BF Labs has suffered losses of key employees, losses of vendors due to perceived stigma of working with a company being shut down by a governmental agency's action, the economic waste of unique technology sitting idle while competitive windows narrow, and the public disclosure of social security and other identifying information of a key BF Labs employee, among other things.

85. None of these costs identified in paragraph 84 would have been incurred if the FTC had not omitted critical facts from its *ex parte* TRO Suggestions to the Court.

### Count I (Wrongful Injunction)

86. BF Labs incorporates by reference each of the allegations contained in all prior paragraphs of the Counterclaims as if fully set forth here.

87. Upon fundamentally flawed, incomplete, misleading, and ultimately incorrect allegations, the FTC sought and obtained, after giving no notice to BF Labs, a TRO prohibiting, among other things, BF Labs from operating its business and from accessing or using its assets, and forcing BF Labs to allow a temporary receiver to control its business operations and assets.

88. At all relevant times, BF Labs had the right to access and control of its business operations and assets and to perform other enjoined acts and to object to the interference of a temporary receiver.

89.     The TRO and other equitable relief urged on the Court by the FTC was therefore wrongfully entered.

90.     The FTC never had proper grounds for requesting and obtaining the TRO, asset freeze, and receivership.

91.     Wrongful entry of the TRO and imposition of the asset freeze and receivership damaged BF Labs in an amount to be proven at trial, but in no event less than $4,000,000.00.

## Count II (Defamation)

92.     BF Labs hereby incorporates by reference each of the allegations contained in all prior paragraphs of the Counterclaims as if fully set forth here.

93.     The FTC published the Release on September 23, 2014.

94.     The FTC defamed BF Labs in the Release, in that the Release referred to BF Labs as "bogus," and "scammers," who received "ill-gotten gains."

95.     The FTC's defamatory statements were sufficiently derogatory to injure BF Labs' reputation.

96.     The FTC's defamatory statements are false.

97.     The FTC's defamatory statements are capable of being proven false.

98.     As a result of the TRO, BF Labs was deprived of a property interest protected by the Fifth and Fourteenth Amendments to the United States Constitution.

99.     BF Labs' property deprivation was a material, government-imposed burden in addition to and temporally proximate to the FTC's defamatory statements.

100.     The property deprivation damaged BF Labs in an amount greater than $75,000.

## Prayer For Relief

WHEREFORE, BF Labs Inc. respectfully requests that the Court enter judgment on its claims as follows:

1.      On BF Labs' First Cause of Action, for judgment against the FTC in an amount to be proven at trial, including actual damages, punitive damages, and prejudgment and post-judgment interest thereon;

2.      On BF Labs' Second Cause of Action, for judgment against the FTC in an amount to be proven at trial, including actual damages, punitive damages, and prejudgment and post-judgment interest thereon;

3.      For payment of all Temporary Receiver fees and expenses, including those of firms or contractors engaged by the Temporary Receiver, for payment of all of BF Labs' expenses and costs incurred in challenging and dissolving the TRO and successfully defending against imposition of a preliminary injunction and any further asset freeze and receivership; and

4.      For such further relief as the Court deems just and proper.

**Demand For Jury Trial**

BF Labs demands trial by jury on all issues in these Counterclaims triable to a jury.


Respectfully submitted,


/s/ Mark A. Olthoff
Mark A. Olthoff                          MO # 38572
Michael S. Foster                        MO # 61205
Miriam E. Bailey                         MO # 60366
Polsinelli PC
900 W. 48th Place, Suite 900
Kansas City, Missouri  64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
molthoff@polsinelli.com
mfoster@polsinelli.com
mbailey@polsinelli.com

27

Braden M. Perry                        MO # 53865
Kennyhertz Perry, LLC
420 Nichols Road, Suite 207
Kansas City, MO 64112
Direct: 816-527-9445
Fax: 855-844-2914
braden@kennyhertzperry.com

Attorneys for Defendant BF Labs Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 5th day of June, 2015, a true and correct copy of the foregoing was filed electronically with the United States District Court for the Western District of Missouri using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

      /s/ Mark A. Olthoff
Attorney for BF Labs Inc.